SUBMITTED WITHOUT REQUEST FOR ORAL ARGUMENT

In The

# United States Court of Appeals

### For The District of Columbia Circuit

## EDNA DOAK,

*Plaintiff – Appellant,*

**v.**

## JEH CHARLES JOHNSON, Secretary, U.S. Department of Homeland Security,

*Defendant – Appellee.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————

## JOINT APPENDIX

———————

Alan Lescht
ALAN LESCHT & ASSOCIATES, PC
1050 17th Street, NW, Suite 400
Washington, DC 20036
(202) 463-6036

Michelle Lo
R. Craig Lawrence
John C. Truong
OFFICE OF THE U.S. ATTORNEY
555 4th Street, NW
Washington, DC 20530
(202) 252-2524

*Counsel for Appellant*

*Counsel for Appellee*

THE LEX GROUP[DC] ♦ 1825 K Street, N.W. ♦ Suite 103 ♦ Washington, D.C. 20006
(202) 955-0001 ♦ (800) 856-4419 ♦ Fax: (202) 955-0022 ♦ www.thelexgroup.com

# TABLE OF CONTENTS

**Appendix Page**

Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Complaint**
    filed July 18, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Answer to Complaint**
    filed September 24, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Defendant's Motion to Dismiss and for Summary Judgment,**
**With Statement of Undisputed Material Facts, Attachments and Exhibits,**
    filed August 27, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    **Attachments:**

    **Transcript of Deposition of Starlisha Anderson**
        taken April 15, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

            Examination by Ms. Travanty . . . . . . . . . . . . . . . . . . . . . . . . 31

    **Excerpts of Transcript of Deposition of Gregory Cohen**
        taken April 15, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

            Examination by Ms. Travanty . . . . . . . . . . . . . . . . . . . . . . . . 46
            Examination by Ms. Lo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

    **Transcript of Deposition of Rory Souther**
        taken April 15, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

            Examination by Ms. Travanty . . . . . . . . . . . . . . . . . . . . . . . . 73
            Examination by Ms. Lo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

    **Exhibits:**

    1.    **Organizational Chart**
            undated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Defendant's Motion to Dismiss and for Summary Judgment,
With Statement of Undisputed Material Facts, Attachments and Exhibits,
    filed August 27, 2013, continued:

    <u>Exhibits</u>, continued:

4.    **Family Medical Leave Act Information**
    **dated March 5, 2012** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **94**

6.    **Email Correspondence between**
    **Gregory Cohen, and Joseph Sundland**
    **Re: Remove from RDO**
    **dated January 5, 2011** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **98**

7.    **Alternate Work Hour Schedule and Credit Hour Program**
    **dated July 11, 2007** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **101**

8.    **Performance Plan and Evaluation**
    **dated May 14, 2010** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **109**

9.    **Memorandum to**
    **Edna Doak from**
    **Gregory Cohen**
    **Re: Employment Status**
    **dated January 19, 2010** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **119**

10.    **Sick Leave Information**
    **dated March 6, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **123**

11.    **Memorandum to**
    **Edna Doak from**
    **Gregory Cohen**
    **Re: AWOL Status**
    **dated January 25, 2010** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **127**

12.    **Memorandum to**
    **Edna Doak from**
    **Gregory Cohen**
    **Re: Letter of Reprimand**
    **dated February 22, 2010** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **130**

Defendant's Motion to Dismiss and for Summary Judgment,
With Statement of Undisputed Material Facts, Attachments and Exhibits,
     filed August 27, 2013, continued:

     <u>Exhibits</u>, continued:

13.    Abeyance Agreement
        dated February 22, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

15.    Memorandum to
      Edna Doak from
      Gregory Cohen
      Re:  Request for Medical Documentation
        dated March 24, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

18.    Agency Telecommuting Program Information
        dated July 15, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

20.    Plaintiff's Objection and Responses to Defendant's
      First Set of Interrogatories to Plaintiff
        dated March 18, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

21.    Email Correspondence between
      Jeffrey Daye and Gregory Cohen
      Re:  Cube Lighting
        dated May 5, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

23.    Email to
      Edna Doak from
      Gregory Cohen
      Re:  Work Hour Accommodation
        dated June 1, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

24.    Memorandum to
      Edna Doak from
      Gregory Cohen
      Re:  Letter of Reprimand
        dated May 24, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Defendant's Motion to Dismiss and for Summary Judgment,
With Statement of Undisputed Material Facts, Attachments and Exhibits,
    filed August 27, 2013, continued:

    <u>Exhibits</u>, continued:

27.    Email Correspondence between
    Gregory Cohen, Elena Hughes, Rory Souther
    Re: Start Time
        dated August 16 through August 17, 2010 . . . . . . . . . . . . 183

29.    Email Correspondence between
    Edna Doak and Gregory Cohen
    Re: July 20, 2010 Email
        dated July 20, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

30.    Career Path Information
        undated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

31.    Email Correspondence between
    Gregory Cohen, Rory Souther and Edna Doak
    Re: Telecommute Request
        dated August 4 through September 2, 2010 . . . . . . . . . . . 193

32.    Memorandum to
    Edna Doak from
    Gregory Cohen
    Re: Notice of Proposed Removal
        dated August 9, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

33.    Letter to
    Rory Souther from
    Nate Nelson
    Re: Response to Proposed Removal
        dated August 31, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

34.    Memorandum to
    Edna Doak from
    Rory Souther
    Re: Notice of Decision on Proposed Removal
        dated September 3, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . 211

Defendant's Motion to Dismiss and for Summary Judgment,
With Statement of Undisputed Material Facts, Attachments and Exhibits,
    filed August 27, 2013, continued:

        Exhibits, continued:

    35.    Complaint of Edna Doak
                dated February 22, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218

    36.    Settlement Agreement
                dated October 8, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

    37.    Revocation of Settlement Agreement
                dated November 11, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . 227

Plaintiff's Opposition to Defendant's
Motion to Dismiss and for Summary Judgment,
With Exhibits,
    filed October 9, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

        Exhibits:

    A.    Declaration of Edna Doak,
          With Exhibits,
                sworn October 9, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . 245

            Exhibits:

        1.    Request for Personnel Action
                    dated October 11, 2010 . . . . . . . . . . . . . . . . . . 254

        2.    Email to
              Rory Souther form
              Edna Doak
              Re:  Revocation of Settlement
                    dated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

Plaintiff's Opposition to Defendant's
Motion to Dismiss and for Summary Judgment,
With Exhibits,
     filed October 9, 2013, continued:

<u>Exhibits</u>, continued:

A.    Declaration of Edna Doak,
       With Exhibits,
           sworn October 9, 2013, continued:

           <u>Exhibits</u>, continued:

               3.      Letter to
                     Edna Doak from
                     Lorna Jerome
                     Re: Agency Response to Revocation of Settlement
                          dated November 12, 2010 . . . . . . . . . . . . . . . 259

               4.      Letter to
                     Edna Doak from
                     Veronica Venture
                     Re:  Agency's Decision
                     Dismissing Edna Doak's Complaint
                          dated July 1, 2011  . . . . . . . . . . . . . . . . . . . . . 261

               5.      Edna Doak's Appeal of Agency Decision
                          dated September 28, 2011 . . . . . . . . . . . . . . . 268

               6.      EEO Decision on Edna Doak's Appeal
                        dated February 10, 2012  . . . . . . . . . . . . . . . . 279

               7.      Final Agency Decision
                        dated June 19, 2012 . . . . . . . . . . . . . . . . . . . . 287

               8.      Dr. Berbano's Medical Statement for Edna Doak
                      dated March 3, 2010 . . . . . . . . . . . . . . . . . . . 297

               9.      Edna Doak's Payroll Information
                      various dates . . . . . . . . . . . . . . . . . . . . . . . . . 299

**Defendant's Reply in Further Support of**
**Motion to Dismiss and for Summary Judgment,**
**With Exhibit,**
    **filed November 6, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **350**

    <u>**Exhibit:**</u>

    **1.**    **Defendant's Reply to Plaintiff's Statement of**
          **Material Facts as to Which there Exists a**
          **Genuine Issue Necessary to be Litigated**
               **dated November 6, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **363**

**Order of**
**The Honorable Rudolph Contreras**
**Re:  Granting Defendant's Motion to Dismiss and**
**Motion for Summary Judgment**
    **filed February 10, 2014** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **371**

**Memorandum Opinion of**
**The Honorable Rudolph Contreras**
**Re:  Granting Defendant's Motion to Dismiss and**
**Motion for Summary Judgment**
    **filed February 10, 2014** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **372**

APPEAL,CLOSED,JURY,TYPE–H

## U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:12–cv–01177–RC

DOAK v. NAPOLITANO
Assigned to: Judge Rudolph Contreras
Demand: $300,000
Case in other court:  USCA, 14–05053
Cause: 28:794 Rehabilitation Act

**Plaintiff**

Date Filed: 07/18/2012
Date Terminated: 02/12/2014
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**EDNA DOAK**

represented by **Alan Lescht**
ALAN LESCHT &ASSOCIATES
1050 17th Street, NW
Suite 400
Washington, DC 20036
(202) 463–6036
Fax: (202) 463–6067
Email: alan.lescht@leschtlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Constance Travanty**
ALAN LESCHT &ASSOCIATES
1050 17th Street, NW
Suite 400
Washington, DC 20036
(202) 463–6036
Fax: (202) 463–6067
Email: constance.travanty@leschtlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DEPARTMENT OF HOMELAND
SECURITY**
*\*\*\*ERROR\*\*\**
*TERMINATED: 02/10/2014*

represented by **Michelle Lo**
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530
(202) 252–2541
Fax: (202) 252–2599
Email: Michelle.Lo@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JEH JOHNSON**
*Secretary, US Department of Homeland
Security*

represented by **Michelle Lo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JANET NAPOLITANO**
*Secretary, US Department of Homeland
Security*
*TERMINATED: 02/10/2014*

| Date Filed | # | Docket Text |
| --- | --- | --- |

| 07/18/2012 | 1 | COMPLAINT against DEPARTMENT OF HOMELAND SECURITY ( Filing fee $ 350 receipt number 0090–3007209) filed by EDNA DOAK. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Lescht, Alan) (Entered: 07/18/2012) |
| --- | --- | --- |
| 07/18/2012 | | Case Assigned to Judge Rudolph Contreras. (sth, ) (Entered: 07/18/2012) |
| 07/18/2012 | 2 | ELECTRONIC SUMMONS (3) Issued as to DEPARTMENT OF HOMELAND SECURITY, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Summons)(sth, ) (Entered: 07/18/2012) |
| 08/02/2012 | 3 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the District of Columbia Attorney General. Date of Service Upon District of Columbia Attorney General 7/24/2012. Answer due for ALL D.C. DEFENDANTS by 8/14/2012. (Lescht, Alan) (Entered: 08/02/2012) |
| 08/02/2012 | 4 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 7/25/2012. (Lescht, Alan) (Entered: 08/02/2012) |
| 08/02/2012 | 5 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DEPARTMENT OF HOMELAND SECURITY served on 7/24/2012 (Lescht, Alan) (Entered: 08/02/2012) |
| 09/24/2012 | 6 | NOTICE of Appearance by Michelle Lo on behalf of DEPARTMENT OF HOMELAND SECURITY (Lo, Michelle) (Entered: 09/24/2012) |
| 09/24/2012 | 7 | ANSWER to Complaint by DEPARTMENT OF HOMELAND SECURITY.(Lo, Michelle) (Entered: 09/24/2012) |
| 10/02/2012 | | MINUTE ORDER. It is hereby ORDERED that the parties shall submit a meet and confer report under Local Civil Rule 16.3 on or before October 24, 2012. SO ORDERED. Signed by Judge Rudolph Contreras on 10/2/2012. (lcrc3) (Entered: 10/02/2012) |
| 10/03/2012 | | Reset Deadlines: Meet &Confer Statement due by 10/24/2012. (tj ) (Entered: 10/03/2012) |
| 10/24/2012 | 8 | MEET AND CONFER STATEMENT. (Attachments: # 1 Text of Proposed Order)(Lo, Michelle) (Entered: 10/24/2012) |
| 10/24/2012 | | MINUTE ORDER. It is hereby ORDERED that the following schedule shall govern this litigation. Initial disclosures are due November 23, 2012; the parties shall amend the pleadings and/or join any additional parties by March 1, 2013; and discovery closes May 1, 2013. Each party shall be limited to 25 interrogatories, 25 requests for the production of documents, 10 depositions, and 25 requests for admission. Dispositive motions are due June 14, 2013; oppositions are due July 12, 2013; and replies, if any, are due August 2, 2013. It is FURTHER ORDERED that, before bringing a discovery dispute to the court's attention, the parties must confer in good faith in an attempt to resolve the dispute informally. If the parties are unable to resolve the dispute, they must contact chambers to arrange for a telephone conference with the court. The parties must obtain leave of the court before filing any motion relating to a discovery dispute. Any motions that are filed prior to obtaining such leave may be summarily denied for failure to comply with this order. SO ORDERED. Signed by Judge Rudolph Contreras on 10/24/2012. (lcrc3) (Entered: 10/24/2012) |
| 10/26/2012 | | Reset Deadlines: Initial Disclosure due by 11/23/2012; Amended Pleadings due by 3/1/2013. Discovery due by 5/1/2013. Dispositive Motions due by 6/14/2013. Response to Dispositive Motions due by 7/12/2013. Reply to Dispositive Motions due by 8/2/2013. (tj ) (Entered: 10/26/2012) |
| 03/21/2013 | 9 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Constance Travanty, :Firm– Alan Lescht &Associates, PC, :Address– 1050 17th St. NW, Suite 400, Washington, DC 20036. Phone No. – 202–463–6036. Fax No. – 202–463–6067 by EDNA DOAK (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Lescht, Alan) (Entered: 03/21/2013) |

| | | |
|---|---|---|
| 03/29/2013 | | MINUTE ORDER granting 9 Motion for Leave to Appear Pro Hac Vice. It is hereby ORDERED that Constance Travanty is admitted pro hac vice. SO ORDERED. Signed by Judge Rudolph Contreras on 3/29/2013. (lcrc3) (Entered: 03/29/2013) |
| 04/24/2013 | 10 | Consent MOTION for Extension of Time to Complete Discovery by DEPARTMENT OF HOMELAND SECURITY (Lo, Michelle) (Entered: 04/24/2013) |
| 04/24/2013 | | MINUTE ORDER: The Court hereby GRANTS the Consent Motion for Extension of Time to Complete Discovery 10 . Deadlines are reset as follows: All discovery shall be completed by July 1, 2013. Dispositive motions are due August 14, 2013. Oppositions are due September 12, 2013. Replies, if any, are due October 2, 2013. The parties shall appear for a status conference on July 10, 2013 at 10:30 a.m. in Courtroom 14, before Judge Rudolph Contreras. SO ORDERED. Signed by Judge Rudolph Contreras on 4/24/13. (lcrc3) (Entered: 04/24/2013) |
| 04/25/2013 | | Set Deadlines/Hearings: Discovery due by 7/1/2013; Dispositive Motions due by 8/14/2013; Response to Dispositive Motions due by 9/12/2013; Reply to Dispositive Motions due by 10/2/2013; Status Conference set for 7/10/2013 @ 10:30 AM in Courtroom 14 before Judge Rudolph Contreras. (tj) (Entered: 04/25/2013) |
| 07/08/2013 | 11 | Consent MOTION to Continue *Status Conference* by EDNA DOAK (Lescht, Alan) (Entered: 07/08/2013) |
| 07/08/2013 | | MINUTE ORDER granting the 11 motion to continue the status conference currently scheduled for 7/10/13 @ 10:30. The status conference is hereby RESCHEDULED for 7/22/13 @ 10:00am (So Ordered Judge Rudolph Contreras on 7/8/13). (tj) Modified event title on 7/9/2013 (znmw, ). (Entered: 07/08/2013) |
| 07/08/2013 | | Reset Hearings: Status Conference set for 7/22/2013 @ 10:00 AM in Courtroom 14 before Judge Rudolph Contreras. (tj ) (Entered: 07/08/2013) |
| 07/22/2013 | | Minute Entry for proceedings held before Judge Rudolph Contreras: Status Conference held on 7/22/2013. Parties report that discovery has ended, and a motion for summary judgment to be filed. (Court Reporter: Vicki Eastvold.) (tj) (Entered: 07/22/2013) |
| 08/09/2013 | 12 | Consent MOTION for Extension of Time to File *Defendant's Dispositive Motion* by DEPARTMENT OF HOMELAND SECURITY (Lo, Michelle) (Entered: 08/09/2013) |
| 08/12/2013 | | MINUTE ORDER granting 12 Consent Motion for Extension of Time: It is hereby ORDERED that Defendant's dispositive motion will be due on August 21, 2013; Plaintiff's opposition will be due on September 19, 2013; and Defendant's reply will be due on October 9, 2013. SO ORDERED. Signed by Judge Rudolph Contreras on 8/12/2013. (lcrc3) Modified event title on 8/13/2013 (znmw, ). (Entered: 08/12/2013) |
| 08/14/2013 | | Reset Deadlines: Dispositive Motions due by 8/21/2013; Opposition to Dispositive Motions due by 9/19/2013; Reply to Dispositive Motions due by 10/9/2013. (tj ) (Entered: 08/14/2013) |
| 08/19/2013 | 13 | Consent MOTION for Extension of Time to File *Defendant's Dispositive Motion* by DEPARTMENT OF HOMELAND SECURITY (Lo, Michelle) (Entered: 08/19/2013) |
| 08/20/2013 | | MINUTE ORDER granting 13 Consent Motion for Extension of Time: It is hereby ORDERED that Defendant's dispositive motion shall be due on August 27, 2013; Plaintiff's opposition shall be due on October 9, 2013; and Defendant's reply shall be due on November 6, 2013. SO ORDERED. Signed by Judge Rudolph Contreras on 8/20/2013. (lcrc3) Modified event title on 8/21/2013 (znmw, ). (Entered: 08/20/2013) |
| 08/27/2013 | 14 | MOTION to Dismiss , MOTION for Summary Judgment by DEPARTMENT OF HOMELAND SECURITY (Attachments: # 1 Exhibit Anderson Transcript, # 2 Exhibit Cohen Transcript, # 3 Exhibit Souther Transcript, # 4 Exhibit 1, # 5 Exhibit |

|            |    | 4, #_6 Exhibit 6, #_7 Exhibit 7, #_8 Exhibit 8, #_9 Exhibit 9, #_10 Exhibit 10, #_11 Exhibit 11, #_12 Exhibit 12, #_13 Exhibit 13, #_14 Exhibit 15, #_15 Exhibit 18, #_16 Exhibit 20, #_17 Exhibit 21, #_18 Exhibit 23, #_19 Exhibit 24, #_20 Exhibit 27, #_21 Exhibit 29, #_22 Exhibit 30, #_23 Exhibit 31, #_24 Exhibit 32, #_25 Exhibit 33, #_26 Exhibit 34, #_27 Exhibit 35, #_28 Exhibit 36, #_29 Exhibit 37, #_30 Text of Proposed Order)(Lo, Michelle) (Entered: 08/27/2013) |
|------------|----|------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 08/27/2013 | 15 | Consent MOTION for Order *to File Under Seal* by DEPARTMENT OF HOMELAND SECURITY. (Lo, Michelle) (Entered: 08/27/2013) |
| 08/27/2013 |    | MINUTE ORDER granting_15 Motion to File Under Seal: It is hereby ORDERED that the Clerk shall file under seal unredacted versions of (1) the Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss and for Summary Judgment and Defendant's Statement of Undisputed Material Facts; (2) the transcripts of the depositions of Plaintiff, Dr. Elizabeth Berbano, Dr. Erica Schwartz, and Dr. Brent Pennington; and (3) Defendant's Exhibits 2, 3, 5, 14, 16, 17, 19, 22, 25, 26, and 28. SO ORDERED. Signed by Judge Rudolph Contreras on 8/27/2013. (lcrc3) (Entered: 08/27/2013) |
| 08/28/2013 | 16 | SEALED DOCUMENT re_14 MOTION to Dismiss MOTION for Summary Judgment filed by DEPARTMENT OF HOMELAND SECURITY. (This document is SEALED and only available to authorized persons.) (Attachments: #_1 Exhibit 2, #_2 Exhibit 3, #_3 Exhibit 5, #_4 Exhibit 14, #_5 Exhibit 16, #_6 Exhibit 17, #_7 Exhibit 19, #_8 Exhibit 22, #_9 Exhibit 25, #_10 Exhibit 26, #_11 Exhibit 28, #_12 Transcript Berbano, #_13 Transcript Doak, #_14 Transcript Pennington, #_15 Transcript Schwartz)(zjf, ) (Entered: 08/29/2013) |
| 10/09/2013 | 17 | Memorandum in opposition to re_14 MOTION to Dismiss MOTION for Summary Judgment filed by EDNA DOAK. (Attachments: #_1 Exhibit)(Lescht, Alan) (Entered: 10/09/2013) |
| 11/06/2013 | 18 | REPLY to opposition to motion re_14 MOTION to Dismiss MOTION for Summary Judgment filed by DEPARTMENT OF HOMELAND SECURITY. (Attachments: #_1 Reply Exhibit 1)(Lo, Michelle) (Entered: 11/06/2013) |
| 02/10/2014 | 19 | ORDER granting_14 Motion to Dismiss; granting_14 Motion for Summary Judgment. See document for details. Signed by Judge Rudolph Contreras on 2/10/2014. (lcrc1) (Entered: 02/10/2014) |
| 02/10/2014 | 20 | MEMORANDUM OPINION granting_14 Motion to Dismiss; granting_14 Motion for Summary Judgment. See document for details. Signed by Judge Rudolph Contreras on 2/10/2014. (lcrc1) (Entered: 02/10/2014) |
| 03/05/2014 | 21 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to_19 Order on Motion to Dismiss, Order on Motion for Summary Judgment by EDNA DOAK. Filing fee $ 505, receipt number 0090–3641442. Fee Status: Fee Paid. Parties have been notified. (Lescht, Alan) (Entered: 03/05/2014) |
| 03/06/2014 | 22 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re_21 Notice of Appeal to DC Circuit Court. (znmw, ) (Entered: 03/06/2014) |
| 03/10/2014 |    | USCA Case Number 14–5053 for_21 Notice of Appeal to DC Circuit Court filed by EDNA DOAK. (kb) (Entered: 04/02/2014) |

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| EDNA DOAK<br>501 Granville Dr.<br>Silver Spring, MD 20901<br><br>Plaintiff,<br><br>v.<br><br>JANET NAPOLITANO, SECRETARY<br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civ. Action No.

Jury Trial Demanded

### COMPLAINT

Plaintiff, Edna Doak, by and through counsel, complains of Defendant as follows:

### JURISDICTION AND VENUE

1. This action is brought pursuant to § 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791, et seq (Rehabilitation Act). This Court has federal question jurisdiction and venue is proper because Plaintiff was formerly employed in Washington, D.C.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

2. Plaintiff has exhausted her administrative remedies by filing a complaint with Defendant's Office for Civil Rights and Civil Remedies and has filed this lawsuit within 30 days of receipt of the U.S. Department of Homeland Security's (Agency) final agency decision on June 28, 2012.

### THE PARTIES

3. Plaintiff, Edna Doak, resides at 501 Granville Dr., Silver Spring, MD 20901.

4. On information and belief, Defendant Janet Napolitano, Secretary, U.S. Department of Homeland Security, is named in her official capacity as secretary of the agency that formerly employed Plaintiff within the U.S. government.

**FACTS**

5. Plaintiff was formerly employed by Defendant as a Program Analyst (Financial) from November 27, 2007 until August 9, 2009.

6. From August 2009 to October 31, 2010, Plaintiff worked as a Management Program Analyst.

7. Plaintiff is 63 years old and suffers from major depressive disorder, migraines, hypothyroidism, and obstructive sleep apnea.

8. Plaintiff's disabilities substantially limit one or more of her major life activities, including sleeping and concentrating.

9. On February 22, 2010, Plaintiff received a letter of reprimand for being absent without leave even though Defendant was aware the Plaintiff had difficulty getting up in the morning due to her disabilities, had called her supervisor to inform him she would be late, and provided medical documentation for her absences.

10. On April 16, 2010, Plaintiff submitted medical documentation to her supervisor indicating that she suffered from major depressive disorder, migraines, hypothyroidism, and obstructive sleep apnea and requested the following accommodations: telework; full-spectrum light for her work space; anti-glare computer monitor screen; work in an area in that is not subject to cool air currents; adjusted work schedule from 11 am to 7 pm because of her difficulty arising in the morning due to her medical condition; and optional weekend work hours.

11. Instead of accommodating Plaintiff's request for a later start time, on May 24, 2010, Plaintiff received another letter of reprimand for being absent without leave even though Defendant was aware the Plaintiff had difficulty getting up in the morning due to her disabilities and Plaintiff had called her supervisor to inform him that she was going to be late.

12. On June 1, 2010, Plaintiff's request for reasonable accommodation in the form of a flexible work schedule was denied and she was required to report for duty at 9 am.

13. On July 16, 2010, Plaintiff submitted additional medical documentation from her doctor requesting that her start time be adjusted to 9:30 am or that she be permitted to telework to accommodate her disability.

14. Defendant failed to engage in an interactive dialogue with Plaintiff regarding her requests for accommodations.

15. Defendant continued to deny her requests for reasonable accommodations and on July 23, 2010, required her to report for duty at 9 am.

16. Defendant denied Plaintiff's request to telework.

17. Following Plaintiff's requests for accommodations, Plaintiff's supervisor also reassigned Plaintiff's work duties to her co-workers, excluded Plaintiff from meetings, and denied Plaintiff numerous training opportunities.

18. On August 9, 2010, Defendant issued Plaintiff a notice of proposed removal.

19. On August 31, 2010, Plaintiff submitted a written reply and on September 1, 2010, Plaintiff presented an oral reply to the notice of proposed removal.

20. On September 30, 2010, Defendant removed Plaintiff, effective October 8, 2010 from her position claiming Plaintiff was not capable of performing the essential functions of her

position due to her inability to maintain a regular schedule. The reasons given were false and pretext to mask unlawful discrimination.

21. On October 6, 2010, Plaintiff contacted an EEO officer.

22. On February 22, 2011, Plaintiff filed a formal complaint of discrimination alleging discrimination on the basis of her race (Caucasian), national origin (Hispanic), disability, sex (female), age (1948), and retaliation.

23. On June 19, 2012, Defendant issued a final agency decision finding Plaintiff failed to prove discrimination.

24. Plaintiff has sustained damages as a result of Defendant's unlawful conduct consisting of lost wages, lost benefits, front pay, front benefits, emotional distress, pain and suffering, and mental anguish.

## COUNT 1

25. Plaintiff repeats and realleges paragraphs 1-24 as if fully set forth herein.

26. By and through its conduct, Defendant violated the Rehabilitation Act by discriminating against Plaintiff and discharging her from her employment because of her disability, its perception of her as if she were disabled, and its record of her disability.

## COUNT 2

27. Plaintiff repeats and realleges paragraphs 1-26 as if fully set forth herein.

28. By and through its conduct, Defendant violated the Rehabilitation Act by failing to engage in the interactive process and denying Plaintiff reasonable accommodations for her disability.

## COUNT 3

29. Plaintiff repeats and realleges paragraphs 1-28 as if fully set forth herein.

30. By and through its conduct, Defendant violated the Rehabilitation Act by terminating

Plaintiff in retaliation for requesting reasonable accommodations.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims.

WHEREFORE, Plaintiff demands judgment against Defendant on Counts 1, 2, and 3 and

seeks lost wages, front pay and benefits, $300,000 in compensatory damages for pain and

suffering, mental anguish, and emotional distress on each count, interest, costs, the amount of tax

on any award, and reasonable attorney's fees.

Dated: July 18, 2012                    Respectfully submitted,

Alan Lescht, DC Bar # 441691
Susan L. Kruger, DC Bar # 414566
Rani Rolston, DC Bar # 974052
Alan Lescht & Assoc., PC
1050 17th St., NW, Suite 400
Washington, D.C. 20036
Tel (202) 463-6036
Fax (202) 463-6067
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| EDNA DOAK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case 1:12-cv-1177-RC |
| v. | ) |
| | ) |
| JANET NAPOLITANO, Secretary, | ) |
| U.S. Department of Homeland Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**ANSWER**

Defendant, Janet Napolitano, Secretary, U.S. Department of Homeland Security ("Defendant"), by and through undersigned counsel, responds to Plaintiff's Complaint as follows:

**FIRST AFFIRMATIVE DEFENSE**

The Complaint fails to state a claim upon which relief may be granted.

**SECOND AFFIRMATIVE DEFENSE**

Plaintiff has failed to exhaust her administrative remedies.

**THIRD AFFIRMATIVE DEFENSE**

To the extent Plaintiff was subjected to any adverse action motivated by an impermissible factor, Defendant would have taken the same action in the absence of the impermissible motivating factor.

\* \* \*

In response to the numbered paragraphs and sentences of the Complaint, Defendant admits, denies, or otherwise responds as follows:

### JURISDICTION AND VENUE[1]

1.  This paragraph contains statements of law regarding jurisdiction and venue to which no response is required.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

2.  Admit that Plaintiff filed a complaint with Defendant's Office for Civil Rights and Civil Remedies and filed this lawsuit within 30 days of receipt of the U.S. Department of Homeland Security's final agency decision dated June 20, 2012.  Defendant avers that Plaintiff refused to participate in a telephonic interview with the EEO investigator or respond to interrogatories.

### THE PARTIES

3.  Upon information and belief, admit.

4.  Admit.

### FACTS

5.  Admit.

6.  Admit.

7.  Upon information and belief, admit.

8.  Upon information and belief, admit.

9.  Admit only that February 22, 2010, Plaintiff's supervisor, Gregory Cohen, Chief, Business Management & Metrics Division, issued Plaintiff a Letter of Reprimand based on her failure to follow leave request procedures and several dates on which Plaintiff was charged with AWOL.  Deny the remaining allegations in this paragraph.

---

[1]  Defendant has included the headings listed in the Complaint simply to assist in reading the pleadings and does not admit the accuracy of those headings.

10. Admit that Plaintiff submitted medical documentation to the Agency's Medical Review Officer on April 16, 2010, and requested accommodations, and aver that the documentation is the best evidence of its contents.

11. Admit only that on May 24, 2010, Mr. Cohen issued Plaintiff another Letter of Reprimand based on several dates on which Plaintiff was charged with AWOL.  This Letter superseded the Letter dated February 22, 2010, and is the best evidence of its contents.  Deny the remaining allegations in this paragraph.

12. Admit that Mr. Cohen agreed to move Plaintiff's start time from 8:15 am to 9:00 am in an effort to respond to her reasonable accommodation request to start at 10:00 or 11:00 am.

13. Admit that Plaintiff addressed such a request to Captain M. Boquard, and state that the request is the best evidence of its contents.

14. Deny.

15. Admit only that Mr. Cohen continued to provide a reasonable accommodation of a 9:00 am start time versus Plaintiff's original start time of 8:15 am

16. Admit, and further aver that Plaintiff failed to submit a "Self-Certification Safety Checklist for Telecommuters Working at Home" or verify that she had the technical capacity to telework.

17. Deny.

18. Admit.

19. Admit.

3

12

20. Deny, except to admit only that on September 30, 2010, Rory Souther upheld the proposed removal and Plaintiff was to be removed effective October 8, 2010. Plaintiff signed a voluntary resignation form effective October 31, 2010.

21. Admit.

22. Admit.

23. Admit.

24. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, deny.

## COUNT 1

25. Defendant incorporates by reference its responses to paragraphs 1-24.

26. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, deny.

## COUNT 2

27. Defendant incorporates by reference its responses to paragraphs 1-26.

28. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, deny.

## COUNT 3

29. Defendant incorporates by reference its responses to paragraphs 1-28.

30. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, deny.

## JURY DEMAND

The remainder of Plaintiff's Complaint contains her prayer for relief to which no answer is necessary, but to the extent that an answer may be deemed necessary, it is denied that Plaintiff

4

is entitled to any of the relief requested in the "Wherefore" clause.  Defendant further avers that

any relief may be limited by 42 U.S.C. § 2000e-5(g)(2)(B).

WHEREFORE Defendant prays that Plaintiff take nothing by her Complaint, for

judgment in favor of Defendant and against Plaintiff, for all costs of suit, including reasonable

attorney's fees, and for such other and further relief as this Court deems proper and just.

Date:  September 24, 2012                              Respectfully submitted,

                                                       RONALD C. MACHEN JR., D.C. Bar #447889
                                                       United States Attorney
                                                       for the District of Columbia

                                                       DANIEL F. VAN HORN, D.C. Bar #924092
                                                       Civil Chief

                                                       By:    /s/ Michelle Lo
                                                       MICHELLE LO
                                                       Assistant United States Attorney
                                                       555 4th Street, N.W.
                                                       Washington, D.C. 20530
                                                       Tel: (202) 514-5134   Fax: (202) 514-8780
                                                       Michelle.Lo2@usdoj.gov

*Of counsel:*
Lorna Jerome, Esq.
Commandant
U.S. Coast Guard

5

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EDNA DOAK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:12-cv-01177-RC |
| v. | ) |
| | ) |
| JANET NAPOLITANO, | ) |
| Secretary, U.S. Department of Homeland | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

Defendant, Janet Napolitano, Secretary, U.S. Department of Homeland Security, respectfully moves the Court pursuant to Federal Rule of Civil Procedure 12(b)(1) to dismiss certain of Plaintiff's claims for failure to exhaust and pursuant to Federal Rule of Civil Procedure 56 for summary judgment on all claims raised in Plaintiff's complaint. Plaintiff brings this action against her former employer, the United States Coast Guard, a component of the U.S. Department of Homeland Security, alleging that Defendant discriminated against her on the basis of disability and subjected her to retaliation in violation of the Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791, *et seq.* Defendant moves for summary judgment on the grounds that there are no material facts in dispute and, as such, Defendant is entitled to judgment as a matter of law. In support of this motion, Defendant submits the accompanying memorandum of points and authorities and exhibits thereto, Local Rule 7(h) statement of material facts not in dispute, and a proposed order.[1]

---

[1] Defendant is filing herewith a motion for leave to file under seal an unredacted version of its Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss and for Summary Judgment, along with transcripts of the depositions of Edna Doak, Dr. Elizabeth

Date:  August 27, 2013

Respectfully submitted,

RONALD C. MACHEN JR., D.C. Bar #447889
United States Attorney
for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By:  /s/ Michelle Lo
MICHELLE LO
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
Tel: (202) 252-2541  Fax: (202) 514-8780
Michelle.Lo2@usdoj.gov

*Of counsel:*
Lorna Jerome, Esq.
United States Coast Guard

---

Berbano, Dr. Erica Schwartz, and Dr. Brent Pennington, and Exhibits 2, 3, 5, 14, 16, 17, 19, 22, 25, 26, and 28.  Defendant will file unredacted versions of these materials under seal on August 28, 2013, and will send a courtesy copy of its under seal filings to the Plaintiff today and to the Court on August 28, 2013.

2

**16**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EDNA DOAK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:12-cv-01177-RC |
| v. | ) |
| | ) |
| JANET NAPOLITANO, | ) |
| Secretary, U.S. Department of Homeland | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7(h), Defendant Janet Napolitano, Secretary, U.S. Department of Homeland Security, respectfully submits the following statement of material facts as to which there is no genuine dispute:

1.     At all times relevant to this action, Plaintiff was employed as a GS-13 Management Program Analyst in the Office of Acquisition Resources Management within the U.S. Coast Guard's Acquisition Directorate.  Compl. ¶ 6; Doak Tr. at 10:21-12:16; Ex. 1.

2.     Plaintiff's first-line supervisor was Greg Cohen, Chief of the Business Management and Metrics group, and her second-line supervisor was Rory Souther, Chief of Acquisition Resources Management.  Doak Tr. at 13:19-17:6; Ex. 1.

3.     Plaintiff had very little interaction with Mr. Souther, as he did not assign her work.  Doak Tr. at 16:8-21.

4.     Initially, Plaintiff worked in the Air Program, but she clashed with Valerie Warner, the team leader, when Ms. Warner made a comment at a meeting suggesting that Plaintiff had arrived at work after other members of the team.  *Id.* at 17:7-20:5.

5.    Plaintiff complained to Mr. Cohen and requested a transfer, and Mr. Cohen accommodated her request and transferred her to the Surface Program in August 2009. *Id.* at 17:7-20:5, 65:23-66:2.

6.    Plaintiff's day-to-day responsibilities were to support the Surface Program, which included monitoring the budget, preparing obligation plans, working with the program manager, preparing procurement requests, and meeting with the program manager and the support team to plan for the building of boats. *Id.* at 21:13-22:15; Ex. 2 at Resp. to Interrogatory No. 5.

7.    In August 2009, following a car accident, Plaintiff submitted a medical certification of a serious health condition relating to the car accident to support her request for Family and Medical Leave Act ("FMLA") protections, which the Agency approved on September 3, 2009. Doak Tr. at 82:12-83:18; Ex. 3; Ex. 5.

8.    Around late December 2009, Mr. Cohen met with Plaintiff to discuss her inability to work a complete nine-hour day and counsel her about the fact that she was using up her leave balances very quickly and the need to monitor her leave balances. *See* Ex. 6; *see also* Ex. 8.

9.    Plaintiff's start time was 8:15 AM, the latest start time of the approximately 20 staff members in Mr. Cohen's group. *See* Cohen Tr. at 64:14-19; Doak Tr. at 226:15-227:4; Souther Tr. at 49:1-51:1.

10.    In January 2010, Mr. Cohen issued an "Employment Status" memorandum requesting that Plaintiff return immediately to a full-time duty status and notifying her that her continued absences were having a negative impact on her work because her position required daily interactions with project, contracting, and resource staff and Plaintiff had not completed required certifications and mandatory training. Ex. 9 ¶¶ 1-2.

2

11.     Mr. Cohen advised Plaintiff that as of January 19, 2010, she had used 440.30 hours of FMLA, along with -233 hours of sick leave and -35.15 hours of annual leave, and that Plaintiff would be required to request leave without pay ("LWOP") for his approval along with supporting documentation for future absences because he could no longer advance leave. *Id.* ¶ 3.

12.     Mr. Cohen reminded Plaintiff of the need to request leave properly, and put her on notice that her continued failure to submit appropriate requests could result in disciplinary action. *Id.*; Ex. 10 at 3.

13.     On January 25, 2010, Plaintiff was absent without leave ("AWOL") for 3:30 hours. Ex. 11.

14.     As of January 25, 2010, Plaintiff had used 480 hours of FMLA leave, and incurred leave balances of -237:45 hours of sick leave and -43:30 hours of annual leave and, as a result, Mr. Cohen reiterated that he could no longer approve advance sick or annual leave. *Id.* ¶ 2.

15.     Mr. Cohen reminded Plaintiff of the procedures for requesting leave and asked her to let him know if she suffered from a medical condition that required an accommodation. *Id.* ¶¶ 3-4.

16.     According to Plaintiff, the -237:45 hours of sick leave was a large negative balance and her supervisor likely was frustrated by her absences and negative leave balances. Doak Tr. at 118:14-120:10.

17.     By memorandum dated February 22, 2010, Mr. Cohen officially reprimanded Plaintiff for being AWOL for 3:30 hours on January 25, 2010, and 4:15 hours on January 26, 2010, and for failing to comply with leave request procedures. Ex. 12 ¶ 1.

3

18.     The Agency agreed to hold the letter of reprimand in abeyance in order for Plaintiff to provide acceptable medical documentation to support (1) absences unrelated to FMLA leave; (2) AWOL absences on January 25 and 26, 2010; and (3) pending or outstanding leave requests related to medical issues or doctor's appointments. Ex. 13.

19.     On March 9, 2010, Plaintiff submitted a memorandum to Mr. Cohen to inform him that, in connection with the abeyance agreement, she was separately submitting three medical letters directly to the Agency's medical review officers. Ex. 14.

20.     Based on the medical officers' report that the documentation did not support Plaintiff's absences, or indicate whether Plaintiff had medical conditions that required accommodations, Mr. Cohen issued a "Request for Medical Documentation" on March 24, 2010, and directed Plaintiff to provide medical information to Starlisha King Anderson, a human resources specialist, by April 9, 2010. Ex. 15 ¶¶ 2-3.

21.     The Coast Guard's Division of Operational Medicine and Medical Readiness reviewed requests for accommodations made by civilian employees. Pennington Tr. at 8:1-11:2; Schwartz Tr. at 5:1-10:13.

22.     Human Resources forwarded accommodation requests and supporting documents directly to physicians in the Division to render a medical opinion as to whether the requested accommodations were medically justified.  Pennington Tr. at 8:1-11:2; Schwartz Tr. at 5:1-10:13; Anderson Tr. at 13:19-16:17.

23.     In April 2010, Plaintiff submitted to Human Resources her first request for workplace accommodation. Doak Tr. at 157:2-6.

24.     In a letter dated April 16, 2010, Plaintiff's treating physician, Dr. Elizabeth Berbano, indicated that Plaintiff had been diagnosed with major depressive disorder, migraines,

4

hypothyroidism (and hyperthyroidism), and obstructive sleep apnea, and recommended that

Plaintiff be granted certain accommodations: (1) telecommuting; (2) full-spectrum lighting for

her workspace; (3) anti-glare computer screen; (4) work in an area not subjected to cold air

currents; (5) "[c]onsideration for adjustment of work schedule to be 11 AM to 7 PM because of

the difficulty arising in the morning"; and (6) "[c]onsideration for the option of weekend work

hours to make up for week day hours missed." Ex. 16.

    25.



    26.

    27.    Dr. Berbano was not aware of Plaintiff's job title or duties, and knew only that

"she did a lot of computer work and attended meetings." Berbano Tr. at 38:21-39:7.

    28.    Dr. Berbano's recommendation of an 11 AM to 7 PM schedule was based on

Plaintiff's report of her optimal time to work, just as her recommendation of weekend work

hours was also based on Plaintiff's suggestion. *Id.* at 41:25-45:24.

    29.



    30.    Dr. Erica Schwartz, a board certified occupational medicine physician in the

Division of Operational Medicine, evaluated the April 16, 2010, letter from Dr. Berbano and

5

consulted with the Department of Labor's Job Accommodation Network in order to determine which of the requested accommodations were reasonable. Schwartz Tr. at 10:19-14:3.

31.     Based on her assessment, Dr. Schwartz recommended that the following accommodations be provided: (1) the addition of fluorescent light filters to existing lights, a change in lighting, or a move to a private area to allow for personal adjustment to lighting; (2) an anti-glare filter for the computer monitor; (3) use of sunglasses or anti-glare glasses; (4) noise-canceling headsets; and (5) a dark, private area for use when medically necessary. Ex. 17; Schwartz Tr. at 10:19-14:3.

32.     Dr. Schwartz viewed the requests for telework, the 11 AM to 7 PM schedule, and weekend work hours to be medically unsupported. *See* Schwartz Tr. at 12:12-13:14.

33.     At the time Mr. Cohen considered Plaintiff's request for accommodation, he did not have before him any of the supporting medical documentation because Plaintiff submitted the materials directly to Human Resources due to her privacy concerns. Cohen Tr. at 9:9-17, 47:8-18; Doak Tr. at 133:18-134:15; Souther Tr. at 21:17-24:14; Anderson Tr. at 32:15-35:11.

34.     Mr. Cohen's understanding of Plaintiff's medical condition was limited to his knowledge that she had been in a car accident and that she suffered from migraines. Cohen Tr. at 7:4-14, 9:2-8; Doak Tr. at 106:3-108:19.

35.     Although supervisors were not required to follow the recommendations of medical review officers, the supervisors nevertheless took the recommendations into account because they did not have any of the supporting medical documentation and the medical review officers "have the medical education the same as any other doctor, so they were the only ones in a position to assess the memorandum or the documentation from Ms. Doak's physician and to

6

make an assessment." Souther Tr. at 21:3-21; Cohen Tr. at 44:10-45:9, 47:19-48:16, 60:11-20; Anderson Tr. at 17:12-18:9.

36.     Mr. Cohen also relied on guidance from Starlisha King Anderson, the human resources specialist who assisted him with drafting responses to Plaintiff. Anderson Tr. at 21:16-26:13.

37.     Pursuant to the Acquisition Directorate's Standard Operating Procedure #1, the Directorate's designated working hours were set as "the hours between 0600 and 1800 Monday through Friday," with the Directorate closed on weekends and government holidays. Ex. 7 ¶ 5.f, 5.j; Cohen Tr. at 38:17-40:8.

38.     Pursuant to Commandant Instruction 12630.1, supervisors had the option of permitting telecommuting provided that the employee occupies a position with "[p]ortable work activities members and employees can perform effectively outside the office" and "[t]he worker can meet the requirements for face-to-face contact with other workers or the public by working in the office at least one day a week." Ex. 18 ¶ 8.e(1), 8e(7).

39.     In addition to signing and maintaining a written agreement, an employee who seeks to telework must also submit a "Self-Certification Safety Checklist" and a "Self-Certification Security Audit Checklist." *Id.* at Enclosures 3 & 4.

40.     In a May 6, 2010, response based on the recommendations set forth in Dr. Schwartz's April 28, 2010, memorandum, Mr. Cohen provided Plaintiff with a noise-canceling headset and anti-glare screen for computer screen, permitted her to wear sunglasses in the office as needed, asked that three of the overhead lights directly above her desk be turned off, and identified break rooms that the Plaintiff could use as necessary for medical reasons.. *See* Ex. 19; Ex. 20 at Resp. to Interrogatory No. 6; Ex. 21; Doak Tr. at 138:9-142:25.

7

**23**

41.   Mr. Cohen provided all of the accommodations recommended by the medical review officers because "[t]he goal was always to get Edna back to work, so [he] provided everything in this April 28, 2010 memo as best as [he] could." Cohen Tr. at 22:3-14, 52:6-20.

42.   Mr. Cohen also offered Plaintiff a move to a cubicle that was in a darker area, which Plaintiff rejected after saying that she had to check with the union first. *See* Ex. 19; Doak Tr. at 138:18-139:10.

43.   In response to Plaintiff's request for an 11 AM to 7 PM work schedule, Mr. Cohen explained that because her position with an acquisition project required daily and frequent interaction with project staff, other business managers, resource staff, and numerous agencies, the proposed 11 AM arrival time was not feasible as it would place the project and resource office in a hardship position. *See* Ex. 19 ¶ 4.

44.



45.   Mr. Cohen understood Plaintiff to have rescinded her request for an 11 AM start time, and responded on June 1, 2010, that "[a] 1000 start is also not acceptable but I would like to offer you a change from 0815 to 0900. Please let me know if the 0900 start is acceptable, if it is I will have the time card adjusted at the beginning of the next pay period." Ex. 23; Doak Tr. at 236:3-237:2.

8

46.     Plaintiff did not accept Mr. Cohen's offer to adjust her start time to 9 AM. Doak Tr. at 237:3-239:6.

47.     At the end of May, Plaintiff was arriving at work before noon and sometimes around 11 AM, and also "sometimes earlier closer to 10 o'clock." Doak Tr. at 271:3-10.

48.     On May 24, 2010, Mr. Cohen issued Plaintiff a Letter of Reprimand based on 30:75 hours of AWOL that she had incurred, including approximately 23:30 hours of AWOL the week of May 10, 2010. Ex. 24 ¶¶ 1-2.

49.     Her leave balances reflected -137:45 hours of annual leave, -238 sick leave, and 134:15 hours of LWOP, all of which Plaintiff agreed would be "concerning" to an employer. *Id.* ¶ 3; Doak Tr. at 155:9-22.

50.     Plaintiff believed she should have been permitted LWOP whenever she requested it. Doak Tr. at 50:6-9.

51.     Plaintiff's managers learned through a timecard audit of her potential misuse of leave when Plaintiff received approval for nine hours of "Sick Leave – FMLA" on December 18, 2009, yet showed up for a party in another Coast Guard building. Ex. 2 at Resp. to Interrogatory No. 19.

52.     Three months after her April 2010 request, Plaintiff submitted another letter from Dr. Berbano dated July 16, 2010, that was entitled "Clarification of Medical Letter dated 16 Apr 2010." Ex. 25.

53.     

9



54.

55.     Dr. Berbano revised the prior accommodation request and recommended instead that Plaintiff be given a trial of flexible work hours, "to include an adjusted start time of 0930 or telecommuting." *Id.*; Doak Tr. at 160:1-21.

56.     As with her prior suggestion, Dr. Berbano's revised recommendation of a 9:30 AM start time was based on "the patient letting me know when she felt most optimal to concentrate on her work and be the most productive." Berbano Tr. at 62:5-63:7.



57.

58.

59.     The physicians in the Division of Operational Medicine did not know which supervisor ultimately made the decision regarding Plaintiff's accommodation requests, nor did

10

they ever have any discussions with any supervisor regarding Plaintiff's requests. *See* Pennington Tr. at 40:17-41:2; Schwartz Tr. at 22:3-23:13; Cohen Tr. at 17:14-22.

60.     At a meeting on July 23, 2010 with Mr. Souther and Mr. Cohen, Plaintiff agreed to a 9 AM arrival time at work.  Souther Tr. at 35:14-36:10, 24:15-25:15; Cohen Tr. at 57:6-18; Anderson Tr. at 27:2-22; Doak Tr. at 240:20-242:22; Ex. 27.

61.     Despite agreeing to the 9 AM start time, Plaintiff was still unable to arrive at work on time. *See* Cohen Tr. at 58:3-60:10; Ex. 28.

62.     As a result of her frequent absences and late arrivals, Plaintiff was not fulfilling her duties on her projects, thus requiring that other colleagues perform her duties, including attending meetings, preparing and processing funding documents, developing obligations plans, and gathering data to respond to Congressional inquiries.  Ex. 29; Ex. 2 at Resp. to Interrogatory No. 16; Doak Tr. at 185:5-188:4.

63.     Plaintiff's position required that she complete BCF 106 and Appropriations Law training, but Plaintiff never completed either course.  Ex. 2 at Resp. to Interrogatory No. 17; Doak Tr. 126:9-19, 188:5-192:16.

64.     By memorandum dated August 9, 2010, Mr. Cohen provided Plaintiff with notice of his proposal to remove her from her management analyst position and from Federal service due to (1) her medical inability to perform the essential duties of her position, which caused her to be unable to maintain her regular work schedule and (2) her hours in AWOL status.  Ex. 32.

65.     Plaintiff was absent from duty for at least 52 percent of her scheduled work hours since January 31, 2010, had exhausted all of her sick and annual leave, and had been granted over 173.45 hours of LWOP. *See id.*

11

66.    Even though Plaintiff's supervisors agreed to change her start time from 8:15 AM to 9:00 AM, effective July 26, 2010, Plaintiff continued to have unscheduled and unexplained absences on July 27, 28, 29, 30, and August 2, 3, 4, 2010. *Id.*

67.    On behalf of Plaintiff, the union responded to the Notice of Proposed Removal on August 31, 2010. Ex. 33.

68.    After careful consideration of the evidence before him, including Plaintiff's oral and written responses, Mr. Souther determined on September 30, 2010, that Plaintiff's removal from Federal service was warranted to promote the efficiency of the service. Ex. 34.

69.    Although Plaintiff's unscheduled absences decreased briefly after her receipt of the Notice of Proposed Removal, Mr. Souther noted that her unscheduled absences "continued and increased significantly since 10 September 2010," preventing her from participating in meetings and creating undue hardship for her colleagues. *See id.* ¶ 3.

70.    In addition, Plaintiff exhausted 492.75 hours of FMLA, including the maximum allowable annual and sick leave and advanced annual and sick leave, and also incurred 209 hours of LWOP in all instances where she had a documented medical appointment between January 31 and September 11, 2010. *See id.* ¶ 4; Doak Tr. at 255:7-261:8.

71.    Plaintiff had not performed a complete leave audit and admitted that an independent audit of her FMLA usage had been performed by Human Resources, not Mr. Cohen. Doak Tr. at 52:5-53:15, 93:2-95:15, 200:14-201:14.

72.    Even treating Plaintiff's AWOL hours as LWOP, Mr. Souther found that her absences "remain 52 percent of the work time between 31 January 2010 and 17 July 2010, and 45 percent of the work time through 11 September 2010." *See* Ex. 34 ¶ 6.

12

73.   On October 6, 2010, Plaintiff contacted an Equal Employment Opportunity ("EEO") officer to file an informal complaint, stated that she was challenging the notice of proposed removal on September 30, 2010, and indicated that she first became aware of the alleged discrimination on "8/9/10." Compl. ¶ 21; Ex. 35.

74.   On February 22, 2011, Plaintiff filed a formal complaint. Compl. ¶ 22.

75.   The Agency entered into a settlement agreement under which it agreed to permit Plaintiff to retire effective October 31, 2010, in lieu of being terminated. Doak Tr. at 261:11-263:17; Ex. 36.

76.   Although Plaintiff revoked the settlement agreement on November 4, 2010, the Agency did not undo her retirement, so Plaintiff has been receiving retirement benefits since December 2010 and her separation is designated as a retirement. Doak Tr. at 261:11-263:17; Ex. 37; Souther Tr. 63:2-65:7.

Date:  August 27, 2013

Respectfully submitted,

RONALD C. MACHEN JR., D.C. Bar #447889
United States Attorney
for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By:   /s/ Michelle Lo
MICHELLE LO
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
Tel: (202) 252-2541  Fax: (202) 514-8780
Michelle.Lo2@usdoj.gov

*Of counsel:*
Lorna Jerome, Esq.
United States Coast Guard

13

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-------------------------------x

EDNA DOAK                        )

                             )

    Plaintiff           )

                             )

      vs.           )Case No. 1:12-cv-1177-RC

                             )

JANET NAPOLITANO, SECRETARY,     )

U.S. DEPARTMENT OF HOMELAND      )

SECURITY                         )

                             )

    Defendant.          )

-------------------------------x

               April 15, 2013

               Washington, D.C.


        The Deposition of STARLISHA ANDERSON was

taken on April 15, 2013, commencing at 12:54 p.m. and

concluding at 1:52 p.m., at Merrill Corporation,

1325 G Street, Suite 200, Washington, D.C., before

Karen Geddes, Court Reporter and Notary Public.

STARLISHA ANDERSON - 4/15/2013

| Page 2 | Page 4 |
|---|---|
| 1　　　　APPEARANCES | 1　WHEREUPON, |
| 2 | 2　　　　　STARLISHA ANDERSON, |
| 3　ON BEHALF OF PLAINTIFF: | 3　having been called by the Plaintiff and first duly |
| 4　CONSTANCE TRAVANTY, ESQUIRE | 4　sworn by a certified court reporter and notary |
| 5　Alan Lescht & Associates, P.C. | 5　public, testified as follows: |
| 6　1050 17th Street, N.W., suite 400 | 6　　　　EXAMINATION BY COUNSEL FOR PLAINTIFF |
| 7　Washington, DC 20036 | 7　BY MS. TRAVANTY: |
| 8　Telephone: (202)463-6036 | 8　　Q.　Good morning, Ms. King. My name is |
| 9　Fax: (202)463-6067 | 9　Constance Travanty. I represent Ms. Doak in her |
| 10　E-mail: Constance.travanty@dcemploymentattorney.com | 10　case against the Coast Guard. |
| 11 | 11　　　Could you please state your name for the |
| 12　ON BEHALF OF DEFENDANT: | 12　record. |
| 13　MICHELLE LO, ESQUIRE | 13　　A.　Starlisha J. Anderson. |
| 14　Assistant United States Attorney | 14　　Q.　And what is your current position title? |
| 15　555 Fourth Street, N.W. | 15　　A.　Human resource specialist. |
| 16　Washington, D.C. 20530 | 16　　Q.　How long have you held that position? |
| 17　Telephone: (202)514-5134 | 17　　A.　About ten years. |
| 18　Fax: (202)514-8780 | 18　　Q.　In that capacity did you interact with |
| 19　E-mail: michelle.lo2@usdoj.gov | 19　Ms. Doak? |
| 20 | 20　　A.　During -- yes. Within the ten years -- |
| 21 | 21　I'm not sure. |
| 22 | 22　　　MS. LO: I think you want to clarify |

| Page 3 | Page 5 |
|---|---|
| 1　　　EXAMINATION INDEX | 1　where she currently works versus where she had |
| 2　　　　　PAGE | 2　previously worked. |
| 3　Examination by Ms. Travanty.................　4 | 3　BY MS. TRAVANTY: |
| 4 | 4　　Q.　Okay. You have been an HR specialist for |
| 5 | 5　the last ten years? |
| 6　　　EXHIBITS | 6　　A.　Right, but I've worked for different |
| 7　NO.　　　　　PAGE | 7　agencies, so if you need to know where I work now |
| 8　1 Memorandum from Greg Cohen to Edna Doak | 8　and the period of time I worked for -- |
| 9　　dated May 6, 2010 regarding Medical Status | 9　　Q.　Where are you currently working? |
| 10　　and Accommodations...........................　10 | 10　　A.　I work for the Department of Defense. |
| 11　2 E-mail from Starlisha King to Mr. Cohen on | 11　　Q.　How long have you been at the Department |
| 12　　May 4, 2010, Subject Doak Medical | 12　of Defense? |
| 13　　Documentation................................　33 | 13　　A.　About a year and a half. |
| 14 | 14　　Q.　And prior to that were you an HR |
| 15 | 15　specialist with the Coast Guard? |
| 16 | 16　　A.　Yes. |
| 17 | 17　　Q.　So in that capacity would you have |
| 18 | 18　interacted with Ms. Doak? |
| 19 | 19　　A.　Yes. |
| 20 | 20　　Q.　Were you aware that Ms. Doak was |
| 21 | 21　disabled? |
| 22 | 22　　　MS. LO: Objection. You may answer, if |

2 (Pages 2 to 5)

STARLISHA ANDERSON - 4/15/2013

Page 6

1  you understand.
2  BY MS. TRAVANTY:
3     **Q.   Were you aware that Ms. Doak suffered**
4  **from medical conditions?**
5     A.  Yes.  First -- should I explain that when
6  I first became aware?
7     **Q.   When did you first become aware?**
8     A.  It was during 2010.
9     **Q.   How did you first become aware?**
10    A.  Through personnel inquiries concerning
11 management-employee relationships in my capacity as
12 an HR specialist.
13    **Q.   And what does that mean?**
14    A.  It was Ms. Doak had brought it to the
15 attention of management and myself during the
16 process of employee relations -- employee and
17 management relations personnel inquiries.
18    **Q.   So Ms. Doak brought what to the attention**
19 **of management?**
20    A.  The medical condition.
21    **Q.   So was there a meeting or how did she**
22 **bring it to their attention?**

Page 7

1     A.  I mean, there were a course of several
2  meetings and discussions and documentation, and so
3  through various venues we became aware of her
4  medical condition.
5     **Q.   What was your understanding of her**
6  **medical condition?**
7     A.  I vaguely recall the specific condition
8  or conditions.  I just recall there being -- I was
9  only aware of what was provided by Ms. Doak and her
10 physicians about various medical issues that she was
11 having during the time, but I don't remember
12 specifically what they were.
13    **Q.   At the time, though, you were aware of**
14 **certain medical conditions that she had?**
15    A.  Oh, that's a question? I'm sorry.
16    **Q.   Yeah.  I was asking, at the time were you**
17 **aware of the specific medical conditions that**
18 **Ms. Doak had?**
19    A.  Yes.
20    **Q.   And do you recall now what those are?**
21    A.  Not specifically, no.
22    **Q.   You mentioned that Ms. Doak had brought**

Page 8

1  **this to management's attention.  Who were you**
2  **referring to?**
3     A.  Mr. Greg Cohen and that was her immediate
4  supervisor at the time, and then Mr. Rory Souther
5  was the second level supervisor that was involved in
6  some of the issues as well.
7     **Q.   When would you say that she brought her**
8  **medical condition to their attention?**
9       MS. LO:  Objection.
10      MS. TRAVANTY:  If you know.
11 BY MS. TRAVANTY:
12    **Q.   Or are you aware of when she brought it**
13 **to their attention?**
14    A.  Not the specific date, no.
15    **Q.   Would it have been around the time that**
16 **you became aware?**
17      MS. LO:  Objection to that as well.  I
18 don't think that time has been established.
19 BY MS. TRAVANTY:
20    **Q.   I believe you testified in 2010 you first**
21 **became aware?**
22    A.  2010, yes.

Page 9

1     **Q.   And are you aware, is that when Mr. Cohen**
2  **and Mr. Souther also became aware of Ms. Doak's**
3  **conditions?**
4       MS. LO:  Same objection.
5       THE WITNESS:  I can't answer that.  I
6  know I first became aware of it in the 2010 time
7  frame.
8  BY MS. TRAVANTY:
9     **Q.   So she brought it to the attention of**
10 **management in 2010, but you don't know if that was**
11 **the first time they became aware?**
12    A.  Right, yes.
13    **Q.   Do you recall Ms. Doak requesting**
14 **reasonable accommodations at any point?**
15    A.  Yes.
16    **Q.   Do you know what she requested?**
17    A.  I don't remember all of the items
18 requested, but I do remember there was a list of
19 things that a physician had listed and then over
20 conversations there were other things that Ms. Doak
21 had requested.  So I remember there was a request
22 for lighting, like desk lighting, work schedule

3  (Pages 6 to 9)

| Page 10 | Page 12 |
|---|---|
| 1  changes. What else? I can't remember the rest of | 1  testimony was that she didn't recall whether it was |
| 2  them, but I do remember there were a couple of | 2  submitted directly to her. |
| 3  things listed. | 3  BY MS. TRAVANTY: |
| 4          (Deposition Exhibit 1 was | 4      Q.   Do you recall whether Ms. Doak was |
| 5          marked for identification.) | 5  granted the accommodations in paragraph 7? |
| 6  BY MS. TRAVANTY: | 6      A.   Yes, vaguely, because I do recall having |
| 7      Q.   I'd like you to take a look at what has | 7  a conversation with management about considering |
| 8  been marked Exhibit 1. Do you recognize this | 8  these and I believe there was -- I believe the |
| 9  document -- well, first let's look at the first | 9  lighting might have been -- very vaguely, I can't |
| 10  page. It's a memorandum dated April 28, 2010, from | 10  remember exactly specifically which ones were |
| 11  Captain Boquard. | 11  implemented. I do know they were considered. |
| 12          Do you recognize this document? | 12      Q.   Considered by whom? |
| 13      A.   Yes. | 13      A.   Management. |
| 14      Q.   What is this? | 14      Q.   Management meaning Mr. Cohen? |
| 15      A.   This is the MRO's review of medical | 15      A.   Meaning the supervisor, that's Mr. Cohen. |
| 16  documentation that Ms. Doak had submitted. | 16  I don't recall exactly what it was, but I believe |
| 17      Q.   Are the three pages after that the | 17  the lighting, something with the lighting, there was |
| 18  medical documentation you're referring to dated | 18  a request for that, and that was given. |
| 19  April 16th? | 19          I remember the work schedule adjustment, |
| 20      A.   Yeah. It looks familiar, uh-huh, yeah. | 20  the 11:00 a.m. to 7:00 p.m. was not granted, but |
| 21      Q.   So turning to the April 16th medical | 21  there were some work schedule changes that were |
| 22  documentation, did Ms. Doak submit this medical | 22  granted. |

| Page 11 | Page 13 |
|---|---|
| 1  documentation to you? | 1          Yeah, I believe the antiglare computer |
| 2      A.   I don't recall. I don't recall if this | 2  screen, that was given, and I think the cubicle may |
| 3  specific document was submitted to me directly. | 3  have been changed to address the work area issue. |
| 4  There were various documents I believe she had | 4      Q.   And who would have granted or denied |
| 5  submitted to me and the MRO. | 5  these requests? |
| 6      Q.   So Ms. Doak submitted medical | 6      A.   Mr. Cohen, the supervisor. |
| 7  documentation to you on several occasions? | 7      Q.   If you could, turn to the first page and |
| 8      A.   Yes, that had occurred. Uh-huh. | 8  take a look at the memorandum. Do you recognize |
| 9      Q.   If you could turn to the second page of | 9  this document? |
| 10  the medical documentation, paragraph 7, you will see | 10      A.   Yes, it looks familiar. |
| 11  there is recommendations for accommodation include | 11      Q.   What is it? |
| 12  "a" through "f." Are these the accommodations that | 12      A.   This is the statement that the MROs |
| 13  you were referring to earlier that Ms. Doak | 13  usually send back to management to the HR |
| 14  requested? | 14  specialist, a summary of their review of the |
| 15      A.   Yes. I recall these now. Uh-huh. | 15  documentation. |
| 16      Q.   Does that refresh your recollection as to | 16      Q.   A review of an employee's medical |
| 17  whether you reviewed this document? | 17  documentation? |
| 18      A.   Oh, yeah. I've reviewed it, yes. | 18      A.   Yes. |
| 19      Q.   And did Ms. Doak submit this to you -- | 19      Q.   What was the process? Generally you |
| 20  it's dated April 16th. Did she submit this to you | 20  would submit medical documentation to the Medical |
| 21  around that date? | 21  Review Office? |
| 22          MS. LO: I'm going to object. Her | 22      A.   Right. The process at Coast Guard at the |

4 (Pages 10 to 13)

STARLISHA ANDERSON - 4/15/2013

Page 14

1    time was that if medical documentation was
2    requested, the employee would submit documentation.
3    They had the option of submitting it either through
4    their supervisor to HR, to the MRO, or to HR and
5    then HR would forward the documentation to the MRO,
6    so the --
7    **Q.    So the employee could send it to any of**
8    **those -- to HR, to the MRO or their supervisor?**
9        A.    Right. At that time we would typically
10   give the employee an option with whatever they felt
11   comfortable doing.
12   **Q.    So in Ms. Doak's case, do you recall what**
13   **she did?**
14       A.    I do recall, like I said earlier,
15   receiving medical documentation from Ms. Doak, I
16   just don't recall which ones specifically because
17   there were various documents that were submitted.
18   So I do recall her putting some medical
19   documentation in a sealed envelope and dropping it
20   off with me or someone within HR if I wasn't in the
21   office, but there were various documentations
22   submitted throughout the course of this process.

Page 15

1    **Q.    And so then after she would submit her**
2    **medical documentation to you, would you forward it**
3    **to the Medical Review Office?**
4        A.    Yes.
5    **Q.    And you mentioned that she would**
6    **sometimes submit her medical documentation in a**
7    **sealed envelope. Do you recall whether you ever --**
8    **were they always submitted in a sealed envelope?**
9        A.    I don't recall if they were always
10   submitted in a sealed envelope. Like I said, there
11   were various documents. I couldn't say that every
12   single one of them was in a sealed envelope, I just
13   recall her having done so.
14   **Q.    Do you remember reviewing any of the**
15   **medical documentation?**
16       A.    Well, I would typically have to look at
17   the medical documentation in order to provide my
18   summary to the MRO to let them know what they are
19   looking at, so yes. Have I read medical
20   documentation, yes.
21   **Q.    So you would look at what the employee**
22   **was submitting and you would draft some sort of**

Page 16

1    **summary to the Medical Review Office?**
2        A.    Right. The process at the time for the
3    Coast Guard was that we submit like a cover sheet, a
4    cover letter to the MRO advising them that this is,
5    you know, medical documentation submitted by a
6    civilian employee and subject to all the privacy
7    laws and then we will submit a copy of a HIPAA or
8    privacy documents that the employee would sign. So
9    there was a process in place to make sure that the
10   MRO knew what they were reviewing and what for, if
11   it was a reasonable accommodation or an FMLA
12   request.
13   **Q.    So the Medical Review Office would**
14   **receive medical documentation along with your**
15   **summary and then they would return a memorandum like**
16   **we are looking at in Exhibit 1; is that the process?**
17       A.    Yes.
18   **Q.    Did you ever discuss Ms. Doak's request**
19   **for reasonable accommodation with her?**
20       A.    One-on-one or in a --
21   **Q.    In any setting.**
22       A.    Yes, we have had various discussions and

Page 17

1    typically they were between management, myself and
2    Ms. Doak.
3    **Q.    So Mr. Cohen or Mr. Souther?**
4        A.    Primarily Mr. Cohen would be involved in
5    those discussions.
6    **Q.    What do you recall was discussed during**
7    **these meetings?**
8        A.    I don't recall. It was 2010. I couldn't
9    tell you. I mean, if the subject was reasonable
10   accommodations, I would say it was about the
11   accommodations.
12   **Q.    Was it your understanding that Mr. Cohen**
13   **would need to follow the recommendation of the**
14   **Medical Review Office in granting or denying a**
15   **request for reasonable accommodation?**
16       A.    That he would need to follow them, no,
17   not necessarily. That's not the reasonable
18   accommodation policy or I should say, the reasonable
19   accommodation law doesn't say you need to.
20   **Q.    So the purpose of submitting the**
21   **documents to the Medical Review Office was just**
22   **simply to get their recommendation as to whether or**

5  (Pages 14 to 17)

Page 18

1    not the employee should be provided with
2    recommendations, or what was the purpose?
3        A.   Yes.  Yes.  The MRO provides
4    recommendations based on their review of medical
5    documentation.  They do not make the decisions.
6        Q.   And the process would generally be that
7    the supervisor would take into account the MRO's
8    recommendation in making their final decision?
9        A.   Yes.
10       Q.   And do you recall discussing with
11   Mr. Cohen Ms. Doak's request for accommodations?
12       A.   Yes, I recall discussions.
13       Q.   What do you recall?
14       A.   Again, since it was 2010, I can't recall
15   specifically what we discussed, but if it was
16   involving the accommodations, it would have included
17   my advice and guidance on whether or not
18   accommodations should be considered and what the
19   policy and regulations were in regards to reasonable
20   accommodations.
21       Q.   And did you believe that Ms. Doak needed
22   accommodations?

Page 19

1        A.   I didn't give my -- it's not my job to
2    give my opinion on that, so I wouldn't have given my
3    opinion on that.
4        Q.   I thought that's what you just testified
5    that you would give your opinion as to whether --
6        A.   My advice and guidance, not my opinion.
7        Q.   So what do you mean by "advice and
8    guidance"?
9        A.   Advice and guidance based on the rules,
10   regulations and procedures, not my opinion.
11       Q.   So you would provide advice to?
12       A.   Management.
13       Q.   Management regarding what?
14       A.   Regarding what the policy -- what the
15   reasonable accommodation policy is for the agency,
16   what the reasonable accommodation regulations the
17   ADA Act, you know, all of those things that, you
18   know, reasonable accommodations fall under that,
19   that is what my advice and guidance would be based
20   on.
21       Q.   So isn't that the point of the memorandum
22   from the Medical Review Office?

Page 20

1        A.   Not necessarily.  The MRO, they are
2    not -- they're not the HR, you know, they can't give
3    advice and guidance based on HR policies or
4    recommendation.  Although they understand what the
5    ADA Act is and what reasonable accommodations are,
6    they only can give recommendations based on a review
7    of medical documentation.  It's sent up to the HR
8    adviser or legal to give advice or guidance so
9    taking those recommendations, considering the law
10   and then giving advice and guidance to management on
11   how to proceed.
12       Q.   So you were sort of the in-between
13   between the Medical Review Office and management in
14   terms of -- in other words, you would review the
15   recommendations from the Medical Review Office and
16   make your own recommendations to management?
17       A.   I would give them advice and guidance.
18       Q.   So in Ms. Doak's case, what advice and
19   guidance did you give?
20       A.   Well, again, I can't really say
21   specifically unless there's -- unless you have a
22   copy of something where I gave advice and guidance.

Page 21

1    But I do recall considering the recommendations, you
2    know, basically letting them know what's considered
3    an accommodation, what's not considered an
4    accommodation, what they should look at in
5    considering, who they should talk to to get those
6    accommodations in place, looking at past practice,
7    you know, are these accommodations that we have
8    given before.
9            So that's probably the gist of how my
10   discussions and stuff would have went.  Again, I
11   can't recall specifically what advice and guidance I
12   gave in this case, but like I said, I don't really
13   recall what all the ones that were actually put in
14   place.  I'll have to look at something to recall my
15   memory.
16       Q.   Ms. Anderson, would you take a look at
17   what has been marked Exhibit 1.
18       A.   Okay.
19       Q.   Do you recognize this document?
20       A.   Yes.
21       Q.   Were you involved in -- I guess, first,
22   what is this document?

6  (Pages 18 to 21)

STARLISHA ANDERSON - 4/15/2013

|  | Page 22 |
|---|---|
| 1 | A.    So based on the date, it looks like it is |
| 2 | the medical status and accommodations memo from |
| 3 | Mr. Cohen to Ms. Doak basically addressing the |
| 4 | accommodations that were requested based on the |
| 5 | medical documentation. |
| 6 | **Q.    So in other words, this is Mr. Cohen's** |
| 7 | **response to Ms. Doak's request for accommodations?** |
| 8 | A.    Yes. |
| 9 | **Q.    Were you involved in drafting this?** |
| 10 | A.    Yes. |
| 11 | **Q.    And what was your involvement?** |
| 12 | A.    As HR specialists, we draft the document |
| 13 | on behalf of management, so basically management |
| 14 | makes a decision and we reduce it to writing.  So I |
| 15 | would have taken management's decision and drafted |
| 16 | this memo based on that decision. |
| 17 | **Q.    So would you have met with Mr. Cohen** |
| 18 | **prior to drafting this to discuss what** |
| 19 | **accommodations he would or wouldn't be providing?** |
| 20 | A.    Yes, we would have that discussion. |
| 21 | **Q.    Do you recall what you discussed?** |
| 22 | A.    Well, I mean, generally, we discussed the |

|  | Page 23 |
|---|---|
| 1 | accommodations and what could or couldn't be |
| 2 | provided.  We discussed the MRO's assessment. |
| 3 | **Q.    Okay.  Let's turn to paragraph 4.  Do you** |
| 4 | **recall discussing Ms. Doak's start time with** |
| 5 | **Mr. Cohen, or I should say her request for a later** |
| 6 | **start time?** |
| 7 | A.    On several occasions, yes. |
| 8 | **Q.    And did you recommend a later start time** |
| 9 | **to Mr. Cohen?** |
| 10 | A.    Did I recommend a later start time?  I |
| 11 | don't recall that, recommending a later start time. |
| 12 | **Q.    Did you believe that Ms. Doak should be** |
| 13 | **permitted to come in later as an accommodation?** |
| 14 | A.    The only thing I recall from the work |
| 15 | schedule discussions was that determining what was |
| 16 | reasonable and what was unreasonable.  So again, you |
| 17 | know, during these discussions of work times and I |
| 18 | can't say, though, specifically in regards to this |
| 19 | because there were several discussions concerning |
| 20 | work schedule changes. |
| 21 | **Q.    For Ms. Doak?** |
| 22 | A.    Yes. |

|  | Page 24 |
|---|---|
| 1 | **Q.    And these discussions were with who?** |
| 2 | A.    Mr. Cohen, the supervisor. |
| 3 | **Q.    What do you recall about these** |
| 4 | **discussions?** |
| 5 | A.    You know, again, the discussions, the |
| 6 | only thing I recall is that we talked about what is |
| 7 | reasonable and what's not reasonable, again, what |
| 8 | the policy of the agency was at the time as far as |
| 9 | core duty hours, and what's considered, you know, |
| 10 | something that's an accommodation, you know, work |
| 11 | performance, what could they allow, discussions |
| 12 | would have revolved around that. |
| 13 | Again, ultimately the management makes |
| 14 | its decision.  You know, my advice and guidance |
| 15 | would have been based on what the current policy |
| 16 | was, what we have done in the past as an agency as |
| 17 | far as accommodating any issues, and then I will |
| 18 | look to management to determine, you know, well, |
| 19 | what is reasonable, unreasonable, if reasonable, why |
| 20 | unreasonable?  So we would have those kind of |
| 21 | analytical discussions about work schedules and |
| 22 | then, you know, management will make a decision. |

|  | Page 25 |
|---|---|
| 1 | **Q.    So in terms of policies that you would** |
| 2 | **look at in deciding what was a reasonable work** |
| 3 | **schedule, what would you be looking at?** |
| 4 | A.    So at the time the Coast Guard had a work |
| 5 | schedule policy that defined core duty hours, so |
| 6 | that would be something that I would look at, what |
| 7 | the core duty hours are. |
| 8 | Also looking at, you know, what |
| 9 | management has provided, any past practices or |
| 10 | current work schedule -- current work schedules |
| 11 | within the office or the organization, so we would |
| 12 | look at that.  Because at the time, you know, there |
| 13 | was -- a lot of the Coast Guard had their own -- |
| 14 | different directors might have their own policies or |
| 15 | own procedures or allowing employees to work |
| 16 | different hours, et cetera, within the Coast Guard, |
| 17 | so I would look at that.  I would ask management |
| 18 | about that, is there any directorate policy that you |
| 19 | follow. |
| 20 | **Q.    So could an employee have a later start** |
| 21 | **time or have a start time outside of core work hours** |
| 22 | **as a reasonable accommodation?** |

7 (Pages 22 to 25)

STARLISHA ANDERSON - 4/15/2013

|  | Page 26 |
|---|---|
| 1 | MS. LO: Objection, calls for |
| 2 | speculation. You may answer, if you can. |
| 3 | THE WITNESS: I mean, to my knowledge, in |
| 4 | any agency or any organization, sure. |
| 5 | BY MS. TRAVANTY: |
| 6 | Q. What about with respect to the Coast |
| 7 | Guard? |
| 8 | A. Outside of core duty hours, I can't |
| 9 | really answer that because I don't recall exactly |
| 10 | what the Coast Guard was doing at the time. |
| 11 | Q. Do you recall any employees who had a |
| 12 | start time that was after core hours? |
| 13 | A. Not that I remember. |
| 14 | Q. Do you recall any of the specifics |
| 15 | regarding Ms. Doak's request for accommodations? |
| 16 | A. Any of the specifics? |
| 17 | Q. Do you recall her request to telework? |
| 18 | Were you involved in discussions about that? |
| 19 | A. Yeah, sure. Certainly, I was involved in |
| 20 | all of these discussions during this time frame. |
| 21 | And, you know, as far as me reading this, you know, |
| 22 | I do recall the request for telework and work |

|  | Page 27 |
|---|---|
| 1 | schedule changes and I mean -- |
| 2 | Q. So do you recall what work schedule was |
| 3 | ultimately granted to Ms. Doak? |
| 4 | A. The last thing I recall was that there |
| 5 | was agreed-upon I think 09:00 start time, a 9:00 |
| 6 | start time was the last thing I recall. |
| 7 | Q. And were you involved in a meeting in |
| 8 | which that start time was discussed? |
| 9 | A. In meetings, yeah. It may have came up |
| 10 | in a few of our meetings that we've had with |
| 11 | Ms. Doak. There was ongoing discussions about that. |
| 12 | Q. Do you know the reason why Ms. Doak was |
| 13 | given a 9:00 a.m. start time? |
| 14 | A. Well, there was some issues I guess with |
| 15 | her coming in late, her not being able -- be able to |
| 16 | come into the workplace early or too early, so there |
| 17 | was discussion back and forth with, Well, what time |
| 18 | could you possibly make it to work? And I believe |
| 19 | Ms. Doak had requested 9:00 at some point in time, |
| 20 | so I do know it was revolving around tardiness |
| 21 | issues and when could she possibly get to work, what |
| 22 | was a good time for her to get to work. |

|  | Page 28 |
|---|---|
| 1 | Q. So turning to Exhibit 1, page 3, in |
| 2 | paragraph 7 were you aware of all of these requests |
| 3 | for accommodations? |
| 4 | A. Yes. |
| 5 | Q. And when you received them, did you |
| 6 | inform Mr. Cohen that one of his employees was |
| 7 | requesting accommodations? |
| 8 | A. Oh, yeah, Mr. Cohen was aware of the |
| 9 | accommodation request as well, so yes. There were |
| 10 | -- you know, we communicated about these all the |
| 11 | time, so yes. |
| 12 | Q. So Mr. Cohen was aware that Ms. Doak had |
| 13 | requested tele-commuting, for instance? |
| 14 | MS. LO: Objection to form. |
| 15 | BY MS. TRAVANTY: |
| 16 | Q. What did you do when you received this |
| 17 | document from Ms. Doak? |
| 18 | A. I would have prepared it to submit it to |
| 19 | the MRO. |
| 20 | Q. I mean with respect to notifying |
| 21 | Mr. Cohen, did you give him a copy of this? Did you |
| 22 | inform him of these recommendations for |

|  | Page 29 |
|---|---|
| 1 | accommodations or what did you do? |
| 2 | A. No. No. I would have advised him of |
| 3 | when Ms. Doak submitted the documentation and that |
| 4 | it was at the MRO for review. I would not have |
| 5 | discussed it with him until after the MRO's review |
| 6 | most likely, unless they came up in a discussion. |
| 7 | Q. So once you received the MRO's review, |
| 8 | would you then discuss that with Mr. Cohen? |
| 9 | A. Yes. |
| 10 | Q. So I guess turning to page 1 of |
| 11 | Exhibit 1, the memorandum dated April 28th -- |
| 12 | A. Okay. |
| 13 | Q. -- so this memorandum appears to address |
| 14 | Ms. Doak's request for accommodation, but it only |
| 15 | addresses several of them. It doesn't say anything |
| 16 | about telework or her schedule or anything. |
| 17 | A. Right. |
| 18 | Q. So I'm wondering did you discuss the |
| 19 | telework and adjusted schedule -- did you discuss |
| 20 | that with Mr. Cohen? |
| 21 | A. So again, the MRO provides their |
| 22 | recommendations, so in here they've recommended |

8 (Pages 26 to 29)

Page 30

1  these accommodations. They didn't recommend
2  telework. They didn't recommend --
3     Q.   So my question is: Do you discuss with
4  management all of the recommendations that an
5  employee makes -- I mean, all of the requests that
6  an employee makes or only those that the MRO
7  recommends?
8     A.   Oh, no. It would be all and any
9  accommodations an employee would have recommended.
10    Q.   And what did Mr. Cohen say about
11 telecommuting and an adjusted work schedule; were
12 those granted?
13    A.   I know the 11:00 start time based on this
14 memo here that you gave me, I know that the 11:00
15 start time was an issue with management and so that
16 is addressed in this response here, so that was not
17 granted for the reasons.
18    Q.   You are looking at Exhibit 1?
19    A.   I can't tell. Exhibit 1, yes, paragraph
20 4, explains that the 11:00 to 19:00 was not
21 sufficient.
22    Q.   So in paragraph 4, Mr. Cohen denied the

Page 31

1  request for an 11:00 start time?
2     A.   Right.
3     Q.   So why does Mr. Cohen not address this
4  request to telework in his letter dated May 6?
5        MS. LO: Objection to form. You may
6  answer, if you know.
7        THE WITNESS: I do not know why it's not
8  addressed in here. However, I do recall there being
9  conversations addressing telework.
10 BY MS. TRAVANTY:
11    Q.   Conversations between who?
12    A.   Between management and Ms. Doak involving
13 telework.
14    Q.   In preparing Exhibit 1 for Mr. Cohen, did
15 you discuss Ms. Doak's request for telework?
16    A.   I would have discussed any and all
17 accommodations with Mr. Cohen prior to even drafting
18 this letter.
19    Q.   Was the telework request just overlooked
20 then or do you know if there is a specific reason
21 why it's not in this memo?
22    A.   I don't recall. I don't recall.

Page 32

1     Q.   In your experience typically would
2  management address all of the requests, would they
3  provide a response to all of the employee's requests
4  for accommodations?
5     A.   You know what, I could be -- you know, I
6  don't know. That could be a yes or no question. It
7  could have been addressed somewhere else or in a
8  different venue so therefore not put in a letter, in
9  this particular letter, and it varies on, you know,
10 what the situation is, and really I think we're more
11 focused on what we can provide and what we have
12 provided, or what was provided in this memo, so that
13 would vary. I can't answer that question
14 specifically.
15    Q.   Are you aware whether Mr. Cohen received
16 medical documentation in support of Ms. Doak's
17 requests?
18    A.   If he received the medical documentation?
19    Q.   Correct.
20    A.   Not to my knowledge. I wouldn't have
21 given it to him.
22    Q.   So you would have only informed him of

Page 33

1  the specific requests, you wouldn't have submitted
2  the medical documentation to him?
3     A.   Right, yes.
4        MS. TRAVANTY: Let's go off the record.
5        (Recess 1:34 p.m. to 1:40 p.m.)
6        (Deposition Exhibit No. 2 was
7        marked for identification.)
8  BY MS. TRAVANTY:
9     Q.   Ms. Anderson, do you recognize this
10 document, Exhibit 2?
11    A.   Yes. Uh-huh.
12    Q.   So this appears to be an e-mail from you
13 to Mr. Cohen on May 4, 2010, subject: Doak medical
14 documentation.
15    A.   Okay.
16    Q.   And it appears that you are sending a
17 copy of the recommendation from the MRO?
18    A.   Yes.
19    Q.   Do you recall whether you had discussed
20 Ms. Doak's request for accommodations with Mr. Cohen
21 prior to this?
22    A.   I'm going to say yes, there were

STARLISHA ANDERSON — 4/15/2013

Page 34

1    conversations about accommodations prior to the
2    submission of even the medical documentation, so
3    yes.
4        Q.    So you would talk to the employee's
5    supervisor before you even submit the medical
6    documentation to the MRO office?
7        A.    Well, in this case, you know, I do
8    recall -- again, this was a, you know, there were
9    various ongoing conversations leading up to
10   Ms. Doak's accommodation request.  So there were
11   prior discussions, you know, even before receiving
12   medical documentation about accommodations in the
13   workplace.  So we would have had discussions prior
14   to and after this.
15       Q.    I guess what I'm referring to is the
16   specific request in the April 16th medical
17   documentation, so with respect to those that we just
18   looked at in Exhibit 1, paragraph 7, those requests,
19   would you have discussed those with Mr. Cohen prior
20   to then sending him the recommendation from the MRO
21   addressing those specific requests?
22       A.    No, I would have not discussed what was

Page 35

1    in the medical documentation prior to sending it to
2    the MRO.
3        Q.    So you would e-mail Mr. Cohen the
4    recommendation and then discuss her request?
5        A.    Then we would have a follow-on discussion
6    about the medical request and the recommended
7    accommodations.
8        Q.    So the only documentation that Mr. Cohen
9    would receive would be the MRO recommendation; is
10   that correct?
11       A.    Right.
12       Q.    My question is the MRO recommendation
13   doesn't set forth what is being requested so is it
14   up to you to then tell management this is in
15   response to these specific requests?
16       A.    Yes.
17       Q.    So at some point you did discuss that
18   with Mr. Cohen?
19       A.    Yes.  Yes.
20       Q.    And do you recall I guess maybe we just
21   covered that would, would have been what you are
22   referring to after you e-mailed him on May 4th the

Page 36

1    recommendation for the MRO?
2        A.    Right.  About we can discuss all of this
3    tomorrow if necessary.  That would be the typical
4    procedure, that we would have a discussion about
5    accommodations and the MRO's recommendations.
6        Q.    And with respect to those same requests,
7    did you -- would you ever have an occasion to inform
8    Mr. Souther about her requests?
9        A.    I know in this case I didn't deal
10   directly with Mr. Souther because he was the second
11   level, so I would only engage Mr. Souther if
12   Mr. Cohen had engaged Mr. Souther, so I wouldn't
13   engage him unless it was necessary.
14       Q.    So are you aware as to whether or not
15   Mr. Souther knew of the specific request for
16   accommodation in paragraph 7 of Exhibit 1?
17           MS. LO: I'm going to object to that.
18           THE WITNESS: I wouldn't know when he
19   became aware of that.
20   BY MS. TRAVANTY:
21       Q.    Or if he became aware?
22       A.    For the medical documentation, yeah, I

Page 37

1    can't answer that.  I wouldn't know.  I don't recall
2    what point in time Mr. Souther became aware of the
3    accommodation request.
4        Q.    But from your knowledge, he was aware of
5    these requests at some point?
6        A.    I can't recall of the specific request,
7    but as a second level supervisor, typically, you
8    know, they would have to be made aware of any kind
9    of personnel actions, so I can't recall specifically
10   what information he was given.
11       Q.    Okay.  And do you know whether I guess
12   generally speaking does management discuss the
13   recommendations with the MRO office before making
14   their decisions generally?
15       A.    Does management?
16       Q.    Right.  Like would a supervisor ever
17   contact the MRO office to discuss the
18   recommendations?
19       A.    Very rarely would they do that on their
20   own.
21       Q.    Would they maybe go through human
22   resources?

10 (Pages 34 to 37)

STARLISHA ANDERSON – 4/15/2013

Page 38

1    A.    Yes.
2    Q.    Because I think if you look at Cohen
3    Exhibit 1, the memorandum refers you to a contact
4    should you have additional questions?
5    A.    Right. They do that. Yeah, they put
6    that on all their memos.
7    Q.    Did Mr. Cohen ever contact the MRO
8    office?
9    A.    I mean, he wouldn't -- I don't recall him
10   requesting that I follow up, but I typically would.
11   That was part of my job to have a relationship with
12   the MRO.
13   Q.    Would you discuss their recommendations,
14   for instance, if there was clarification required by
15   a supervisor, was it your role to contact the MRO to
16   understand their recommendations?
17   A.    Yes, or we would do it together. So
18   either management, myself and MRO, would seek
19   clarification or I would be the person to contact
20   the MRO for clarification.
21   Q.    And then report back to management?
22   A.    Then report back to management.

Page 39

1    Q.    But with respect to Ms. Doak's case, you
2    said you don't recall doing that?
3    A.    I don't recall specifically if I needed
4    to do that, no.
5    Q.    But to the extent that Mr. Cohen had
6    concerns, he could have brought them to you to take
7    to the MRO office?
8    A.    Yes.
9    Q.    Were you involved in discussions
10   regarding the proposal to remove Ms. Doak?
11   A.    Yes.
12   Q.    What was your involvement?
13   A.    As an adviser, employee relations adviser
14   on the proposed action, and advice and guidance.
15   Q.    Did you feel that Ms. Doak should have
16   been removed?
17         MS. LO: Objection to form.
18         THE WITNESS: I don't have an opinion
19   about that.
20   BY MS. TRAVANTY:
21   Q.    Did you advise Mr. Cohen that he could
22   remove Ms. Doak?

Page 40

1         MS. LO: I'm going to object to that as
2    well.
3    BY MS. TRAVANTY:
4    Q.    What is your role in advising, if you can
5    help me understand? If you don't have an opinion,
6    what are you advising, whether legally they can
7    remove her?
8    A.    Yes. So as an employee relations
9    specialist, you do give advice and guidance based on
10   the regulations and what would be an acceptable or a
11   justifiable action depending on any conduct or
12   performance issue. So my role would have been to
13   give advice and guidance on what we call progressive
14   discipline or how to appropriately correct actions,
15   so I would give what the statutory guidelines are,
16   what the personnel process is for handling specific
17   issues, I would also seek legal advice on issues
18   concerning removals from federal service and
19   advising management on the appropriate documentation
20   to support any actions that are being proposed in
21   that capacity.
22   Q.    Did management contact you for your

Page 41

1    advice and guidance with respect to Ms. Doak's
2    proposed removal?
3    A.    Yes.
4    Q.    Do you recall when that would have been?
5    Was it before they issued the proposal? Were you
6    involved all along with the disciplinary actions
7    given to Ms. Doak?
8    A.    Yes. I was involved from the beginning
9    prior to her proposed removal.
10   Q.    What do you mean the beginning?
11   A.    From the time management would contact
12   our office and at the time I was the servicing
13   employee relations specialist and they would contact
14   me with any issues and then we would, you know,
15   start having conversations about those issues.
16   Q.    So prior to management issuing any
17   memorandum, like a letter of reprimand, AWOL, or any
18   of those, they would have to contact you?
19   A.    Yes. Any action, they would have to
20   contact me as their adviser.
21   Q.    Then they would give you the facts as to
22   why they would want to take this action and then you

11 (Pages 38 to 41)

STARLISHA ANDERSON – 4/15/2013

Page 42

1  would render advice as to if it was an appropriate
2  action?
3      A.   Yes.
4      Q.   And so in Ms. Doak's case with respect to
5  the proposed removal, why did you feel that that was an
6  appropriate action, or did you?
7      A.   Well, management -- well, my advice and
8  the reason why in advising them on what the
9  appropriate steps to take and a proposed removal was
10  warranted based on the facts of the case and the
11  materials --
12      Q.   Are you speaking generally or with
13  respect to Ms. Doak's specific case?
14      A.   With Ms. Doak. So with Ms. Doak's case,
15  I advised the proposed removal based on the facts of
16  the case, the facts as presented by management, the
17  issues associated with, you know, whether it was the
18  medical issues or the conduct or performance and
19  promoting the efficiency of the service, so that
20  would be the gist of my --
21      Q.   So you felt that based on the facts given
22  to you her removal should have been proposed?

Page 43

1      A.   The action was warranted.
2      Q.   The action was warranted?
3      A.   Uh-huh.
4      Q.   And again, your basis for that was what,
5  or what was the reason why you felt it was
6  warranted?
7      A.   Well, based on the facts of the case and
8  that we were, you know, addressing the issues at
9  hand in a progressive way trying to correct it.
10      Q.   I'm asking you do you recall the specific
11  issues, reasons why?
12      A.   No, I don't recall this. This was 2010
13  and I had many other cases, so specifically, no. If
14  you have a document to refresh my memory, I would
15  want to look at it, but I can't remember every
16  detail.
17      MS. TRAVANTY: I have no further
18  questions.
19      MS. LO: I don't have any questions.
20  Thank you. We will read and sign.
21      (Deposition was concluded at 1:52 p.m.)
22

Page 44

1           CERTIFICATE OF NOTARY PUBLIC
2        I, Karen Geddes, Court Reporter and Notary
3  Public in and for the District of Columbia, before
4  whom the foregoing deposition was taken, do hereby
5  certify that the witness whose testimony appears in
6  the foregoing deposition was duly sworn by me; that
7  the testimony of said witness was taken by me in
8  shorthand at the time and place mentioned in the
9  caption hereof and thereafter transcribed by me; that
10  said deposition is a true record of the testimony
11  given by said witness; that I am neither counsel for,
12  related to, or employed by any of the parties to the
13  action in which this deposition was taken; and
14  further, that I am not a relative or employee of any
15  counsel or attorney employed by the parties hereto,
16  financially or otherwise interested in the outcome of
17  this action.
18        Certified to by me on this 29th day
19  of April, 2013.
20            _____
          Karen Geddes, CSR
21            Notary Public in and for the
          District of Columbia
22  My commission expires:
   April 30, 2017

Page 45

1          DEPOSITION ERRATA SHEET
2  Job No. 1-232372
   Case Caption: Doak v Department of Homeland Security
3
     DECLARATION UNDER PENALTY OF PERJURY
4
5        I declare under penalty of perjury
6  that I have read the entire transcript of my
7  Deposition taken in the captioned matter or the same
8  has been read to me, and the same is true and
9  accurate, save and except for changes and/or
10  corrections, if any, as indicated by me on the
11  DEPOSITION ERRATA SHEET hereof, with the
12  understanding that I offer these changes as if still
13  under oath.
14
15      Signed on the _____ day of _____,
16  2013.
17
18
19
20         _____
       STARLISHA ANDERSON
21
22

12 (Pages 42 to 45)

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
------------------------------x
EDNA DOAK                     )
                             )
       Plaintiff            )
                             )
          vs.               )Case No. 1:12-cv-1177-RC
                             )
JANET NAPOLITANO, SECRETARY, )
U.S. DEPARTMENT OF HOMELAND  )
SECURITY                     )
                             )
       Defendant.           )
------------------------------x
```

April 15, 2013
Washington, D.C.

The Deposition of GREGORY COHEN was taken
on April 15, 2013, commencing at 9:35 a.m. and
concluding at 10:52 a.m., at Merrill Corporation,
1325 G Street, Suite 200, Washington, D.C., before
Karen Geddes, Court Reporter and Notary Public.

GREGORY COHEN - 4/15/2013

```
                                                     Page 2
1                       APPEARANCES

2

3    ON BEHALF OF PLAINTIFF:

4      CONSTANCE TRAVANTY, ESQUIRE

5      Alan Lescht & Associates, P.C.

6      1050 17th Street, N.W., suite 400

7      Washington, DC 20036

8      Telephone: (202)463-6036

9      Fax:  (202)463-6067

10     E-mail: Constance.travanty@dcemploymentattorney.com

11

12   ON BEHALF OF DEFENDANT:

13     MICHELLE LO, ESQUIRE

14     Assistant United States Attorney

15     555 Fourth Street, N.W.

16     Washington, D.C. 20530

17     Telephone: (202)514-5134

18     Fax:  (202)514-8780

19     E-mail:  michelle.lo2@usdoj.gov

20

21

22
```

Page 3

1                    EXAMINATION INDEX

2                                                PAGE

3   Examination by Ms. Travanty.................    5

4   Examination by Ms. Lo......................   53

5

6                       EXHIBITS

7   NO.                                            PAGE

8

9   1  Memorandum from M. Boquard to CG-1214 dated

10     April 28, 2010, Bates No. 00265, and attached

11     Memorandum dated April 16, 2010, to Greg

12     Cohen from Elizabeth P. Berbano, MD,

13     Bates Nos. 00259 through 00261, Regarding

14     Medical Documentation of Edna Doak..........   14

15  2  Memorandum from B. Pennington to CG-1214,

16     Bates No. 00258, and attached Memorandum to

17     Capt M. Boquard from Elizabeth P. Berbano,

18     M.D., Bates 00262 through 00264, dated

19     July 16, 2010, regarding Clarification of

20     Medical Letter...........................   18

21  3  E-mail string beginning May 5, 2010 at

22     8:05 a.m. from Starlisha King to Gregory Cohen,

Page 4

1     Bates No. USCG9........................... 41

2   4 Memorandum dated January 25, 2010 from

3     Gregory Cohen to Edna Doak, Bates No. USCG81

4     to USCG82................................. 53

5   5 Handwritten notes from when Edna called in

6     sick or called in, Bates Nos. USCG83 to

7     USCG87.................................... 57

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 5

1    WHEREUPON,

2                        GREGORY COHEN,

3    having been called by the Plaintiff and first duly

4    sworn by a certified court reporter and notary

5    public, testified as follows:

6              EXAMINATION BY COUNSEL FOR PLAINTIFF

7    BY MS. TRAVANTY:

8        Q.      Good morning, Mr. Cohen.

9        A.      Morning.

10       Q.      My name is Constance Travanty.  I

11   represent Ms. Doak, as I'm sure you are aware, in

12   her case against the Coast Guard.  I will be asking

13   you some questions this morning.

14              Could you please state your full name for

15   the record.

16       A.      Gregory Kelly Cohen.

17       Q.      And what is your position titled?

18       A.      I'm a Chief, Business Management and

19   Metrics.

20       Q.      And how long have you held that position?

21       A.      I don't know.  Eight years or so, I

22   guess.

Page 8

1      A.     I'm sure someone has got the paperwork

2   with whenever it was signed.  Initially she was

3   going to put in for it and then I think there was a

4   discussion because I believe Ms. Doak thought FMLA

5   was free leave.  So there was some confusion we had

6   to get straightened out by HR and once she found out

7   you had to take actual leave, that's when all the

8   paperwork got straightened out.

9      Q.     So at that time you weren't aware that

10  she would have had a medical condition to qualify

11  her for FMLA leave?

12     A.     Well, you have to have something to

13  qualify you for FMLA leave, but I don't approve

14  participation in the FMLA program.

15     Q.     Who would be responsible for that?

16     A.     I'm assuming the Coast Guard HR, CG-1,

17  approved her participation in FMLA.

18     Q.     So you didn't receive the documents or

19  approve it, you were just aware that she was taking

20  it?

21     A.     Right, that it was approved.  I don't

22  believe I signed any of that.  I would have to go

Page 9

1    and dig up the paperwork.

2         Q.      **So the extent of your knowledge at the**

3    **time of Ms. Doak's medical condition was that she**

4    **had been in a car accident and that she suffered**

5    **from migraines?**

6         A.      Right.

7         Q.      **Were you aware of any other conditions?**

8         A.      No.

9         Q.      **Were you aware that Ms. Doak had**

10   **submitted medical documentation to the -- I think**

11   **you said Medical Review Office?**

12        A.      I know she submitted paperwork to them on

13   numerous occasions.  Like I said, I only received a

14   synopsis from the medical people.

15        Q.      **So you never actually reviewed any of the**

16   **medical documentation?**

17        A.      No.

18        Q.      **So did Ms. Doak submit the medical**

19   **documentation directly to the Medical Review Office?**

20               MS. LO:  Objection.  You may answer.

21               THE WITNESS:  You'd have to ask her how

22   she submitted it.  I don't know how Edna submitted

Page 7

1       Q.      So you received a note from them.  Do you

2   recall when that would have been?

3       A.      No, I don't.

4       Q.      So you were only aware that Ms. Doak

5   suffered from migraines?

6       A.      Yes.

7       Q.      You weren't aware of any other medical

8   conditions?

9       A.      No.  Not until the day before she retired

10  when my supervisor showed me some documentation that

11  was part of her package.  All the documentation

12  would always go to the medical office.  I would

13  never get any of it.  I only got their little

14  synopsis.

15      Q.      Did Ms. Doak ever apply for FMLA leave?

16      A.      Yes.

17      Q.      Would you have been aware that she had

18  some sort of medical condition based on that?

19      A.      Well, it was for her car accident.

20      Q.      The FMLA leave?

21      A.      Yes.

22      Q.      Do you recall when that would have been?

Page 17

1          Q.       And at the bottom it says:  If you have

2     any questions, please contact Commander Schwartz.

3                   Did you ever contact Commander Schwartz?

4          A.       No.  It's pretty simple.  I didn't have

5     any questions.

6          Q.       So you felt that you would just provide

7     what the Medical Review Office --

8          A.       Right.  I provided it within one day.  We

9     tried to do everything we could to help her out and

10    get her back to work.  Even when the building people

11    said something about changing the lights, Star King

12    contacted them and said to change them, so we got

13    that changed right away too.

14         Q.       Did you ever have any conversations with

15    Captain Pennington in the Medical Review Office?

16         A.       I don't believe I've ever talked to

17    anybody in there.  We may have exchanged one e-mail.

18         Q.       Anybody in the Medical Review Office?

19         A.       No.  Their point of contact was Star

20    King; my point of contact was Star King.

21         Q.       So everything went through Ms. King?

22         A.       Right.

Page 22

1    accommodation people would say; I don't know.  I

2    don't know what I don't know.

3         Q.    I guess I'm confused as to why you

4    wouldn't follow up with the Medical Review Office if

5    you were unclear what her accommodation requests

6    were and what supporting documentation had been

7    submitted?

8                    MS. LO:  Objection to form.

9                    THE WITNESS:  I received this from the

10   medical office.  It clearly states what

11   accommodations she needed to get her back to work.

12   The goal was always to get Edna back to work, so I

13   provided everything in this April 28, 2010 memo as

14   best as I could.

15   BY MS. TRAVANTY:

16        Q.    Did you provide Ms. Doak with natural

17   lighting?

18        A.    It says a more natural lighting or change

19   lighting completely, so we changed the lighting

20   above her cube by disabling some of the

21   fluorescence.  The building supervisor came in and

22   the maintenance people and disabled some of the

Page 37

1     A.     Request to telework to complete a DAU

2  acquisition course.

3     Q.     **And did she ever request to telework on a**

4  **full-time basis?**

5     A.     No.

6     Q.     **Did she request --**

7     A.     To request to telework, you have to

8  submit three forms.  I'm sorry I cut you off.  Go

9  ahead.

10     Q.     **Earlier you said that you didn't believe**

11  **that Ms. Doak's absences or late start times were**

12  **due to her medical condition; is that correct?**

13     A.     Yes.  I said it was -- according to the

14  medical officer, it was due to her not managing the

15  time that she took her pain medication and the time

16  she went to sleep every night.

17     Q.     **So were you aware that she was working**

18  **with her doctor to adjust the timing of her**

19  **medication?**

20     A.     No.  Edna never really shared anything

21  about her doctor or medical stuff with me.

22     Q.     **Did she share anything with Ms. King that**

Page 38

1    you're aware of?

2        A.      I would not know.

3        Q.      Did Ms. Doak ever request to work

4    optional weekend hours?

5        A.      I never received a request to telework

6    officially in the forms.  There's three forms that

7    have to be filled out:  One is the request to

8    telework, one that certifies that your home is safe

9    for teleworking, you have all the proper equipment

10   and chairs and desks, and the other is the IT

11   request.

12       Q.      But I didn't ask about telework, I asked

13   about optional weekend hours.

14       A.      That's when you would have to telework,

15   right on the weekend?  I don't understand the

16   question.  I'm sorry.

17       Q.      Did Ms. Doak ask to work in the office on

18   the weekends?

19       A.      The office is closed on the weekends.  I

20   never received an official request.  The building

21   isn't heated or air-conditioned.  The SOP clearly

22   states that the office is closed, CG-9 is closed on

GREGORY COHEN - 4/15/2013

Page 39

1    weekends.

2        Q.      **So no other employees would work on the**

3    **weekends?**

4        A.      I don't know if employees come in on

5    weekends, but no one comes in on weekends because

6    they're told to come in on weekends.  No supervisor

7    would tell an employee to come in on weekends.

8        Q.      **Under what circumstances could an**

9    **employee come in on weekends?**

10       A.      For official work hours or just on their

11   own because they need to get a life?

12       Q.      **Under any circumstances.**

13       A.      So that's two questions, though.  I need

14   you to ask me one, don't I?

15       Q.      **Okay.  Let me clarify it.  Under what**

16   **circumstances could an employee work in the office**

17   **on the weekends?**

18       A.      And count it as official hours or just

19   because they want to work?  Because there's a

20   distinction, because if it's official hours, we have

21   to pay them which means as a supervisor, I'm on the

22   hook now for telling an employee to work on the

GREGORY COHEN  -  4/15/2013

Page 40

1    weekends which could involve overtime or comp time,

2    could violate union rules, so no one was officially

3    authorized to work on a weekend.

4                I believe some employees log in on

5    weekends, I get e-mails from people all the time on

6    weekends.  I don't know if it's from their phone or

7    if they're at a desk at home or what, but that's all

8    on their own under no direction of the organization.

9         Q.       So if Ms. Doak had requested a reasonable

10   accommodation to work on the weekends, would that

11   have been feasible?

12        A.       I don't know.  She never requested that.

13   You're kind of asking me to predict the future,

14   aren't you?  I have never had anybody request to

15   work on weekends, and I don't know if I'm answering

16   the question.

17        Q.       I'd like to turn to Ms. Doak's removal

18   now.  Were you involved in the decision to remove

19   her?

20        A.       I believe I made the recommendation to

21   remove her.

22        Q.       And then it was Mr. Souther who made the

GREGORY COHEN - 4/15/2013

Page 41

1   decision?

2        A.      Ms. Doak was not removed.  She retired.

3        Q.      But there was a decision that was issued?

4        A.      I thought it was all thrown out because

5   she retired.

6        Q.      So did you draft the notice of proposed

7   removal?

8        A.      HR drafts all those letters and I just

9   sign them, but I read it.

10       Q.      I guess I'm asking, was it you or

11  Mr. Souther who proposed her removal initially?

12       A.      I believe, though, she should have

13  something that is signed from me.

14       Q.      What was the reason that you proposed to

15  remove her?

16       A.      I think there were numerous reasons in

17  there.  You'd have to show me the memo.  It's been

18  three years.

19              I believe it was for continued absence

20  from work; just a long litany of things.  You would

21  have to show me the memo.  Could I see the memo?

22              (Deposition Exhibit 3 was

Page 42

1              marked for identification.)

2    BY MS. TRAVANTY:

3         Q.      So going back to Ms. Doak's request for

4    accommodations --

5         A.      So we've left --

6         Q.      We will come back to the removal.  I'd

7    like to look at this e-mail.  Exhibit 3 is an e-mail

8    from you to Ms. King dated May 5, 2010.

9                 Do you recall this e-mail?

10        A.      Yeah.

11        Q.      And here you're saying -- I believe it

12   looks like you are addressing one of the memorandums

13   from the Medical Review Office, and you say that you

14   don't understand how the items listed by the

15   commander will help her get to work on time.

16                What did you mean by this e-mail?

17        A.      The issue with Edna -- well, I think you

18   are also missing pages of the memo, but --

19        Q.      Yeah.  There's more e-mail string, but I

20   just want to look at this e-mail, though.

21        A.      Don't they all build on each other,

22   though?

Page 43

1      Q.      What did you mean by this e-mail?

2      A.      So what I meant by this, was that Edna's

3  issue was coming to work on time, so absent her

4  providing me any medical documentation at all, I get

5  a memo out of the blue from the commander and I

6  think you're talking about this first one from

7  April, right, Exhibit 1; is that the one you're

8  talking about?

9              So I said how is that going to help her

10  get to work on time.  That's all I was asking for,

11  how are we going to get her back to work on time.

12  But then you see in the rest of the letter, I said I

13  provided everything I could.

14      Q.      Okay.  In paragraph one, the last

15  sentence --

16      A.      What I'm saying here is that --

17      Q.      Hold on.  In paragraph one in the last

18  sentence you state:  I don't think a thorough review

19  of this issue is being conducted or I am just

20  frustrated.

21              What do you mean by that?

22      A.      I'm frustrated.  I'm trying to get Edna

Page 44

1    to work on time.

2        Q.      But what do you mean by I don't think a

3    thorough review of this issue is being conducted?

4        A.      Well, because I've not seen any

5    documentation, so I don't know what's going on.  So

6    I don't know what anybody is seeing or what people

7    are reviewing, and as a supervisor, I'm responsible

8    to get her to work on time and get the work done,

9    yet I'm not seeing anything, so I'm frustrated.

10       Q.      So you were frustrated because you didn't

11   really understand her medical situation and she was

12   providing documents to the Medical Review Office?

13       A.      Right.  I was frustrated that Edna wasn't

14   providing me any documentation, so I don't know what

15   is being reviewed, I don't know what kind of review

16   is doing, but like I said in the thing, I complied

17   with everything in the thing, but my concern was the

18   whole goal was to get Edna to work on time.  Okay.

19   So starting out way long ago in 2009 when we first

20   met, we received a promise from her that she would

21   be off her medicine soon and be able to come to work

22   on time, and that's after we adjusted her hours the

Page 45

1    first time, she never complied with any of those

2    things; and then the second time we adjusted, she

3    never complied with anything.

4            So now I get this stuff for a reasonable

5    accommodation or this thing from the doctor that

6    said provide this stuff, which we did, but like I

7    said, not once in the whole time Edna was there did

8    she ever call me up and say:  I need to leave work

9    early because I have a migraine.

10   Q.      **Did you ever think maybe there were other**

11   **medical conditions other than the migraines?**

12   A.      No.

13   Q.      **So again, I guess, if you were so**

14   **concerned with Ms. Doak getting to work on time, why**

15   **would you not contact the Medical Review Office to**

16   **discuss how to best meet her needs?**

17   A.      I just did; I contacted Star.  Star was

18   my point of contact into the Medical Review Office.

19   I don't think the Coast Guard medical officer wants

20   every supervisor in the Coast Guard calling them.

21   That's why you have HR specialists.

22   Q.      **But I believe you said earlier that Star**

Page 46

1    also didn't know of Ms. Doak's medical

2    documentation?

3        A.    No, that's not what I said.

4        Q.    Or that you didn't know if Ms. King was

5    aware?

6        A.    I said I don't know what Star knows.

7        Q.    So if you had contacted Ms. King, what

8    did she tell you?

9        A.    She said based on her medical, it is

10   anticipated she will continue to improve her

11   treatment over the next three to six months.

12              I mean, all I have -- I don't know where

13   the rest of the pages are to this.  I don't know

14   what else is in here.

15       Q.    So, I mean, I guess as her supervisor

16   making the decision regarding her request for a

17   reasonable accommodation, if you didn't have all the

18   information you needed, you didn't think you would

19   need to ask additional information?

20       A.    Once again, she never requested

21   reasonable accommodations and provided me that.

22       Q.    She did request them from the Medical

Page 47

1    **Review Office.**

2        A.      I don't know if she requested reasonable

3    accommodations using the correct Coast Guard form or

4    did she just -- did her doctor say this would help

5    her out at work.  I don't know what she requested,

6    but I complied, I did the best I could with what the

7    doctor recommended.

8        **Q.      I mean, again, if you saw these documents**

9    **that it appeared she was trying to make a request**

10   **for a reasonable accommodation, why wouldn't you**

11   **direct her to the proper form?**

12       A.      I didn't know if she was requesting that.

13   She is sending documentation directly to the medical

14   skipping the supervisor because I didn't have a

15   right to know, according to her, so it's impossible

16   for me to make a judgement cal on that.  All I know

17   is I received something from the doctor and I

18   complied with it.

19       **Q.      So you didn't know she was requesting**

20   **reasonable accommodations even when you granted her**

21   **different lighting, an antiglare monitor.**

22       A.      It says right here that Ms. Doak has a

Page 48

1   medical condition that warrants reasonable

2   accommodations.  Okay.  That warrants it, it doesn't

3   say that she requested it.  It just says -- as far

4   as I know that the Coast Guard medical officer, the

5   way I read this, interpreted her medical data that

6   was provided and said you can help her out by

7   providing this.  I don't know if she actually

8   requested that, but the way I read this, and it

9   could be I'm reading it wrong, but I don't think so,

10  I'm reading it that Ms. Doak has a condition that

11  warrants reasonable accommodations.  It doesn't say

12  that she requested reasonable accommodations.  So

13  based on what the doctor said that it warrants a

14  reasonable accommodation, I went and provided it,

15  which is the only thing she has ever requested or

16  that the doctor recommended.

17              MS. LO:  Can I have the record reflect he

18  was talking about Exhibit 1.

19              MS. TRAVANTY:  Thank you.

20              THE WITNESS:  Yeah.  Sorry.

21              Can I add something?

22              MS. TRAVANTY:  Off the record.

GREGORY COHEN - 4/15/2013

Page 52

1     Q.     So you felt that it was her fault there

2   was no accommodation that could assist her?

3             MS. LO:  Objection to form.

4             THE WITNESS:  I didn't say that.

5   BY MS. TRAVANTY:

6     Q.     Did you think that there was anything you

7   could do to assist her at the time?

8     A.     I believe I did everything I could to

9   assist her over a year and a half period:  I moved

10  her from one team to another team, I adjusted her

11  start time from 7:30 to I think it was 8:30 or 8:15

12  or somewhere, 8:15 to 8:30, whatever it was, I moved

13  her from a highly stressful project to a least

14  stressful project, I provided these things that the

15  doctor recommended, these that warrants reasonable

16  accommodation, I provided those within less than

17  four or five hours after I received them,

18  Mr. Souther adjusted her start time to zero-nine.

19  We did everything we could to get her back to work,

20  so I think I did everything I could.

21    Q.     It seems to me that you didn't feel that

22  the accommodations that were granted to her would

GREGORY COHEN - 4/15/2013

Page 56

1    Q.      Could they if they wished to do so?

2    A.      For a reasonable accommodation?

3    Q.      Yes.

4    A.      No.  It would be attached to that form

5    and go to HR.  I don't have the storage for medical

6    documentation.  There's all kind of rules.

7    Q.      Did Ms. Doak at any time ever submit any

8    medical documentation directly through you?

9    A.      No.

10   Q.      And would it have been appropriate for

11   her to do so?

12   A.      No.

13   Q.      Do you know, would it have been

14   appropriate for you to contact the Medical Review

15   Office at any time to find out what Ms. Doak

16   submitted to the Medical Review Office?

17   A.      No.  My point of contact is the HR

18   department.

19   Q.      Why is that?

20   A.      I don't think we're allowed to know that,

21   and HR, they have to sanitize it and make sure

22   whatever the supervisor is allowed to know because

GREGORY COHEN - 4/15/2013

Page 57

1    of laws and regulations and privacy.

2         Q.      So you never went and asked and looked

3    into what bases she had for requesting a reasonable

4    accommodation, did you?

5         A.      No.

6         Q.      Now, you testified earlier that the

7    9:00 a.m. start time was not in order to accommodate

8    any medical reasons that you were aware of.

9              Why did you adjust her start time to

10   9:00 a.m.?

11        A.      I think me and Mr. Souther when we sat in

12   the meeting with Ms. Doak, she told us that she was

13   on some medicine and then she would be done with it

14   soon and the 9:00 start time would work for her.  So

15   we adjust employees' start times all the time.

16        Q.      And was it your understanding that the

17   9:00 a.m. start time was agreeable to her?

18        A.      Yes.  She agreed to it in the meeting.

19              (Deposition Exhibit 5 was

20              marked for identification.)

21              MS. LO:  Let me show Ms. Travanty.

22              This is a document bearing the Bates

GREGORY COHEN - 4/15/2013

Page 58

1    numbers USCG83 to USCG87.

2    BY MS. LO:

3         Q.      Mr. Cohen, do you recognize this

4    document?

5         A.      Yes.  Those are my notes from when Edna

6    called in sick or called in.

7         Q.      Is this in any sort of order?

8         A.      I think they were in date order.  It goes

9    all the way back to 2009.  Yeah, so it's oldest to

10   newest, I think.

11        Q.      Okay.  And let me ask you specifically

12   about the first page.

13        A.      Okay.

14        Q.      Taking a look at the August times, what

15   do those entries indicate?

16        A.      Called at 09:25, migraine not coming to

17   work.

18        Q.      Okay.  And so that was dated what date?

19        A.      August 2nd.

20        Q.      Okay.

21        A.      Called in August 5th at 09:09, on my way,

22   could not sleep.

GREGORY COHEN - 4/15/2013

Page 59

1                    Called in August 12th at 07:30, no power

2    - thunder might be late.

3        Q.      **Does it reflect what time she showed up**

4    **that day?**

5        A.      No.   That would be to go to the time

6    card.

7        Q.      **Okay.**

8        A.      8/26, 10:15 a.m., incapacitated for

9    migraine medication.

10                   August 26th, 12:55, p.m., leaving doctor

11   feel better.

12       Q.      **So that was the same day?**

13       A.      Same day.

14                   Those are the August ones.

15       Q.      **What are some of the other reasons you**

16   **were given?**

17       A.      Home appointment canceled -- earliest

18   14:00, not feeling incapacitated for work.

19                   Just woke have fever - going to bed --

20   10:25 on September 15th -- incapacitated.

21       Q.      **Does that indicate that in the months**

22   **of -- let me ask first:  At this time do you recall**

GREGORY COHEN - 4/15/2013

Page 60

1    what Ms. Doak's start time would have been?

2        A.    I believe it was either 8:30 or 9:00

3    then.  These might be after the 9:00 adjustment.

4    I'd have to go back and find those records.

5        Q.    Does it reflect -- you were asked earlier

6    whether Ms. Doak was able to come in at 9:00 after

7    the adjusted time had been adjusted to 9:00.

8             Does that refresh your recollection as to

9    whether she was able to do so?

10       A.    Yes.  She was not able to do so.

11       Q.    When you received the medical opinions

12   from the Medical Review Office, who was that

13   through?

14       A.    Star King.

15       Q.    Did you rely on that information that was

16   presented in it?

17       A.    Yes.

18       Q.    And why did you do that?

19       A.    That's all I have to work off of as the

20   supervisor.

21       Q.    And in terms of you mentioned that

22   Ms. Doak, the only time that you were aware of her

GREGORY COHEN - 4/15/2013

Page 64

1    staff and all of that, it's 9:00 to 3:00, you can

2    guarantee that everybody is supposed to be there

3    from 9:00 to 3:00.

4        **Q.     In the 2009 to 2010 time period,**

5    **approximately how many employees did you supervise?**

6        A.     Approximately 25.

7        **Q.     Do you know the male-female breakdown, as**

8    **best as you can recall?**

9        A.     I believe I had five or six, seven males,

10   the rest were females, and my business managers,

11   they were mostly females.  Most of my males were on

12   my cost estimating team, the Coast Guard officers up

13   there.

14       **Q.     What is the latest start time that**

15   **anybody your start staff had?**

16       A.     I believe I had an 8:00, may have been an

17   8:15, and that would have been Edna at the 8:15, but

18   I think the 8:00 I had a person that had to drop

19   their kids off at private school.

20              MS. LO:  Just give me one moment, please.

21              All right.  I don't have any other

22   questions.

Page 66

1                CERTIFICATE OF NOTARY PUBLIC

2            I, Karen Geddes, Court Reporter  and

3    Notary Public in and for the District of Columbia,

4    before whom the foregoing deposition was taken, do

5    hereby certify that the witness whose testimony

6    appears in the foregoing deposition was duly sworn by

7    me; that the testimony of said witness was taken by

8    me in shorthand at the time and place mentioned in

9    the caption hereof and thereafter transcribed by me;

10   that said deposition is a true record of the

11   testimony given by said witness; that I am neither

12   counsel for, related to, or employed by any of the

13   parties to the action in which this deposition was

14   taken; and further, that I am not a relative or

15   employee of any counsel or attorney employed by the

16   parties hereto, financially or otherwise interested

17   in the outcome of this action.

18                      Certified to by me on this 29th day

19   of April, 2013.

20                            _____
                             Karen Geddes, CSR
21                           Notary Public in and for the
                             District of Columbia
22   My commission expires:
     April 30, 2017

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-------------------------------x

EDNA DOAK                          )

                               )

    Plaintiff        )

                               )

      vs.     )Case No. 1:12-cv-1177-RC

                               )

JANET NAPOLITANO, SECRETARY,       )

U.S. DEPARTMENT OF HOMELAND        )

SECURITY                           )

                               )

    Defendant.       )

-------------------------------x

                April 15, 2013

                Washington, D.C.


      The Deposition of RORY SOUTHER was taken
on April 15, 2013, commencing at 10:57 a.m. and
concluding at 12:20 p.m., at Merrill Corporation,
1325 G Street, Suite 200, Washington, D.C., before
Karen Geddes, Court Reporter and Notary Public.

Page 2

1           APPEARANCES
2
3    ON BEHALF OF PLAINTIFF:
4    CONSTANCE TRAVANTY, ESQUIRE
5    Alan Lescht & Associates, P.C.
6    1050 17th Street, N.W., suite 400
7    Washington, DC 20036
8    Telephone: (202)463-6036
9    Fax: (202)463-6067
10   E-mail: Constance.travanty@dcemploymentattorney.com
11
12   ON BEHALF OF DEFENDANT:
13   MICHELLE LO, ESQUIRE
14   Assistant United States Attorney
15   555 Fourth Street, N.W.
16   Washington, D.C. 20530
17   Telephone: (202)514-5134
18   Fax: (202)514-8780
19   E-mail: michelle.lo2@usdoj.gov
20
21
22

Page 3

1            EXAMINATION INDEX
2                    PAGE
3    Examination by Ms. Travanty.................  4
4    Examination by Ms. Lo.......................  59
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 4

1    WHEREUPON,
2                RORY SOUTHER,
3    having been called by the Plaintiff and first duly
4    sworn by a certified court reporter and notary
5    public, testified as follows:
6           EXAMINATION BY COUNSEL FOR PLAINTIFF
7    BY MS. TRAVANTY:
8       Q.   Good morning Mr. Souther.  My name is
9    Constance Travanty.  As you know, I represent
10   Ms. Doak in her case against the Coast Guard?
11      A.   Okay.
12      Q.   Could you please state your full name for
13   the record.
14      A.   Rory Lee Souther.
15      Q.   And what is your current position?
16      A.   I'm the Chief, Office of Resource
17   Management, Coast Guard Acquisition Directorate.
18      Q.   How long have you held that?
19      A.   That position, a little over four years.
20      Q.   What was your position prior to that?
21      A.   I was the assistant to the Deputy Chief
22   Acquisition Officer for about 18 months.

Page 5

1       Q.   Did you ever supervise Ms. Doak?
2       A.   I was the second level supervisor.
3       Q.   What position did you hold when you were
4    her second level supervisor?
5       A.   I was the Chief of the Office of Resource
6    Management, the position I currently hold.
7       Q.   How long were you her second level
8    supervisor?
9       A.   From in an acting capacity from October
10   to right before Christmas in 2008, and then in a
11   permanent capacity then until she retired from
12   federal service on October 31, 2010.
13      Q.   What is the Coast Guard procedure for an
14   employee who wishes to request reasonable
15   accommodations?
16      A.   Actually, there's a Coast Guard policy
17   with a form that an employee is required to complete
18   and request specific accommodations and provide
19   medical documentation as to why these accommodations
20   are required.
21      Q.   Where would an employee obtain this form?
22      A.   You go on the intranet, there's an index

2  (Pages 2 to 5)

Page 6

1  to all the policies and instructions and so on,
2  including the acquisition directing unique
3  instructions. The employee would go there and ask
4  the supervisor if they were familiar with the
5  process, or human resources would be a better place
6  to ask.
7      Q.   Do you know what form you are referring
8  to? Does it have a number or a title?
9      A.   I'm not familiar with the number or the
10  instruction number. I know we are dealing with it
11  currently because we are getting ready to move from
12  our current location to a different building, so we
13  want to make sure we're aware of any accommodations
14  that any of the employees require before we make the
15  move so that we can accommodate once we move.
16      Q.   Who would an employee submit the
17  reasonable accommodation form to?
18      A.   They should go to the supervisor.
19      Q.   Would the employee submit medical
20  documentation to their supervisor along with the
21  form?
22      A.   I would expect that, yes, if I were the

Page 7

1  supervisor.
2      Q.   Turning to Ms. Doak, were you aware that
3  Ms. Doak is disabled?
4          MS. LO: Objection to form.
5  BY MS. TRAVANTY:
6      Q.   Were you aware that Ms. Doak suffered
7  from medical conditions?
8      A.   I was aware she had some medical issues.
9  I was told related to an automobile accident that
10  occurred in June of 2009.
11      Q.   When would you say you first became
12  familiar of any medical issues that Ms. Doak
13  suffered from?
14      A.   The specifics became more clear in early
15  May, the time she was provided accommodations that
16  were requested.
17      Q.   Was that May of 2010?
18      A.   May of 2010, yes.
19      Q.   And that was the first time you became
20  aware?
21      A.   Right. There were some specific
22  accommodations requested, I knew Mr. Cohen had

Page 8

1  basically dropped everything he was working on that
2  day in order to provide those accommodations that
3  had to do with modifications to the lighting in the
4  cube, a screen for the monitor, some headsets. He
5  struggled a little bit with the place where Ms. Doak
6  could go to have quiet or darkness to deal with
7  migraines. Looked first at the eleventh floor, that
8  wasn't suitable for her, so looked around to where
9  we had conference rooms and things that were
10  available she could go to and use.
11      Q.   How did you specifically become aware of
12  her medical conditions?
13      A.   When at first Greg pretty much told me
14  about it. As I began meeting with her in -- really
15  in July, I became more aware of it. There was an
16  instance at some point in there where I believe I
17  either reviewed or approved a request for her
18  participation in the voluntary leave transfer
19  program and that was related also to the automobile
20  accident.
21      Q.   Would there have been medical
22  documentation to support a voluntary leave?

Page 9

1      A.   I don't recall seeing any specific
2  medical documentation at that time.
3      Q.   And you said you had conversations with
4  Greg Cohen about Ms. Doak's medical conditions?
5      A.   He just mentioned in early May, it was
6  around May 3rd, that she had a doctor's note and it
7  had mentioned certain accommodations that were
8  recommended and he was working to provide those, and
9  that's really all I knew about it.
10      Q.   So did Mr. Cohen seek you out to make you
11  aware of her requests or how did these conversations
12  come about?
13      A.   I talked to him several times a day and
14  at one particular point in time, he said: Hey, I've
15  got these requests, I'm off working.
16      Q.   So he wasn't seeking your assistance?
17      A.   No, he didn't need my approval. He just
18  made me aware that he was taking action.
19      Q.   You also said that at some point you
20  started having meetings with Ms. Doak?
21      A.   I think I met with her in June briefly,
22  and then again we met -- or maybe early July, and

3  (Pages 6 to 9)

RORY SOUTHER - 4/15/2013

Page 10

1 then she, Greg and I met on the 23rd of July and
2 specifically discussed her start time.
3    Q.    So the purpose of the meeting was to
4 discuss her start time?
5    A.    She and Greg had been going back and
6 forth on the appropriateness of charging the
7 voluntary leave or donated leave, use of FMLA
8 whether it was totally used up or not, how many
9 hours you had to work before you had -- you know,
10 like your government employee works six hours, they
11 are entitled to 30 minutes of break time for a meal,
12 which we cannot deny an employee, there was a lot of
13 that stuff going on, and I don't know if I asked or
14 maybe Ms. Doak asked for us to meet, but we met and
15 we pretty much talked about her medical condition,
16 her desire to have her meds work together and such
17 that she could come to work regularly.
18    Q.    So during these meetings, what was your
19 understanding of her medical condition?
20    A.    Migraines was one because that goes to
21 all the accommodations provided, and the fact that
22 she would sometimes medicate and be in the office

Page 11

1 late after other people had left, and also dealt
2 with the reason for medication and coming in late.
3 I don't know if that was all that clear to me at
4 that point in time, but, you know, her belief that
5 she would suffer an episode of perhaps migraines and
6 then need to perhaps go to Walter Reid on the way to
7 work instead of coming straight to work or to
8 medicate and lay down and then not come to work, it
9 was -- a lot of that was going on at that point in
10 time.
11    Q.    So at the time did you believe that her
12 medical condition was just the migraines that she
13 suffered from?
14    A.    That was the most of it at that point in
15 time that I believe I was aware of.  I mean, later
16 on or at some point it all came together that stress
17 was involved and the migraines -- there were a few
18 other things that just aren't popping up in my mind
19 right now.
20    Q.    A few other conditions?
21    A.    Right.  Sleep apnea was one; I think I
22 didn't learn about that, though, until they made the

Page 12

1 response for the proposed removal, it was later.
2 Sleep apnea, dizziness, migraines, of course
3 sensitivity to light I think was part of it.
4    Q.    You said during these meetings you
5 discussed Ms. Doak's leave request as well as her
6 start time; is that correct?
7    A.    I don't recall talking much about the
8 voluntary -- the donor leave thing.  I'm not in a
9 position to approve or disapprove that.  That was
10 pretty much related to the 9:00 or 9:30 start time.
11    Q.    What was your understanding of the
12 reasons why Ms. Doak was requesting a later start
13 time?
14    A.    As I learned -- perhaps not at that
15 point, but as I learned throughout this ordeal is
16 that she would sometimes get up, prepare to come to
17 work, feel the onset of a headache, take medication
18 and then lay down.
19    Q.    So you believed that she was requesting
20 leave or start time because she often experienced
21 migraines in the morning before coming to work?
22    A.    Uh-huh.

Page 13

1    Q.    And so what did you discuss in terms of
2 what start time would be feasible?
3    A.    She had a note and I believe it was the
4 one for the medical review officer that indicated
5 that in their view, the medical documentation didn't
6 support an arbitrary start time of 8:30, 9:30 or
7 9:00.  We talked about 9:30, she had indicated that
8 she had changed medications, she had made it in at
9 9:00 that day.  I asked if 9:00 was achievable, she
10 had indicated it was, and we agreed that 9:00 would
11 be her start time from that point on.
12         Now, Greg was interested in getting her
13 start time earlier, as was I, because we needed to
14 get the appropriations law course which typically
15 starts at 8:00.  I had a requirement that all my
16 people have that course by 31 December 2009.  She
17 was, as far as I know, the last one that didn't have
18 it going into July and seven months later, and was
19 interested in getting some type of a regular start
20 time as close to 8:00 as possible.
21         Now, if 9:00 was doable and that was the
22 best we could get, that would be fine.  It would at

4  (Pages 10 to 13)

RORY SOUTHER - 4/15/2013

Page 14

1   least give us the option to work with the vendor
2   that provides the training to perhaps get a course
3   that starts at that point in time, so that was in
4   the back of my mind at the time also.
5       **Q.   So during the meeting, did you understand**
6   **this discussion regarding Ms. Doak's start time to**
7   **be a request for a reasonable accommodation?**
8       A.   I didn't really think of it in those
9   terms, no.
10      **Q.   Did you understand that she was**
11  **requesting a later start time based on her medical**
12  **conditions?**
13      A.   Yes.  It had to do with the headaches,
14  with the self-medication, with the inability to
15  leave the house at 8:00, let's say, to get to work.
16      **Q.   And you mentioned a memorandum from the**
17  **Medical Review Office?**
18      A.   Uh-huh.
19      **Q.   How did you see that memorandum; was that**
20  **sent to you?**
21      A.   I believe the first time I saw it she
22  brought it to us that day.

Page 15

1       **Q.   So ms. Doak brought it to the meeting?**
2       A.   Yeah.
3       **Q.   What was your understanding of that**
4   **document?**
5       A.   Pretty much it was very short and it said
6   that the medical documentation reviewed or received
7   does not support a later start time of 09:00,
8   08:30 or 09:30 and it used those three times in it.
9       **Q.   Why would the Medical Review Office be**
10  **issuing that memorandum?**
11      A.   Because she had provided medical
12  documentation for their review, which was the
13  process that had been used through this time, is
14  that she would mark the medical documentation
15  privacy -- you know, whatever -- it starts with an
16  "H," H-I-P-A-A or something -- and it would go to
17  the medical folks and then they would in turn render
18  an assessment of that documentation.  And there were
19  times they provided it back to her, she gave it to
20  Mr. Cohen.  I don't know if they ever gave it
21  directly to Mr. Cohen or not.  You'd have to ask
22  him.

Page 16

1       **Q.   And so what was your understanding as to**
2   **why Ms. Doak was submitting her medical**
3   **documentation to the Medical Review Office?**
4       A.   I thought she was a very private person
5   and she didn't want those that she works with or for
6   to be fully aware of all the details of her
7   situation.
8       **Q.   So did you think that Ms. Doak was**
9   **submitting medical documentation to the Medical**
10  **Review Office to request reasonable accommodations?**
11          MS. LO:  Objection to form.
12          MS. TRAVANTY:  You can go ahead and
13  answer.
14          THE WITNESS:  At one point I thought she
15  was submitting the medical documentation related to
16  the use of the FMLA, of the 480 hours under the law
17  that she was granted.
18          Later, as that ended and she was pretty
19  much given free rein to come and go as she pleased
20  without having a doctor's note for any absences, I
21  believe Greg met with her and Mr. Cohen, and
22  indicated she needed to come to work on a regular

Page 17

1   basis, FMLA was done and so on.
2          And she'd indicated to him that -- he
3   actually had issued an -- I don't know if it was a
4   letter of reprimand or an order to return to work or
5   something but had issued that, met with the union,
6   they asked for -- I guess it was toward the end of
7   February, they entered into an abeyance agreement to
8   give her time to get the medical documentation and
9   provide that.
10         That didn't come very quickly.  I think
11  she was given ten days.  They requested more time.
12  I'm not sure Mr. Cohen gave them more time initially
13  or not, but over time I know the union rep, Elena
14  Hughes, called me and asked me if she could have
15  more time.
16  BY MS. TRAVANTY:
17      **Q.   And what was the reason she was**
18  **submitting the medical documentation?**
19      A.   To justify the continued absences from
20  work, and it was more so, at that point in time to
21  my understanding, that it was to justify the
22  absences from work.

5 (Pages 14 to 17)

RORY SOUTHER - 4/15/2013

Page 18

1     Q.   So your understanding was it was based on
2  Mr. Cohen's request that Ms. Doak submit medical
3  documentation, not that Ms. Doak was requesting
4  reasonable accommodations?
5     A.   Right. I had no notice at that time.
6  Again, the first indication -- you know, of course
7  I'm going now to what I know today or what I knew
8  several months later, but there was a 16 April memo
9  from her physician that was provided to the medical
10 review officer. They issued a memo in late April or
11 early May that says, you know, we've read this memo
12 and the following accommodations are recommended,
13 and it was the reduce lighting, the noise canceling
14 headset, the ability to wear sunglasses, ability to
15 go to a dark, quiet place, the screen for the
16 monitor, those things that were mentioned in that 16
17 April memo.
18    Q.   Is that the memorandum that you're
19 referring to that Ms. Doak brought to the meeting?
20    A.   No. The one she brought to the meeting
21 was another MRO review based on a -- I think it was
22 a 16 July memo from her doctor, both of which were

Page 19

1  included in her response to the proposed removal
2  that I got on the 1st of September, which is really
3  the first time I read either document.
4     Q.   So at some point you became aware that
5  Ms. Doak was submitting the medical documentation to
6  the Medical Review Office in support of a request
7  for reasonable accommodations?
8     A.   At the time, I knew very little of the
9  documentation or any of the specifics and had no
10 knowledge that she was requesting accommodation,
11 again, until Mr. Cohen got the memo that said
12 recommend the following, and the following was --
13    Q.   So you saw the memo that Ms. Doak brought
14 to the meeting that talks about accommodations that
15 should be provided. So I guess is that the first
16 time --
17    A.   That's the first time, yeah.
18    Q.   -- that you were aware there was a
19 request for reasonable accommodations made?
20    A.   Right.
21    Q.   Okay. And that meeting I think you said
22 was in June and July you had a meeting; is that

Page 20

1  correct?
2     A.   Right. The key meeting was July 23rd is
3  when we discussed the start time, which is the first
4  time -- I mean, again, I wasn't aware that that was
5  a request for an accommodation. I was aware that
6  that was a request for a later start time because of
7  the self-medicating that made it difficult to get to
8  work, and again, we provided that.
9     Q.   So you believe that her only request for
10 reasonable accommodation had to do with the lighting
11 and the other accommodations that had already been
12 provided?
13       MS. LO: Objection to form. You may
14 answer.
15       THE WITNESS: Yeah, those were the only
16 accommodations that we were aware of at the time
17 that were requested.
18 BY MS. TRAVANTY:
19    Q.   In terms of the memorandum from the
20 Medical Review Office that we're referring to, is
21 that -- does the Medical Review Office make
22 decisions as to whether to grant or deny an employee

Page 21

1  accommodations?
2     A.   I don't believe so.
3     Q.   Is the letter that the Medical Review
4  Office -- the memorandum, is that a recommendation?
5     A.   In the form it came to us, it was in a
6  recommendation we took it. Of course that has some
7  weight because they are medical officials and we are
8  not. They have the medical education the same as
9  any other doctor, so they were the only ones in a
10 position to assess the memorandum or the
11 documentation from Ms. Doak's physician and to make
12 an assessment. I mean, we didn't have that before
13 us, so we can't -- you can't make a judgement on
14 something you don't have. The only thing we had was
15 the doctor's -- the MRO's memo that said recommend
16 provide these accommodations.
17    Q.   I see. So because you didn't have the
18 underlying medical documentation, you just went by
19 the recommendations?
20    A.   The best information we had available.
21 It's the best anybody can do, I think.
22    Q.   I guess what I was asking you generally,

6 (Pages 18 to 21)

RORY SOUTHER - 4/15/2013

Page 22

1  whose decision is it to grant or deny any employee a
2  reasonable accommodation?
3  A.   It would be the first level supervisor.
4  Q.   So in Ms. Doak's case it would have been
5  Mr. Cohen's decision?
6  A.   Yes.  And had he denied any and came to
7  me and told me that he had denied or why we would
8  have discussed that, and if I'd felt the need I
9  would have overruled it, but that wasn't the
10  situation.  Every accommodation that we were aware
11  of that was requested was provided.
12  Q.   Did Mr. Cohen ever discuss with you the
13  fact that he hadn't actually received any medical
14  documentation himself?
15  A.   Not necessarily.  He had the notes from
16  the MRO.  He assumed those were based on the right
17  information and it wasn't until after we got the
18  response to the proposed removal that we had the two
19  doctors' notes, the one from April and the one from
20  July, one of those was addressed to him.
21       And I said:  Did you ever get this?  And
22  he said:  No, I have never seen that before.

Page 23

1       And it was unfortunate that the note that
2  was addressed to him wasn't given to him, but, you
3  know, be it as it may, again, we went to the
4  physicians who made an assessment and we acted on
5  their recommendation.  Had they said something in
6  there about a time, we would have acted on it.  When
7  we got the note in July that mentioned a start time
8  we met and discussed it with Ms. Doak and we agreed
9  on 9:00 when she said she could achieve 9:00.  Had
10  it been a later time, we would have discussed a
11  later time and discussed the pros and cons of a
12  later time, we would have strongly considered
13  anything else.  But the note said that the medical
14  documentation didn't support an arbitrary -- I
15  believe it used the word "arbitrary" start time of
16  8:30, 9:00 or 9:30, and she said she came in at 9:00
17  that morning.
18       And Do you think you can make it in at
19  9:00 every morning?  The answer was yes, and let's,
20  Okay, we're good.  That gets us closer to her being
21  there with the rest of her work group, the rest of
22  the people in the office and gets us closer to getting

Page 24

1  that course completed.
2  Q.   So in your opinion, should Ms. Doak have
3  been submitting her medical documentation to
4  Mr. Cohen instead of the Medical Review Office?
5  A.   Had it been me and I was sick, I would
6  have shared that with my boss.  She chose -- she had
7  privacy issues that -- I can't speak for her.  I
8  mean, there's reasons she didn't give them straight
9  to Greg or me or anybody else in the chain, and
10  instead gave them to the MRO.  I'm not totally
11  familiar with how that process works, but I would
12  have shared them with my boss so they had a full
13  understanding of my situation and could act with the
14  most information possible.
15  Q.   So going back to I think you said it was
16  the July 23rd meeting in which you discussed
17  Ms. Doak's start time, who was present at the
18  meeting?
19  A.   Mr. Cohen, she and I.
20  Q.   And how did you arrive at a 9:00 a.m.
21  start time?
22  A.   She had -- I don't know if she had the

Page 25

1  actual July note from her doctor and pointed to the
2  time or the MRO piece of paper.  I believe it was
3  the MRO piece of paper that had the 8:30, 9:00 or
4  9:30, and said that that was arbitrary and the
5  medical documentation did not support the start.
6       We talked a little bit about 9:30 and she
7  had indicated she had been there at 9:00 that day,
8  and I said:  Do you think you can continue to come
9  in at 9:00?  And she said she was on different
10  medications, they were still fighting each other a
11  little bit, but she felt they would settle down soon
12  and maybe after a few more days it wouldn't be a
13  problem and she would be able to make it at 9:00.
14  And I said, Well, can we all agree that 9:00 is a
15  good start time? and that's how we arrived at 9:00.
16  Q.   So at the time of the meeting were you
17  aware of her request to start at 9:30?
18  A.   Based on the documentation I saw, I saw
19  that it was clear that that was one of the times
20  mentioned.
21  Q.   And the documents, you are referring to
22  the Medical Review Office memorandum?

7 (Pages 22 to 25)

RORY SOUTHER - 4/15/2013

Page 26

1    A.   Right. We had relied on the MRO's
2   assessment previously and I was going to continue to
3   rely on the MRO's assessment so I felt it was valid.
4   Ms. Doak had not expressed any concern with that
5   being inaccurate, at least at that point, and I had
6   no reason to doubt the veracity of the information
7   we were being provided.
8    Q.   So you mentioned a meeting in June
9   of 2010 as well?
10    A.   There may have been briefly. I can't
11   remember exactly even what we talked about.
12    Q.   Do you recall who the meeting would have
13   been with?
14    A.   I think Ms. Doak just stopped by the
15   office and probably let me know she was working hard
16   to get to work.
17    Q.   So it would just be Ms. Doak and you at
18   the meeting?
19    A.   Yeah. You know, she was -- you know,
20   perhaps -- said she had a few tears over the
21   difficulty that she was having in trying to get her
22   meds to work together and all of that, but, you

Page 27

1   know, I probably told her that we cared about her
2   and wanted to see her be successful, which was our
3   goal all along, and wanted to see her come to work
4   on a regular basis because it was important to have
5   her come to work on a regular basis and it was
6   important for all of us to come to work on a regular
7   basis.
8    Q.   Do you recall discussing the core hours
9   of Ms. Doak's position with her?
10    A.   Not really, no.
11    Q.   Do you know now what the core hours are?
12    A.   Well, for people under flexible -- it
13   would apply to people under flexible work schedule
14   and it's pretty much from -- I believe it's 9:30 to
15   11:00 and then 1:00 to 3:00 that everybody should be
16   there. She was not on a flexible work schedule at
17   the time. She would have gone to one had we been
18   able to get her medical appointments on the same day
19   of the pay period. That was our hope at the end of
20   July.
21    Q.   Can we go back to the -- you said a
22   flexible work schedule was what hours?

Page 28

1    A.   Well, if people are on a flexible work
2   schedule, basically you come in any time from 6:00
3   in the morning and work until 6:00 at night. You
4   work a nine-hour day or a ten-hour day if it's a
5   ten-hour type of schedule. But everyone is required
6   to be there, and it's in the policy, it's
7   acquisition directorate policy number one we
8   provided, but I believe it's from 9:30 to 11:00 that
9   everyone needs to be at work and from 1:00 to
10   3:00 -- maybe 1:00 to 3:30 -- probably 1:00 to 3:30,
11   but it's those sorts of hours, that type of band
12   where we want everybody there at 9:30.
13    Q.   Are you saying 9:30 would be the latest
14   an employee could come in?
15    A.   Under the policy under a flexible
16   schedule, yes.
17    Q.   Okay. What about under a non-flexible
18   schedule?
19    A.   You still would have to look at start and
20   stop times on an eight-hour day with a stop at
21   6:00 p.m. If you back that up, you've got six hours
22   to noon, you back it up two more hours for an

Page 29

1   eight-hour day, that takes it to ten but with a
2   half-hour lunch that takes it to 9:30. So 9:30
3   would be the latest start time under any
4   schedule with our basic work hours being from 6:00
5   in the morning to 6:00 at night. So someone working
6   an eight-hour workday could come in at 6:00 and
7   leave at 2:30, I guess, or 3:30.
8    Q.   And the policy or the document that would
9   set this forth would be which document?
10    A.   That's acquisition directorate policy --
11   I believe it's number one, and I think we're on our
12   second revision, but the original was put into
13   effect in 2007, almost with the standup of the
14   acquisition director.
15    Q.   Is there also an SOR that would set this
16   forth or is that the same thing?
17    A.   SOR, I think -- yeah, SOP. I think
18   you're thinking SOP, standard operating procedure,
19   yeah.
20    Q.   So that would be the same document you
21   are referring to?
22    A.   Yes.

Merrill LAD

Page 30

1    Q.    So you are saying under the SOP, 9:30
2    would be the latest start time?
3    A.    Uh-huh.
4    Q.    So then in Ms. Doak's case, if she
5    requested to come in at 9:30, could she have done
6    so?
7    A.    Had we believed that it be absolutely
8    necessary, we would have discussed that and
9    considered it.  Again, we talked about that and she
10   said she would come to work at 9:00.  We were
11   interested in the 8:00 start time, because in large
12   part, we needed to support the training, not only
13   the acquisitions or appropriations law training that
14   starts at 8:00, once she completed the cost
15   estimating course which was online and entered level
16   two business -- at the time business financial
17   management and cost estimating certification, some
18   of those were classroom courses that started at
19   8:00 in the morning, and we needed at some point, at
20   least for the sake of those courses at whatever
21   times we might be able to get them in the future, to
22   get to an 8:00 start time so that she could have her

Page 31

1    required certification training.
2              And she mentioned she could start at 9:00
3    and I asked if that was agreeable to her and she
4    agreed to 9:00 and we settled on 9:00.  Had she said
5    I really positively can't make it, I probably would
6    have considered 9:30, but that's speculation.  I
7    wanted to get closer to 8:00, Greg wanted closer to
8    8:00, she wanted evidently 9:30 but agreed to 9:00,
9    and once we had an agreement, there was no further
10   need to consider or discuss any other option.
11   Q.    Did you ever discuss telework with
12   Ms. Doak?
13   A.    Not directly, no.
14   Q.    Do you know whether Mr. Cohen did?
15   A.    She had -- and I may have been copied on
16   an e-mail, he may have shared it with me, but she
17   was working on her second or third completion of
18   BCF-106 which is the cost estimating course, and was
19   running into her last -- I think once you register
20   online, you get 90 days to complete and it might
21   have been the second attempt because I think her
22   original enrollment had expired in April, she

Page 32

1    enrolled again after that.  I believe this
2    enrollment ended around the 7th of September and
3    this was around the 1st, 2nd, 3rd of August she
4    requested to telework to complete the course and
5    Greg had indicated that, you know, there was some
6    time to go before her due date, like another month,
7    and that she needed to complete a telework agreement
8    if she needed to do that, and it is general policy
9    we don't complete training at home so you do that
10   during work time.
11             So said, you know, keep trying, see what
12   progress you can make on the course and as you get
13   closer to that 90-day expiration date, call me and
14   we will reconsider.
15   Q.    So other than in the one instance for the
16   course training did Ms. Doak ever discuss telework
17   as an accommodation?
18   A.    Not that I'm aware of.  The first time I
19   really heard about it was in the response to the
20   proposed removal on the 1st of September when it was
21   included in the her union-generated -- which would
22   be her response, but it was drafted in part by the

Page 33

1    union attorney, that telework would solve
2    everything.  That's pretty much how it was
3    presented.  It was a five or six-page memo, but that
4    was prevalent in the document.
5    Q.    So I guess were you aware that Ms. Doak's
6    doctor had recommended a later start time or
7    telework?
8    A.    Directly, no, not until September 1st.
9    Q.    And that would be the response that you
10   were referring to?
11   A.    That would be the response to the
12   proposed removal.  We had the MRO's assessment on
13   July 23rd that implied that that must have been
14   either recommended or she requested it -- and I
15   wasn't sure.  I mean, she could have requested a
16   later start time, submitted the documentation to the
17   MRO and the MRO said the medical documentation does
18   not support an arbitrary start time of 8:30, 9:00 or
19   9:30.  I wasn't sure of the details in anything from
20   her physician.
21   Q.    Do you know whether Mr. Cohen was aware
22   of Ms. Doak's request to telework?

9  (Pages 30 to 33)

RORY SOUTHER - 4/15/2013

Page 34

1       MS. LO: Objection.
2       THE WITNESS: I'm not sure what he was
3  aware of at that point.
4  BY MS. TRAVANTY:
5      **Q.   Did you ever have any discussions with**
6  **the Medical Review Office as to ascertain what**
7  **accommodations Ms. Doak was seeking?**
8      A.   No.
9      **Q.   Would it have been appropriate to do so?**
10     A.   Mr. Cohen was having those communications
11  and I didn't need to second-guess his actions or
12  decisions at that point based on what I witnessed.
13     **Q.   So you felt it was Mr. Cohen's**
14  **responsibility to handle that?**
15     A.   Yes.
16     **Q.   And so then I guess why did you end up**
17  **involved in the meetings regarding Ms. Doak's start**
18  **time if Mr. Cohen was to handle these issues?**
19     A.   There was a lot of banter back and forth
20  at that particular time.
21     **Q.   Between Ms. Doak and Mr. Cohen?**
22     A.   Right.  It could potentially -- and maybe

Page 35

1  it was an ad hoc request, or at least had the
2  appearance of an ad hoc request, I really can't get
3  here, I need to start later, I need to start later.
4       I wanted to clear the air and ask and get
5  out what is going on.  What are we trying to do
6  here.
7      **Q.   Did you feel that Mr. Cohen wasn't**
8  **adequately addressing the situation?**
9      A.   Well, the communication between he and
10  Ms. Doak, they were both frustrated with each other
11  and I decided to insert myself to maybe alleviate
12  the frustration and let them both know how we might
13  approach it better.
14     **Q.   And that's when you had the July 23rd**
15  **meeting and you felt that the 9:00 a.m. start**
16  **time -- I guess did you feel then that the 9:00 a.m.**
17  **start time had resolved the issue?**
18     A.   Ms. Doak felt the 9:00 a.m. was a good
19  start time and I thought that was a good resolution.
20  Mr. Cohen I think wanted 8:00 and he probably
21  wasn't happy with the decision, but she indicated
22  9:00 was reasonable and was acceptable to her and I

Page 36

1  support that.
2       I think I told him to make it happen in
3  the middle of the pay period or the end of the pay
4  period or however that works and usually there's a
5  form we fill out where everybody indicates what
6  their work hours are and I told him to go off and
7  take care of those things and her official time
8  would then be 9:00, it would be 9:00 later.  I think
9  I indicated in an e-mail to her union rep that it
10  would be 9:00 as long as medically necessary.
11     **Q.   So by adjusting Ms. Doak's start time to**
12  **9:00 a.m., did you consider that an accommodation?**
13     MS. LO: Objection, asked and answered.
14  You can answer.
15     THE WITNESS: Yes.  I figure most of
16  anything I do for any employee whether it be in the
17  course of work or not, is an accommodation of some
18  form and anything we could do to help her get to
19  work on a regular basis was something we should do.
20  BY MS. TRAVANTY:
21     **Q.   What I wanted to clarify is whether you**
22  **felt that you were just adjusting Ms. Doak's start**

Page 37

1  **time or whether you thought that you were**
2  **accommodating a request for reasonable accommodation**
3  **due to her medical condition?**
4      A.   I don't know that it matters which one it
5  is.  We were providing an accommodation for her to
6  come in at a time later than her supervisor
7  preferred, so yes, we were providing an
8  accommodation.
9      **Q.   So I guess if another employee who didn't**
10  **have a medical condition that affected their ability**
11  **to arrive at work could they similarly have come in**
12  **at a later start time?**
13     A.   It would depend on the circumstances.
14  Yeah, they could come in and ask, but whether it's
15  granted or not would depend on the situation.  If
16  it's not medically related, it's probably not going
17  to happen.
18     **Q.   Would it have been feasible for Ms. Doak**
19  **to telework?**
20     A.   I don't believe so.
21     **Q.   And why not?**
22     A.   And this comes from the medical

10  (Pages 34 to 37)

RORY SOUTHER - 4/15/2013

Page 38

1  documentation I was actually able to read that was,
2  I believe, the 16 July memo that I got on
3  September 1st, and there was a portion in there that
4  said she is incapacitated when self-medicating
5  whether doing the day-to-day activity of living or
6  whether working. And I have yet, almost three years
7  later, two and a half years later, been able to
8  reconcile work with incapacitation. They seemed to
9  be mutually exclusive to me.
10      When one cannot function to do the
11  day-to-day activities of living, they cannot work,
12  and telework requires conversations on the phone, it
13  requires participation in meetings over the phone,
14  it requires short turnaround responses over the
15  computer. In the case of our folks that do business
16  management work, they have to have a computer, which
17  she indicated in one e-mail that it was kind of hit
18  and miss on whether her computer worked right or her
19  internet connection worked or whatever. But you
20  have to have a computer with certain capabilities to
21  in order handle the financial procurement desktop
22  software, core accounting system software, which is

Page 39

1  all internet-based, acquisition performance
2  management system software, be able to access those
3  systems as well as do e-mail and to communicate with
4  your coworkers. And when you don't have a
5  functioning computer, at least haven't done the
6  things that you need to do to indicate that you have
7  that equipment and the software loaded and so on,
8  and there's -- a commandant instruction requires a
9  home safety checklist that the employee has to
10  complete and certify, we can't go in the home and do
11  a safety inspection, but, you know, had those things
12  been done and had we been able to work through the
13  incapacitation issue, certainly we would have
14  considered it, but we never got to that point.
15  Q.   So could Ms. Doak's position have been
16  performed through telework?
17      A.   It could. Okay. It could have been
18  performed through telework if she had a computer
19  that works, worked reliably, had the software loaded
20  and she was able to sit there and function and do
21  the work; and a telephone and talk on the phone and
22  participate in meetings and so on.

Page 40

1  BY MS. TRAVANTY:
2      Q.   So could she have teleworked full-time?
3      A.   The current union agreement, which wasn't
4  in effect at the time, but the current union
5  agreement only allows three days of telework -- I
6  don't know if it's a week or a pay period, it may be
7  a week, so today we'd have that limitation. At the
8  time, the most we had anybody working or doing
9  telework I believe was one day a pay period, which
10  is once every two weeks, and we had a couple at the
11  time that were actually teleworking.
12      Q.   I guess at the time was there any sort of
13  limitation?
14      A.   Not really, that I'm aware of, that I
15  recall.
16      Q.   Earlier you testified that you felt that
17  Ms. Doak couldn't telework because of the doctor's
18  indication that she was incapacitated?
19      A.   Yes.
20      Q.   Did you understand that to mean she would
21  be incapacitated all day, or what did you understand
22  incapacitated to mean?

Page 41

1      A.   Based on the information I had at the
2  time and some of it was based on conversations we'd
3  had looking at the timekeeping records, there were
4  days she didn't come to work at all, there were
5  days she came in at 2:00 or 2:30, there were days
6  she was in by 11:00, there were days she was in by
7  9:00, although the earlier those times were, the
8  fewer they were, it was my understanding most of
9  those were related to self-medication and which led
10  to or contributed to the incapacitation.
11      She had said many times, or at least a
12  few to me that really stuck in my mind was: I'm
13  getting ready to leave for work, I feel the onset of
14  a migraine, I take medication, I lay down; that's
15  incapacitation.
16      Q.   So did you feel that that would happen
17  throughout the day and that would interfere with her
18  job duties?
19      A.   Yes. I no indication that it wouldn't
20  happen. The attendance had been -- you know,
21  absences as I indicated in my statement were,
22  roughly, 50 percent of the time from June or July of

11 (Pages 38 to 41)

RORY SOUTHER - 4/15/2013

Page 42

1  2009 through this period, and it improved very
2  slightly after she got the notice of proposed
3  removal in August of 2010 but didn't improve that
4  much.  And we were trying for 9:00, trying to get to
5  work.  Had we been able to continue and progress and
6  solve some regularity with the 9:00 time, got
7  regularity in the medical appointments such that we
8  could go perhaps to a regular day off schedule where
9  she could have that day and take care of those
10  things and work the other days, the next progression
11  probably would have been to try telework.  But the
12  first thing we would have had to have for telework
13  is a demonstrated ability to do so, and that's the
14  computer connection, the reliable computer
15  connection, the software loaded and so on, and even
16  a trial, Hey, look, I can do it, and that never
17  happened.  We never got the request, we never got
18  the safety checklist, none of that stuff.
19      Q.    Did anyone ever inform Ms. Doak of these
20  things that you are aware of?
21      A.    Mr. Cohen mentioned the telework
22  agreement to her and it's all included as part of

Page 43

1  that.  In the early August 2009 e-mail when she
2  discussed the training, he mentioned, you know:
3  Hey, well, try to complete it, if not -- or maybe it
4  was early September, but at one of those times the
5  need for a telework agreement was indicated, I mean
6  in writing.  I don't know if he has ever had that
7  discussion separately verbally, you'd have to ask
8  him, but I know I saw it in some of the e-mail
9  traffic related to completion of DCF106, cost
10  estimating course.
11      Q.    So if you felt that Ms. Doak could not
12  telework because she was so incapacitated, why was
13  it you felt she would be able to work a 9:00 a.m.
14  schedule?
15      A.    Because she said she could make it to
16  work.
17      Q.    And did she make it to work at 9:00 a.m.?
18      A.    She did for a few days and then had
19  difficulties subsequent to that.  I don't have the
20  timekeeping records in front of me.
21      Q.    Did anyone discuss a later start time
22  after she was unable to meet the 9:00 a.m.?

Page 44

1      A.    Not that I'm aware of.  There was no
2  discussions to a change that I know of and to the
3  change in the start time or telework until we got
4  the response to the proposed removal on
5  September 1st.  And I was out somewhat in August, I
6  was on leave for about a week or so because my wife
7  had some medical issues that were on our minds at
8  that point in time.
9      Q.    Were you aware of any requests by
10  Ms. Doak to work optional weekend hours?
11      A.    I'm trying to think of where I first saw
12  that.  That I believe was also in the response to
13  the proposed removal.  As the SOP indicates, though,
14  we're closed on the weekends.
15      Q.    So no employees are permitted to work on
16  the weekends?
17      A.    Employees can come in and do things if
18  they want to do them on their own time, but they are
19  not compensated for it, other than perhaps at
20  particular times of the year.  The contracting
21  officers toward the end of the fiscal year in
22  September will sometimes work overtime evenings and

Page 45

1  weekends to get contracting actions done before the
2  funds expire on 30 September, but that's pretty much
3  it.  The rest of us don't need to be there.
4      Q.    So under the SOP, Ms. Doak would not have
5  been able to make up any hours that she missed?
6      A.    No.  Sop says we don't work weekend
7  hours.  We work in a building and in an area where,
8  at least in 2008, perhaps later, but I know I talked
9  to people in 2008 that told me they were there late
10  because sometimes the Admirals stay late and they
11  couldn't get a cab to come down and get them, I
12  don't want necessarily want anybody that works for
13  me down there late at night or on the weekends in
14  that environment and it's not something I would
15  champion.
16            It's an industrial area, other than
17  security force there aren't a lot of people there,
18  there aren't a lot of people between -- I mean, now
19  that there is a baseball stadium there, you get a
20  few more people on that side of South Capitol
21  Street, and on baseball game nights you see baseball
22  people around so there's a little more traffic, but

12 (Pages 42 to 45)

RORY SOUTHER - 4/15/2013

Page 46

1  that wasn't necessarily prevalent, although I don't
2  think the ball people had found the area of the
3  building was a good place to park for ball games at
4  that point in time, and it's just not a good place
5  to be. I don't like being down there late at night.
6          MS. TRAVANTY: Let's go off the record.
7          (Recess 11:49 a.m. to 11:55 a.m.)
8  BY MS. TRAVANTY:
9      Q.  Mr. Souther, I just have a couple more
10 questions regarding the meetings we were discussing.
11         So we were discussing the July 23rd
12 meeting in which you indicated that Ms. Doak agreed
13 to a 9:00 a.m. start time?
14     A.  Uh-huh.
15     Q.  Did Ms. Doak indicate to you that it had
16 taken her a while to adjust to a 9:30 start time?
17     A.  She may have.
18     Q.  Do you recall?
19     A.  I don't specifically recall, but she may
20 have. She was typically encouraging in how hard she
21 was working to try to make earlier start times and
22 that wouldn't have been unlikely.

Page 47

1      Q.  During the meeting did Ms. Doak indicate
2  that she would try to adjust to a 9:00 a.m.
3  schedule?
4      A.  She said she had achieved 9:00 that day
5  and she was on new medications that weren't fighting
6  as much as the old ones, but she was concerned she
7  would have issues with these fighting.
8          And I said: Do you think you can make
9  9:00 on a regular basis? And she indicated she
10 would try and we agreed to 9:00.
11         And I turned to Greg and said: Okay,
12 let's make 9:00 the time and do whatever you have to
13 do to make it happen.
14     Q.  Was it your understanding that there may
15 be an adjustment period or it would have taken her
16 some time to get to the 9:00 a.m. start time?
17     A.  Maybe for a day or two. I don't know
18 what day the 23rd was, was it Thursday or Friday, I
19 think it was late in the week, but it may have been
20 a Thursday, that she might have -- you know, between
21 the next day and the weekend might have had some
22 issues, but the next week was a new week and it was

Page 48

1  how I felt at the time. I felt positive that we had
2  a time that was -- certainly, again, like I said
3  earlier, more agreeable to her than it was to Greg,
4  but it would meet her needs and give her the
5  incentive and the encouragement she needed to get
6  there at 9:00 and achievable. But the key was
7  achievable for her, and also key is being present
8  and being able to do the work, but, you know, 9:00
9  was fine with her and we were -- I felt we had a
10 win-win situation.
11     Q.  Had you previously asked Ms. Doak or told
12 her that she could come in at 9:30?
13     A.  I don't recall that at all.
14     Q.  You don't recall showing Ms. Doak the SOP
15 and discussing a 9:30 start time at any point?
16     A.  I don't know. I may have. If I did, I
17 said I would take it up with Greg and discuss it
18 with him what we needed to do, but I generally rely
19 on the policy. Whatever the policy says is what we
20 try to go with because that gives consistency
21 throughout the work group, which my group is
22 relatively small compared to the entire directorate.

Page 49

1      Q.  So essentially whatever you would have
2  discussed with Ms. Doak regarding her start time was
3  subject to Mr. Cohen's agreement?
4      A.  Collaboration.
5      Q.  So you wouldn't have given her a later
6  start time that Mr. Cohen didn't approve?
7      A.  If I gave her a later start time, I would
8  have told him that's the start time. When we met on
9  the 23rd and she said she could make it to work at
10 9:00, I turned to him and said: 9:00 is her start
11 time.
12         He wanted her there at 8:00 because she
13 was the only person in his entire organization of 23
14 or 25 people at the time that started after 8:00;
15 everybody else was there at 8:00. So if he came in
16 and wanted to have a meeting with his group earlier
17 in the day 8:00 as they all got in because of some
18 funds usage issue which occurred quite often,
19 unfortunately still do, not with the frequency we
20 had in those days, but you get everybody together
21 and you say: Hey, here's the deal, here's what's
22 going on, you know, you don't use government funds

13 (Pages 46 to 49)

RORY SOUTHER - 4/15/2013

Page 50

1 to buy -- this is just an example -- but you don't
2 use government funds to buy refreshments for a
3 meeting, for example. If we had an instance where
4 that occurred, we would call everybody together and
5 say: Don't process a funding document if you see
6 this in a statement of work, you know, light
7 refreshments in a statement of work.
8       If he had such a meeting, he had to then
9 remember to go back when she came to work and make
10 sure she got the word, and if that was at 9:00 or
11 that was 11:00 or that was 2:30 or it was the next
12 day or two days later, whenever that occurred, he
13 had to close that loop to make sure everybody had
14 the same information or ensure the team lead had the
15 information so they could pass it on which involved
16 somebody taking notes and making sure they could
17 share it.
18       But not impossible or insurmountable;
19 certainly inconvenient for the day-to-day operations
20 of what we're doing, which is why we kind of wanted
21 to have everybody there at the same time, but we
22 understood her situation and attempted to

Page 51

1 accommodate the later start time.
2     Q.   Did you refuse to look at Ms. Doak's
3 medical documentation during the July 23rd meeting?
4     A.   I may have.
5     Q.   Why would that be?
6     A.   Like I explained earlier, she had it
7 marked with the privacy act stuff, I had not seen
8 anything in any detail previously that was so marked
9 and I may have indicated to her that she needed to
10 share that with the medical review officers as they
11 were the ones who had been consistently reviewing
12 the documentation and providing assessments.
13     Q.   I thought earlier you testified that an
14 employee should submit the medical documentation to
15 their supervisors when they were requesting
16 reasonable accommodation?
17     A.   Uh-huh. And she was also very private
18 and hadn't done anything up to that point. I was
19 concerned with how she felt about her privacy and at
20 that point in time didn't feel it necessary to read
21 the thing in detail. She had pointed to the 9:30
22 start time and we had discussed that and resolved

Page 52

1 it. I didn't need to know anything else because
2 that was the only thing we were discussing at the
3 time, just general her medications and health and
4 desire to come to work and working hard to get
5 there, but the gist of it was the 9:30. I saw the
6 9:30, I saw the MRO's assessment and we agreed with
7 9:00. I didn't really need to know anything else
8 because we had already provided the other
9 accommodations several months previously and it was
10 my belief at the time, had we not provided anything
11 that was desired or recommended that she would have
12 made it known and we had no knowledge of any other
13 accommodations at the time.
14     Q.   So you didn't had you looked at the
15 medical documentation you might have learned of
16 other requests?
17         MS. LO:   Objection.
18         THE WITNESS:   We were there to discuss
19 the start time. She showed me the portion that had
20 the start time in it.
21 BY MS. TRAVANTY:
22     Q.   You weren't there just as a discussion of

Page 53

1 Ms. Doak's performance?
2     A.   I don't recall that.
3     Q.   So you understood the meeting to be
4 solely about her start time?
5     A.   My concern was her start time, yes,
6 getting to work. If you consider not being able to
7 come to work your regular time on a regular basis to
8 be a performance issue, then it was a performance
9 discussion. My concern was the start time and how
10 we could resolve that and move on and try to get her
11 to work and try to get some work from her and more
12 involvement in the project and such.
13     Q.   What did you tell Ms. Doak when she tried
14 to give you the medical documentation?
15     A.   I don't specifically recall saying
16 anything other than if you haven't given it to the
17 MRO, you need to give it to the MRO, they're the
18 people who have been the recipient of this stuff up
19 to this point. If things had been done a certain
20 way over a period of time and it was based on I
21 thought her desire to do it that way. She didn't
22 give the stuff to Greg, she gave it to the MRO, The

14 (Pages 50 to 53)

RORY SOUTHER - 4/15/2013

Page 54

1  MRO lent her an assessment. I don't want to break
2  that chain at that point. We were at a point where
3  I thought we were going to see a turnaround. Her
4  participation in the leave transfer program by her
5  own request to participate in it ended on 30 June.
6  We were now into July. It was my hope and my belief
7  that we were going to start turning the corner and
8  that the notice of proposed removal perhaps wouldn't
9  be necessary in August. And yes, we were working on
10 it at the time. We had discussed it and were
11 considering it, but I was hoping we wouldn't have to
12 do that.
13     **Q.    So was the July 23rd meeting sort of your**
14 **last effort prior to issuing the notice of proposed**
15 **removal?**
16     A.    Direct effort it may have been. It
17 certainly wasn't my last concern.
18     **Q.    When would you say you started**
19 **considering proposing her removal?**
20         MS. LO: I would object to that. Go
21 ahead.
22         THE WITNESS: Greg had discussed it with

Page 55

1  me when, you know, we -- basically the return to
2  work order end of January, February, the inability
3  to get any specific medical documentation, and then
4  when it was received, it said, you know, change the
5  lighting and whatnot, but there was no clarity in
6  terms of this is specific cause and effect in terms
7  of why she can't get to work, you know, based on the
8  medical documentation, he provided the
9  accommodations we were aware of, or that one in May,
10 and that would help remedy the situation is what we
11 knew at the time.
12 BY MS. TRAVANTY:
13     **Q.    So your answer to when -- when is what?**
14     A.    Well, over time, you know, we were
15 continuing working trying to see progress in coming
16 back to work, so again, we knew the accommodations
17 that we provided in May and then when we discussed
18 telework or --
19     **Q.    When did you first discuss with Mr. Cohen**
20 **proposing Ms. Doak's removal?**
21     A.    Well, when we got to the probably end of
22 May and were issuing -- you know, hadn't resolved

Page 56

1  the original letter of reprimand, the original,
2  again, because of the stuff I was just going
3  through, the original letter of reprimand was in
4  abeyance and there was another one issued I believe
5  the 23rd of May; it was toward the end of May. And
6  at the time we issued that, we talked about, okay,
7  what happens next? What if this doesn't turn
8  around, where do we go, and removal is always a
9  possibility.
10     **Q.    So the end of May you discussed possibly**
11 **removing her and then in July you had the meeting in**
12 **which you thought things might turn around if she**
13 **could come in at 9:00?**
14     A.    Uh-huh.
15     **Q.    And then her removal was proposed on**
16 **August 9th?**
17     A.    Right.
18     **Q.    Did you feel that from July 23rd to**
19 **August 9th was a sufficient amount of time for her**
20 **to adjust to a 9:00 a.m. schedule?**
21     A.    She said at the time she was able to make
22 it.

Page 57

1      **Q.    She specifically stated that she would be**
2  **able to come in at 9:00 a.m. the next day or what?**
3      A.    She said she made it in at 9:00 that day
4  and thought she could regularly make it in at 9:00
5  every day. She said she may have some issues with
6  her medications over the next few days, but
7  otherwise was certain she could make it at 9:00.
8  She felt really good that day and could make it in.
9      **Q.    I thought you indicated earlier that you**
10 **thought there would be an adjustment period for her**
11 **to come in at 9:00?**
12     A.    When she talked about the medicines
13 fighting each other, that implied to me an
14 adjustment period, but I felt comfortable that that
15 adjustment period was very short, and at the time I
16 was thinking that it would be, you know, what was
17 left of that week and over the weekend and we're
18 good to go was my sense of the situation.
19     **Q.    I see. So you felt like maybe a week she**
20 **should be at a 9:00 a.m. start time?**
21     A.    I don't think it was a week. It was a
22 couple of days.

15 (Pages 54 to 57)

Page 58

1    Q.   A couple of days then?
2    A.   Yeah.
3    Q.   So by the time -- by August 9th when I'm
4  guessing she did not come in at 9:00 a.m.?
5    A.   There were issues in there that you would
6  have to go to the notice of proposed removal to get
7  the specifics out of, but I believe it involved not
8  coming in some days at all, indicating that her
9  medical appointments would be on Mondays and then
10  the appointments on Tuesdays and then there's no
11  note saying that she was at the doctor, you know,
12  and it was that sort of thing. We never got to that
13  routine that was certainly my expectation that we
14  might get in terms of when appointments would occur,
15  when attendance would improve, and so just the same
16  old pattern seemed to continue by that point.
17    Q.   So you felt from July 23rd to August 9th
18  significant improvement wasn't shown?
19    A.   Yeah. It didn't look to me like
20  significant improvement was shown, if I look back on
21  it now.
22    Q.   And you didn't believe that with more

Page 59

1  time Ms. Doak would have been able to come in at
2  9:00 a.m.
3    A.   This attendance issue had begun for
4  purposes of the action which we didn't take, but the
5  action in June or July 2009. Information I had
6  indicated her attendance issues were problems almost
7  from the day we hired her in late 2007. So
8  attendance issues are attendance issues and I had to
9  look at the totality of that, as well, when I was
10  thinking through the thing. You know, it went on
11  for a long time and Greg pretty much after the FMLA
12  was used in January, February, 2010, should have
13  been clear, you need to come to work regularly.
14  Anybody in any job knows you need to come to work
15  regularly and strive to get there, and based on the
16  conversation we had on the 23rd I thought we were
17  there and over the next two or three weeks I guess
18  we didn't get there.
19        MS. TRAVANTY: I have no further
20  questions.
21        EXAMINATION BY COUNSEL FOR THE DEFENDANT
22  BY MS. LO:

Page 60

1    Q.   I just have a few questions. You were
2  testifying earlier about core work hours, and where
3  is that information found?
4    A.   It's in acquisition directorate standard
5  operating procedure number one. I believe it's
6  number one.
7    Q.   Would the hours that are listed in there
8  control as the core hours?
9    A.   Yes.
10    Q.   What was your recollection of what the
11  core hours were?
12    A.   They were either 9:00 or 9:30 start, and
13  end around 11:00 and then start again I think at
14  1:00 or 1:30 and then go till 3:00 or 3:30 in the
15  afternoon. Those are the ones that really stick out
16  in my mind. So it could have been 9:00.
17    Q.   Do you recall when the start time was?
18    A.   For the flex schedule?
19    Q.   No. For the core hours.
20    A.   Oh, pretty much everybody is expected to
21  be there between 6:00 in the morning and 6:00 at
22  night.

Page 61

1    Q.   And what are listed as the core hours; do
2  you recall?
3    A.   Okay. For in terms of flexible bands,
4  it's 9:00 or 9:30 to 11:00 or 11:30, and I'm unclear
5  on that, I believe we have provided the document,
6  and after the lunch period it starts at maybe 1:00
7  and goes till 3:00 or 3:30. I don't use that myself
8  so I don't look at it very often and it's been quite
9  a while since I have looked at it.
10    Q.   Counsel was asking you questions about
11  the July 2010 meeting and the August 9th notice of
12  proposed removal. Had there been other notices
13  issued to Ms. Doak about performance or disciplinary
14  notices prior to that time?
15    A.   Well, there was the -- I'll say 22
16  February, but it was late February letter of
17  reprimand was issued related AWOL. That's when they
18  requested an abeyance agreement and the opportunity
19  to provide medical documentation which led to the 16
20  April memo from the doctor that was provided the
21  MRO. Over time when that wasn't considered or at
22  least the assessment wasn't considered sufficient to

16  (Pages 58 to 61)

RORY SOUTHER - 4/15/2013

Page 62

1   justify the absences, is when the second, and
2   actually the first, because the other letter of
3   reprimand was never issued, so the first letter of
4   reprimand was issued in late May, that of course
5   then preceded the 9 August notice of proposed
6   removal which preceded the 1 September response and
7   then the decision on 30 September.
8       **Q.   And to your knowledge, did Mr. Cohen**
9   **consult with any other offices?**
10      A.   He consulted with human resources, they I
11  think consulted with the legal office, MRO, other
12  people.
13      **Q.   Why were there multiple notices sent?**
14      A.   Again, the first one was issued certainly
15  one to get Ms. Doak's attention that the absences,
16  you know, we need to get the absence under control
17  or if there is leave, it needs to be justified with
18  a doctor's note on the appointment and so on. So
19  from February toward the end of May when it really
20  didn't change, the pattern of absences didn't
21  change, then we issued the letter of reprimand, and
22  then when it didn't change really from then until

Page 63

1   August, then the proposed removal was issued.
2       **Q.   Did you make a decision on the proposed**
3   **removal?**
4       A.   I made a decision which I delivered on
5   the 3rd of September 2010.
6       **Q.   And what was that decision?**
7       A.   That decision was removal.
8       **Q.   And what happened? Was Ms. Doak removed**
9   **from the Coast Guard?**
10      A.   She was not removed from federal service.
11  She asked to retire, which we entered a settlement
12  agreement which was signed on the 7th of October in
13  which the government gave several considerations:
14  One was six days of administrative leave through the
15  end of that pay period, that was basically admin
16  leave, you know, paid not coming to work, the letter
17  of reprimand was removed from her official record, I
18  believe the documentation related to the dismissal
19  was removed from the record, she was allowed to
20  retire on the 31st of October of 2010 which of
21  course gave her a month's more service for
22  retirement benefits than she would have had --

Page 64

1   actually she wouldn't have had any benefits if the
2   dismissal had occurred.
3       **Q.   So what happened with that?**
4       A.   We were in agreement, gave her time to
5   come in and pick up her personal belongings and
6   leave, Mr. Cohen supervised that with the union
7   present. I went down November 1st to make sure the
8   letter of reprimand was removed from her official
9   personnel file of the Coast Guard, talked to the
10  staff there, and then she called me four days later
11  late in the afternoon on Thursday, the 4th of
12  November and said she wanted to revoke the
13  settlement, to which I was shocked that someone
14  would want to forego retirement benefits to have a
15  letter of reprimand and a dismissal put into their
16  record and go through that, but -- and those
17  actions, to my knowledge, never occurred.
18      **Q.   What do you mean those actions to your**
19  **knowledge?**
20      A.   To my knowledge, she's drawing a
21  retirement check and the letter of reprimand is not
22  in her record and the record of dismissal is not in

Page 65

1   her record. It's as though the government met its
2   obligations under the settlement agreement, and as
3   far as I know it's done, I took no action to reverse
4   any of those things.
5       **Q.   So you did not go back and institute the**
6   **dismissal?**
7       A.   No.
8       **Q.   Why not?**
9       A.   Well, when I talked to the legal folks,
10  they said that the settlement agreement was valid,
11  the government met its obligations, it couldn't be
12  revoked. So to my knowledge it was in effect.
13      **Q.   What did you say to Ms. Doak when she**
14  **told you she was going to rescind the settlement**
15  **agreement?**
16      A.   I asked her what she wanted to do. I
17  asked her if she would rather be fired or dismissed,
18  I'm not sure what word I used, and have the
19  information -- and you know, all of the information
20  done and forego her retirement benefits if -- you
21  know, to cancel the settlement agreement, and she
22  said: Yes, that's what I want.

17 (Pages 62 to 65)

RORY SOUTHER - 4/15/2013

Page 66

1    And my response, I know what we're
2 leading to is, I said: Well, this will be fun.
3 Because I had no idea how we could take a letter of
4 reprimand that had been destroyed and recreate it
5 and how we would turn off retirement benefits once
6 they are turned on. I know it takes some time to
7 turn them on, but all the paper and everything. The
8 paper to start it is bad enough, the paper to stop
9 it after it's been started has got to be horrendous
10 and I can't imagine what all that work was. And at
11 the time we were under the belief that my wife may
12 be suffering from ovarian cancer, she had an ovary
13 removed on the 3rd of December, and after this
14 ordeal with her removal and what I was led to
15 believe by at least her union rep that it may put
16 her in dire financial straits and she might lose her
17 home, that I had potential to throw someone on the
18 street that would be destitute was a very troubling
19 and trying decision to make, one I didn't want to
20 make, one I hope I'm never in a position to make
21 again and I was generally concerned for her
22 well-being and what would happen.

Page 67

1    And I apologize for how you took the
2 statement. It's a statement I've used for well over
3 30 years from my days in submarines when we were
4 told that you're not doing it right if you're not
5 having fun, so every time we got underway on the
6 boat when we thought we were going to be in port
7 we'd look at each other and say "Are we having fun
8 yet?" I mentioned to an individual at the bus stop
9 today that the normally 40-minute bus ride took an
10 hour and a half the other day to get from my
11 neighborhood to the Pentagon and he said: I'll bet
12 that was fun.
13    MS. TRAVANTY: Generally it's in question
14 and answer unless Ms. Lo has additional questions.
15    THE WITNESS: I'm sorry. Sorry to make
16 you cry, but there was no -- no --
17    MS. LO: No. That's all right. You may
18 answer it, finish what you were saying.
19    THE WITNESS: There was no harm intended.
20 It was just that, you know, I thought I was going to
21 get my life back to some sense of normalcy and when
22 that bomb was dropped on me to try to undo all this

Page 68

1 stuff that we were so careful to do properly, and
2 the nights I laid awake and I talked and irritated
3 my wife, but I just didn't want to do this, I didn't
4 want to make that decision.
5 BY MS. LO:
6    Q.   Mr. Souther, so in the end did you have
7 to make the decision; was there a removal that took
8 place?
9    A.   There was not a removal, no.
10    MS. LO: I don't have any further
11 questions.
12    We will read and sign.
13    (Deposition was concluded at 12:20 p.m.)
14
15
16
17
18
19
20
21
22

Page 69

1    CERTIFICATE OF NOTARY PUBLIC
2    I, Karen Geddes, Court Reporter and Notary
3 Public in and for the District of Columbia, before
4 whom the foregoing deposition was taken, do hereby
5 certify that the witness whose testimony appears in
6 the foregoing deposition was duly sworn by me; that
7 the testimony of said witness was taken by me in
8 shorthand at the time and place mentioned in the
9 caption hereof and thereafter transcribed by me; that
10 said deposition is a true record of the testimony
11 given by said witness; that I am neither counsel for,
12 related to, or employed by any of the parties to the
13 action in which this deposition was taken; and
14 further, that I am not a relative or employee of any
15 counsel or attorney employed by the parties hereto,
16 financially or otherwise interested in the outcome of
17 this action.
18    Certified to by me on this 29th day
19 of April, 2013.
20    _____
21    Karen Geddes, CSR
       Notary Public in and for the
       District of Columbia
22 My commission expires:
    April 30, 2017

18 (Pages 66 to 69)

## *Merrill LAD*
### *21 Church Street, Suite 150, Rockville, MD 20850*
### (800) 735-6005 FAX (866) 225-4066
### E-MAIL: Rebekah.Febus@merrillcorp.com
### ERRATA SHEET

#### 05/01/2013

IN RE: EDNA DOAK v. JANET NAPOLITANO, SECRETARY, U.S. DHS
DEPOSITION DATE: 04/15/2013
DEPONENT/AFFIANT: RORY SOUTHER
REPORTER: Karen Geddes
RETURN BY: 06/12/2013
JOB NO.: 232372

| PAGE NUMBER | LINE | CORRECTION AND REASON |
|---|---|---|
| 6 | 2 | CHANGE "DIRECTING" TO "DIRECTORATE" / CORRECT OFFICE TITLE |
| 29 | 14 | CHANGE "DIRECTOR" TO "DIRECTORATE" / CORRECT OFFICE TITLE |
| 32 | 11 | ADD "HE" TO "SO HE SAID" / GRAMMAR & COMPLETENESS |
| 38 | 20 | DELETE "TO" / GRAMMAR |
| 38 | 21 | ADD "IT" AFTER "IN ORDER" / GRAMMAR |
| 41 | 4 | CHANGE "TALL" TO "ALL" / ACCURACY |
| 41 | 19 | ADD "HAD" TO "I HAD NO INVOLVED" / ADD ACCURACY |
| 43 | 1 | CHANGE "2009" TO "2010" / CLARIFY YEAR REFERRED TO |
| 43 | 9 | CHANGE "DEF" TO "BCF" / ACCURACY |
| 44 | 2 | CHANGE "DISCUSSIONS" TO "DISCUSSION" / GRAMMAR |
| 63 | 5 | CHANGE "3RD" TO "30TH" / ACCURACY |
| | | |
| | | |
| | | |
| | | |
| | | |

5/16/13.
(DATE)                                    (SIGNATURE)

DEPOSITION OF RORY SOUTHER
CONDUCTED ON 04/15/2013

\* \* \*

## ACKNOWLEDGMENT OF DEPONENT

I, _Rory Lee Souther_ , do hereby acknowledge that
I have read and examined the foregoing testimony, and
the same is a true, correct, and complete
transcription of the testimony given by me, and any
corrections appear on the attached errata sheet signed
by me.

_5/16/13_
(Date)

(Signature)

Job No.: 232372

*Merrill LAD*
*21 Church Street, Suite 150, Rockville, MD 20850*
(800) 735-6005 FAX (866) 225-4066

# EXHIBIT 1

# Office of Acquisition Resource Management

## CG-9283



Chief of Acquisition Resource Management
CG-928
00065695-SUPV
Rory Souther GS-15

Business Management & Metrics
0001 4996-SUPV
CG-9283
Gregory Cohen GS-15

Mgmt Program Analyst Fin
00088561
Angela Kennedy-Johnson GS-14

Mgmt Program Analyst Fin
VACANT GS-13

Mgmt Program Analyst
00037432
Edna Denk GS-13

Mgmt Program Analyst Fin
0001 4997
Jacqueline Sutton GS-13

Mgmt Program Analyst
00055643
Marya Kirwin GS-13

Mgmt Program Analyst Fin
00088533X
Tracy Tenvalde GS-12

Mgmt Program Analyst Fin
00082022
Neena Spearman GS-12

Mgmt Program Analyst
00039731
Cheryl Milton GS-13

Mgmt Program Analyst Fin
00007714
LT Michael Hennessy

Mgmt Program Analyst Fin
00088460
LT Ronald Killipmph

Mgmt Program Analyst Fin
00075696
LCDR Kathryn Perry

Mgmt Program Analyst
00055543
LCDR Luce Seamon

Mgmt Program Analyst Fin
00060484
Judy Hadley GS-9-13

Mgmt Program Analyst Fin
000666661
Valerie Warner GS-14

Mgmt Program Analyst Fin
000888662
George Bixler GS-14

Mgmt Program Analyst Fin
000888665
Timothy Pierpoint GS-14

Mgmt Program Analyst Fin
000888664
Michael Leathe GS-14

Mgmt Program Analyst Fin
000886623
Yvonne Heffner GS-13

Mgmt Program Analyst Fin
000888663
William Timmons GS-13

Mgmt Program Analyst
00015046
Michele Chapman GS 13

Mgmt Program Analyst Fin
00086536
Annette Berg GS-12

Mgmt Program Analyst Fin
00053044
VACANT

Mgmt Program Analyst Fin
000680036
GS-9-13

Mgmt Program Analyst Fin
00005140
Kim Hebron CC-9-13

Mgmt Program Analyst Fin
001105456
VACANT GS-9-13

USCG286

93

# EXHIBIT 4

Office of Civilian Human Resources (CG-121) - Family Medical Leave Act          Page 1 of 3



**U.S. Department of**
**Homeland Security**

**United States**
**Coast Guard**



**Office of Civilian**
**Human Resources  CG-121**

## Leave - Family Medical Leave Act

Under the Family and Medical Leave Act of 1993 (FMLA), most Federal employees are entitled to a total of up to 12 workweeks of unpaid leave during any 12-month period for the following purposes:

- the birth of a son or daughter of the employee and the care of such son or daughter;
- the placement of a son or daughter with the employee for adoption or foster care;
- the care of spouse, son, daughter, or parent of the employee who has a serious health condition; or
- a serious health condition of the employee that makes the employee unable to perform the essential functions of his or her position.

Under certain conditions, an employee may use the 12 weeks of FMLA leave intermittently. An employee may elect to substitute annual leave and/or sick leave, consistent with current laws and OPM's regulations for using annual and sick leave, for any unpaid leave under the FMLA. FMLA leave is in addition to other paid time off available to an employee.

Under the National Defense Authorization Act (FY 2008), an eligible employee who is the spouse, son, daughter, parent, or next of kin of a covered service member who suffers a serious injury or illness on active military duty is entitled to 26 workweeks of leave during a single 12-month period to care for the service member. This includes the 12 weeks of regular FMLA leave and is not in addition to it. The FY 2010 Defense Department Appropriations Act extended caregiver leave to cover care for a veteran for up to five years after the veteran leaves military service. Although these provisions are in effect, OPM regulations are pending.

### Definitions

- Family member is defined only to include parent, spouse, son and daughter.
- A parent may be a biological parent, or an individual who stood (or stands) in loco parentis to the employee when the employee is a son or daughter. This term does not include parents-in-law.
- An individual may be in loco parentis when he/she has day-to-day responsibility for the care or financial support of a child, or who did when the employee was a child. A biological or legal relationship is not necessary to establish this relationship.

00380

Exhibit G-8

- A serious health condition under the FMLA has been defined as an illness, injury, impairment, or physical or mental condition that involves either inpatient care or continuing treatment by a health care provider.
- A spouse is defined as an individual who is a husband or wife according to a legal union between one man and one woman, including common-law marriage. A domestic partner is not included as a spouse.
- The definition of "serious illness or injury" as it pertains to military caregiver leave was changed by the FY 2010 Defense Authorization Act of October 2009. The previous definition was an injury or illness incurred by an active duty Armed Forces servicemember in the line of duty that may render the servicemember medically unfit to perform the duties of his/her office, grade, rank or rating. Now the definition includes a condition that may have been incurred in the line of duty or may have existed before the military service but was aggravated by that service. The condition need not have manifested itself during military service but, instead, could appear or develop after the end of military service.

### Eligibility

- To be eligible for FMLA leave, an employee must have worked as a civil servant for 12 months.
- Time served outside the civil service (such as at the Postal Service) and time spent as an intermittent employee does not count toward the requisite 12 months.
- Federal holidays during the period when an employee uses FMLA leave will not count toward the entitlement.
- A part-time employee is entitled to prorated FMLA leave. A federal temporary employee must have an appointment with a time limitation beyond one year and meet other employee eligibility requirements in order to receive FMLA leave.

### Intermittent Leave

- FMLA leave may be taken intermittently due to a "serious health condition," if it is medically necessary.
- Intermittent FMLA leave related to new child purposes is permissible, if the employee and the agency agree to it.

### Notice

- An employee must invoke the FMLA when requesting leave.
- A statement of unspecified illness, without accompanying medical documentation, is not sufficient notice.
- When FMLA is based on an expected birth, placement of a child, or planned medical treatment, an employee must give a 30 calendar day advance notice for FMLA leave.
- If the need for leave is not foreseeable, such as a medical emergency or due to the unexpected availability of a child for adoption or foster care, and the employee cannot provide 30 calendar days notice of the need for leave, the employee must provide notice within a reasonable period of time appropriate to the circumstances involved.
- If the need for leave is foreseeable, and the employee fails to give 30 calendar days notice with no reasonable excuse for the delay of notification, the agency may delay

00381

the taking of leave until at least 30 calendar days after the date that the employee provides notice of the need for FMLA leave.
- An employee may not retroactively invoke entitlement to FMLA leave. However, if an employee and his/her personal representative are physically or mentally incapable of invoking the employee's entitlement to FMLA leave during the entire period in which the employee is absent from work, the employee may retroactively invoke entitlement to FMLA leave within two workdays after returning to work.

**Medical Certification**

- The FMLA provides that medical certification will be sufficient if it satisfies the statutory minimal requirements under 5 USC 6383 (b).
- All medical records are subject to the confidentiality provisions of the Privacy Act. The Department of Labor Medical Certification Forms (see reference below), specifically designed for the FMLA, prompts agencies to request the appropriate medical information as specified in 5 CFR 630.1207.
- If the agency requests medical certification, an employee must provide the written medical certification required, signed by the health care provider, no later than 15 calendar days after the date of request.
- If it is not practical to provide medical certification within 15 calendar days after the date requested by the agency, despite the employee's diligent, good-faith efforts, the employee will have up to 30 calendar days to have medical certification submitted.
- If an agency doubts the validity of medical records, it can require a second and third (and final) opinion at the agency's expense.

**Job Benefits and Protection**

- Upon return from FMLA leave, an employee must be returned to the same position or to an "equivalent position with equivalent benefits, pay, status, and other terms and conditions of employment."
- An employee who takes FMLA leave is entitled to maintain health benefits coverage. An employee on unpaid FMLA leave may pay the employee share of the premiums on a current basis or pay upon return to work.

00382

# EXHIBIT 6

## Sundland, Joseph CDR

| | |
|---|---|
| **From:** | Cohen, Gregory |
| **Sent:** | Wednesday, January 05, 2011 9:23 AM |
| **To:** | Sundland, Joseph CDR; Kennedy-Johnson, Angela |
| **Cc:** | Souther, Rory |
| **Subject:** | RE: Statement - removal from RDO program |

Ms. Doak never formally submitted a training request for FPD training. Ms. Doak reached an agreement with me, her team lead, Hr representative and Union representative to attend FPD training. Ms. Doak never followed up nor did she complete any of the items she agreed to in our 2009 meeting when we agreed to transfer her to cutter boats.

-----Original Message-----
From: Sundland, Joseph CDR
Sent: Wednesday, January 05, 2011 9:08 AM
To: Kennedy-Johnson, Angela
Cc: Cohen, Gregory
Subject: RE: Statement - removal from RDO program

It was in late December, and thank you.

Mr. Cohen
Would you be able to provide a statement on Ms. Doak's FPD training - why it was disapproved or if she never requested it, thanks.

Sent from my GoodLink synchronized handheld (www.good.com)

-----Original Message-----
From: Kennedy-Johnson, Angela
Sent: Wednesday, January 05, 2011 08:57 AM Eastern Standard Time
To:    Sundland, Joseph CDR
Cc:    Cohen, Gregory
Subject:    RE: Statement - removal from RDO program

I agree with the statement below, but can't validate the month Ms. Doak was removed from the RDO schedule.

Angela Kennedy-Johnson
Office of Acquisition Resource Management (CG-9283) Lead Business Manager Surface Programs (CG-932) 2100 2nd Street SW, Stop 7701
Work: 202-475-3791
angela.d.kennedy-johnson@uscg.mil

-----Original Message-----
From: Cohen, Gregory
Sent: Tuesday, January 04, 2011 4:13 PM
To: Sundland, Joseph CDR
Cc: Kennedy-Johnson, Angela
Subject: RE: Statement - removal from RDO program

Ms. Doak meet with me and her team lead (Angela Kennedy-Johnson) around January 2010 (I think). We discussed the fact that she was absent for FMLA for long periods of time (August

1                    ENCLOSURE (15)

2009 through January 2010) and unable to work a complete 9-hour day let alone a full 8-hour day. We discussed that she was burning through her leave balances very quickly and that she need to monitor her leave balances. I also recommended and she agreed to go back to an 8-hour work-day until she was better and fully able to work a complete 8-hours a day without interruption. In the future, when she was able to show that she could work 8-hour days we would all meet again and place her back on the 9-hour RDO schedule.

Ms. Doak never objected to this arrangement.

Angela - please correct anything if I have it wrong.


-----Original Message-----
From: Sundland, Joseph CDR
Sent: Tuesday, January 04, 2011 3:28 PM
To: Cohen, Gregory
Subject: Statement - removal from RDO program

Mr. Cohen
Sir I just left you a voicemail requesting a statement from you on your decision to remove Ms. Doak from the RDO program. If you can provide this to me by COB 5 January, that would be great, thanks.
V/r,
CDR Sundland

Sent from my GoodLink synchronized handheld (www.good.com)

2

# EXHIBIT 7

**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: CG-921
Phone: (202) 475-3173
Fax: (202) 475-3900

JUL 1 1 2007

### ACQUISITION DIRECTORATE (CG-9)
### STANDARD OPERATING PROCEDURE #1
### ALTERNATE WORK SCHEDULES AND CREDIT HOUR PROGRAM

1. **PURPOSE**. To establish policies and procedures for Alternate Work Schedules including the Compressed Work Schedule, Gliding Flexible Work Schedule and Credit Hour Program for all CG-9 Directorate members. These Alternate Work Schedules are management tools, not employee entitlements. Employment terms, conditions and official duty station do not change for employees/members electing to participate in the programs described in this Standard Operating Procedure (SOP).

2. **APPLICABILITY**. All CG-9 Directorate personnel. Members working on a Compressed Work Schedule are prohibited from also participating in a Gliding Flexible Work Schedule and Credit Hour Program.

3. **DIRECTIVES AFFECTED**. Compressed Work Schedules for Coast Guard Members, COMDTINST M5330.9 remains in effect. This SOP authorizes a Gliding Flexible Work Schedule option and Credit Hour Program under the authority of 5 U.S.C. 6120-6126 in addition to the Compressed Work Schedule.

4. **OVERVIEW**. Implementing alternative work schedules offers the Coast Guard additional flexibilities for recruiting and retaining a high quality and diverse workforce. This program reflects our support of these goals. Employees/members can participate in a single program, but multiple programs cannot be used at the same time for a single individual.

5. **DEFINITIONS.**

   a. Alternate Work Schedule (AWS) – refers to the Compressed and Flexible Work Schedules.

   b. Basic Work Requirements – for a full-time civilian employee, 80 hours of work in a bi-weekly pay period; for a part-time civilian employee, fewer than 80 hours of work in a bi-weekly pay period. For a military member 80 hours of work in a consecutive 2 week period.

   c. Compressed Work Schedule (CWS) – an employee's/member's basic work requirement, scheduled by the agency for less than 10 workdays. Coast Guard authorizes a 5-4/9 schedule where employees and members work eight 9-hour days, one 8-hour day, and have one regular day off (RDO).

   d. Core Hours – designated periods of the day where employees/members must be present for work or in a leave status.

   e. Credit Hours – allows full and part-time employees/members to elect credit for work beyond their basic work schedule. The law limits the number of bi-weekly carry over credit hours to 24

Case 1:12-cv-01177-RC   Document 14-7   Filed 08/27/13   Page 3 of 8

hours for full-time employees.  For part-time employees the number of carry over hours is pro-rated.

f.  Designated Working Hours – normally the hours between 0600 and 1800 Monday through Friday.  The CG-9 Directorate is closed on weekends and government holidays.

g.  Flexible Work Schedule (FWS) Program – allows employees to schedule their work requirements within the bi-weekly pay period based on locally designated core and flexible hours.

h.  Gliding Work Schedule (GWS) Program – under the FWS authorization employees/ members can select daily start and stop and mid-day break times within locally designated flexible hours.

i.  Telecommuting Program – a broad management tool which offers employees a voluntary opportunity to work at an alternative site such as the employee's home, a satellite facility, or a mobile office at least one day every two weeks.  Telecommuting is distinct from occasional work at-home days for special or short-term projects.  Reference Commandant Instruction 12630.1 for additional guidance.

j.  Traditional Work Hours – an authorized schedule, which consists of ten 8-hour workdays in bi-weekly pay periods, Monday through Friday.  The offices are closed on weekends and government holidays.

## 6.  RESPONSIBILITIES.

a.  Supervisors/managers:

   (1)  Ensure compliance with this SOP.

   (2)  Ensure that civilian employee's time and attendance are certified.

   (3)  Ensure copies of this SOP are available to all personnel, to include new employees/ members during in-processing.

   (4)  Ensure employees/members meet their AWS or telecommuting program procedures.

   (5)  Ensure the work unit is fully functional every day of the traditional workweek and exercise discretion in approving tours of duty so that the needs of the organization are met.

   (6)  If CG-9 determines any AWS/telecommuting program is adversely affecting mission performance, the program(s) will be modified or terminated immediately, consistent with 5 U.S. Code, Chapter 71 and any other negotiated agreements.

b.  Employees/members:

   (1)  Comply with provisions of this SOP and all applicable references.

   (2)  Request approval from supervisors/managers to participate in the AWS program.

2

**103**

   (3) Prepare written agreement for work schedule with supervisor/manager approval; provide a
       copy to the timekeeper.

   (4) Seek approval of all changes to the work schedule from the supervisor/manager prior to
       implementing.

   (5) Discuss with supervisor/manager how work responsibilities will be met and processed
       while telecommuting and prepare a written agreement to enter the program.

7. **PROGRAM OVERVIEW.** The Coast Guard currently has the Compressed Work Schedule
   (CWS) and Telecommuting Program available as management tools. In addition, the Coast Guard
   offers the Gliding Flexible Work Schedule (FWS), and Credit Hour Program.

   a.  Compressed Work Schedule (CWS). Compressed work schedule is a management tool, which
       offers eligible employees/members a voluntary opportunity to work a non-traditional work
       schedule. CWS cannot be used in conjunction with FWS programs.

       (1) Employees/members have the option to participate in this program, or continue with the
           traditional 8-hour per day, 5-day per week pay period work schedule. Participation in
           CWS and the requested work schedule are subject to supervisory approval. Supervisors
           retain the right to limit participation in CWS when the mission needs so dictate. The
           CWS program is a 5-4/9 planned workweek that includes eight 9-hour days, one 8-hour
           day and one regular day off (RDO) in the biweekly pay period. Work must be performed
           between the hours of 0600-1800, with all CG-9 employees/members present during the
           core hours of 0930-1030 and 1330-1430, Monday through Friday. Employees/members
           uncompensated 30 minute lunch period should be taken between the hours of 1030 and
           1330 daily. Employees/ members may not elect a lunch period to coincide with a late
           arrival or early departure (i.e.; if the normal departure time is 1700 hours a departure of
           1630 is not authorized in lieu of taking a lunch break). Employees/members may change
           the CWS schedule at any time with the supervisor's approval. Changes are effective at
           the beginning of the next pay period after the agreed change. Members may participate in
           the CWS along with telecommuting subject to their supervisor's approval.

       (2) Leave accrual under CWS will remain the same as accrual under the traditional
           workweek. Leave usage for CWS employees will be charged to the appropriate leave
           category. In the case of a civilian employee scheduled to work a 9-hour day, one day of
           sick or annual leave would be charged as 9 hours leave. When the employee is scheduled
           to work the 8-hour day, one day of sick or annual leave would be charged as 8-hours.
           When an employee takes an entire week of leave and if the week contains the RDO, leave
           would be charged as 36-hours of sick or annual leave. When the employee takes an entire
           week of leave and if the week contains four 9-hour days and one 8-hour day, leave would
           be charged as 44 hours of sick or annual leave.

       (3) If a holiday falls on a scheduled RDO in the first week of the pay-period, the work day
           immediately following the holiday would be designated as the "in lieu of" holiday for that
           pay-period. If the holiday falls on a scheduled RDO in the second week of the pay-period
           the "in lieu of" holiday will fall back to the last work day prior to the RDO.

3

**104**

b.  Gliding Flexible Work Schedule Program Requirements. Allows employees/members working a FWS to make daily changes in start and stop times within flexible time bands. Members may use the midday flexible time band to extend their workday to accommodate personal needs such as appointments or other short-term errands. During core hour periods, members are expected to be present at work or using approved leave. Employees/members must provide their supervisor with their intended work schedule for the pay period or two-week work period. Once approved by the supervisor, the employee/member must provide the work schedule to the timekeeper for payroll purposes. Employee/members will be required to sign-in and sign-out daily when they report to work, when they use flexible time during the course of the day and when they depart in the evening. (See Enclosure 1). Members may participate in the FWS along with telecommuting subject to their supervisor's approval. The Gliding Flexible Work Schedule Program cannot be used with the CWS.

   (1)  Supervisory Responsibilities: Supervisors must implement the following procedures:

      (a)  Ensure employees/members and timekeepers are trained in the requirements and procedures before implementing the program. Sample training materials are available through the Command Staff Advisor (CSA) and also in the "What's New Section" of the civilian personnel web page http://www.uscg.mil/hq/cgpc/cpm/news/newinf.htm.

      (b)  Maintain business hour coverage Monday-Friday from 0700 to1600 hours. CG-9 does not have scheduled weekend and holiday hours.

      (c)  Direct changes in the work schedule to meet the management and operational needs of the work unit regardless of the cause e.g., workload, leave schedules, emergencies, etc. Schedule changes will not be changed arbitrarily and in most cases employees/members should be given at least a week advance notice when time permits.

   (2)  Employee/Member Responsibilities: Employees/members must use the following procedures:

      (a)  Complete an 8-hour workday plus a minimum 30-minute unpaid lunch period if working a fulltime work schedule (Monday-Friday). The lunch period cannot occur at the beginning or ending of the workday.

      (b)  If working less than a full-time work schedule (e.g., part-time, intermittent) must take a 30 minute unpaid lunch if scheduled to work more than 6 hours in a workday.

      (c)  Plan and coordinate a two-week work schedule. Ensure supervisor/manager approval in advance.

4

**105**

    (d)   Use sign-in and sign-out sheets to record start and stop times and credit hours earned.

    (e)   Ensure supervisor approval prior to deviations from the typical arrival and departure times and/or mid-day breaks.

(3)   Flexible Time Bands and Core Hours-Applicable Monday through Friday of the workweek:

    (a)   Morning Flexible Time Band: 0600-0930 hours.

    (b)   Core Hour 0930-1030 hours.

    (c)   Mid-Day Flexible Time Band: 1030-1330 hours (at least a 30 minute uncompensated lunch period must be taken within this time band).

    (d)   Core Hour 1330-1430 hours.

    (e)   Afternoon Flexible Time Band: 1430-1800 hours.

    (f)   Flexible Time Bands are not applicable Saturday, Sunday or holidays.

c.   Credit Hour Program Requirements: Allows employees/members to elect credit for work performed beyond their basic 8-hour per day work schedule. A Credit Hour Program is not authorized for members participating in a CWS.

(1)   Carryover:

    (a)   By law, the number of credit hours carried over in a bi-weekly period is limited to 24 hours for full time employees.

    (b)   The number of credit hours earned by a part-time employee is prorated (no more than ¼ of the hours earned for carryover from one bi-weekly pay period to the subsequent pay period). For example, a part-time employee whose work schedule is 64 hours per bi-weekly pay period can carry over no more than 16 credit hours to the next pay period.

(2)   Credit Hour-Earning and Use:

    (a)   Supervisors must agree there is a legitimate work-related reason to earn credit hours.

    (b)   Credit hours must be earned and used in 15-minute increments.

    (c)   Credit hours may be earned and used in the same pay period.

5

   (d)   Employee must request in writing the use of carried over hours.

   (e)   Supervisors must approve the employee's/member's request to use credit hours following the same procedures as an annual leave request.

   (f)   Employees/members must use any accumulated credit hours before a request to work a CWS or request to move out of a FWS will be effected.

   (g)   Credit hours are not earned for training or travel.

(3) Other:

   (a)   Credit hours differ from overtime hours in that they are not officially ordered and approved in advance by management. However, prior to earning credit hours the supervisor must agree there is a legitimate business reason for the employee/member to work the credit hours.

   (b)   Credit hours also differ from compensatory hours or "comp time." Since compensatory time is considered time off in lieu of overtime pay, "comp time" hours must be officially ordered and approved in advance by management. The number of compensatory hours earned is limited to 160 hours.

   (c)   Credit hours differ from overtime and comp time, in that employees/members will not be paid for unused credit hours.

8. **LABOR-MANAGEMENT CONSIDERATIONS**. The development, establishment, termination, or modification of the Gliding Flexible Work Schedule and Credit Hour Program for bargaining unit civilian members is subject to the requirements of 5 U.S.C., Chapter 71, and any existing negotiated agreements, and requires union negotiations, where applicable.

M.F. TANGOKA
Deputy Chief Acquisition Officer (CAO)
Director of Acquisition Services

Encl (1):  Flexible Work Schedule Sign In/Out Sheet

6

**107**

Flexible Work Schedule

Sign-in and Sign-out Sheet

**Pay Period Dates:**_____

Employee Name:_____

### Week One:

| | Time in | Time Out | Time in | Time Out | |
|---|---|---|---|---|---|
| Monday | | | | | |
| Tuesday | | | | | |
| Wednesday | | | | | |
| Thursday | | | | | |
| Friday | | | | | |

### Week Two:

| | Time in | Time Out | Time in | Time Out | |
|---|---|---|---|---|---|
| Monday | | | | | |
| Tuesday | | | | | |
| Wednesday | | | | | |
| Thursday | | | | | |
| Friday | | | | | |

_____
Supervisor's Approval

7

# EXHIBIT 8

# U.S. COAST GUARD
## PERFORMANCE PLAN AND EVALUATION

**PURPOSE:** To document job expectations and assess performance. Ratings may impact a variety of personnel actions concerning promotions, rewards, pay and retention.

## Part I. IDENTIFYING INFORMATION

| Employee Name | Social Security Number | Appraisal Period | |
|---|---|---|---|
| | | From | To |
| EDNA DOAK | | 04/01/09 | 03/31/10 |

| Title, Series, and Grade | Organization Unit and Location |
|---|---|
| Program Analyst | CG-9283 |
| GS-343-13 | USCG HQ, Washington, DC |

## Part II. PERFORMANCE PLAN

**Instructions to Supervisor (Rating Official):** Develop and discuss performance plan with employee. Identify a minimum of 4 applicable Core Competencies by checking the boxes provided in Part IIa. Forward the completed Performance Plan to the second level supervisor (approving official) for approval and provide employee with a copy of the Plan. Maintain original to document progress reviews and final ratings. A Work Plan, Part IIb, is optional, but may be included to clarify performance standards and/or identify tasks and projects to be completed during the rating cycle.

| Rating Official Signature | Date |
|---|---|
| Greg Cohen CG-9283 | 4-30-09 |
| Approving Official Signature | Date |
| Rory Souther CG-928 | 5/5/09 |
| Employee Signature (Certifies that Performance Plan has been discussed) | Date of Discussion |
| | 4-30-09 |

## Part III. PROGRESS REVIEWS

**Instructions to Supervisor (Rating Official):** A minimum of two progress reviews is required during the full-year rating cycle; one review is required if the appraisal period is 91-180 days. The purpose of these reviews is to provide two-way communication with employee concerning his/her performance measured against the standards provided in selected Core Competencies, and to review the performance plan and indicate changes if required.

## Part IV. EMPLOYEE INPUT FOR PERFORMANCE RATING (OPTIONAL)

Employees may use the space provided to list their accomplishments during the rating cycle as input to their final rating.

## Part V. RATING (CHECK TYPE OF RATING)   ☐ Annual Rating   ☑ Interim Rating

Narrative in Part V.

☐ **Exceeds** — Not more than one core competency rated Meets and none rated Fails to Meet

☒ **Meets** — Two or more core competencies rated Meets and none rated Fails to Meet.

☐ **Fails to Meet** — One core competency rated as Fails to Meet results in a final rating of Fails to Meet.

| Rating Official Signature | Date |
|---|---|
| | 4-26-10 |
| Approving Official Signature | Date |
| | 4/30/10 |
| Employee Signature (I have reviewed the completed document and it has been discussed with me. This does not necessarily mean that I agree with the information in it or that I forfeit any rights of review.) | Date of Discussion |
| (Employee comments to be provided asap) (Due to illness) | 5/14/10 |

CG-3430.8 (Rev. 06-04)
Previous Edition Obsolete

USCG185

110

 

# PERFORMANCE PLAN AND EVALUATION

## Part IIa. CORE COMPETENCIES

| CORE COMPETENCIES | PERFORMANCE STANDARDS |
|---|---|
| 1. Check applicable core competencies.<br>2. Minimum of four core competencies is required.<br>3. At end of rating cycle, check applicable rating as measured against the performance standard. | Performance Standards are defined at the "Meets" level. |
| **Mandatory - All Employees/Supervisors**<br>[X] Applied Job Knowledge and Skills<br><br>Rating<br>[ ] Exceeds<br>[X] Meets<br>[ ] Fails to Meet | • Maintains knowledge in current procedures, policies, and/or practices.<br>• Demonstrates quality, thoroughness and accountability in work activities.<br>• Uses sound judgement and rationale in making decisions or problem solving.<br>• Communicates effectively to accomplish work assignments. |
| **Mandatory - All GS and WG Supervisors**<br>[ ] Supervisory Leadership<br><br>Rating<br>[ ] Exceeds<br>[ ] Meets<br>[ ] Fails to Meet | • Creates a positive work environment by encouraging mutual respect, communication, innovation learning and supporting EEO and diversity. Manages conflict constructively.<br>• Supports organizational goals by effectively planning, evaluating, and continuously improving services and products.<br>• Effectively administers performance management responsibilities including timely completion of performance plans and ratings, provision of meaningful feedback and coaching, and taking appropriate steps to deal with performance and conduct issues.<br>• Effectively uses a variety of rewards and recognition (monetary, honorary, and creative recognition) throughout the year.<br>• Supports employee development by providing appropriate guidance, coaching and feedback. Assigns work and/or optimize employees' skills and abilities, and promotes opportunities for career growth.<br>• Maintains appropriate balance between concerns for people and concerns for mission. |
| **Optional - Employees/Supervisors**<br>[X] Teamwork<br><br>Rating<br>[ ] Exceeds<br>[X] Meets<br>[ ] Fails to Meet | A. Team Leader (includes GS and WG Team Leaders)<br>• Skillfully organizes and facilitates teams to accomplish mutual goals.<br>• Creates an environment of open communication, mutual respect, innovation and shared vision.<br>• Effectively coordinates work and/or projects, keeping team members informed and focused on organizational goals.<br>• Actively involves team members in decisions and problem solving.<br>• Effectively communicates information on performance, work status, changes, issues and results.<br><br>B. Team Player<br>• Uses effective interpersonal skills in working with others.<br>• Interacts with others to collectively resolve problems, accomplish mutual goals, and fosters an atmosphere of trust.<br>• Shares information and ideas to improve quality of services and products. |

- 2 -

USCG186

111

# PERFORMANCE PLAN AND EVALUATION

| Part IIa. CORE COMPETENCIES (CONTINUED) |  |
|---|---|

| CORE COMPETENCIES | PERFORMANCE STANDARDS |
|---|---|
| Optional - Employees/Supervisors<br><br>[X] **Customer Service**<br><br>Rating<br><br>[ ] Exceeds<br>[X] Meets<br>[ ] Falls to Meet | • Asks questions to clarify customer requirements.<br>• Takes a variety of actions to meet customers' needs as required until needs are met.<br>• Responds to customers with an appropriate level of urgency.<br>• Builds confidence in customers that their needs are given the highest priority.<br>• Uses feedback to assess customer satisfaction and improve products and services. |
| Optional - Employees/Supervisors<br><br>[X] **Communication**<br><br>Rating<br><br>[ ] Exceeds<br>[X] Meets<br>[ ] Falls to Meet | • Communicates constructively and effectively with others.<br>• Keeps supervisor (and others, if relevant) informed of work status and related issues.<br>• Provides information and suggestions in a timely and effective manner. |
| Optional - Employees/Supervisors<br><br>[X] **Quality of Work**<br><br>Rating<br><br>[ ] Exceeds<br>[X] Meets<br>[ ] Falls to Meet | • Delivers quality products and services.<br>• Work is accurate, thorough, and complete.<br>• Continuously improves products and services. |
| Optional - Employees/Supervisors<br><br>[X] **Timeliness and Quantity of Work**<br><br>Rating<br><br>[ ] Exceeds<br>[X] Meets<br>[ ] Falls to Meet | • Plans and organizes work to ensure timeliness and productivity goals are met.<br>• Successfully adapts to changing priorities or customer requirements. |
| Optional - Employees/Supervisors<br><br>[ ] **Safety**<br><br>Rating<br><br>[ ] Exceeds<br>[ ] Meets<br>[ ] Falls to Meet | • Understands, supports and adheres to applicable work place safety requirements.<br>• Reports safety violations promptly and appropriately. |
| Optional - Employees/Supervisors<br><br>[X] **Funds Management**<br><br>Rating<br><br>[ ] Exceeds<br>[X] Meets<br>[ ] Falls to Meet | • Manages financial resources effectively to support program or policy implementation.<br>• Assures organizational long and short term resource planning reflects changing needs and priorities. |

- 3 -

USCG187

112

# PERFORMANCE PLAN AND EVALUATION

**Part IIb. WORKPLAN (Optional)**

Rating Official - Optional Form which can be used to clarify performance standards and/or identify tasks or projects to be completed during the rating cycle.

CG-92 Goal: Meets: With supervisor, develop individual development plan for satisfying required acquisition training and track course completion progress to achieve and maintain designated acquisition certification level.
Exceeds: All required training courses completed on schedule. Completed Acquisition/Continuous Learning courses reported in ACMIS, as applicable, with an information copy to CG-9211 (Charles Harper).

EXCEEDS LEVEL:

APMS: Develops Project and/or Program specific financial and EVM web-based reports for use in their daily work and by their PM. Deploys web-based reports to their personal portal pages.

Execution: Negative commitments, Obligations, PE or 4-digit PE balances in CAS must be reported to the FINCEN for resolution and tracked. Resolve all negative accounting line balances for all project PE's.

Obligation planning sheets for all active appropriations and out-year funding streams are continually updated and accurate. Active appropriations must be at the execution level and CIP appropriations must be at the useful segment level. Out year appropriations must be at the approved funding level.

Data mine the accounting systems for all assigned Program Elements to de-obligate excess funds. Capture and report de-obligated values at end of each quarter to CG-9283.

Cost Estimating: Work with CG-9283 Cost Estimating team to keep the project's (Project Initiation, CT&D and CD&D Phases) LCCE and Independent LCCE accurate in regards to schedule and major changes that would impact the cost estimate.

Ensure all PES unresolved transactions are cleared within 14-days or reported to CG-9283.

Ensure all PES errors are resolved within 30-days of being reported to FINCEN or reported to CG-9283.

Ensure all PES reports completed - no partial PES reports in System over 14-days or reported to CG-9283.

Provide timely and accurate business/financial related input to Questions and Answers, Questions for the Record, Budget Background Documents, and other program oversight, as well as required financial information for asset capitalization.
- Team Leads Ensure consistency of responses across the Surface, Air, and C4I Domains through coordination of responses among the Domain BM peer group.

Ensure the system of internal controls for funds management is consistently followed and provide recommendations for internal controls improvements. Ensure all UDO's and Pipeline Certifications are completed on time. Ensure the KO and PM are identified in the UDO certification process in the OOVA system.

Team Leads Only EARS
Exceed: Submit progress reviews of all employees no later than 15 July, 15 November, and 15 March of the performance period.
All EARS Exceed: Submit progress reviews for your EARS no later than 15 days before the end of each performance period.

-4-

USCG188

113

# PERFORMANCE PLAN AND EVALUATION

## Part III. PROGRESS REVIEWS

Two progress reviews and discussions are required during the full-year rating cycle; one review is required if the appraisal period is 91-180 days. the purpose of these reviews is to foster 2-way communication between supervisors and employees in discussing performance expectations and results.

| First Discussion Rating Official Signature | Employee Signature | Date of Discussion |
|---|---|---|
| | Edna M Cook | 8/28/09 |

Rating Official, key points made, if desired.

Must focus on timeliness of tasks and work.

Must master automated information systems such as FPD, CAS, APMS, WEBTA, eRP. Edna has been provided sufficient training and time to use the systems to be able to master these systems.

Behind on Acquisition Certifications. Edna has been in the acquisition directorate long enough to have attained level I certification and should be working on level II certification at this time.

Focus on better communication efforts with team leads.

Employee comments, if desired.

- H-60 and H-65 FY11 eRPs submitted one day early; timely responded to reasonable deadlines for FTA requests, budget calls, QPR/MPRs.
- Worked with H-60/H-65 PMs to prepare Obligation Plans based on working spend plans to ensure all data captured/standardized into CG-928 format. Kept PMs informed; worked through delays in receipt of PM data to ensure last minute changes included and deadline met.
- Recommendation to change name for "Cost Category" in Obligation Plan was adopted.
- Fostered atmosphere of trust by frequent contact with PMs on data calls; providing high quality work.
- Received H-65 PM feedback: "very thorough with development of mid-year review" (contributed to H-65 Project and Program Managers receiving accolades from CG-9 for 24 April Mid Year Review).
- Acted for Air Lead BFM week 4-8 May 2009 and received "good job". Also supported C-130 and UAS PMs that week.
- Notified/updated Air Lead BFM and supervisor by phone of all leave for absences.
- After personal confrontation at 15 April group meeting, continued to apprise Air Lead BFM of work assignments; maintained professionalism in all communications, continuing to reassignment to IDS Small Boats 3 August.
- Level I certification stymied by twice cancelled BCF102 by FAI. On wait list for BCF102/106; enrolled ACQ201A for Level II.
- Alerted supervisor BFMs have differing levels of access to FPD, leading to review/determination of accesses needed. Also noted internal control issue when Lead BFM both creates/approves FTAs. (FPD Basic User access to be upgraded)
- After interim rating period received initial FPD Training 14 July and APMS refresher 8 August; completed ISS 30 June.

-5-

USCG189

## PERFORMANCE PLAN AND EVALUATION

| Part III. PROGRESS REVIEWS (Continued) | | |
|---|---|---|
| Second Discussion<br>Rating Official Signature | Employee Signature | Date of Discussion<br>/2-/8-09 |

Rating Official, key points made, if desired.

Edna has been sick this evaluation period and has been participating in the FMLA program.

Due to the nature of this job, daily meetings with project managers and staff and required interaction with the project team and other surface business managers Edna will be behind her contemporaries due to absences this period.

Must complete Level I certification this period.

Transitioned to SRP project this period, currently being assisted by other BM's during absences.

Must stay current in required annual training. Missed Appropriation Law training due to illness.

Employee comments, if desired.

Employee did not provide any comments and has not signed.

- 6 -

## PERFORMANCE PLAN AND EVALUATION

**Part IV. EMPLOYEE INPUT FOR FINAL RATING (Optional)**
Accomplishments: Comments are optional, should be completed before final rating, and limited to this space.

*Employee did not provide any input.*

*MK LL*
*5-12-10*

**Part V. FINAL RATING**
Rating Official - Comments are required regardless of rating and limited to this space. The comments need not discuss all applicable core competencies, but should highlight actual outcomes and results achieved.

Edna's performance this rating cycle is good. Assignments are completed, but often requires assistance from team lead and/or peers to meet tight deadlines.

Edna is currently enrolled in BCF 106 and is on track to submit her Level I BCEFM Certification package May 2010.

APMS used to review required reports such as OOVA and the Prior Year Recovery List. Negative commitments, Obligations, are tracked and reported to the FINCEN for early resolution.

Resolved all negative accounting line balances for all project PE's.

Accounts are reconciled and available funds recaptured and reissued for project requirements.

Accurate input to questions and answers to all project business/financial related input to questions and answers are consistent and accurate with assistance from team lead and/or peers.

Obligation planning sheets are not current for all appropriations and out-year funding streams require update and should be accurate at all times. Active appropriations must be at the execution level and CIP appropriations must be at the useful segment level. Out year appropriations must be at the approved funding level.

-7-

USCG191

116

 

## Nomination Form for a Performance-Related Award
### (Quality Step Increase or Performance Award)

*Note: Attach this nomination ON TOP OF the rating of record upon which the nomination is based.*

**Justification.** The award must be justified based on the attached performance evaluation. The quality step increase (QSI) recognizes sustained, high quality performance which significantly enhances mission accomplishment. The performance award recognizes high levels of performance.

**Eligibility.**

- An employee may receive a QSI or a performance award for the same rated performance, but not both.

- Quality Step Increase. The QSI may be granted only to GS/GM employees who meet the following conditions:

  - Currently at Step 9 or lower
  - Rating of record is "Exceeds."
  - Have not received a QSI within the preceding 52 weeks.

- Performance Award. To be eligible, the employee must have been rated either "Exceeds" or "Meets" for the appraisal period.

## Part I. Identifying Information

Employee Name _____

Nominated for (Choose One Only):
Quality Step Increase _____

Performance Award _____ Amount _____

## Part II. Approvals

Nominated by _____
                        (Name, Title, Signature & Date)

Note: Nominations may be made by the employee's immediate supervisor or a higher-level official, as determined by local procedures set by the Performance Incentive Pay Official.

Reviewed and __ Endorsed __ Not Endorsed by _____
                                             (Name, Title, Signature & Date)

Note: This review may be made by the employee's second-level supervisor or a higher-level official, as determined by local procedures set by the performance Incentive pay Official.

__ Approved __ Not Approved by _____
                                        (Name, Title, Signature & Date)

Note: All quality step increases and performance awards require approval of the Performance Incentive Pay Official or his or her designee.

- 8 -

USCG192

117

U.S. DEPARTMENT OF HOMELAND SECURITY
U.S. COAST GUARD

## PERFORMANCE APPRAISAL FORM

This form shall be used for appropriated fund civilian employees in the General Schedule (GS/GM) and Wage Grade (WG) pay systems covered by the Excellence, Achievement, and Recognition System (EARS).

### INSTRUCTIONS TO RATING OFFICIAL

1. Beginning of the Appraisal Rating period.

   a. Develop and discuss performance plan with the employee. In Part IIa, identify a minimum of four Core Competencies (CC's) applicable to the employee, including any that are Mandatory, by checking the appropriate boxes.

   b. Clarify standards or specific tasks in Part IIb. (Optional).

   c. Sign the performance appraisal form as the rating official and obtain the approving official's and employee's signature in the designated boxes in Part II.

   d. Provide a copy of the performance appraisal to the employee and retain the original for your records.

   e. In order to protect the privacy of the employee, keep the performance appraisal form in a secure place.

2. Progress Reviews.

   a. EARS requires two documented progress reviews to discuss performance to date and changes in the Performance Plan. Part III of the form must be used to document completion of the progress reviews. Changes to the Performance Plan should be documented and, comments, if any, may be stated in the space indicated for rating official and employee in Part III.

3. The End of the Appraisal Rating Period.

   a. Provide the employee an opportunity to comment on accomplishments for final rating in Part IV.

   b. In Part IIa, check the appropriate rating (Exceeds, Meets or Fails to Meet) as measured against the performance standard for each applicable Core Competency.

   c. Summarize outcomes and results achieved by the employee in part V and check box indicating final rating (Exceeds, Meets or Fails to Meet) based on these criteria:

   Exceeds - No more than one CC is rated as "Meets" and no CC is rated "Fails to Meet." This is superior, truly noteworthy performance, accomplished with little supervision. Performance at this level adds an unusual degree of value to the organization and significantly contributes to mission accomplishment.

   Meets - Two or more CC's are rated "Meets" and none is rated "Fails to Meet." This is good, sound performance, accomplished with normal supervision. "Meets" encompasses the broad range of performance including at the upper end performance of high organizational value and commendable mission accomplishment.

   Fails to Meet - One or more CC's is rated "Fails to Meet." The performance fails to meet the performance standard's criteria. Requires unusually close supervision or correct work substantially.

   d. Approving official's concurrence must be obtained prior to discussing the rating of record with the employee.

   e. Sign the performance appraisal form as the rating official and forward to the approving official for signature in the designated boxes in Part V.

   f. When rating is completed and approved, supervisor discusses rating with the employee and the employee signs. Original appraisal forms are maintained by the Civilian personnel Management Division. Copy of appraisal is provided to employee.

- 9 -

# EXHIBIT 9

**U.S. Department of
Homeland Security**

**United States
Coast Guard**



Commandant
United States Coast Guard

2100 Second Street, S.W., Stop 7111
Washington, DC 20593-0001
Staff Symbol: CG-928
Phone: (202) 475-3009
Email : gregory.k.cohen@uscg.mil

12630
19 January 2010

# MEMORANDUM

From:   Greg Cohen
         CG-9283

Reply to   CG-9283
Attn of:   Greg Cohen

To:     Ms. Edna Doak
         Management Analyst, GS-0343-13

Subj:   EMPLOYMENT STATUS

1.  Your continued irregular attendance requires that I request you immediately return to a full
time duty status. Regretfully, this office is unable to accommodate your continued absences and
tardiness due to the disruption of the work routine and the negative impact to your assigned
project. While I understand and am sympathetic to your personal circumstances, your presence is
essential to resource office operations.

2.  As discussed during your second interim performance review, your continued absence is
having a negative impact on the work for your project. Your job requires daily interaction with
the project staff, contracting, and resource staffs. Your unplanned absences do not allow us to
provide timely support to the IDS Small Boats Project. You have been unable to complete
required certifications and mandatory training; which is also affecting your performance.

3.  You have also been given specific guidance on requesting leave under the Family and
Medical Leave Act (FMLA) from Coast Guard Civilian Personnel and me. You submitted
medical documentation in August 2009 to support your leave request under FMLA. As of 19 Jan
2010, you have used 440.30 hours (approximately 11.5 weeks) of FMLA, and only have 19.30
hours (approximately 2.5 days) remaining. You currently have negative 233 hours of sick leave
and negative 35.15 hours of annual leave. Under these circumstances, advance sick and annual
leave can no longer be afforded to you. You will need to request leave without pay (LWOP)
under FMLA for the remainder of your entitlement to leave under FMLA. You will be required
to submit LWOP for my approval along with supporting documentation for any future absences
after completion of your entitlement to leave under FMLA.

4.  I have repeatedly given you guidance and discussed with you the requirements concerning
requesting leave appropriately. However, your excessive absences and continued failure to
submit appropriate requests for leave in advance cannot continue to be excused and may result in
disciplinary action being taken against you. Therefore, I remind you of the leave requesting
procedures: Leave should be requested, in advance, not more than 2 hours after the time in
which you are scheduled to report for duty or before leaving work during normal duty hours.
You should call me directly and leave a message to request leave if I am not available. Leave
must be requested and approved by submitting an OPM Form 71 (Request for approved leave or
absence) or in WEBTA.

5.  If you suffer from a medical condition that requires an accommodation to assist you in
performing the essential duties of your position, please let me know so that we can follow the
proper procedures for assessing the need for reasonable accommodations in the workplace. For
assistance and to receive more information on your FMLA (Family and Medical Leave Act)

Exhibit

GOVERNMENT
EXHIBIT
Doak   6
4/9/13     DT

00272

Subj: EMPLOYMENT S  TUS

12630
19 January 2010

entitlement and the Voluntary Leave Transfer Program (VLTP), you may contact Mr. Robert Gitschier at (202) 475-5346. However, I need to know your current status as it relates to your ability to maintain regular attendance at work or I will be forced to make decisions regarding your employability based upon the information I have on hand.

6. I am also concerned about your health and well-being, and I would encourage you to utilize the Employee Assistance Program (EAP). It is the policy of the U.S. Coast Guard to offer counseling to employees who may be experiencing personal problems that may be affecting their work performance, attendance, or work-related conduct. I encourage you to seek an EAP counselor if you believe that the Employee Assistance Program (EAP) can be of assistance, at 1-800-222-0364, or I will be happy to schedule an appointment for you at your request. The EAP is a confidential, free, and voluntary program.

7. If you have any questions concerning the content of this letter, I will be glad to meet with you and/or respond to your concerns or you may wish to contact Starlisha King, Human Resources Specialist, on (202) 475-5288, for assistance.

#

Copy:   CG-1214
        CG-921

Please sign the receipt acknowledgement below as evidence that you have received this letter. Your signature does not mean that you agree with the contents of the letter; nor by signing are you forfeiting any of your rights.

_____      _____
Signature                            Date

2

Enclosure (1) to COMDTINST M12750.4

DISCUSSION DOCUMENTATION SHEET

Name of Employee  Edna Doak          Date of Discussion  1/27/10

DESCRIBE THE INCIDENT. (Briefly describe what the employee did or
did not do that was wrong; where did it occur; how did it violate
regulations, standards, etc., and when did the incident happen and who
was involved, to include witnesses.) Employee AWOL 1/26, 1/26, 1/27, did not provide
any advanced notice of time-off. called 1/25 and 1/26 approximately
3 hours after workday started saying "just woke up", 1/27 did not call at
all.

DESCRIBE THE ACCEPTABLE STANDARDS OF CONDUCT OR PERFORMANCE.
(Attach any written guidance given to the employee.)
show up at work on time at 0815 everyday. lunch 1215 to 1245.
End work at 1645.

DESCRIBE THE EMPLOYEE'S EXPLANATION FOR THE INCIDENT. (To include  Edna says she fell
any mitigating or aggravating factors.) down, she will provide report from front
desk. Also late from migraine, Ms. Doak believes she still has some
remaining, I saw her Thursday after her fall and she
never said anything to me. Employee states she wants to be
DESCRIBE YOUR RESPONSE TO THE EMPLOYEE.              left alone.
we will audit → FMLA. → ask WEBTA - ask HR AWOL to FMLA,
must show up for work on time -
must submit requests for using leave beforehand or within 2 hours.
must provide appointment slips.          _AKH_
                                         SUPERVISOR'S SIGNATURE

Edna will provide Police Report          _1/27/10_
on FALL - on Thursday I talked to Ms. Doak for an hour and she    DATE
If additional space is needed to complete the required information,
attach extra sheets.
never mentioned the incident to me.

witness - Angela Kennedy-Johnson 00274

122

# EXHIBIT 10



**U.S. Department of**
**Homeland Security**

**United States**
**Coast Guard**



## Office of Civilian Human Resources   CG-121

## Leave - Sick

Sick leave is designed to allow an employee time off from work with pay for periods when
they or any one of their family members are ill or are undergoing medical treatment.
Specifically, sick leave is granted to employees when they:

- receive medical, dental or optical examination or treatment;
- are incapacitated for the performance of duties by physical or mental illness, injury,
  pregnancy, or childbirth;
- provide care for a family member who is incapacitated as the result of physical or
  mental illness, injury, pregnancy, or childbirth or who receives medical, dental, or
  optical examination or treatment. Number of hours an employee may use for this
  purpose is limited. See "Sick Leave for Family Care or Bereavement";
- make arrangements necessitated by the death of a family member or attends the
  funeral of a family member. Number of hours an employee may use for this purpose
  is limited. See "Sick Leave for Family Care or Bereavement";
- would jeopardize the health of others by their presence on the job because of exposure
  to a communicable disease (as determined by the health authorities having jurisdiction
  or by a health care provider); or,
- are required to be absent from duty for purposes related to the adoption of a child.

An OPM final rule effective July 14, 2010 amended the definition of "family member" for
purposes of leave administration (excluding leave under the Family and Medical Leave
Act), including sick leave under 5 CFR 630.201 (b). Family members include:

1. Spouse and spouse's parents.
2. Sons and daughters, and their spouses.
3. Parents and their spouses.
4. Brothers and sisters, and their spouses.
5. Grandparents and grandchildren, and their spouses.
6. Domestic partner and domestic partner's parents, including domestic partners of any
   individual named in (2) through (5), above.
7. Any individual related by blood or affinity whose close association with the employee
   is the equivalent of a family relationship.

- For leave purposes, a domestic partner is an adult living in a committed relationship

00372                    Exhibit 6- 4

with another adult. A "committed relationship is one in which the employee, and the domestic partner of the employee, are each other's sole domestic partner (and are not married to or domestic partners with anyone else); and shares responsibility for a significant measure of each other's common welfare and financial obligations." Both domestic partners of the same sex and of the opposite sex are included, along with those living in relationships acknowledged by states as marriages or equivalent to marriage. The children of domestic partners are considered the equivalent of the employee's own children, and in loco parentis relationships are included under "parents" and "sons and daughters".

## Sick Leave Accrual

- Full-time Employees
  - o 1/2 day (4 hours) for each biweekly pay period (13 days per year).
- Part-time Employees
  - o 1 hour for each 20 hours in a pay status.
- There are no limits on the amount of sick leave that can be accumulated. Unused sick leave accumulated by employees covered by the Civil Service Retirement System (CSRS) will be used in the calculation of their annuities.
- Sick leave was initially not creditable for Federal Employees Retirement System (FERS) employees hired since January 1, 1984. However, the FY 2010 Defense Department Appropriations Act of October 2009 provided a phased in arrangement for FERS retirees. Through December 31, 2013, 50 percent of unused sick leave will count toward FERS annuities. From 2014, 100 percent of sick leave will be used.

## Requesting Sick Leave

- Typically, an employee should request supervisory approval for sick leave as far in advance as possible. Requests should be made in writing by use of the Request for Leave or Approved Absence Form (OPM-71) or other approved method of requesting leave. Under normal circumstances, no further documentation (other than the OPM-71 or other approved method of requesting leave) is necessary to support a sick leave absence for up to three (3) days. Medical certificates *may* be required for absences extending beyond three workdays. Under certain circumstances, employees may be placed on a Letters of Requirement, making it mandatory that employees provide medical documentation to support any absence due to illness or medical treatment.
- Employees should schedule leave for prearranged examinations or treatment in advance of the absences. However, when it is necessary for employees to be absent from work due to illness (either the illness of the employee or a family member), employees should notify their supervisor before, or as soon as possible after, they are scheduled to report for duty. Typically, this notice should be done within two hours of the start of an employee's scheduled workday. (An employee covered by a union contract should refer to any specific provisions set forth in the contract to ensure they are following the proper leave procedures.) Employees should obtain supervisory approval prior to departing early from work for illness or to leave to care for a family member who is ill.

## Granting Sick Leave

00373



- An agency may grant sick leave only when supported by evidence administratively acceptable by the agency. For absences in excess of 3 days or for a lesser period and when determined necessary by the agency, an agency may require a medical certificate or other administratively acceptable evidence to support the absence.

## Advancing Sick Leave

- A maximum of 30 days (240 hours) of sick leave may be advanced to full-time employees at the beginning of a leave year, or at any time thereafter when required by the exigencies of the situation, for a serious disability or ailment of the employee or a family member or for purposes relating to the adoption of a child. Thirty days is the maximum amount of advance sick leave an employee may have to his or her credit at any one time.
- The maximum amount of sick leave an agency may advance to part-time employees (or employees on an uncommon tour of duty) is prorated according to the number of hours in the employees' regularly scheduled administrative workweek.
- Requests for advanced sick leave should be made in writing through the supervisory chain, and should include the amount of leave requested and the reason the advance sick leave. Applications should also be supported by documentation appropriate to the situations (e.g., for adoption purposes, the employee's certification and attorney's certification may be required; for medical/illness purposes, a medical certification would be required). In the case of advanced sick leave for illness or disability, the medical documentation must include a diagnosis, prognosis, and the physician's estimate of the time of incapacitation.
- Typically, advanced sick leave will not be granted to employees when it is known that employees do not intend to return to duty or when available information indicates that there is only a remote possibility that employees will be returning to work; when employees have applied for disability retirement; or when employees have signified their intention to resign for disability reasons.
- Advances of sick leave are considered debts due the U.S. Government, and therefore obligate employees to repay the advances either by charges against subsequently earned leave or by repayment upon separation. However, employees with advanced sick leave who enter active military duty with restoration rights, who die, or who are separated due to disability are not required to liquidate their indebtedness for advanced sick leave.



00374

# EXHIBIT 11



GOVERNMENT
EXHIBIT
Doak 8
4/9/13    05

**U.S. Department of**
**Homeland Security**



**United States**
**Coast Guard**

Commandant
United States Coast Guard

2100 Second Street, S.W., Stop 7111
Washington, DC 20593-0001
Staff Symbol: CG-928
Phone: (202) 475-3009
Email : gregory.k.cohen@uscg.mil

12630
25 January 2010

# MEMORANDUM

From:   Greg Cohen
        CG-9283

Reply to   CG-9283
Attn of:   Greg Cohen

To:     Ms. Edna Doak
        Management Analyst, GS-0343-13

Ref:    (a) CG-9283 Ltr 12630, 19 Jan 2010

Subj:   ABSENT WITHOUT LEAVE (AWOL) STATUS

1.  On January 25th, 2010 you were AWOL from your place of duty for 3:30 hours. Reference (a) informed you that you had exhausted your Family Medical Leave Act allowance of 460 hours and that you were to return to a full duty status. Once again I would like to reiterate that you must immediately return to a full time duty status.

2.  You leave balance sis as follows:

    o   -237:45 hours Sick Leave

    o   -43:30 hours Annual Leave
        [handwritten: after leave awoit]

    o   460:00 hours FMLA

Due to the negative balances in all your leave accounts, I cannot approve any additional advance sick or annual leave. You will be required to submit LWOP for my approval, along with supporting documentation (from appropriate medical authority), for any future absences for medical appointments in advance of those appointments. All other absences will be documented as AWOL.

3.  I would like to remind you of the leave requesting procedures: Leave should be requested, in advance, not more than 2 hours after the time in which you are scheduled to report for duty or before leaving work during normal duty hours. You should call me directly and leave a message to request leave if I am not available. Leave must be requested and approved by submitting an OPM Form 71 (Request for approved leave or absence).

4.  If you suffer from a medical condition that requires an accommodation to assist you in performing the essential duties of your position, please let me know so that we can follow the proper procedures for assessing the need for reasonable accommodations in the workplace. For assistance and to receive more information on your FMLA (Family and Medical Leave Act) entitlement and the Voluntary Leave Transfer Program (VLTP), you may contact Mr. Robert Gitschier at (202) 475-5346. However, I need to know your current status as it relates to your ability to maintain regular attendance at work or I will be forced to make decisions regarding your employability based upon the information I have on hand.

5.  I am also concerned about your health and well-being, and I would encourage you to utilize the Employee Assistance Program (EAP). It is the policy of the U.S. Coast Guard to offer

194

Subj: EMPLOYMENT STATUS

12630
19 January 2010

counseling to employees who may be experiencing personal problems that may be affecting their work performance, attendance, or work-related conduct. I encourage you to seek an EAP counselor if you believe that the Employee Assistance Program (EAP) can be of assistance, at 1-800-222-0364, or I will be happy to schedule an appointment for you at your request. The EAP is a confidential, free, and voluntary program.

6. If you have any questions concerning the content of this letter, I will be glad to meet with you and/or respond to your concerns or you may wish to contact Starlisha King, Human Resources Specialist, on (202) 475-5288, for assistance.

#

Copy:   CG-1214
        CG-921

DeLivered   20 JAN, 1042   witness   Angela Kennedy-Johnson

USCG82

129

# EXHIBIT 12

**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commandant
United States Coast Guard

1900 Half Street, S.W.
Washington, DC 20593-0001
Staff Symbol: CG-921
Phone: (202) 475-3009
Email : gregory.k.cohen@uscg.mil

12750
22 February 2010

# MEMORANDUM

From:   Greg Cohen
        CG-9283

Reply to   CG-9283
Attn of:   Greg Cohen

To:     Ms. Edna Doak
        Management Analyst, GS-0343-13

Ref:    (a) Civilian Personnel Actions: Discipline, Performance, Adverse Actions, Appeals and
            Grievances, COMDTINST M12750.4, CH-1 dated 12/15/87
        (b) Employment Status memorandum dtd 19 January 2010
        (c) Absent without leave (AWOL) status memo dtd 25 January 2010

Subj:   LETTER OF REPRIMAND

1. I am officially reprimanding you under the provisions of reference (a) for absent without
   leave (AWOL) and for your failure to follow leave request procedures. These charges are
   based on the following:

   Absent without leave (AWOL)

   On January 19, 2010, you were issued an employment status memorandum, reference (b),
   requesting you immediately return to a full time duty status and notifying you of your
   current leave status and giving you specific guidance on future leave request. This memo
   came after you were previously counseled on numerous occasions concerning your time
   and attendance. You have failed to follow this guidance.

   On January 25, 2010 you were AWOL from your place of duty for 3:30 hours. You called
   in at 10:30 and left a message stating you had just woken up. You did not request leave in
   advance for this time-off. You requested leave through the timecard system upon arrival
   at work and this leave was denied because you did not provide any proof of a medical
   appointment and you have a negative annual and sick leave balance. You were issued a
   memorandum, reference (c) notifying you of your AWOL status on this day.

   On January 26, 2010 you were AWOL from your place of duty for 4:15 hours. You called
   in at 11:15 to say you had just woken up. You did not request leave in advance for this
   time-off. You requested leave through the timecard system upon arrival at work and this
   leave was denied because you did not provide any proof of a medical appointment and
   you have a negative annual and sick leave balance.

   Given the above instances and your failure to contact your Supervisor or provide any
   documentation for your absences and tardiness, you were charged as absent without
   Leave (AWOL) for approximately 7:45 hours on January 25th and 26th as follows:

   25 January 2010 – 3:30 hours
   26 January 2010 – 4:45 hours

GOVERNMENT
EXHIBIT
Exhibit
Doak
4/9/13

00276

Subj: LETTER OF REPRIMAND

12750
22 February 2010

<u>Failure to follow leave request procedures</u>

On 19 January 2010, you were issued a employment status memorandum, reference (b), notifying you that your continued absence is having a negative impact on your work and that you are required to request leave in advance, not more than 2 hours after the time in which you are scheduled to report for duty or before leaving work during normal duty hours. You were to call your Supervisor directly and leave a message to request leave if your supervisor is not available. You have failed to follow this direction.

On January 25th, 2010 you were directed you to follow proper leave procedures which you did not follow for your absence on January 26$^{th.}$ You failed to follow leave request procedures requiring you to request leave in advance for medical appointments or for days you would be sick to call in within two-hours of the start of the workday. This is unacceptable and cannot be tolerated.

On January 27th, 2010 you were counseled concerning your failure to follow leave procedures to request leave in advance or to call in within two-hours of the start of the workday and for your continued absences and tardiness. This was in follow up to previous discussions back to December during your mid-term performance discussion with your team lead in which your leave balances were discussed and you were notified that you leave balances cannot exceed the 480 hours of FMLA or 240 hours advanced sick leave.

2. On August 13, 2010, you submitted medical documentation to be reviewed by civilian personnel and the Coast Guard medical review officer in order to support your request for leave under the Family Medical Leave Act (FMLA). Your medical documentation was assessed and satisfied the requirements of the FMLA. Since September 3, 2010 you have been granted 480 hours of FMLA (approximately 12 weeks) with the use of sick and annual leave, and leave without pay. The law specifically states that employees may only be granted up to 12 weeks of paid or unpaid leave under the FMLA. Therefore, you no longer can be granted leave under the FMLA.

3. You have been reminded of the leave request procedures. You have also been given specific guidance on requesting leave under the Family and Medical Leave Act (FMLA). You have been notified of the need to submit the appropriate requests and supporting documentation for your absences. However, you have continually failed to meet these requirements; your excessive absences and tardiness cannot continue to be excused and may result in further disciplinary action being taken against you. You are required to work eight and one-half hours each scheduled work day, with one-half hour of non-compensated time being allowed for lunch. You are reminded that you currently have negative sick and annual leave balances and advanced sick leave is not being afforded to you. You will need to request leave without pay (LWOP) or advanced annual leave for Supervisroy approval along with supporting documentation.

4. In determining this disciplinary action, the impact your conduct has had on this command was considered. Your work ethic, specifically your inability to provide eight solid hours of work each scheduled work day is having a negative impact on the Coast Guard. Your failure to follow leave request procedures is unacceptable. As discussed during your performance review you are not able to adequately support your project with these continued absences. Also, you missed mandatory Appropriation Law training and have failed to obtain your Business Manager Level I Certification. You have been counseled on numerous occasions on the importance of maintaining a good attendance record and the need for you to improve your behavior and communication efforts. Also considered,

2

00277

Subj: LETTER OF REPRIMAND

12750
22 February 2010

were such factors as the nature and seriousness of the offense, and its relation to your duties and responsibilities, including your length of service and clarity with which you were on notice or warned about the conduct in question. However, the seriousness of your misconduct is unacceptable and cannot be tolerated.

5. This reprimand is imposed to impress upon you the seriousness of this offense and to deter you from engaging in future acts of misconduct. This reprimand is the minimum remedy necessary to correct your behavior and maintain good order and discipline in the organization. Any further violations of this nature or any future instances of misconduct may result in more severe disciplinary action being taken against you, up to and including removal from Federal service.

6. While I am concerned with the economy and efficiency of operations, I am also concerned about your health and well-being. It is the policy of the U.S. Coast Guard to offer counseling to employees who may be experiencing personal problems that may be affecting their work performance, attendance, or conduct. If you are experiencing any personal problems that may be affecting your ability to report for and/or remain at work during normal scheduled work hours, you can receive assistance by contacting a counselor with the Employee Assistance Program (EAP) at 1-800-523-5668. The EAP is a confidential service available to all employees. If you choose to utilize the services of the EAP during normal working hours, you must notify me in advance so that I may schedule/excuse your absence from work.

7. You may reply in writing to this reprimand. This reprimand and any reply submitted will be retained as a temporary record in your Official Personnel Folder (OPF) for a reckoning period of up to two (2) years, or upon your separation from the agency. Consideration will be given to removing this letter from your OPF after one year if it is determined that there have been no further instances of misconduct of this kind in the intervening period.

8. You have the right to file a grievance under the negotiated grievance procedure outlined in the Memorandum of Agreement (MOA) between The United States Coast Guard and AFGE 3313. Any grievance filed should be submitted within fifteen (15) calendar days to Mr. Rory Souther.

9. If you believe this action is based on prohibited discrimination because of your race, color, religion, sex, national origin, age, or physical or mental disability you have the right to file an Equal Employment Opportunity (EEO) complaint in accordance with COMDTINST M5350.4 and 29 CFR 1614. To do so, you must contact an EEO counselor within forty-five (45) calendar days of the effective date of this action. You may use either the EEO complaint process or the negotiated grievance procedure, but not both.

10. If you have any questions concerning the procedural aspects of this action, you may contact Starlisha King, Human Resources Specialist, at 202-475-5288.

#

Copy:  OPF
       CG-1214
       CG-921

00278

133

Subj: LETTER OF REPRIMAND

12750
22 February 2010

Please sign the receipt of acknowledgement below as evidence that you have received this letter. Your signature does not mean that you agree with the contents of the letter; nor by signing, are you forfeiting any of your rights cited above.

Receipt Acknowledged: _____   _____

Employee's signature                Date

00279

134

# EXHIBIT 13

## ABEYANCE AGREEMENT

By written notice dated 22 February 2010, Ms. Edna Doak was issued a letter of reprimand for absence without leave (AWOL) and failure to follow leave request procedures. However, after discussion by the parties, the parties agreed to hold the letter of reprimand in abeyance for a period of ten (10) workdays providing Ms. Edna Doak agrees to and complies with the provisions listed below.

1. Provide acceptable medical documentation to support absences not related to leave taken under the Family Medical Leave Act (FMLA).
2. Provide acceptable medical documentation to support absences of AWOL on January 25, 2010 and January 26, 2010, and
3. Provide acceptable medical documentation to support pending or outstanding leave request related to medical issues or doctor's appointments.

Acceptable medical documentation consists of consists of original medical documentation on physician letterhead and must contain all of the following information:

a) the dates of your incapacitation,
b) the diagnosis (short term or long term ongoing health condition),
c) the date(s) and time(s) a physician saw you,
d) the handwritten signature of the attending physician or other medical personnel responsible for treatment.

Ms. Doak hereby recognizes that this agreement is entirely voluntary on her part and clearly understood and desired, and that there is no element of coercion or involuntariness.

Should Ms. Doak fail to comply with the provisions of the agreement by the end of the abeyance period (10 workdays), the letter of reprimand shall be promptly effected. This constitutes the entire agreement and there are no other provisions either expressed or implied.

It is agreed that the effective date of this agreement will be 23 February 2010.

Employee Signature   24 Feb 2010

Supervisor Signature

Elena Hughes, 24Feb 2010
Union Official

Exhibit

GOVERNMENT EXHIBIT
Doak   10
1/9/13   DJ

# EXHIBIT 15

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commandant
United States Coast Guard

1900 Half Street, SW
Washington, DC 20593
Staff Symbol: CG-9283
Phone: (202) 475-3009
Email: gregory.k.cohen@uscg.mil

12339
Date – 24 MAR 10

# MEMORANDUM

From: Mr. Greg Cohen, CG-9283

Reply to
Attn of:

G. Cohen
(202) 475-3009

To: Ms. Edna Doak
Management Analyst, GS-0343-13

Subj: REQUEST FOR MEDICAL DOCUMENTATION

Ref: (a) 5 CFR 339
(b) Employment Status memorandum dtd 19 January 2010
(c) Abeyance Agreement dtd 23 February 2010

1. I am concerned about your health and well-being. My concern for your health stems from your continuing absence from work. However, as a supervisor, I must also be concerned with the economy and efficiency of operations. It appears that you may have an ongoing medical condition or more than one medical condition that is affecting your ability to maintain regular attendance at work and is limiting you from duty. Therefore, the purpose of this memorandum is to request detailed medical documentation regarding your current medical condition(s) and how it relates to your ability to perform the essential functions of your position and maintain regular attendance at work.

2. Reference (b), expressed my concern over your continued absences and requested that you return to a full time duty status and provide any documentation to support a reasonable accommodation. You were also notified of your current leave status and given specific guidance on future leave request. Per reference (d), you were given the opportunity to provide acceptable medical documentation to support absences which you had no prior documentation. On 9 March 2010, you submitted this documentation to civilian personnel to be reviewed by the Coast Guard medical review officers.

3. On 19 March 2010, the Coast Guard medical review officers reported that the documentation submitted by your physicians did not support your absenteeism nor did it clearly address a diagnoses or whether your medical conditions require reasonable accommodations. As this condition may be limiting you for duty, and in order to determine the best course of action for you and the organization, I will need a detailed medical report addressing the information requested below so that I can adequately assess the situation. In accordance with reference (a), I am requesting the following information:

   (a) The nature or diagnosis of your current condition(s).

   (b) Clinical findings from the most recent medical evaluation including any of the following, which have been obtained: findings of physical examination, results of laboratory testing, x-rays, EKGs, and other special evaluations or diagnostic procedures; and in the case of psychiatric evaluation of psychological assessment, the

GOVERNMENT
EXHIBIT
Doak 12
4/9/13

Subj: REQUEST FOR MEDICAL DOCUMENTATION              DATE

> findings of a mental status examination and the results of psychological tests, if appropriate;

> (c) A discussion of how the condition(s) and/or treatment specifically prevent you from doing, or adversely impacts/restricts your ability to perform, the functions of your position.

> (d) Diagnosis, including the current clinical status.

> (e) Prognosis, including plans or recommendations for future treatment and an estimate of the expected date of full or partial recovery, if applicable.

> (f) Recommendations regarding any specific accommodations that are warranted to enable you to perform the essential functions of your position and the duration of the accommodation.

> (g) A narrative explanation of the medical basis for any conclusion that indicates the likelihood that you are or are not expected to suffer sudden or subtle incapacitation by carrying out, with or without accommodation, the tasks or duties of your position.

> (h) Any changes to your working conditions or requirements that could facilitate your ability to maintain a regular work schedule and return to work.

3. You must obtain this information from your physician or health care professional and return to Ms. Starlisha King, HR Specialist as soon as possible. Please provide this information no later than **9 April 2010**, so that I can evaluate your situation quickly and expeditiously. You are responsible for any costs incurred in connection with obtaining this documentation. So that your physician has sufficient information to respond to the items concerning your ability to perform in your job and accommodations that might be recommended, it is important that you provide him/her with your position description (encl (2)).

4. The requested information should be submitted on the <u>physician's letterhead</u> with the <u>original signature of the physician</u> and it should be in a sealed envelope marked "Medical-Confidential". It is essential that this information be provided within the specified time frame so that appropriate administrative decisions can be made in light of your situation, including the consideration of any appropriate accommodations, if necessary. The information you provide will be treated in a confidential manner and only individuals who have a need to know will review it. I have enclosed medical release forms for you to sign so that if a Coast Guard medical review officer or I have questions, we can contact your physician for clarification.

5. If you do not provide the medical documentation I requested by **9 April 2010** and your condition continues to limit you for duty, I will be forced to make decisions regarding your employability based upon the information I have on hand.

6. I am certainly interested and willing to discuss with you and your physician how we might be able to assist and support you, to the extent that we are able, in dealing with whatever circumstances you are experiencing. Also, the Employee Assistance Program

Subj: REQUEST FOR MEDICAL DOCUMENTATION          DATE

(EAP) is available to you and your family members to discuss any personal or medical problems that may be impacting your ability to maintain your work schedule. The EAP is a confidential, free and voluntary program available to all employees. You can call 1-800-222-0364 to schedule an appointment.

7. This action is not intended to be disciplinary or punitive in nature. These steps are taken simply to comply with standard personnel practices. You may contact me if further information or assistance is needed to satisfy this request or if you need additional time to submit the requested medical information. If you have any questions about your rights or the procedural aspects of this matter, you may contact Starlisha King, Human Resources Specialist on (202) 475-5288.

#

Enclosures:          (1) Consent for release of medical information
                     (2) Position Description
                     (3) HIPPA med release form

Copy:   CG-1214

Please sign the receipt of acknowledgement below as evidence that you have received this letter. Your signature does not mean that you agree with the contents of the letter. Please return the photocopy of this letter with your signature to me.

Receipt Acknowledged: _____  3/24/10
                         Signature          Date

# EXHIBIT 18

13



**U.S. Department of Transportation**

**United States Coast Guard**

Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: G-WPC-3
Phone: (202) 267-1704

COMDTINST 12630.1
15 JUL 1997

COMMANDANT INSTRUCTION 12630.1

Subj: COAST GUARD TELECOMMUTING PROGRAM

Ref: (a) Departmental Personnel Manual Letter 368-1 dated 1 April 1994

1. PURPOSE. This Instruction establishes the Coast Guard's telecommuting policy. It represents our evolving efforts to capture the benefits and efficiencies of new technology and gives us more flexibility to meet the demands of today's work environment.

2. ACTION. Area and district commanders, commanders of maintenance and logistics commands, commanding officers of Headquarters units, assistant commandants for directorates, Chief Counsel, and special staff offices at Headquarters shall ensure compliance with this Instruction's provisions.

3. DIRECTIVES AFFECTED. None.

4. BACKGROUND. Telecommuting is one of 50 initiatives arising from the President's 1993 Climate Change Action Plan. developed to meet the twin challenges of responding to the threat of global warming and strengthening the economy. The Secretars' of the Department of Transportation subsequently issued reference (a) directing participation in telecommuting. The Commandant supports this initiative as a way to leverage technology and provide a flexible means to meet Service needs while achieving national goals.

5. TELECOMMUTING. Telecommuting is a management tool allowing work at alternate work sites at least one day every two weeks. Telecommuters must report to their official duty station at least one day a week. Alternate work sites include:



Exhibit G/2

00410

142

COMDTINST 12630.1
15 JUL 1997

    a. At home in space specifically set aside as an office or work area; or

    b. At a satellite facility the Coast Guard, General Services Administration (GSA) or another public or private organization owns or leases; or

    c. At mobile offices in the field where work is performed using portable equipment.

6. PARTICIPATION. Telecommuting programs must be accomplished under specific work conditions, explained in paragraph 8. Civilian personnel assigned to either appropriated or non-appropriated positions and military personnel assigned to either active duty or reserve billets may be eligible to participate. Participants must fulfill position and billet criteria and personal attributes described in paragraph 8.e. through 8.g. Before implementing a telecommuting work arrangement with civilian employees, local commanders must be sure to meet their labor relations responsibilities.

7. TELECOMMUTING BENEFITS.

    a. Uses technology to solve transportation problems by decreasing traffic, parking congestion, energy use, and air and noise pollution;

    b. Improves employee productivity and efficiency, recruitment and retention, and the quality of work life; and

    c. Identifies potential excess office space.

8. PROGRAM REQUIREMENTS. Telecommuting is a management option. It is not an employee benefit or right and does not change employment terms and conditions. Take all factors into consideration when establishing a telecommuting program.

    a. Mission Impact. Telecommuting must not adversely affect organizational missions and functions. If managers determine it does, they must immediately modify or terminate the telecommuting arrangement, subject to fulfilling any labor relations obligations. Managers must establish specific controls and oversight to ensure service to the public, work productivity, and that operating costs do not suffer adverse impacts.

    b. Funding. There are no central funds to support telecommuting initiatives. Organizations establishing telecommuting programs must do so within existing resources. If implementing telecommuting involves some additional start-up, transition and maintenance costs, the long-term benefits should offset them.

    c. Other Program Requirements. Depending on the telecommuting arrangement, managers must consider a host of requirements, including: orientation, written agreements and

2

checklist, labor management responsibilities, time and attendance accountability, computer security, and telecommunications requirements. Enclosures (1) through (4) provide guidelines in these areas.

d. Participant Selection. Supervisors identify billets or positions for telecommuting and select employees to participate voluntarily. Because telecommuting is a supervisor-approved work option, continued participation is not an automatic right should supervisors change, modify, or terminate the program due to mission needs or other eligibility considerations.

e. Appropriate Position or Billet.

(1) Portable work activities members and employees can perform effectively outside the office;

(2) Quantifiable or project-oriented job tasks;

(3) Unclassified work for which data security, including sensitive, nonclassified and Privacy Act concerns is adequate (those performing work involving classified data or information should do so only in a Government office where adequate controls exist to protect the data);

(4) Technology for off-site work is available;

(5) The worker does not need close supervision or input from sources accessible only in the office;

(6) The worker can gain access to specialized equipment by periodically working in the office; and

(7) The worker can meet the requirement for face-to face contact with other workers or the public by working in the office at least one day a week.

f. Appropriate Employee or Member.

(1) Dependable self-starter who can function independently,

(2) Highly motivated,

(3) Good time-management skills,

(4) Proficient or higher performance evaluations,

3

00412

COMDTINST 12630.1
15 JUL 1997

      (5) Fully understands organization's operations,

      (6) Agrees-to meet alternative work site requirements and,

      (7) Possesses knowledge and references needed to work off-site.

   g. Appropriate Supervisor:

      (1) Understands the employee's telecommuting proposal,

      (2) Is comfortable evaluating performance by results as opposed to direct observation,

      (3) Can effectively communicate and clearly define tasks and expectations and,

      (4) Understands and can adequately address security issues.

9. PROGRAM APPROVAL.

   a. Area and district commanders, and commanders of maintenance and logistics commands (MLC's) shall:

      (1) Establish an overall telecommuting program for their respective Area, district, and MLC staffs and respective units.

      (2) Review and approve individual unit telecommuting programs for respective Area, district, and MLC and units.

      (3) Designate a telecommuting coordinator and report names to Commandant (G-WPC).

   b. Commanding Officers of Headquarters units and Commanding Officer, Coast Guard Headquarters shall:

      (1) Establish and approve a telecommuting program, if appropriate, for their units.

      (2) Designate a telecommuting coordinator and report names to Commandant (G-WPC).

   c. Other Unit Commanding Officers and Officers in Charge. Within the telecommuting guidelines established by their respective Areas, district or MLC, submit proposed unit programs through the chain of command for approval.

10. PROGRAM ROLES AND RESPONSIBILITIES.

   a. Telecommuting Coordinators shall:

4

00413

145

COMDTINST 12630.1
15 JUL 1997

    (1)  Review proposed unit telecommuting programs and provide recommendations to their appropriate approving authority.

    (2)  Serve as the primary advisor on the logistical aspects of telecommuting;

    (3)  Provide telecommuting orientation materials, available from civilian command staff advisors, for their units with only military members.

    (4)  Track and report telecommuting participation for their program area of responsibility and submit summary data to Commandant (G-g/PC), when requested per enclosure (5).

  b.  Civilian Command Staff Advisors or NAF Personnel Liaisons shall: Provide telecommuting advice and orientation materials to management, telecommuting coordinators, and those units that have both civilian and military employees.

  c.  If Applicable, Unit Commanding Officers (Other than Headquarters units) shall:

    (1)  Prepare unit program proposals for approval.

    (2)  Designate a telecommuting coordinator.

    (3)  Submit summary participation data to respective Area, district or MLC commander telecommuting coordinators.

  d.  Supervisors shall:

    (1)  Prepare, approve and retain a copy of individual telecommuting agreements (within an approved unit telecommuting program).

    (2)  Identify and discuss with participants, their assignments to accomplish under telecommuting arrangements.

    (3)  Ensure the telecommuting requirements provided in this instruction and enclosures are followed.

  e.  Local ADP Security Officer. The ADP System Security Officer will review enclosure (3) with the telecommuter to ensure the adequacy of computer security

11.  PROGRAM TERMINATION. Any individual or organizational telecommuting program may be terminated by the immediate supervisor or others in the chain of command and/or by Commandant (G-CCS) if they determine the arrangement:

5

00414

COMDTINST 12630.1
15 JUL 1997

    a.   Does not support mission needs;

    b.   Is counter to public service requirements;

    c.   Threatens the security of U.S. Coast Guard data, information, or equipment;

    d.   Is likely to increase long-term costs; or

    e.   Other work-related reasons.

 

                       J.M. LOY
                       Chief of Staff

Encl:   (1) Telecommuting Program Guidelines
        (2) Telecommuting Agreement Between USCG and Employee
        (3) USCG Self-Certification Safety Checklist
        (4) USCG Self-Certification Security Audit Checklist
        (5) Telecommuting Summary Report

6

Enclosure (1) to COMDTINST 12630.1

## TELECOMMUTING PROGRAM GUIDELINES

I. **GENERAL REQUIREMENTS**:

    A. ORIENTATION AND TECHNICAL ASSISTANCE. Managers, supervisors, and employees must approach telecommuting very differently from traditional work arrangements. Therefore, participating managers, supervisors, and employees must receive a telecommuting orientation before they participate in a program to ensure they fully understand the success of each telecommuting program depends largely on the supervisor and employee establishing a joint commitment. Supervisors and bargaining units must make their arrangements under any negotiated agreements. Suggested orientation materials are available from the appropriate command staff advisor and servicing telecommuting coordinators.

    B. LABOR MANAGEMENT RELATIONS AND PARTNERSHIPS. Before initiating, modifying, or terminating a telecommuting program in a collective bargaining unit, all appropriate labor relations obligations must be fulfilled. Managers and supervisors must contact the appropriate command staff advisor to discuss these requirements.

    C. WRITTEN AGREEMENTS. Each person in a telecommuting arrangement and his or her immediate supervisor must sign and maintain a written agreement. Enclosure (2) is the standard written agreement to use.

    D. WORK SCHEDULES. Employees must perform scheduled work either at the office or an approved telecommuting work site. Each telecommuting arrangement must identify the time for work in each setting to address face-to-face meetings, reference and equipment access, isolation and communication difficulties, and proper time and attendance certification. Supervisors and bargaining units must make their arrangements under any negotiated agreements. The arrangement should specify a weekly minimum number of days at the official duty station to ensure the employee is available in the office during the week for face-to-face meetings, access to facilities, etc. Supervisors should periodically review work schedules to meet employee and organizational requirements and must coordinate absences from either office or telecommuting work site.

    E. TIME AND ATTENDANCE. Monitoring and certifying employee work time are critical. Supervisors must correctly report time and attendance to ensure employees are paid for work performed and account for absences. To carry out this responsibility, supervisors may visit the employee's work site (at a pre-



00416

Enclosure (1) to COMDTINST 12630.1

    arranged time), establish telecommunication contact, determine reasonableness of work output for the time spent, or use other appropriate certification methods.

F.  HOME OFFICE SPACE. Employees must have a designated work space to work at home and communicate easily by telephone during the work day. The Coast Guard will not provide home office furnishings. Each employee must complete a self-certification check list for home work space to ensure it meets health, safety, building code, physical security and other requirements. A supervisor may deny an employee the opportunity to participate or rescind a telecommuting agreement based on safety or security problems in the home. Supervisors may inspect homes by appointment. Enclosure (3) is a required safety check list and enclosure (4) a required security check list.

G.  FAMILY CARE. Telecommuting is not a substitute for child or elder care. The opportunity to telecommute is offered only with the understanding the telecommuting work site is a space and time exclusively for work.

H.  INFORMATION AND RECORDS MANAGEMENT. Information and records processed are subject to the maintenance and disposition authority cited in COMDTINST M5212.12, Paperwork Management Manual. Employees shall manage all such information and data processed according to applicable U.S. Coast Guard regulations.

## II.  COMPUTER AND TELECOMMUNICATIONS SUPPORT:

A.  ADDITIONAL COMPUTER AND TELECOMMUNICATIONS SUPPORT. There is no specific requirement or obligation for additional telecommuting computer or telecommunications resources to support this initiative.

B.  HOME TELECOMMUNICATIONS COSTS. Home telephone costs associated with work at home may be reimbursable. Any reimbursement authorized is the sponsoring unit's or office's responsibility. Local units may reimburse telephone and telecommunications costs, including official long distance calls, based on statutory authority and availability of sponsoring unit funds. Use of FTS 2000 Calling Cards and FTS 2000 toll-free (800) numbers for telecommuting is prohibited. Units desiring long-distance telecommunications access for telecommuting should obtain calling cards or toll-free numbers from their local telephone companies (Regional Bell Operating Company) or long-distance companies and charge them against the unit's AFC 30 account. Also, the Coast Guard will not presently pay for any Internet Service Provider (ISP) or on-line services associated with telecommuting.

2



00417

Enclosure (1) to COMDTINST 12630.1

C.   ORGANIZATION CAPABILITIES. Managers should:

1.   Reconfigure organizational computer and telecommunications resources and evaluate using employee equipment if offered.

2.   Allocate U.S. Coast Guard microcomputer resources under the Microcomputer Allowance List (MAL). If managers can achieve significant organizational improvements that require a change to the MAL, they shall submit complete justifications with submissions to alter their microcomputer allowances. If employees use U.S. Coast Guard computer and telecommunications resources, the U.S. Coast Guard unit office sponsoring the telecommuter pays for computer hardware, software and telecommunications maintenance, repair, and replacement costs. The employee may be liable for computer and telecommunications resources issued to him or her for telecommuting and subsequently damaged by non-employees. Employees may use Government-owned computers only for Government purposes.

D.   INDIVIDUAL CAPABILITIES. Employees may use personal computers and telecommunications if they desire at their own expense for maintaining, repairing, and replacing their computer and telecommunications resources, including any personal files or data. The U.S. Coast Guard is not responsible for the expense to repair, restore or replace any personal computers, peripherals, media or data files used for telecommuting from the home work site.

II.   SECURITY REQUIREMENTS. Telecommuting and any access to U.S. Coast Guard computers or networks from an alternate work site (such as from a hotel room while on TAD), creates security risks for the U.S. Coast Guard's information systems hardware and software infrastructure.

A.   The primary concerns are the transmission of software viruses, unauthorized access to U.S. Coast Guard data, and theft of computer and telecommunication resource time. A computer virus is software deliberately created to spread mischief or in severe cases temporarily disable a company's or Government agency's telecommunication networks and/or computers. Viruses can unknowingly reside on an individual's home computer and spread on floppy disks or modem transmission to U.S. Coast Guard computers and data files. Unauthorized access to Government data files for financial or military advantage is an all-too-common problem whose perpetrators range from teenage hobbyists to foreign governments' agents. Access by unauthorized users (especially those with a malicious intent) can degrade the performance of U.S. Coast Guard software applications and telecommunications networks, impairing mission-critical

3

00418

Enclosure (1) to COMDTINST 12630.1

information systems. All telecommuters will comply with the Automated Information Systems (AIS) Security Manual COMDTINST M5500.13A (series) to reduce risks to U.S. Coast Guard computers, data, and telecommunications networks. Employees generally will not have remote access capability, pending further Commandant (G-S) policy on remote access security issues.

B. Classified information is not allowed at home work sites. Employees shall not gain remote access (i.e., use modems to enter data files on another computer) to classified data or EFTO FOUO record messages. An employee will report any and all access to classified material, whether accidental or not, to the appropriate security officers, who will declassify personal computing resources under COMDTINST M5500.13A (series).

## IV.  **OTHER ISSUES**:

A. NEGOTIATIONS WITH OTHER AGENCIES. In several areas agencies are forming consortia either among themselves or with local public or private sector organizations to create satellite telecommuting facilities, perhaps including Federal Executive Boards, local governments, and universities. Managers are encouraged to participate in or initiate such activities if they support mission accomplishment within resource capabilities. Managers and supervisors should contact their servicing legal office, Command Staff Advisor, and/or employee relations labor management staff. Managers must fulfill all appropriate labor relations obligations before concluding any negotiations.

B. GENERAL SERVICES ADMINISTRATION (GSA) SATELLITE OFFICES. The GSA establishes satellite telecommuting offices in a wide variety of locations. Managers can identify local availability by contacting the local GSA office.

4



00419

Enclosure (2) to COMDTINST 12630.1

## U.S. Coast Guard and Employee Telecommuting Agreement

### Approval for Alternative Work Site

Name: _____

Organization/Office: _____

Current Duty Station: _____

Geographical Location: _____

Approved Alternative
Work Place: _____

Geographical Location: _____

**Voluntary Participation**

I voluntarily agree to work at the approved alternative work site indicated above and agree to follow all applicable policies and procedures. I recognize this arrangement is not an employee benefit but an additional method the agency may approve to accomplish work.

**Official Duty Station**

For Coast Guard, the telecommuter's official duty station is the main office. Working at an alternative work site is not a basis for changing my salary or benefits.

**Official Duties**

I shall perform official duties only at the official duty station or U.S. Coast Guard-approved alternate work site and will not conduct personal business, such as caring for dependents or making home repairs, while in official duty status at the alternate work site.

**Work Schedule and Tour of Duty**



00420

152

Enclosure (2) to COMDTINST 12630.1

Unless the U.S. Coast Guard and I agree otherwise, the number of hours I am scheduled to work remains the same. My official tour of duty will be: (specify days, hours, and location such as official duty station or alternative work site). I further understand I am expected to report for work at my official duty station at least one day a week. I am also expected to attend all required staff meetings at my official duty station.

**Time and Attendance**

My timekeeper will have a copy of my schedule. My supervisor will certify biweekly the time and attendance for hours worked at the official duty station and alternative work site. (Note: the organization may require me to complete a self-certification form.)

**Leave**

I shall follow established office procedures for requesting and obtaining approval of leave.

**Overtime (Not Applicable for Military Members)**

As a civilian, I agree to work overtime only if my supervisor so orders and approves in advance. Working overtime without such approval may result in terminating the telecommuting privilege and/or other appropriate action.

**Equipment and Supplies**

I shall protect any U.S. Coast Guard-owned equipment and use it only for official purposes. The agency will install, service, and maintain U.S. Coast Guard-owned equipment. I shall install, service, and maintain any personal equipment I use. The U.S. Coast Guard will provide and/or reimburse me for all necessary office supplies and business-related long distance telephone calls. The U.S. Coast Guard agrees to provide this equipment: (specify equipment here, if applicable)

**Security**

I will comply with U.S. Coast Guard security policies and protect all U.S. Coast Guard resources, including U.S. Coast Guard data and information, at the alternate work site.

**Liability**

The U.S. Coast Guard is not liable for damages to my personal or real property while I work at the approved alternate work site except to the extent the Federal Tort Claims Act or the Military Personnel and Civilian Employees Claims Act hold the U.S. Coast Guard, as a Government agency, liable.

2

00421

Enclosure (2) to COMDTINST 12630.1

**Work Area**

I shall provide a furnished work area adequate for performing official duties.

**Work Site Inspection**

I agree to permit the U.S. Coast Guard to inspect my alternate work site during normal working hours to ensure proper maintenance of U.S. Coast Guard-owned property and conformity to safety standards. (I will complete a self-certification safety checklist for an at-home work site.)

**Alternative Work Site Costs**

The U.S. Coast Guard will not pay operating costs associated with using my home as an alternate work site (e.g., home maintenance and insurance) except for authorized home telecommunication costs. However, I do not relinquish any entitlement to reimbursement for authorized expenses incurred while conducting business for the U.S. Coast Guard, as provided for by statute and implementing regulations.

**Injury Compensation (Check the Applicable Paragraph)**

___ As a *civilian member*, I am covered under the Federal Employee's Compensation Act (appropriated fund employee) or Longshore & Harbor Workers' Act (NAF employee) if injured while I actually perform official duties at my official duty station or alternate work site. I agree to notify my supervisor immediately of any accident or injury that occurs at the alternate work site; the supervisor will investigate my report immediately.

___ As a *military member*, I am covered under 10 USC 1201 if injured while I actually perform official duties at my official duty station or alternate work site. I agree to notify my supervisor immediately of any accident or injury that occurs at the alternate work site. The supervisor will investigate my report immediately.

**Work Assignments**

I shall complete all assigned work according to procedures my supervisor and I mutually agree to and according to guidelines and standards in my performance plan.

**Performance**

To work at an alternate work site, my most recent performance ratings must be at least "Proficient" or equivalent. My supervisor may require me to report regular progress to assist in judging performance. A decline in performance may be grounds to cancel the telecommuting agreement.

3

00422

154

Enclosure (2) to COMDTINST 12630.1

**Disclosure**

I shall protect U.S. Coast Guard and Government records from unauthorized disclosure or damage and will comply with requirements of the Privacy and Freedom of Information Act Manual, COMDTINST M5260 (series). I will not store, gain access to, or use classified information at a home work site.

**Standards of Conduct**

I understand the United States Coast Guard standards of conduct continue to apply to me while I work at my telecommuting site(s) in accordance with COMDINST M5370.8 (series).

**Cancellation**

After appropriate notice to my supervisor, I may resume working my regular schedule at my official duty station. After appropriate notice to me, the U.S. Coast Guard may instruct me to resume working my regular schedule at my official duty station, if my performance declines, the project fails to benefit organizational needs, the need for in-office interaction between me and my coworkers or customers arises, or for other work-related reasons. The U.S. Coast Guard will follow any applicable administrative or negotiated telecommuting procedures.

**Other Action**

Nothing in this agreement precludes the U.S. Coast Guard from taking any appropriate disciplinary or adverse action against me if I fail to comply with the provisions of this agreement.

**Employee's Signature and Date:** _____

**Supervisor's Signature and Date:** _____

**Cancellation Date**

If this agreement is canceled please indicate date of cancellation below:

**Cancellation Date:** _____

**Employee's Acknowledgment and Date:** _____

**Supervisor's Signature and Date:** _____

4



00423

Enclosure (2) to COMDTINST 12630.1

## SUMMARY INFORMATION

Check the description that applies:

Telecommuting Arrangement

___1 day per 2 weeks      ___ More than 1 day per 2 weeks      ___ Occasionally
(i.e., project nature)

Position or Billet Type:

Civilian:      ___Appropriated Fund      ___ Non-Appropriated Fund
(NAF)
Military:      ___Active Duty      ___ Reserve

*Please send a copy of the agreement and enclosures to your supervisor, and retain a copy for your records.*

*Please send a copy of this summary information sheet to your telecommuting coordinator.*

00424

Enclosure (3) to COMDTINST 12630.1

**U.S. COAST GUARD**
**SELF-CERTIFICATION SAFETY CHECKLIST FOR**
**TELECOMMUTERS WORKING AT HOME**

**Name:** _____

**Organization/Office:** _____

**Geographical Location:** _____

**Telephone:** _____

*This checklist assesses the overall safety of the home work site. Each participant should read, complete, sign, and date the self-certification safety checklist.*

Address of home work site location:

_____

_____

Describe the designated home work area:

_____

_____

A. WORKPLACE ENVIRONMENT

1. Are temperature, noise, ventilation, and lighting
   levels adequate to maintain your normal level of
   job performance?                                    __Yes      __No

2. Are all stairs with four or more steps equipped
   with handrails?                                      __Yes      __No

3. Does the electrical system conform to appropriate
   local building codes?                                __Yes      __No

4. Are aisles, doorways, and corners free of obstructions
   to permit visibility and movement?                   __Yes      __No

00425

157

Enclosure (3) to COMDTINST 12630.1

5.  Are file cabinets and storage closets arranged so
    drawers and doors do not open into walkways?          __Yes     __No

6.  Do chairs have any loose casters (wheels) and are
    chair legs sturdy?                                    __Yes     __No

7.  Are the phone lines, electrical cords, and
    extension wires secured under a desk or
    along a baseboard?                                    __Yes     __No

8.  Is the office space neat, clear, and free of excessive
    amounts of combustibles?                              __Yes     __No

9.  Are floor surfaces (including carpets) clean, dry,
    level, and free of worn or frayed seams?              __Yes     __No

10. Is there enough light to read?                        __Yes     __No

11. Is the residence equipped with working smoke
    detectors?                                            __Yes     __No

COMPUTER WORKSTATION (IF APPLICABLE)

12. Is your chair adjustable?                             __Yes     __No

13. Does a back rest support your back
    adequately?                                           __Yes     __No

14. Is your computer monitor at eye level?                __Yes     __No

15. When keying, are your forearms close to parallel
    with the floor? Are your wrists fairly straight?

Employee Signature_____ Date_____

*Please attach a copy of this list to your Telecommuting Agreement and retain a copy for your records.*

2

00426

Enclosure (4) to COMDTINST 12630.1

### U.S. COAST GUARD SELF-CERTIFICATION
### SECURITY AUDIT CHECKLIST FOR
### TELECOMMUTERS WORKING AT HOME

**Name:** _____

**Organization/Office/Location:** _____

**Phone:** _____

*This checklist assesses the overall ability to protect U.S. Coast Guard data and information processed, stored, or transmitted or received at the home work site. Each participant shall read, complete, sign, and date the security audit checklist.*

Home work site location:

### PHYSICAL SECURITY

1. Do all doors and windows have adequate locking devices? ___Yes ___No

2. Is there a lockable file cabinet or container available to store floppy disks, removable hard disks, and documents? ___Yes ___No

### HARDWARE SECURITY

1. Is the computer hardware positioned so unauthorized persons cannot see the screen? ___Yes ___No

2. Are there adequate environmental controls to protect the hardware from extreme temperatures and humidity? ___Yes ___No

3. Does the computer have either a keyboard or power supply locking device? ___Yes ___No

### DATA SECURITY

1. Are the computer and removable media (e.g., floppy disks, CD-ROMs, backup tapes) adequately protected

00427

Enclosure (4) to COMDTINST 12630.1

from unauthorized access (e.g., friends, relatives, roommates, etc.)? __Yes __No

2. When remotely accessing other systems, is your user password encrypted? __Yes __No

3. Can others gain access to the computer from other systems (e.g., via Internet, dial-up, etc.)? __Yes __No

## USER SECURITY

1. Have you received adequate Automated Information Systems (AIS) security awareness and training? __Yes __No

2. Have you signed an AIS user responsibility acknowledgment form? __Yes __No

3. Do you possess an adequate working knowledge of how your computer transmits and receives data? __Yes __No

4. Do you possess an adequate working knowledge of what data needs to be protected when you transmit or receive? __Yes __No

5. Do you possess an adequate working knowledge on properly storing and handling storage media (e.g., floppy disks, CD-ROMs, backup tapes, etc.)? __Yes __No

6. Are you familiar with computer virus detection and eradication procedures? __Yes __No

## SYSTEM INFORMATION

1. What is the operating system? _____

2. What is the microcomputer make and model? _____

2

00428

Enclosure (4) to COMDTINST 12630.1

3. If remote access will be used to access U.S. Coast Guard systems:

What is the modem speed?

Is the modem internal or external?

What communications software is installed?

4. If you have Internet access, with what firm is the account?

Employee Signature_____Date_____

*Please attach a copy of this list to your Telecommuting Agreement, send a copy to your ADP System Security Officer (ADPSSO) and retain a copy for your records.*

3

00429

Enclosure (5) to COMDTINST 12630.1

## TELECOMMUTING SUMMARY REPORT

UNIT NAME:

Telecommuting Coordinator name, e-mail address, and phone number:

### CIVILIAN PARTICIPATION:

1. Specify total numbers of Civilian *Appropriated Fund* telecommuters by the indicated categories:

____1 day per 2 weeks          _____ More than 1 day per 2 weeks

____Occasionally (i.e., Project Nature)

2. Specify total numbers of Civilian *Non-Appropriated Fund* telecommuters by the indicated categories:

____1 day per 2 weeks          _____ More than 1 day per 2 weeks

____Occasionally (i.e., Project Nature)

### MILITARY PARTICIPATION:

1. Specify total numbers of Military *Active Duty* telecommuters by the indicated categories:

____1 day per 2 weeks          _____ More than 1 day per 2 weeks

____Occasionally(i.e., Project Nature)

2. Specify total numbers of Military Reserve telecommuters by the indicated categories:

____1 day per 2 weeks          _____ More than 1 day per 2 weeks

____Occasionally (i.e., Project Nature)

00430

# EXHIBIT 20

IN THE U.S. DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDNA DOAK                                    :
                                             :
          Plaintiff,                         :
     v.                                      :     Case No. 1:12 CV 1177-RC
                                             :
JANET NAPOLITANO, SECRETARY,                 :
U.S. DEPARTMENT OF HOMELAND                  :
SECURITY                                     :
          Defendant.                         :

### PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

Plaintiff Edna Doak ("Plaintiff"), by and through her undersigned counsel, hereby provides

as follows for her objections and responses to Defendant Janet Napolitano, Secretary, U.S.

Department of Homeland Security's ("Defendant") First Set of Interrogatories ("Interrogatories"):

### GENERAL OBJECTIONS

The following objections are asserted as applicable to each of Defendant's interrogatories:

1.    Plaintiff objects to Defendant's First Set of Interrogatories to the extent that the

      information sought is protected from disclosure by the attorney-client privilege and/or the

      attorney work-product doctrine.  Any inadvertent disclosure of such information is not

      intended as, nor should it be construed as, a waiver of any applicable privilege.

2.    Plaintiff objects to Defendant's First Set of Interrogatories to the extent that they contain

      terms, or phrases that are vague or ambiguous, and are overly broad, unduly burdensome,

      and seek information that is not relevant to the subject matter of this action and not

      reasonably calculated to lead to the discovery of admissible evidence.

3.    Plaintiff incorporates by reference all of the above General Objections into each of the

      interrogatories and individual objections set forth below. Plaintiff has also stated specific



GOVERNMENT
EXHIBIT
Doak 9
4/9/13       OJ

objections to certain requests. By making such objections, Plaintiff does not thereby waive

the foregoing General Objections.

## INTERROGATORIES

1.     Identify all alleged physical and/or mental impairments that you claim you have, or have had at any time while employed at USCG, that you contend substantially limit or limited one or more of your major life activities and upon which the claims of disability discrimination in the Complaint are based.

**RESPONSE:**  Subject to and without waiving her general objections, Plaintiff states that she suffers from the following disabilities:

    a. Major depression disorder
    b. Hypothyroidism
    c. Hyperthyroidism
    d. Chronic migraines
    e. Obstructive sleep apnea
    f. Head/neck/shoulder/back/leg pain and muscle spasms

2.  For each alleged impairment identified in Interrogatory No. 1, identify all physicians and other healthcare providers who have treated or examined you, and with whom you have seen or consulted.

**RESPONSE:**  Subject to and without waiving her general objections, Plaintiff states the following:

    a. Dr. Atwell, Dr. Ralston, Dr. Berbano, Dr. Singh, Dr. Wu
    b. Dr. Berbano
    c. Dr. Berbano
    d. Dr. Macedo, Dr. Mazique, Dr. Berbano, Dr. Wilder
    e. Dr. Gofreed, Dr. Berbano
    f. Dr. Macedo, Dr. Berbano, Dr. Wilder

3.  For each alleged impairment identified in Interrogatory No. 1, identify all such impairments that affect your major life activities, indicating, for each alleged impairment, what major life activities you contend are affected by such impairment.

**RESPONSE:**  Subject to and without waiving her general objections, Plaintiff states the following:

**Major Depression Disorder** affects Plaintiff's major life activities of concentrating and sleeping;

**Hypothyroidism** affects Plaintiff's major life activities of sleeping;

**Hyperthyroidism** affects Plaintiff's major life activities of sleeping;

**Chronic Migraines** affect Plaintiff's major life activities of concentrating;

**Obstructive Sleep Apnea** affects Plaintiff's major life activities of sleeping; and

**Head/neck/shoulder/back/leg pain and muscle spasms** affect her major life activities of lifting, sitting, standing, and sleeping

4. For each alleged impairment identified in Interrogatory No. 1, identify all physicians, nurses, therapists, counselors, health care practitioners or other persons with knowledge of how your impairment(s) affects your major life activities.

**RESPONSE:** Subject to and without waiving her general objections, Plaintiff states the following: See response to interrogatory number 2.

5. Provide a complete description of the accommodations for any alleged disability or handicap that you contend was improperly denied and, for each such accommodation, state (a) the nature of each accommodation you requested; (b) the materials you submitted in support of your request; (c) when you first submitted your request for an accommodation and the date of any additional submissions you made to support your request; (d) when the accommodation allegedly was denied; and (e) by whom.

**RESPONSE:** Subject to and without waiving her general objections, Plaintiff states she requested the following reasonable accommodations by letters dated April 16, 2010 and July 16, 2010. See ROI F-10 00259-00264.

**Full spectrum light:** On or about May 6, 2010, Mr. Cohen informed Plaintiff that he had requested several lights be turned off above Plaintiff's desk, however, this did not accommodate Plaintiff's request for full spectrum lighting as opposed to fluorescent lighting. Plaintiff did not receive full spectrum lighting. See ROI F-10 00260

**Telecommuting:** Plaintiff's request to telework was effectively denied on May 6, 2010, when Mr. Cohen failed to provide her telework along with her other requested accommodations. Plaintiff also requested, but was denied telework to complete training via emails dated August 4, 2010 and September 2, 2010. Her requests were denied by Mr. Cohen.

**Work in area not subject to cool air currents:** Plaintiff's request was effectively denied on May 6, 2010 when Mr. Cohen failed to grant this along with other requested accommodations.

**Flexible Work Schedule:** Plaintiff requested to begin work at later times including at 11am by letter dated April 16, 2010; at 10:00 am by letter dated May 21, 2010; and at 9:30am by

3

letter dated July 16, 2010. On May 6, 2010, Mr. Cohen denied her requests. Plaintiff also requested a change in her work schedule by emails dated May 26, 2010 and June 1, 2010 to Mr. Cohen. On June 1, 2010, Mr. Cohen again denied Plaintiff's requests, stating she could come in at 9:00 am at the latest.

**Weekend Work Hours:** Plaintiff's request was effectively denied on May 6, 2010, when Mr. Cohen failed to grant this along with other requested accommodations.

6.      Provide a complete description of any accommodation, whether in part or in full, for any alleged disability or handicap that the Agency has granted you, and identify when any such accommodation was granted and by whom.

**RESPONSE:**   Subject to and without waiving her general objections, Plaintiff states that on May 5, 2010, Plaintiff's supervisor, Greg Cohen, granted her the following accommodations:

- Noise-cancelling headset
- Anti-glare screen for computer screen
- Permitted wearing sunglasses in the office
- Turned off some fluorescent lights in Plaintiff's office

7.      Identify the disability or handicap that you contend was the basis for each requested accommodation described in Interrogatory No. 5, including the (a) physical or mental impairment underlying the disability or handicap; (b) for each such impairment, the manner in which any such impairment affected your major life activities; and (c) to the extent any requested accommodation was due to a change in your mental and/or physical condition, identify when this change in condition first occurred.

**RESPONSE:**   Subject to and without waiving her general objections, Plaintiff states the following:  See Response to interrogatory number 1 and ROI, tab F-10, p. 00259 through 00264

8.      With respect to any claim of disability discrimination in the Complaint, identify each instance in which you claim that the Agency took adverse action against you "because of [your] disability, its perception of [you] as if [you] were disabled], and its record of [your] disability," including (a) a description of any such adverse action; (b) the identity of the person(s) you contend was responsible for taking the adverse action; (c) all facts on which you rely for contending that the action was motivated by any alleged disability or handicap; (d) all facts on which you rely for contending that the Agency perceived you as if you were disabled; and (e) all facts on which you rely for contending that the Agency had a record of your disability.

**RESPONSE:**   Subject to and without waiving her general objections, Plaintiff states that she was denied reasonable accommodations and as a result of the Agency's failure to accommodate her, she was charged AWOL, issued letters of reprimand, and her employment was terminated.

9.      With respect to any claim of retaliation in the Complaint, identify each instance in which you claim that the Agency took adverse action against you based on your prior protected

4

activity, including a description of any such adverse action, the description of your prior protected activity, the identity of the person(s) you contend was responsible for taking the adverse action, how he or she allegedly was aware of your prior protected activity, and all facts on which you rely for contending that the action was motivated by your prior protected activity.

**RESPONSE:** Subject to and without waiving her general objections, Plaintiff states that the Agency terminated her employment on September 30, 2010 in retaliation for requesting reasonable accommodations.

10. Identify any and all persons who investigated the facts of this case for you, and describe with particularity the dates of the investigation, the matter investigated, and whether any record or report was made of the investigation.

**RESPONSE:** Subject to and without waiving her general objections, Plaintiff states the following: See ROI submitted on April 11, 2012.

11. Identify each and every EEO complaint, both formal and informal, that you have filed against the Department of Homeland Security, including in your response the date of each complaint, the allegations contained in each complaint, the identity of the alleged discriminating Agency official(s), and how each complaint was resolved.

**RESPONSE:** Subject to and without waiving her general objections, Plaintiff states that she has not filed any other EEO complaints against the Department of Homeland Security.

12. State with specificity the basis for your apparent contention that you sought an accommodation to telework, and identify the forms that you submitted to verify that you had the technical capacity to telework.

**RESPONSE:** Subject to and without waiving her general objections, Plaintiff states that see response to interrogatory number 5.

13. State with specificity the basis for the apparent contention in Paragraph 14 of your Complaint that "Defendant failed to engage in an interactive dialogue with Plaintiff regarding her requests for accommodations."

**RESPONSE:** Subject to and without waiving her general objections, Plaintiff states that Defendant failed to engage her in an interactive process regarding her requests for reasonable accommodations, declined to grant her doctor's requests that Plaintiff be permitted to telework or have a later start time, and instead marked her as AWOL and terminated her employment.

14. State with specificity the basis for the apparent contention in Paragraph 17 of your Complaint that "Plaintiffs supervisor ... reassigned Plaintiffs work duties to her co-workers, excluded Plaintiff from meetings, and denied Plaintiff numerous training opportunities," and identify the (a) work duties that were allegedly reassigned; (b) the co-workers to whom the duties were reassigned; (c) the meetings from which you were allegedly excluded and dates on which the

5

meetings occurred; and (d) the training opportunities that you were allegedly denied, including the date on which you requested any such training opportunities.

**RESPONSE:**  Subject to and without waiving her general objections, Plaintiff states that she applied for and was approved to attend PRS Made Simple training; however, Mr. Cohen would not permit her to attend.   Plaintiff also requested to telework to complete the Acquisition BCF106 training and was similarly denied.

15.   State all facts that support, serve as the basis for, or otherwise relate to your contention or belief that the reasons stated by employees of the United States Coast Guard in its "Notice of Decision on Proposed Removal" were pretext for the discrimination you are alleging in this civil action.

**RESPONSE:**  Subject to and without waiving her general objections, Plaintiff states that she could have performed the essential functions of her job and/or maintained a regular work schedule if the Agency had provided her with the requested reasonable accommodations.

16.   If you claim that your voluntary retirement effective October 31, 2010, was not voluntary, explain why.

**RESPONSE:**  Subject to and without waiving her general objections, Plaintiff states the following:  See ROI, tab E(2).

17.   State whether you have suffered any economic or compensatory damages as a result of the alleged discrimination and/or reprisal, including the nature and amount of each element of damages you seek to recover (such as back pay, lost benefits, attorney's fees), the formula by which you calculated the amount of each element of damages, each and every fact upon which you rely in claiming damages, and all documents and communications supporting your claim for damages.

**RESPONSE:**  Subject to and without waiving her general objections, Plaintiff states that she seeks the following damages:

Backpay at the GS-13 level; Compensatory damages in the amount of $300,000; and attorney's fees at the Laffey Matrix.

18.   State with specificity whether you have developed any physical or mental condition as a result of the alleged discrimination and/or retaliation, including a description of each such condition, the identity of each health care provider from whom you have sought treatment, any treatment you have received, including the dates and nature of treatment, diagnoses or medications, and all documents concerning such condition and/or treatment.

**RESPONSE:**  Subject to and without waiving her general objections, Plaintiff states that as a result of the discrimination, she suffered increased anxiety and has been receiving treatment from Dr. Singh and Dr. Wu of MedPsych Health Care Center consisting of monthly psychotherapy and daily anti-anxiety medications.

6

19.   Identify any relief other than economic or compensatory damages, whether monetary or equitable, to which you claim to be entitled, describing in detail the relief the basis for your belief that you are entitled to such relief, and identify any witnesses or documents that relate to your claim for such relief.

**RESPONSE:**  Subject to and without waiving her general objections, Plaintiff states that she seeks the following:

a.   Reinstatement to a GS-13 position

b.   Audit of the Voluntary Leave Program and reimbursement of leave; and

c.   Change all AWOL to LWOP.

20.   Identify all expert witnesses you will call or expect to call at the trial in this action and describe the subject matter on which such expert witnesses will testify.

**RESPONSE:**  Subject to and without waiving her general objections, Plaintiff states that she may call the following individuals as her treating physicians as well as expert witnesses regarding her medical condition and how it affected her: Dr. Berbano, Dr. Atwell, Dr. Ralston, and Dr. Singh.

21.   State with specificity your whereabouts during the hours of 2 P.M. and 8 P.M. on December 18, 2009.

**RESPONSE:**  Subject to and without waiving her general objections, Plaintiff states the following:

On November 23, 2009, Plaintiff informed her supervisor, Greg Cohen that she wanted to participate in the Chief Petty Officer Association holiday party for the cafeteria workers that would be held on December 18, 2009.  He asked her how much time would be involved and Plaintiff told him a couple of hours.  Plaintiff asked if he wanted her to take leave and he said no.

On the morning of December 18, 2009, Plaintiff awoke with a major migraine that required her to call in sick.  She would not have left her house except that she had all of the food for the party at her house.  At approximately 12:30 pm she felt able to drive and drove to the Transpoint Building, arriving around 2:00 p.m.  Plaintiff's migraine returned within 45 minutes of her arrival and she went to the Chiefs' Mess to sit in the dark and rest for a while.  While there, she fell asleep and left about 8:00 p.m. to return home.

22.   State with specificity why you had not secured a letter from your physician until March 3, 2010, to cover your January 25-26, 2010, absences, which you mention in your March 9, 2010, letter to your supervisor.

7

**RESPONSE:**   Subject to and without waiving her general objections, Plaintiff states that she did not provide a doctor's note initially because had only missed two days and a doctor's note is not required unless an employee is absent for three days.   On February 22, 2010, after Mr. Cohen issued Plaintiff a letter of reprimand he requested that she obtain medical documentation for the absences.   Plaintiff contacted her doctor as soon as possible thereafter for an appointment and obtained the letter dated March 3, 2010

## VERIFICATION

I certify that the foregoing answers are true and correct to the best of my knowledge and belief.

March 18, 2013
Date

Edna M. Doak
Edna Doak

Date:   March 18, 2013

Respectfully submitted,

Alan Lescht, DC Bar # 441691
Susan L. Kruger, DC Bar # 414566
Rani Rolston, DC Bar # 974052
Alan Lescht & Assoc., PC
1050 17th St., NW, Suite 400
Washington, D.C. 20036
Tel (202) 463-6036
Fax (202) 463-6067
Attorneys for Plaintiff

8

## CERTIFICATE OF SERVICE

I certify that on this 18th day of March, 2013, a copy of the foregoing was sent by electronic and first class mail mail to the following:

Michelle Lo
Assistant United States Attorney
555 4th St. NW
Washington, DC 20530
Michelle.Lo2@usdoj.gov

Alan Lescht

9

# EXHIBIT 21

**Souther, Rory**

| | |
|---|---|
| **From:** | Daye, Jeffery |
| **Sent:** | Wednesday, May 05, 2010 4:11 PM |
| **To:** | King, Starlisha; Cohen, Gregory |
| **Cc:** | Watson, Jon; Souther, Rory; Scott, Kathryn; 'edwinv@douglasdev.com'; Cashwell, Marlyn |
| **Subject:** | RE: CUBE LIGHTING |

Ms. King,

Yes, this meets the requirements.

Thank you.

v/r,

Jeffery A. Daye
Building Operations Manager
Facilities & Engineering Div
USCG, SILC DET Washington
Ph:(202)372-4041
Fax:(202)372-4903

-----Original Message-----
From: King, Starlisha
Sent: Wednesday, May 05, 2010 4:04 PM
To: Daye, Jeffery; Cohen, Gregory
Cc: Watson, Jon; Souther, Rory; Scott, Kathryn; 'edwinv@douglasdev.com'; Cashwell, Marlyn
Subject: RE: CUBE LIGHTING

Hi Mr. Daye,

I'm not familiar with having to disclose that information. As the HR specialist assisting Mr. Cohen with this, I have knowledge of the medical that has been provided to substantiate this request. Mr. Cohen is the supervisor. Please let me know if this meets your requirements. Thanks.

Star

-----Original Message-----
From: Daye, Jeffery
Sent: Wednesday, May 05, 2010 3:57 PM
To: Cohen, Gregory
Cc: Watson, Jon; King, Starlisha; Souther, Rory; Scott, Kathryn; 'edwinv@douglasdev.com'; Cashwell, Marlyn
Subject: RE: CUBE LIGHTING

Mr. Cohen,

Please provide us with a written statement from the employee's physician and/or the CG medical officer.

v/r,

Jeffery A. Daye
Building Operations Manager

USCG6                                        1                                Attachment 4

/ / . )

174

Facilities & Engineering Div
USCG, SILC DET Washington
Ph:(202)372-4041
Fax:(202)372-4903

-----Original Message-----
From: Cashwell, Marlyn
Sent: Wednesday, May 05, 2010 3:45 PM
To: Cohen, Gregory; Daye, Jeffery
Cc: Watson, Jon; King, Starlisha; Souther, Rory; Scott, Kathryn; edwinv@douglasdev.com
Subject: RE: CUBE LIGHTING

Mr. Cohen,

    Thank you for below information; your request has been addressed.


Jemal Building
1900 Half Street
South West
Washington DC 20953
Facilities Specilitlist
Room 7-0714
(202) 475-3348


-----Original Message-----
From: Cohen, Gregory
Sent: Wednesday, May 05, 2010 12:25 PM
To: Cashwell, Marlyn
Cc: Watson, Jon; King, Starlisha; Souther, Rory; Scott, Kathryn
Subject: CUBE LIGHTING

Hi Ms. Cashwell,

I met you down in the lobby of the 7th floor today.

I am requesting that three of the overhead lights, directly above the desk in cube 07-0735 be
turned off in order to provide reasonable work accommodations to employee in that cube.  The
employee's physician and the Coast Guard Medical Readiness Officer have both recommended we
provide her this accommodation.

Please let me know if you can do this for us and an expected timeline so I may let the
employee know.

Thank you so much in advance.

Greg

Greg Cohen
CG-9283 | Business Management and Metrics Division gregory.k.cohen@uscg.mil Office
202.475.3009 | Cellular 202.596.0382 |Fax 202.475.3914 https://apms.uscg.mil/Portal/

USCG7                                                        2                                                        2

# EXHIBIT 23

## Cohen, Gregory

| | |
|---|---|
| From: | Cohen, Gregory |
| Sent: | Tuesday, June 01, 2010 2:09 PM |
| To: | Doak, Edna |
| Cc: | Souther, Rory; King, Starlisha; Hughes, Elena; Kennedy-Johnson, Angela |
| Subject: | WORK HOUR ACCOMODATIONS |

Edna,
In response to your letter of 21 May you requested that your start time be moved from 0815 to 1000. This requests appears to rescind your previous request to start at 1100 which was determined to not be supportable by the office due to project work.

A 1000 start is also not acceptable but I would like to offer you a change from 0815 to 0900. Please let me know if the 0900 start is acceptable, if it is I will have the time card adjusted at the beginning of the next pay period.

Greg

Greg Cohen
CG-9283 | Business Management and Metrics Division gregory.k.cohen@uscg.mil Office
202.475.3009 | Cellular 202.596.0382 |Fax 202.475.3914 https://apms.uscg.mil/Portal/

Exhibit

GOVERNMENT EXHIBIT

# EXHIBIT 24

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commandant
United States Coast Guard

1900 Half Street, S.W.
Washington, DC 20593-0001
Staff Symbol: CG-921
Phone: (202) 475-3009
Email : gregory.k.cohen@uscg.mil

12750
May 24, 2010

## MEMORANDUM

| | | | |
|---|---|---|---|
| From: | Greg Cohen<br>CG-9283 | Reply to<br>Attn of: | CG-9283<br>Greg Cohen |

To:   Ms. Edna Doak
      Management Analyst, GS-0343-13

Ref:   (a) Civilian Personnel Actions: Discipline, Performance, Adverse Actions, Appeals and
           Grievances, COMDTINST M12750.4, CH-1 dated 12/15/87
       (b) 5 CFR 752
       (c) Employment Status memorandum dtd 19 January 2010
       (d) Absent without leave (AWOL) status memo dtd 25 January 2010
       (e) Letter of Reprimand dtd 22 February 2010
       (f) Abeyance Agreement dtd 23 February 2010
       (g) Request for Medical Documentation dtd 24 March 2010
       (h) Medical Status and accommodations memo dtd 6 May 2010

Subj:   LETTER OF REPRIMAND

1.   I am officially reprimanding you under the provisions of reference (a) and (b) for absent
     without leave (AWOL) for 30:75 hours. This letter of reprimand supersedes reference (e),
     which was held in abeyance 23 February 2010, reference (f). This charge is based on the
     following:

     Absent without leave (AWOL)

     On January 19, 2010, you were issued an employment status memorandum, reference (c),
     requesting you immediately return to a full time duty status and notifying you of your
     current leave status and giving you specific guidance on future leave request. This memo
     came after I had previously counseled you verbally on numerous occasions concerning
     your time and attendance. You have failed to follow this guidance.

     On January 25, 2010 you were AWOL from your place of duty for 3:30 hours. You called
     in at 10:30 and left a message stating you had just woken up. You did not request leave in
     advance for this time-off. You requested leave through the timecard system upon arrival
     at work and this leave was denied because you did not provide any proof of a medical
     appointment and you have a negative annual and sick leave balance. You were issued a
     memorandum, reference (d) notifying you of your AWOL status on this day.

     On January 26, 2010 you were AWOL from your place of duty for 4:15 hours. You called
     in at 11:15 to say you had just woken up. You did not request leave in advance for this
     time-off. You requested leave through the timecard system upon arrival at work and this
     leave was denied because you did not provide any proof of a medical appointment and
     you have a negative annual and sick leave balance.

Exhibit

GOVERNMENT
EXHIBIT
Doak 15
4/9/13   RJ

00289

Subj: LETTER OF REPRIMAND
                        12750
                        24 May 2010

Given the above instances and your failure to contact me or provide any documentation for your absences and tardiness, you were charged as absent without Leave (AWOL) for approximately 7:45 hours on January 25th and 26th as follows:

25 January 2010 – 3:30 hours
26 January 2010 – 4:45 hours

On 22 February 2010 you were issued a Letter of Reprimand for AWOL on 25 and 26 January, reference (e). The letter of reprimand was held in abeyance for 10 work days, reference (f) and you were given the opportunity to provide acceptable medical documentation to justify your absences. The medical documentation that you provided did not support your absences on these days and the charges of AWOL have been sustained.

On May 10, 2010 you were charged AWOL from your place of duty for 8:00 hours. You are scheduled to arrive at work at 8:15 a.m. You called in 09:02 and said you were coming in, called again at 11:04 and finally at 11:14 and left a message that you were sick and not coming into work but you did not provide any documentation to support this absence upon your return to work therefore your request for LWOP was denied.

On May 11, 2010 you were charged AWOL from your place of duty for 8:00 hours. You are scheduled to arrive at work 8:15 a.m. You called in at 8:15 a.m. and said you were coming in and then called again at 11:29 and left a message that you were sick and not coming in but you did not provide any documentation to support this absence upon your return to work therefore your request for LWOP was denied.

On May 13th, 2010 you were charged AWOL from your place of duty for 4:00 hours. You are scheduled to arrive at work 8:15 a.m. You called in at 10:02 a.m. and left a message to say you had just woken up after not sleeping well. You arrived at work at 12:15 and requested LWOP. You did not provide any documentation to support this absence so your request for LWOP was denied.

On May 14th, 2010 you were charged AWOL from your place of duty for 3:30 hours. You are scheduled to arrive at work 8:15 a.m. You called in at 10:12 a.m. to say you had just woken up and were coming into work. You arrived at work at 11:14 and requested LWOP. You did not provide any documentation to support this absence so your request for LWOP was denied.

Given the above instances and your failure to provide any documentation for your unscheduled absences and tardiness, I have charged you as absent without Leave (AWOL) for approximately 23:30 hours from 10 – 14 May, 2010.

2. On March 24, 2010, you were issued a memorandum requesting medical documentation regarding your current medical condition(s) and how it relates to your ability to perform the essential functions of your position and allow you to maintain regular attendance at work, reference (g). Since our meeting on 24 March 2010, your leave situation has not changed. You were allowed, pending submission of medical documentation, to take LWOP. We also discussed how you had used all your advanced annual and sick leave and you would have to request LWOP for all future documented absences. Since March 24th you have had an additional 99 hours of unscheduled absences. Your medical documentation does not support your previous nor continued unscheduled absences from work.

00290

Subj: LETTER OF REPRIMAND                                  12750
                                                           24 May 2010

3. On May 6, 2010, I provided you accommodations requested by your medical report to include an anti-glare device, noise cancelling headsets, wearing of sunglasses in the workplace and had the lights turned off over your desk. I also provided you the location of numerous private dark spaces that you could use as needed. These accommodations should assist you with performing the essential functions of your position. Your medical report does not support your incapacitation for duty on a regular and recurring basis. You should be able to arrive at work on time following your doctor's and physician recommendations. I advised you by reference (h), that I will continue to accommodate your leave request for scheduled medical appointments. However, I cannot grant leave that is not available. You currently have the following leave balances:

| Annual | Sick | LWOP |
| --- | --- | --- |
| -137:45 | -238:00 | 134:15 |

You have exhausted your use of leave under the Family Medical Leave Act (FMLA) and have been advanced the maximum amount of leave allowed. Additionally, your leave accrual has reduced to half a pay period for annual and sick leave due to your LWOP status. You have not received any donated leave through the Voluntary Leave Transfer Program (VLTP).

4. In determining this disciplinary action, I considered the impact your absences has had on this command. I have considered your medical condition. Your work ethic, specifically your ability to provide eight solid hours of work each scheduled work day, is lacking. You have been counseled on numerous occasions to impress upon you the importance of maintaining a good attendance record. I also considered such factors as the nature and seriousness of the offense, and its relation to your duties and responsibilities, including your length of service and clarity with which you were on notice or warned about the conduct in question. However, the seriousness of your misconduct is unacceptable and will not be tolerated. I implore you to make an effort to arrive at work on time.

5. I consider this reprimand to be the minimum remedy necessary to correct your behavior and maintain good order and discipline in the organization. Any further violations of this nature or any future instances of misconduct may result in more severe disciplinary action being taken against you, up to and including removal from Federal service.

6. While I am concerned with the economy and efficiency of operations, I am also concerned about your health and well-being. It is the policy of the U.S. Coast Guard to offer counseling to employees who may be experiencing personal problems that may be affecting their work performance, attendance, or conduct. If you are experiencing any personal problems that may be affecting your ability to report for and/or remain at work during normal scheduled work hours, you can receive assistance by contacting a counselor with the Employee Assistance Program (EAP) at 1-800-523-5668. The EAP is a confidential service available to all employees. If you choose to utilize the services of the EAP during normal working hours, you must notify me in advance so that I may schedule/excuse your absence from work.

7. You may reply in writing to this reprimand. This reprimand and any reply submitted will be retained as a temporary record in your Official Personnel Folder (OPF) for a reckoning period of up to two (2) years, or upon your separation from the agency. Consideration will be given to removing this letter from your OPF after one year if I determine that there have been no further instances of misconduct of this kind in the intervening period.

00291

Subj: LETTER OF REPRIMAND

12750
24 May 2010

8.  You have the right to file a grievance under the negotiated grievance procedure outlined
    in the Memorandum of Agreement (MOA) between The United States Coast Guard and
    AFGE 3313. Any grievance filed should be submitted within fifteen (15) calendar days
    to Mr. Rory Souther.

9.  If you believe this action is based on prohibited discrimination because of your race,
    color, religion, sex, national origin, age, or physical or mental disability you have the
    right to file an Equal Employment Opportunity (EEO) complaint in accordance with
    COMDTINST M5350.4 and 29 CFR 1614. To do so, you must contact an EEO
    counselor within forty-five (45) calendar days of the effective date of this action. You
    may use either the EEO complaint process or the negotiated grievance procedure, but not
    both.

10. If you have any questions concerning the procedural aspects of this action, you may
    contact Starlisha King, Human Resources Specialist, at 202-475-5288.

                                                #

Copy:  OPF
       CG-1214
       AFGE 3313

       Please sign the receipt of acknowledgement below as evidence that you have received this
       letter. Your signature does not mean that you agree with the contents of the letter; nor by
       signing, are you forfeiting any of your rights cited above.

Receipt Acknowledged: _____     5/25/10
                          Employee's signature      Date

00292
4

# EXHIBIT 27

## Souther, Rory

| | |
|---|---|
| **From:** | Souther, Rory |
| **Sent:** | Tuesday, August 17, 2010 12:52 PM |
| **To:** | Hughes, Elena; Cohen, Gregory |
| **Cc:** | King, Starlisha; Doak, Edna; 'NELSON@afge.org'; Turner, Joanne |
| **Subject:** | RE: START TIME |

All,

The 0900 start time remains in effect as long as it's medically necessary. However, we need an indication of when Edna might be able to achieve an 0800 start time. Edna's performance plan includes formal training that typically starts at 0800. She has requested training classes (some that include travel) which we've had to deny due to lingering uncertainties with the ability to achieve an 0800 start. Defense Acquisition University classes (for acquisition training) in particular are quota driven, and no-shows or inability to complete the course impact the individual's ability to obtain future quotas. We want to ensure success, and need to know when Edna can achieve an 0800 start to allow for planning and approval of requested training.

Greg's succinct message that started this e-mail string alludes to a meeting on 8 July 2009 to address, among other issues, Edna's work hours due to the effects of medication. Attendees were Greg Cohen - Supervisor CG-9283, Valerie Warner - Team Lead Air, Edna Doak - BM HH60 and Elaine Hughes - volunteer representing 3313. At that time, Greg had agreed to adjust Edna's work hours to an 0830 start because of her medication rather than his recommended 0730 start. Edna was to provide a doctor's note for length of prescription with an indication of when she could return to an earlier start. We discussed this again with Edna on 23 July 2010. We merely want to clarify when she can return to an earlier start time so that, at the earliest opportunity, we can support her requests for training.

Please accept my apology for not engaging sooner. Budget events had me here late last night and fully engaged earlier this morning to meet a 1200 deadline today.

Rory

Rory Souther
Chief, Office of Resource Management (CG-928) Coast Guard Acquisition Directorate (CG-9)

-----Original Message-----
From: Hughes, Elena
Sent: Monday, August 16, 2010 4:26 PM
To: Cohen, Gregory
Cc: Souther, Rory; King, Starlisha; Doak, Edna; 'NELSON@afge.org'
Subject: RE: START TIME

Greg, I do not know what you are asking -- this back and forth is simply not productive. This is the first I heard of this additional requirement for documentation to "indicate when you will be done with your medication".

At this point, she is on a 0900 a.m. arrival as agreed to and Edna is doing all she can to make the arrival at 0900. This arrival time was agreed to in your meeting with Ms. Doak and Mr. Souther on 23 July.

She never had a 0800 arrival time.

USCG225

ENCLOSURE (14)

1

**184**

Elena Hughes
AFGE Local 3313

-----Original Message-----
From: Doak, Edna
Sent: Monday, August 16, 2010 2:22 PM
To: Cohen, Gregory
Cc: Souther, Rory; King, Starlisha; Hughes, Elena; Doak, Edna
Subject: RE: START TIME

Greg,
I have never been on an 0800 start time.  My start time since 26 November 2007 has been 0815.

As far as "medication" is concerned, you will have to identify more specifically what you are
asking.  You may pose your questions to my doctor through the MRO.

However, I can tell you I am being evaluated on 28 August (Saturday) for a treatment which
hopefully will allow tapering off and eventually stopping one of the sedating medications.

I will keep you posted, as I always have.
Thanks,
Edna

-----Original Message-----
From: Cohen, Gregory
Sent: Monday, August 16, 2010 1:51 PM
To: Doak, Edna
Cc: Souther, Rory; King, Starlisha
Subject: START TIME

Edna,
We moved you to 0900 start time but I still do not have any paperwork to indicate when you
will be done with your medication as agreed to by you.  Please provide the documentation so I
know when we can get you back to a 0800 start time.

Greg

Greg K. Cohen
CG-9283
Chief, Business Management and Metrics
(W) 202.475.3009
(C) 202.596.0382

# EXHIBIT 29

**Cross, Chester CTR**

| From: | Doak, Edna |
|---|---|
| Sent: | Tuesday, July 20, 2010 6:34 PM |
| To: | Cohen, Gregory |
| Cc: | King, Starlisha; Cross, Chester CTR; Souther, Rory; Doak, Edna |
| Subject: | RE: 7/20/10 |

Greg,
What "counseling" session was that?
Edna

-----Original Message-----
From: Cohen, Gregory
Sent: Tuesday, July 20, 2010 6:22 PM
To: Doak, Edna
Cc: King, Starlisha; Cross, Chester CTR; Souther, Rory
Subject: RE: 7/20/10

Edna,
According to your team lead and project lead bm, you are not getting anything done related to
the project.  Please remember the counselling session we had last week in regards to your
performance this period.

I authorized time for today.  Not in the future.

Please read my email very carefully and if you don't understand it please ask specific
questions.

Greg

G. K. Cohen


-----Original Message-----
From: Doak, Edna
Sent: Tuesday, July 20, 2010 05:01 PM Eastern Standard Time
To:   Cohen, Gregory
Cc:   King, Starlisha; Cross, Chester CTR; Souther, Rory; Hughes, Elena; Doak, Edna
Subject:   RE: 7/20/10

Greg,
I can assure you I am working when I am here, and your insinuation is not appreciated.  Not
everything I do is on the computer.  I also work extra hours to get the job done.

You are mistaken that I am "blaming" anyone for my problems.  What I am doing, however, is
complying with what is being asked of me and that is to provide more and more medical
documentation and to give more and more personal medical information even though this causes
interruptions to my work.  I do it in good faith that job relations will improve.

Calling from work today for medical documentation was not necessary as I will obtain
information for the MRO next Monday DURING my regular weekly appointment (car accident
related). Thank you for granting 15-30 minutes for such calls in the future.

Since you wrote me you will no longer accept a printout from WRAMC showing I've kept my
appointment as medical documentation, I can only provide medical letters to H.R. for MRO

review and you will be advised later.  This just slows the process and, unfortunately, leaves you without information for a longer time.

I agree to request time in advance when I need to meet with EAP, H.R. or MRO. Please name an alternate who may grant permission in the event you are not available.
Thanks,
Edna

-----Original Message-----
From: Cohen, Gregory
Sent: Tuesday, July 20, 2010 3:49 PM
To: Doak, Edna
Cc: King, Starlisha; Cross, Chester CTR; Souther, Rory
Subject: RE: 7/20/10

Edna,

You may take a reasonable amount of time (15-30 minutes) to call your doctor and request this documentation.  You are not authorized to spend any more time with the MRO or HR without getting approval from me.  You are not authorized to spend any time researching these issues or performing anything other than project or financial work without my permission.  The mission of the organization comes first, anything else must be approved by me beforehand.  I will approve reasonable time periods to talk to HR or the MRO on a case-by-case basis.

Your request for leave on Monday is denied.  You have not provided any medical documentation to substantiate that these appointments are related to your car appointment.  Once again, I am requesting that you please take advantage of the Employee Assistance Program.

You need to stop blaming everyone else for your problems.  All these problems will end if you start coming to work on time and actually working while you are here.

Greg

-----Original Message-----
From: Doak, Edna
Sent: Tuesday, July 20, 2010 3:00 PM
To: Cohen, Gregory
Cc: King, Starlisha; Cross, Chester CTR; Souther, Rory; Hughes, Elena
Subject: RE: 7/20/10

Greg,
You misunderstood.  FYI - I was asked by Mr. Cross to speak with the MRO because she had questions about the medical documentation submitted for yesterday.  She asked me to have my doctor add more information to the letter, and I agreed to return the letter to my doctor for revision at next Monday's weekly appointment on 26 July. I have not yet requested leave for the appointment in WebTA.

I am not making a special trip to get paperwork.  It's a regular weekly appointment that is part of my medical treatment plan.

I am permitted to work on "Edna issues" under the AFGE bargaining unit.  For today, I was requested by H.R. to clarify information for the MRO, a situation which you have caused to be necessary.
Thanks,
Edna

2
2

-----Original Message-----
From: Cohen, Gregory
Sent: Tuesday, July 20, 2010 2:38 PM
To: Doak, Edna
Cc: King, Starlisha; Cross, Chester CTR; Souther, Rory
Subject: RE: 7/20/10

Edna,

You don't have any leave approved for Monday the 26th. I will not authorize leave to get
paperwork at the hospital. I recommend you call them on the phone, have them prepare the
paperwork and then fax it to you. We need you here working eight hours a-day!

You are spending too much time out of the office, without approved leave, for unnecessary
reasons and when you are in the office you are spending too much time trying to justify all
this effort. When you are at the office we need you working on Project and Finance related
issue, not Edna issues. No more time on this please unless you clear it with me or Angela
beforehand.

I expect you to be at work Monday morning like any other day.

Greg

-----Original Message-----
From: Doak, Edna
Sent: Tuesday, July 20, 2010 2:33 PM
To: Cohen, Gregory
Cc: Doak, Edna
Subject: RE: 7/20/10

Hi, Greg,
I spoke with Chester Cross who is handling some of Star's work while she is away. He told me
to talk with the MRO about the letter I had for yesterday's appointment. The MRO gave it
back to me to get additional information when I see my doctor next Monday. I will be
bringing two letters on Monday to cover both appointments.
Thanks,
Edna

-----Original Message-----
From: Cohen, Gregory
Sent: Tuesday, July 20, 2010 1:12 PM
To: Doak, Edna
Subject: RE: 7/20/10

Edna,
I have not received anything from HR or the MRO that substantiates your claim that treatment
for stress is related to your car accident or is a condition that would qualify for VLTP.
The final decision is with CG-1, I made my recommendation based on the data I was provided
and my discussions with CG-1 HR and VLTP staff.

Greg

-----Original Message-----
From: Doak, Edna
Sent: Tuesday, July 20, 2010 10:18 AM
To: Cohen, Gregory

USCG46

3
3

189

Cc: Doak, Edna
Subject: 7/20/10

Good morning, Greg,
As you know, at approx 0800 I called to say "thank you" for denying my request to extend my participation in the VLTP program.  It was the last thing I saw last night, and the first thing on my mind on waking this morning.  I let you know I had a migraine and was getting ready to come to work as soon as possible.

I also called Angela to let her know I would be arriving this morning. I also gave her status on the Funds Transfer Memo I left for Ken King's signature.  However, this morning's events now cause this item to be pending further discussion.

My arrival time was 9:41am.  I will be requesting LWOP in WebTA.
Thanks,
Edna

# EXHIBIT 30

# Professional Certifications – FM Career Path



## Level I Certification
2 years experience

**ACQ 101** Fundamentals of Systems Acquisition Management

Plus the Following

**BCF 103** Fundamentals Of Business Financial Management

**BCF 102** Fundamentals of Earned Value Management

**BCF 106** Fundamentals of Cost Analysis

- Knowledge based - YA 1
- Associated in Applied Science or equivalent business or business-related field

## Level II Certification
4 years experience

**ACQ 201** Intermediate Systems Acquisition

**BCF 211** Intermediate Business Acquisition Management

Plus the Following

**BCF 205** Contractor Business Strategies

**BCF 203** Intermediate Earned Value Management

**CLM 024** Contracting Overview

**CLM 017** Risk Management

Online Pre-Test Required

- Knowledge based - YA 2
- Baccalaureate Degree Required

## Level III Certification
6 years experience

**BCF 301** Advanced Financial Management

**CLM 013** Work Breakdown Structure

**CLM 031** Improve Statement of Work

- Knowledge based - YA 3
- Baccalaureate Degree Required

ACQ 101 would be replaced by the DHS version which is HSAC 101

CG-928 Office of Resource Management

 **Acquisition Directorate**
Resource Management

USCG150

Attachment 24

174

18

# EXHIBIT 31

Souther, Rory

| | |
|---|---|
| From: | Cohen, Gregory |
| Sent: | Thursday, September 02, 2010 4:11 PM |
| To: | Souther, Rory |
| Subject: | FW: BCF 106 - Telecommute request |

-----Original Message-----
From: Doak, Edna
Sent: Thursday, September 02, 2010 4:10 PM
To: Cohen, Gregory
Cc: Kennedy-Johnson, Angela; Doak, Edna
Subject: RE: BCF 106 - Telecommute request

OK, that should work fine.

-----Original Message-----
From: Cohen, Gregory
Sent: Thursday, September 02, 2010 3:57 PM
To: Doak, Edna
Cc: Kennedy-Johnson, Angela
Subject: RE: BCF 106 - Telecommute request

Edna,
There is not enough time now to establish a telecommuting agreement and ensure everything is
functional. I mentioned this to you on August 5th. We would have to review the Commandant
Instruction to see if you qualify for this program.

I recommend you go to HQ and use one of the remote workstations, I think they are on the 5th
floor. They are very quiet and usually completely deserted.

Greg

-----Original Message-----
From: Doak, Edna
Sent: Thursday, September 02, 2010 2:40 PM
To: Cohen, Gregory
Cc: Kennedy-Johnson, Angela; Doak, Edna
Subject: RE: BCF 106 - Telecommute request

Greg,
Following up on this request. I appreciate your offer to telecommute on September 10th, but
the course ends on September 7th. I have a medical appt that morning, and could return home
to study paper copy the rest of the day before completing the exam questions online.

I have not had much success working on this course during the day, there are interruptions
and noise that make it difficult to work, let alone study.

I can go to Kinko's near my house to use their computers if my computer is offline.

Please let me know if I may telecommute on Tuesday, Sept. 7th to complete the course.
Thanks,
Edna

USCG4                                        1

GOVERNMENT
EXHIBIT
Doak  18
4/9/13      DJ

Attachment 3

2 B

194

-----Original Message-----
From: Cohen, Gregory
Sent: Thursday, August 05, 2010 7:50 AM
To: Doak, Edna
Cc: Kennedy-Johnson, Angela
Subject: RE: BCF 106

Edna,

We do not authorize compensatory time to complete on-line training. You should be able to complete this training at your desk during normal work hours. If you get to the last month of the class (September) and you are not yet finished with the course you may work from home Friday September 10th to complete the course. If you need additional time after that please let me and Angela know so we can re-evaluate.

You will need to provide some proof that you can connect to the internet from home and get into the DAU training site before September 10th.

Thanks
Greg

-----Original Message-----
From: Doak, Edna
Sent: Wednesday, August 04, 2010 7:30 PM
To: Cohen, Gregory
Cc: Doak, Edna
Subject: BCF 106

Hello, Greg,

As you know, I am enrolled in BCF106. I request to earn comp time after hours or weekends to complete this course. If that is not possible, I request to telecommute at home where I can study in a quiet environment by the telephone if someone needs me.

Thanks,
Edna



# EXHIBIT 32

U.S. Department of
Homeland Security

United States
Coast Guard

Commandant
United States Coast Guard

U.S. Coast Guard
2100 2ⁿᵈ ST SW
Washington, D.C. 20598
Staff Symbol: CG-92
Phone: 202-475-3222
Email: rory.l.souther@uscg.mil

12750
9 August 2010

MEMORANDUM

From:   Greg Cohen
        CG-9283

Reply to    Mr. Rory Souther
Attn of:    (202) 475-3222

To:     Ms. Edna Doak
        Management Analyst, GS-0343-13

Subj:   NOTICE OF PROPOSED REMOVAL

Ref:    (a) 5 CFR Part 752
        (b) Civilian Personnel Actions:  Discipline, Performance, Adverse Actions, Appeals,
            and Grievances, COMDTINST M12750.4
        (c) Employment Status memorandum dtd 19 January 2010
        (d) Absent without leave (AWOL) status memo dtd 25 January 2010
        (e) Letter of Reprimand dtd 22 February 2010
        (f) Abeyance Agreement dtd 23 February 2010
        (g) Request for Medical Documentation dtd 24 March 2010
        (h) Medical Status and accommodations memo dtd 6 May 2010
        (i) Letter of Reprimand dtd 24 May 2010

1.  This is advance notice that I propose to remove you from your current position of
Management Analyst, GS-0343-13, and from Federal service in accordance with the provisions
of references (a) and (b). The basis for this action are your a) medical inability to perform the
essential duties of your position, due to various medical reasons, which have caused you to be
unable to maintain your regular work schedule and b) Absent without leave (AWOL). If found
warranted, this proposed action will not be effected before the notice period of thirty (30)
calendar days has expired. During this notice period, you will remain in a full pay status. This is
an administrative action; it is not a disciplinary action measure.

2.  Background information related to this misconduct is also included in this letter. The specific
facts regarding these charges are as follows:

Charge a).  Medical inability to perform the essential duties of your position, due to various
medical reasons, which have caused you to be unable to maintain your regular work schedule

Specification:  Since July 2009 and continuing to the date of this notice, you have been
granted a combination of annual leave, advance annual leave, sick leave, advance sick leave,
and leave without pay in addition to being absent without leave (AWOL). These absences,
lasting over twelve months, have continued for an unreasonable period of time with no
foreseeable end in sight. You have been absent from duty as a result of on-going medical
conditions for at least 52% of your scheduled work hours since January 31, 2010. You have
exhausted all of your sick and annual leave and have been granted over 173.45 hours of

Exhibit

GOVERNMENT
EXHIBIT
Doak 20
4/9/13   DJ

Subj: NOTICE OF PROPOSED REMOVAL                 12750
                                                 9 August 2010

Leave Without Pay (LWOP) since pay period 03-2010 due to medical reasons. Your position is one that needs to be filled by an employee available for duty on a regular, full-time basis.

**Charge b).**  Absent Without Leave (AWOL)

Specification: You failed to report to duty as scheduled and failed to submit administratively acceptable documentation to support your absences which were recorded as Absent Without Leave for the following dates:

| Date | Hours/Minutes | Status |
|------|---------------|--------|
| 19 Feb 2010 | 4:00 | AWOL |
| 22 Feb 2010 | 4:15 | AWOL |
| 24 Feb 2010 | 1:45 | AWOL |
| 26 Feb 2010 | 1:45 | AWOL |
| 10 May 2010 | 8:00 | AWOL |
| 11 May 2010 | 8:00 | AWOL |
| 13 May 2010 | 4:00 | AWOL |
| 14 May 2010 | 3:30 | AWOL |
| 18 May 2010 | 5:15 | AWOL |
| 19 May 2010 | 4:45 | AWOL |
| 20 May 2010 | 8:00 | AWOL |
| 21 May 2010 | 2:45 | AWOL |
| 25 May 2010 | 2:15 | AWOL |
| 26 May 2010 | 1:30 | AWOL |
| 27 May 2010 | 3:00 | AWOL |
| 28 May 2010 | 2:45 | AWOL |
| 01 Jun 2010 | 4:15 | AWOL |
| 03 Jun 2010 | 3:30 | AWOL |
| 04 June 2010 | 3:00 | AWOL |
| 22 June 2010 | 3:45 | AWOL |

2

00247

Subj: NOTICE OF PROPOSED REMOVAL

12750
9 August 2010

| | | |
|---|---|---|
| 23 June 2010 | 2:15 | AWOL |
| 24 June 2010 | 3:00 | AWOL |
| 25 June 2010 | 3:30 | AWOL |
| 28 June 2010 | 4:15 | AWOL |
| 29 June 2010 | 3:45 | AWOL |
| 30 June 2010 | 1:15 | AWOL |
| 1 July 2010 | 3:15 | AWOL |
| 2 July 2010 | 2:15 | AWOL |
| 7 July 2010 | 1:45 | AWOL |
| 8 July 2010 | 5:15 | AWOL |
| 9 July 2010 | 5:45 | AWOL |
| 14 July 2010 | 1:45 | AWOL |
| 15 July 2010 | 1:30 | AWOL |
| 16 July 2010 | 4:15 | AWOL |
| 19 July 2010 | 3:15 | AWOL |
| 20 July 2010 | 1:30 | AWOL |
| 21 July 2010 | 5:15 | AWOL |
| 22 July 2010 | 3:30 | AWOL |
| 23 July 2010 | 1:15 | AWOL |
| 27 July 2010 | 1:30 | AWOL |
| 28 July 2010 | 1:15 | AWOL |
| 29 July 2010 | 1:15 | AWOL |
| 30 July 2010 | 0:30 | AWOL |
| 21 July 2010 | 5:15 | AWOL |
| 22 July 2010 | 3:30 | AWOL |
| 2 August 2010 | 8:00 | AWOL |
| 3 August 2010 | 0:30 | AWOL |

3

00248

Subj: NOTICE OF PROPOSED REMOVAL                    12750
                                                    9 August 2010

4 August 2010              1:15                     AWOL

Background:

    a. On July 7th, 2009 I meet with you, your team lead, Coast Guard HR Representative and your union representative to discuss issues with your team lead, your entitlement to leave under the Family Medical Leave Act (FMLA) and performance issues. At the conclusion of the meeting, I agreed to adjust your work hours from 0730-1700 to 0830 – 1800 because of your medication and you agreed to provide medical documentation to document the length of the prescription and then to return to the 0730 start time at the completion of the prescription. You never provided any medical documentation or prescription information to support the later start times agreed to by all parties at the meeting.

    b. On January 19th, 2010 you were issued an employment status memorandum requesting you to return to a full duty status, reference (c). The memorandum discussed the negative impacts on the project and the resource office and your failure to complete mandated training. You were also told that you would not be advanced any additional sick and/or annual leave and that you will have to use Leave without Pay (LWOP) for any future medically documented absences. You were also requested to provide medical documentation so the organization could provide you accommodations if necessary and you were referred to the Employee Assistance Program (EAP).

    c. On January 27th, 2010 a discussion was held with you and your team lead in regards to incidents of AWOL for January 25, 26, and 27, 2010. On January 25 and 26, 2010, you called approximately three (3) hours after your start time, and on January 27, 2010, you did not call at all. We discussed your need to be on time for work at 0815 each day and I emphasized to you that you must show up for work on time, submit requests for leave before hand or within two (2) hours in advance and that you must provide medical appointment slips.

    d. On February 22, 2010, you were issued a Letter of Reprimand for AWOL and for Failure to Follow Leave Procedures. On February 23, 2010, an Abeyance Agreement was entered into with you and AFGE Local 3313 which required you to provide acceptable medical documentation to support the absences cited in the aforementioned Letter of Reprimand. However, the documentation submitted by you did not support the absences in the aforementioned Letter of Reprimand.

    e. On March 24, 2010, you were issued a Request for Medical Documentation. This letter expressed my concern over your continued unauthorized and unscheduled absences, and again requested you return to a full duty status. This letter stated that previous documentation you provided did not support your continued absenteeism nor did it clearly address whether you required any accommodations. You were given a deadline of April 9, 2010 to provide your medical documentation.

Subj: NOTICE OF PROPOSED REMOVAL                    12750
                                                    9 August 2010

      f.   On April 28, 2010, the Coast Guard's Medical Officer provided a review of your medical documentation and recommended that accommodations be provided to you for medical reasons.

      g.   On May 6, 2010, you were provided a letter on your medical status and accommodations. This letter noted that your leave situation had not changed and that you have had continued unscheduled absences since the request for medical documentation was provided. The Letter further confirmed that you were provided all the accommodations except the adjusted work hours from 1100-1900 daily.

      h.   On May 24, 2010, you were issued another Letter of Reprimand for AWOL and you were requested again to return to full duty status.

      i.   On June 1, 2010, you were provided an opportunity via email to accept an accommodation of a work hour start time change to 0900-1730 vice 0815-1645, but you chose not to accept that accommodation.

      j.   On July 23, 2010, we agreed to a change in your work hours from 0900-1730 effective July 26, 2010. You have been unable to adhere to this work schedule. You have continued to have unscheduled absences and have not submitted any further medical documentation to support your continued absences and inability to maintain a regular work schedule.

3. Your position as a Management Analyst, GS-0343-13 is critical to the workforce and is also a full-time position which requires that you be present in the office on a daily basis to perform your assigned duties. Project interaction is a critical part of your job which requires you to be in the office during normal work hours in order to interact with project staff. Likewise, other staff members have had to carry your workload as much as possible during your absences. Additionally, a great number of your assigned projects have not been completed or missed key deadlines due to your absences. Your performance requires constant and direct supervision and therefore we cannot accommodate any additional work hours or location arrangements. As such, and given the significant workload this staff is facing, your continued absences and inability to maintain a regular work schedule has had a negative impact on the mission of this office.

4. In making my decision to propose your removal, in addition to the above facts, I took into consideration the effect your continued absence has had on the organization and the need for the services of a full-time employee in the position. I also considered such things as your length of service, your overall attendance record, past disciplinary action, your medical condition, your continued inability to arrive at work on time, and your performance record. I also considered the amount of effort I have put into communicating my expectations to you. Based on the serious impact of your continued absence on the organization, I have determined that proposing a lesser remedy would not be appropriate. My confidence in your ability to be present for work to perform your assigned duties has been gravely eroded, and thus, I do not believe that you are fit for continued employment with the federal government. This proposal is made to promote the efficiency of the service.

5. This a proposal only. No final decision has been made, nor will it be made until after your reply has been received and considered or until after the expiration of your reply period. As soon

5
00250

Subj: NOTICE OF PROPOSED REMOVAL                          12750
                                                          9 August 2010

as possible after your reply has been received, or upon expiration of your reply period, you will be issued a written decision on this proposal.

6.  Prior to a decision on this matter, you have the right to answer this proposed action, orally and/or in writing to Mr. Rory Souther within seven (7) calendar days following receipt of this notice. You may also furnish affidavits and other documentary evidence in support of your reply. If you wish to make an oral reply, you or your union representative or other representative should contact Mr. Rory Souther to make arrangements. Consideration will be given to extending this period if you or your representative submits a written request to Mr. Rory Souther providing a justifiable reason for the extension. Mr. Souther may also be contacted at (202) 475-3222.

7.  The material upon which this notice is based and which has been relied upon to support the specifications set forth above is available for your review by contacting Starlisha King, Human Resources Specialist, at (202) 475-5288 for an appointment. If requested, you will be provided a reasonable amount of official time to review the material relied on to support this proposal; to prepare a response; and to secure affidavits.

8.  You may be represented by an attorney or other representative when making your reply, but such designation must be in writing and signed/dated by you and submitted to Mr. Rory Souther prior to making any reply. You have the right to be represented by an attorney or other representative of your choice. However, the Coast Guard may disallow a representative having a conflict of interest. Any information you present will be given full consideration. If you do not reply to the proposed action, a final decision will be made by Mr. Rory Souther on the basis of the information on the record.

9.  Because you have more than the requisite 18 months of civilian service under the Federal Employee Retirement System (FERS); and you may meet the medical requirements for disability retirement and have the right to exercise your option by applying for disability retirement. As you are aware, the U.S. coast Guard does not have the authority to make determinations on disability retirements. The Office of Personnel Management (OPM) makes decisions regarding disability retirement for civilian employees. Any request for disability retirement must be filed with OPM within one (1) year of separation from federal service. Since you are covered under FERS, you must also file for disability benefits under Social Security and provide documentation of such filing with your application for disability retirement. If you have any questions or concerns regarding disability retirement, please contact Alarsim Obaigbena of Civilian Human Resources at (202) 475-5323. This proposal does not affect your ability to pursue disability retirement.

10. If you have any questions concerning the procedural aspects of this action, you may contact Starlisha King, Human Resources Specialist at (202) 475-5288.

                                    #


Acknowledgement of Receipt:

Please sign the receipt acknowledgement below as evidence that you have received this letter. Your signature does not mean that you agree with the contents of the letter; nor by signing are you forfeiting any of your rights cited above.

Subj: NOTICE OF PROPOSED REMOVAL                    12750
                                                    9 August 2010

Employee Signature: _____    Date: _____

Copy: CG-1214

7

00252

# EXHIBIT 33

 # AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO



**NATE NELSON**
National Representative, 14th District
80 F Street, N.W. • Washington, D.C. 20001
Phone (202) 639-4017 • FAX (202) 639-6467

August 31, 2010

Mr. Rory Souther, Chief
Office of Resource Management – CG 928
U. S. Coast Guard –2100 2nd Street, SW
Washington, DC 20598

RE:  Ms. Edna Doak – Union's Response to Proposed
      Removal dated August 9, 2010

Dear Mr. Souther:

This letter is in response to the Agency's proposal to remove Ms. Doak from her position of management analyst GS-13 and Federal employment for reasons that follow:

- alleged medical inability to perform the duties of her position and,
- alleged failure to maintain a regular work schedule.

It is significant to note that the Agency has charged Ms. Doak with AWOL on 47 separate occasions, between February 19, 2010, and August 3, 2010. Unfortunate for the Agency, these 47 counts of AWOL are in direct violation of Federal law in which we will cite later.

The Union's request for an extension to respond to the proposed removal was granted until September 1, 2010.

The proposal for removal is totally unjust. It is the Union's position that the Agency could have avoided the entire episode if the agency had not violated Title I of the Americans with Disabilities Act of 1990 (ADA). The ADA requires an employer to make reasonable accommodations to the known physical or mental limitations of otherwise qualified individuals with disabilities, including, Federal employees, unless it results in undue hardship to the Agency. In this particular case, the Union has thoroughly investigated this area and the results are staggering. For the record, prior to an automobile accident, Ms. Doak has been an employee that always performed her job in a satisfactory manner.

The record reflects that Ms. Doak was involved in an automobile accident on June 1, 2009. This was a very serious accident that resulted in exacerbating existing conditions and a diagnosis of new medical conditions requiring multiple outpatient treatment, medications, and therapy.

Although the Union made several request for a reasonable accommodation, primarily, based on the recommendations from Ms. Doak's physician, Dr. Elizabeth P. Berdano, the Agency unilaterally

Exhibit  E-9

TO DO FOR ALL THAT WHICH NONE CAN DO FOR ONESELF



rejected some of Dr. Berdano's recommendations such as, changing Ms. Doak's work hours to 11 a.m. to 7 p.m.

The Agency totally rejected Dr. Berdano's recommendation for Ms. Doak's hours to be adjusted to 11:00 a.m. to 7:00 p.m. Dr. Berdano then wrote a second letter recommending that Ms. Doak's hours be adjusted to 9:30 a.m. to 6:00 p.m.

It appears that the Agency relied upon faulty and very bad medical advice from someone identified as B. Pennington, Capt.-Comdt (CG-1121). This appears to be a medical doctor who does not know or understand the law as it relates to ADA. I reviewed Dr. Berdano's letter and it fully complied with all of the legal requirements that certified Ms. Doak as a person with a legitimate disability. The law is very clear in this area, and all Ms. Doak needed was a medical evaluation indicating that a significant major life function seen as sleeping, breathing, walking and so forth, had been disrupted.

Commander Pennington (Agency's Medical Officer) and the Agency violated Title 1 law when they denied a reasonable request for an accommodation that was not in compliance with the ADA frame work. Commander Pennington's letter did not mention undue hardship in his letter. This was the only legal way the Agency could have denied a reasonable accommodation.

Dr. Berdano also suggested that Ms. Doak be permitted to telework from home. This was the perfect solution to this problem.

At my request, AFGE Local 3313 Union officials conducted an inquiry about the work situation. The inquiry reveals information culled from an electronic communication that Ms. Doak was at her place of work for approximately 80-hours without being compensated or paid by the government. At the very minimum, this time should have been counted against the AWOL charges levied against my client.

After a careful review of this situation, I believe the agency made some mistakes in its proposal to remove my client as it relates to fair and equal treatment.

### THE AWOL CHARGES ARE IN VIOLATION OF LAW

The Agency charged Ms. Doak with 47 counts of AWOL from February 19, 2010, to August 3, 2010. The Agency clearly abused their authority in this area by denying my client's request for sick leave on numerous occasions. Mr. Gregg Cohen is listed as my client's immediate supervisor. The official record indicates that Mr. Cohen even denied Ms. Doak request for sick leave because the illness was not related to the June 1, 2009, automobile accident. It appears that Mr. Cohen is out to inflict hardship and unnecessary injury upon Ms. Doak for unknown reasons at this time. For each occasion that Ms. Doak requested sick leave or leave without pay, Mr. Cohen charged Ms. Doak with AWOL, in direct violation of 5 C.F.R. 630.401, which states, in part, that "an Agency shall grant sick leave to an employee when the employee, (1) receives medical, dental, or optical examination or treatment; (2) is incapacitated for the performance of duties by physical or mental illness, injury, pregnancy, or childbirth."

In each instance, Ms. Doak put her supervisor on notice that she was incapacitated for work or she needed medical treatment. If my client did not have available sick leave, then the Agency could have placed Ms. Doak on leave without pay for medical reasons. Leave without pay is an authorized pay status that does not harm the employee.

00254

Therefore, if an Agency knowingly executes an illegal personnel action, the action can become a prohibited personnel practice. The Union respectfully requests that the AWOL charges be changed to leave without pay.

More significantly, the Union believes that Ms. Doak should be provided the opportunity to work for another supervisor who will be fair. As evidenced by the extra 80-hours my client worked without compensation, I sincerely believe this proves that Ms. Doak wants to work and she is willing to go the extra mile if someone is willing to work with her. If the Agency had provided a reasonable accommodation under Title I of the ADA, then the proposed removal would not be an issue. Specifically, all the Agency had to do was adjust my client's work schedule, 11 a.m. to 7 p.m. as her doctor had suggested.

After I reviewed the electronic accountability system, it revealed that Ms. Doak worked many additional hours outside of her normal schedule just to make sure the job was done. We have evidence of these hours being worked. The point is if Ms. Doak were permitted to work the aforementioned hours without remunerations or other forms of compensation, someone needs to explain to me why this could not be done under a legal action that would constitute a reasonable accommodation, as opposed to the erroneous manner that this was done.

I am convinced that only one management official had full knowledge of these facts and he concealed the facts from his superiors. If this action proceeds to any litigation, then Mr. Cohen will be a good witness for the Union. Unfortunately, Title I laws were flagrantly violated because Mr. Cohen did not want to comply with the law. As Ms. Doak proved with the full cooperation of her immediate supervisor, this did not prove to be an undue hardship to the Agency.

Recently, I now have reason to believe that Mr. Cohen even discriminated against a person with a disability, --just to be mean. Specifically, Mr. Cohen and the Agency told Ms. Doak and the local union representatives that they could not accommodate the 11 a.m. to 7 p.m. schedule because this would disrupt or disturb the Agency's core operations. It should be noted that Mr. Cohen specifically told Ms. Doak that she could not stay past her core hour (9 a.m. to 6 p.m.) to get caught up with her work. However, it was reported to me that Mr. Cohen has permitted non-disabled employees who do not need a reasonable accommodation to work beyond their core hours (or regular schedule) to catch up with their work or just work late. The ADA laws are serious and no management official should be permitted to violate these laws and take reprisal actions against employees who may need a reasonable accommodation. Also, the Union will investigate claims that management even permitted certain employees to earned compensatory time on a routine basis. As you probably know, a personnel action can't be sustained if prohibited personnel practices have occurred.

### THE AGENCY CLAIMS THERE WAS NOT A FORESEEABLE END IN SIGHT AS IT PERTAINS TO MS. DOAK'S MEDICAL CONDITION

The Agency's claim that there was not a foreseeable end to Ms. Doak's medical condition is in direct conflict with the medical evaluation from Ms. Doak medical doctor and my client's current performance and attendance of her job.

Despite repeated requests from Dr. Berdano pertaining to a reasonable accommodation, Mr. Cohen denied and hindered Ms. Doak's rehabilitation by adding stress and creating a hostile work environment by refusing to comply with Title I of the ADA.



3
00255

Ms. Doak was put in a position of worrying about whether her supervisor would approve her required medical treatment from Dr. Berdano. According to 5 C.F.R. 630.401, Mr. Cohen did not have any legal authority to deny requested sick leave, nor did he have any authority to prevent Ms. Doak from receiving medical treatment. For the record, supervisors do not have the authority to deny sick leave to Federal employees. Moreover, Mr. Cohen abused his authority.

Fortunately, Ms. Doak was determined to do her job and improve her attendance without much help from her supervisor; and she did.

AFGE Local 3313 Shop Steward, Elena Hughes conducted a survey and study of Ms. Doak's attendance since May 2010. Ms. Hughes findings reveal a significant improvement from May 2010 until the present. The evidence of improvement in Ms. Doak's attendance is undisputable and significant progress has been made. I am enclosing a copy of Ms. Hughes findings.

More importantly, Dr. Berdano wrote a memorandum for the record dated July 9, 2010, in which she states that my client's medical condition has improved. Further, the memorandum expresses that it is anticipated that Ms. Doak will continue to improve over the course of the next 6 to 12 months. There is no creditable medical information in Ms. Doak's file that disputes Dr. Berdano's evaluation.

Considering Dr. Berdano's evaluation of future continued progress and Shop Steward Elena Hughes' graph report which indicates undisputed progress and improvement, then a reasonable person can conclude that the "no foreseeable end" statement is without any merit or truth. We must remember that is was Mr. Gregg Cohen who authored the proposal to remove letter.

### RECOMMENDATIONS TO INFORMALLY RESOLVE THIS UNFORTUNATE SITUATION

It is the Union's firm position that an illegal adverse action on the part of the Agency will not promote the efficiency of service. The agency has to overcome two major Federal regulations:

• 5 C.F.R. 630.401 and (2) Title I of the ADA.

I recommend that the proposal for removal be expunged from Ms. Doak's record; and Ms. Doak be permitted to transfer to a new section with a new supervisor.

I also suggest that management permit Ms. Doak's to keep her medical appointments and make the environment less hostile by assuring her that management also cares about her health and safety.

### THE ULTIMATE SOLUTION THAT WILL RESOLVE THIS SITUATION

I propose that the Agency adopt Dr. Berdano's recommendation for a reasonable accommodation that indicated Ms. Doak's could telework from home. This certainly would not cause the Agency any undue hardship. This would be very good for the Agency and my client. Ms. Doak could self-medicate herself as needed and get the job done without any additional expense to the Agency. Ms. Doak could schedule her work around her medical appointment. This would be win win for everyone.

4
00256

Ms. Doak's is eligible for full retirement in February 2011. If she had a stress free environment, this would certainly accelerate her healing process. I suggest we try this for a 90 day trial period.

I hope management and labor can work together in order to mutually resolve this most unfortunate situation. I can assure you that the Union and my client are willing to work with you in this regard.

The Union reserves the right to add or supplement this letter with additional information as we complete our review of old, or newly discovered information.

Respectfully submitted,

Nate Nelson
National Representative
AFGE District 14

cc: Ms. Edna Doak
    Ms. Elena Hughes



00257

209



Pay Period 11 to Pay
Period 17 data, of
percentage in the office
worked, as per scheduled
hours timecards.

58.44% (PP 11)
53.44% (PP12)
55.94% (PP13
55.94% (PP14)
70.94% (PP15)
83.13% (PP16)
84.69% (PP17)
**66.07%**

00371



210

# EXHIBIT 34

**U.S. Department of**
**Homeland Security**

**United States**
**Coast Guard**

Commandant
United States Coast Guard

U.S. Coast Guard
2100 Second St SW
Washington, D.C. 20593
Staff Symbol: CG-928
Phone: (202) 475-3222
Fax: (202) 475-3914
Email: Rory.L.Souther@uscg.mil

12750
30 September 2010

## MEMORANDUM

From:   Rory Souther
        CG-928

Reply to    CG-928
Attn of:    Rory Souther
            (202) 475-3222

To:     Ms. Edna Doak
        Management Analyst, GS-0343-13

Subj:   NOTICE OF DECISION ON PROPOSED REMOVAL

Ref:    (a) CG-9283 Memo 12750 of 9 August 2010, Notice of Proposed Removal

1. Reference (a) provided advance notice of a proposal to remove you from your current position of Management Analyst, GS-0343-13, and from Federal service. The reasons for your proposed removal were described in detail in reference (a). The basis for this action are (a) medical inability to perform the essential duties of your position, due to various medical reasons, which have caused you to be unable to maintain your regular work schedule, and (b) absent without leave (AWOL).

2. You were given an opportunity to respond to the proposed action both orally and in writing. You were also provided an opportunity to furnish affidavits and other documentary evidence in support of your reply. The oral reply was provided on 1 September 2010 and included a written reply dated 31 August 2010 submitted on your behalf by Nate Nelson, National Representative, 14th District, American Federation of Government Employees (AFGE), AFL-CIO. In addition to you and me, in attendance on 1 September were Ms. Elena Hughes, AFGE Local 3313; Mr. Nate Nelson, National Representative AFGE; and Ms. Joanne Turner and Mr. Chester Cross, U.S. Coast Guard Office of Civilian Human Resources, Workforce Relations Division (CG-1214). The written reply included CG-1121 Memorandum 12000, of 20 July 2010, "Review of Medical Documentation – Ms. Edna Doak"; Elizabeth P. Berbano, MD MPH FACP, Internal Medicine Physician, Walter Reed Army Medical Center Memorandum of 16 April 2010; Elizabeth P. Berbano, MD MPH FACP, Internal Medicine Physician, Walter Reed Army Medical Center Memorandum of 16 July 2010; and a graph outlining "Pay Period 11 to Pay Period 17 data, of percentage in the office worked, as per scheduled hours timecards".

3. After careful consideration of all of the evidence in this case, including your oral and written replies, it is my decision that your removal from Federal service is warranted to promote the efficiency of the service. Specifically, I found the charges identified in your notice of proposed removal are supported by the evidence. Although your unscheduled absences decreased briefly after you received the Notice of Proposed Removal, your unscheduled absences have continued and increased significantly since 10 September 2010. These frequent unscheduled absences

00293



prevent you from participating in program meetings and other work group collaboration essential to full performance, creating an undue hardship on co-workers required to perform these responsibilities on your behalf. Time devoted by other individuals toward meeting your work responsibilities is also detrimental to the completion of your co-workers' job responsibilities. Frequent absences also prevent you from completing the training required of your position, as evidenced by your third enrollment in the on-line course "Fundamentals of Cost Analysis (BCF106)" and your inability to complete Appropriations Law training consistent with the other members of your work group as required no later than 31 December 2009. Your frequent absences and failure to complete the training required of your position result in your inability to perform the essential functions of your position, creating an undue hardship on your co-workers and the Coast Guard.

4. It is evident that you suffer from a medical condition which requires medication and pain management as documented by your physician. You were granted leave in accordance with the Family Medical Leave Act (FMLA) beginning in August 2009 to manage your medical condition, exhausting 492.75 hours, including the maximum allowable combination of annual leave, sick leave, advanced annual leave, and advanced sick leave. During the FMLA leave period, you were permitted to be absent from work regardless of the reason for the absence, without a requirement for advanced notice, and without charge to absent without leave. You requested, and were provided beginning in July 2009, accommodations related to your medical condition. You were reassigned from the Air Domain to the Surface Domain – at your request – to change your work environment. You were granted leave without pay (LWOP) in all instances where you had a documented appointment with a medical professional, totaling 209 hours between 31 January and 11 September 2010. You were provided reduced lighting in your work space; anti-glare filters for your computer monitor; noise-cancelling headsets; the ability to leave your workspace and visit a dark, private area whenever medically necessary; and a delayed start time when compared to other members of your work group. A late start time was first granted in July 2009, and was modified to a later start time in July 2010, to remain in effect as long as medically necessary. Start times approaching 11 a.m. were requested and considered but determined to be inadequate when compared to other alternative start times due to the incapacitating effects of your need to self-medicate with an unpredictable beginning or end during any given day. Telework was also considered but not granted due to your incapacitation when self-medicating, which prevents you from meeting the Telework requirement to perform effectively outside the office. In order to participate in Telework, you must be available and fully functional at your assigned start time. However, as you indicated on numerous occasions and as indicated by your physician in her 16 July 2010 memorandum, when self-medicating you are "...incapacitated due to the pain and cannot concentrate on the tasks at hand whether at her job or at home performing the routine tasks of daily living..." Further, Dr. Berbano indicates the medication "...immediately makes her drowsy, completely incapacitating her while she is under the influence of the medication, necessitating that she rest in a darkened, quiet room." This prevents you from performing the essential duties of your position from home or other remote location, including participating in meetings via telephone and otherwise communicating with members of your work group. You were also approved for and participated in the Voluntary Leave Transfer Program (VLTP). Despite these efforts, you've been unable to maintain a regular work schedule, rendering these and other proposed accommodations ineffective. Regular

00294

213

Subj: NOTICE OF DECISION ON PROPOSED REMOVAL     12750

attendance at work for interaction with the project staff, contracting officer(s), funds managers, and other business managers within your work group are essential to the performance of the duties of your position.

5. Within the first year of your November 2007 hire into the Air Domain and continuing into the present, you have been witnessed leaving the workplace early in the morning as others arrive for work. These episodes have typically been followed by a call from you regarding anticipated lateness that day, with arrival to work as late as at 2 p.m., if at all. You were counseled regarding this pattern of behavior on several occasions, including during our discussions on 3 June 2010, and 23 July 2010. You were advised that a work-life balance is essential to your well-being, your ability to achieve your work goals, and your ability to achieve success at work, as well as the need for you to report to work as scheduled for full, active participation in project events. Despite the obvious negative impact on your work and repeated advice to leave work at the scheduled time in order to obtain appropriate rest, you have continued to remain in the workplace after scheduled work hours and overnight with no measurable work results. You have explained that you remain at the workplace because you are self-medicating at work and therefore unable to drive. This situation is within your control, and is a contributing factor to your frequent absences and inability to perform the essential duties of your position.

6. You were charged absent without leave (AWOL) in instances where you were unable to provide medical documentation to support a specific medical appointment. These absences were generally the result of using self-administered medications, rendering you unable to drive to work or otherwise perform work tasks due to drowsiness or other medication-related impairments. You have exhausted your earned leave and have been in a deficit leave situation for an extended period. Under these circumstances, you were denied LWOP because (a) there is no foreseeable end to your absence, and (b) your absence places a burden on your co-workers and the Coast Guard. If these AWOL charges were modified to leave without pay (LWOP) as requested, your absences remain 52 percent of the work time between 31 January 2010 and 17 July 2010, and 45 percent of the work time through 11 September 2010. While this demonstrates an overall improving trend, additional unplanned absences of 1.5 hours on 1 September, 3.75 hours on 10 September, 2.45 hours on 13 September, 8 hours on 14 September and 8 hours on 15 September demonstrate a continuation of the prior pattern of absences. LWOP was granted for 14 and 15 September as a result of your providing medical documentation supporting these absences. In addition to the undue hardship on co-workers required to participate in meetings and other program interactions on your behalf, your frequent absences also prevent you from traveling for project work and required training.

7. In your response to the proposed removal notice, you included a memorandum from Dr. Elizabeth Berbano dated 16 April 2010 which indicates in paragraph 4 [3(c)] "Ms. Doak suffers from several symptoms related to the conditions stated above that restrict her ability to perform the functions of her position." Paragraph 6 [3(e)] indicates "...it is anticipated that she will continue to improve with this treatment over the next 3-6 months." Paragraph 4, page 4 of your reply, submitted on your behalf by Mr. Nate Nelson of AFGE, refers to another memorandum from Dr Berbano dated 9 July 2010 and indicates "...the memorandum expresses that it is anticipated that Ms. Doak will continue to improve over the course of the next 6 to 12 months."

Subj: NOTICE OF DECISION ON PROPOSED REMOVAL        12750

These statements support the lack of a foreseeable end to your medical situation when the anticipated improvement period moves from as much as six months in April to 12 months in July. You also included a memo from Dr. Berbano dated 16 July 2010 indicating, in paragraph 5 [Item 3h] "...I now recommend that she be given a trial of flexible work hours, to include an adjusted start time of 0930 or telecommuting..." You were granted a mutually agreed start time of 0900 on 23 July 2010, effective 1 August 2010. The continuing nature of your medical situation and the apparent inability to manage your medication, preventing you from reporting to work when scheduled, creates significant uncertainty regarding the end to your medical situation, and creates an undue hardship on your co-workers and on the Coast Guard.

8. Therefore, you will be removed from Federal service effective <u>Friday, 8 October 2010</u>. A Notification of Personnel Action (SF-50) documenting this action will be provided to you, by mail, at a later date. You will continue to be carried in a duty status and will be granted administrative leave until the effective date of this action. You should make arrangements with your supervisor, Mr. Greg Cohen, to gather your personal belongings and turn in your security badge and Common Access Card. You will be required to leave the building by the close of business on the date of this letter. In determining the appropriateness of this action, I considered the factors outlined in <u>Douglas v. Veterans Administration, 5 MSPB 313 (1981)</u>.

9. You have the right to appeal this action to the Merit Systems Protection Board (MSPB) or to file a grievance in accordance with the negotiated grievance procedure outlined in the Memorandum of Agreement (MOA) between the U.S. Coast Guard, Headquarters and AFGE 3313. Any grievance filed should be submitted within fifteen (15) calendar days to Mr. Michael Tangora. If you elect to file an appeal with the MSPB, your appeal must be directed to the Regional Director, Merit Systems Protection Board (MSPB), Washington, D.C. Regional Office, 1800 Diagonal Road, Suite 205, Alexandria, VA 22314-2840, Fax number (703) 756-7112, and must be filed during the period beginning with the day after the effective date of your removal and ending on the 30th day after the effective date, or 30 days after the date you receive this decision, whichever is later. If you do not submit an appeal within the time set by statute, regulation or order of a judge, your appeal will be dismissed as untimely filed unless a good reason for the delay is shown. Filing must be made with the appropriate MSPB office by personal delivery, by facsimile, by mail, or by commercial overnight delivery. An appeal to the MSPB must be in writing and must set forth your reasons for contesting this action with such offer of proof and pertinent documents, as you are able to submit. A copy of MSPB's regulations and appeal form are enclosed.

10. If you prefer to file your appeal electronically, go to www.mspb.gov and click on MSPB Online E-appeal. You must create a user identification password that will constitute your electronic signature. If you do not wish to file your appeal electronically, MSPB appeal forms and regulations are provided in enclosure (1).

11. If you believe this action is based on prohibited discrimination because of your race, color, religion, sex, national origin, age, or physical or mental disability you have the right to file an Equal Employment Opportunity (EEO) complaint in accordance with COMDTINST M5350.4

Subj: NOTICE OF DECISION ON PROPOSED REMOVAL        12750

and 29 CFR 1614.  To do so, you must contact an EEO counselor within forty-five (45) calendar days of the effective date of this action.

12.  You may use the EEO complaint process, the negotiated grievance procedure, or the MSPB appeal procedure.  However, you may use only one of these grievance/appeal avenues.

13.  As stated in reference (a), you may meet the medical requirements for disability retirement.  You have up to one (1) year after separation to apply to the Office of Personnel Management for disability retirement.  To obtain further information regarding your rights and benefits associated with this option you may contact Mr. Chris Bozeman, Retirement and Benefits Specialist, on (202) 475-5326.

14.  If you have any questions concerning the procedural aspects of this action, you may contact Mrs. Starlisha Anderson, (202) 475-5288.

#

Encl:  (1) MSPB Regulations and Appeal Form

Acknowledgement of Receipt:

Please sign the receipt acknowledgement below as evidence that you have received this letter.  Your signature does not mean that you agree with the contents of the letter; nor by signing are you forfeiting any of your rights cited above.

Employee Signature: _____        Date: _____

Copy: CG-1214

5

Subj: NOTICE OF DECISION ON PROPOSED REMOVAL          12750

and 29 CFR 1614. To do so, you must contact an EEO counselor within forty-five (45) calendar days of the effective date of this action.

12. You may use the EEO complaint process, the negotiated grievance procedure, or the MSPB appeal procedure. However, you may use only one of these grievance/appeal avenues.

13. As stated in reference (a), you may meet the medical requirements for disability retirement. You have up to one (1) year after separation to apply to the Office of Personnel Management for disability retirement. To obtain further information regarding your rights and benefits associated with this option you may contact Mr. Chris Bozeman, Retirement and Benefits Specialist, on (202) 475-5326.

14. If you have any questions concerning the procedural aspects of this action, you may contact Mrs. Starlisha Anderson, (202) 475-5288.

                                        #

Encl: (1) MSPB Regulations and Appeal Form

Acknowledgement of Receipt:

Please sign the receipt acknowledgement below as evidence that you have received this letter. Your signature does not mean that you agree with the contents of the letter; nor by signing are you forfeiting any of your rights cited above.

Employee Signature _Elna M Ogak_ Date: _9/30/10_

Copy: CG-1214

EXHIBIT 23
6-21-13 RL

# EXHIBIT 35

GOVERNMENT
EXHIBIT
Doak 2
4/9/13   DJ

OMB No. 1610-0001 Expiration Date: 6/30/11

| DEPARTMENT OF HOMELAND SECURITY | FOR OFFICIAL USE ONLY |
|---|---|
| | DEPARTMENT CASE NUMBER |

## INDIVIDUAL COMPLAINT OF EMPLOYMENT DISCRIMINATION

*(Use this form for original complaints and amendments.)*

FILING DATE
2/22/11

### PART I COMPLAINANT IDENTIFICATION

**1. NAME (Last, First, Middle Initial)**
DOAK  EDNA  M

**2. TELEPHONE/FAX (Include Area Code)**
Home 301-588-6198   Fax
Work   Fax

**3. HOME ADDRESS (You must notify the Department of any change of address while complaint is pending, or your complaint may be dismissed.)**
501 GRANVILLE DR
SILVER SPRING MD
20901

**4. IF YOU ARE A CURRENT OR FORMER EMPLOYEE OF THE FEDERAL GOVERNMENT, LIST YOUR RECENT TITLE, SERIES, AND GRADE.**
Title MANAGEMENT + PROGRAM
ANALYST
Series GS-343   Grade 13

**5. NAME AND ADDRESS OF ORGANIZATION WHERE YOU WORK (If a Department of Homeland Security Employee)**
Bureau or Component  US COAST GUARD)
2100 2ND ST SW, WASH, DC 20593
Office and Organizational Unit
CG-9
Street Address

City   State   Zip Code

**6. EMPLOYMENT STATUS IN RELATION TO THIS COMPLAINT**
☐ Applicant  ☐ Probationary  ☒ Career/Career Conditional
☐ Uniformed Service Member
☐ Former Employee/Member   10/8/10  Date Left Department
☐ Retired   10/31/10  Date of Retirement
☐ Other *(Specify)*

**7. I certify that all statements made in this complaint are true, complete, and correct to the best of my knowledge and belief.**

| SIGNATURE OF COMPLAINANT OR ATTORNEY REPRESENTATIVE | DATE |
|---|---|
| Edna M Doak | 2/22/11 |

### PART II DESIGNATION OF REPRESENTATIVE

**8. YOU MAY REPRESENT YOURSELF IN THIS COMPLAINT OR YOU MAY CHOOSE SOMEONE TO REPRESENT YOU. YOUR REPRESENTATIVE DOES NOT HAVE TO BE AN ATTORNEY. YOU MAY CHANGE YOUR DESIGNATION OF A REPRESENTATIVE AT A LATER DATE, BUT YOU MUST NOTIFY THE DEPARTMENT IMMEDIATELY IN WRITING OF ANY CHANGE, AND YOU MUST INCLUDE THE SAME INFORMATION REQUESTED IN THIS PART.**

"I hereby designate *(Please Print Name)* _____ to serve as my representative during the course of this complaint. I understand that my representative is authorized to act on my behalf."

Is the representative an attorney?   ☐ YES   ☐ NO

| 9. REPRESENTATIVE'S MAILING ADDRESS | 10. REPRESENTATIVE'S EMPLOYER (If Federal Agency) |
|---|---|
| FIRM/ORGANIZATION | |
| STREET ADDRESS | 11. REPRESENTATIVE'S TELEPHONE/FAX (Include Area Code) Telephone   Fax |
| CITY, STATE, & ZIP CODE | 12a. COMPLAINANT'S SIGNATURE   12b. DATE |

Exhibit A-

DHS Form 3090-1 (9/04)

00001


received
MAR 02 2011

Page 1 of 4

219

## PART III ALLEGED DISCRIMINATORY ACTIONS

| 13. NAME OF PERSON OR DHS COMPONENT WHO TOOK THE ACTION AT ISSUE. | 14. ARE YOU WILLING TO PARTICIPATE IN MEDIATION OR OTHER AVAILABLE TYPES OF ALTERNATIVE DISPUTE RESOLUTION TO RESOLVE YOUR COMPLAINT? |
|---|---|

FIRM/ORGANIZATION
GREG COHEN (CG-9) RORY SOUTHER (CG-9) STARLISHA KING ANDERSON (HR)

STREET ADDRESS
1900 HALF ST SW                      ☐ YES   ☒ NO

CITY, STATE, & ZIP CODE
WASHINGTON DC 20593

15. A. Describe the action taken against you that you believe was discriminatory. 30 SEP 10 DECISION TO REMOVE ME
   B. Give the date when the action occurred, and the name of each person responsible for the action. FROM EMPLOYMENT
   C. Describe how you were treated differently from other employees, applicants, or members for any of the reasons listed in Item 16.
   D. Indicate what harm, if any, came to you in your work situation as a result of this action. (You may, but are not required to, attach extra sheets.)
   E. If the basis of your complaint is parental status, sexual orientation, or protected genetic information, use this form, but your complaint is not statutorily based and will follow separate, parallel process.

   SEE ATTACHED

16. Mark below ONLY the bases you believe were relied on to take the actions described in Item 15.

| ☒ RACE | ☒ AGE (Date of Birth) ▓▓▓▓/48 |
|---|---|
| ☐ COLOR | ☒ PHYSICAL OR MENTAL DISABILITY (Describe) |
| ☐ RELIGION | ☒ RETALIATION/REPRISAL (Dates of Prior EEO Activity) JULY 2010 / OCTOBER 2010 |
| ☒ NATIONAL ORIGIN (Specify) HISPANIC | ☐ SEXUAL ORIENTATION |
|  | ☐ PARENTAL STATUS |
| ☒ SEX (Specify) FEMALE | ☐ PROTECTED GENETIC INFORMATION |

17. WHAT REMEDIAL OR CORRECTIVE ACTION ARE YOU SEEKING TO RESOLVE THIS MATTER
REINSTATEMENT TO EQUIVALENT POSITION, OVERTIME OR COMPENSATION FOR
EXTRA WORK, CHG AWOL TO LWOP, INVESTIGATE H.R. LACK OF ACTION TO PROVIDE READNABL

18. ON THIS SAME MATTER, HAVE YOU FILED A GRIEVANCE OR APPEAL UNDER: ACCOMODATION FOR FLEX SCHED

| Negotiated grievance procedure NOT IN 9/30/10 LTR | ☒ YES | ☒ NO | (SEE |
| Agency grievance procedure | ☐ YES | ☐ NO | ATTACHED, |
| Merit Systems Protection Board appeal procedure | ☐ YES | ☐ NO | CONT'D |

If you filed a grievance or appeal, provide date filed, case number, and present status.
GRIEVANCE FILED 8/31/10 PROPOSAL TO REMOVE DTD 8/9/10

## PART IV CONTACT

**EEO/EO Counseling is not required if you are requesting amendment of an existing, open complaint.**
**Complete items 24 and 25, even if you did not contact a counselor.**

| 19. DATE YOU CONTACTED AN EEO COUNSELOR 10/6/10 | 20. NAME AND TELEPHONE NUMBER OF EEO COUNSELOR Name    Phone ROBERT THOMAS |
|---|---|
| 21. DID YOU DISCUSS ALL ACTIONS RAISED IN ITEM 15 WITH AN EEO COUNSELOR? (If NO, explain on attached sheet) ☒ YES   ☐ NO | 22. DATE YOU RECEIVED YOUR "NOTICE OF RIGHT TO FILE" 2/14/11 |

23. IF YOU ARE REQUESTING AMENDMENT OF AN EXISTING, OPEN, FORMAL COMPLAINT (OR PROVIDING ADDITIONAL EVIDENCE), INDICATE THE COMPLAINT CASE NUMBER OF THAT COMPLAINT.

| 24. DATE OF MOST RECENT DISCRIMINATORY EVENT 11/4/10 | 25. DATE YOU FIRST BECAME AWARE OF THE ALLEGED DISCRIMINATION 8/9/10 |
|---|---|

Page 2 of 2

00002

CAS CONTLALAT

CONTINUATION OF FORMAL ~~MEDIATION REQUEST~~ FORM ITEMS #7-9

ISSUES & NATURE OF DISPUTE:

#7 LS Aggrieved received a Notice of Removal on 9/30/2010 with an effective date of 10/8/2010 which she identified as a continuation of the hostile work environment she was subject to from January 2009 to September 30, 2010. Aggrieved identified the additional issues and basis:

#8 BASIS:
◦Race – White
◦National Origin-Hispanic
◦Disability – Mental (Major Depression)
◦Disability – Physical (Sleep Apnea, Migraines, Muscle Spasms, Body Pain)
◦Age (DOB: 1▓▓▓1948)

#9 LS ISSUES:
◦Disciplinary Action - Removal (August 30, 2010)
◦Harassment (Non-Sexual)
◦Hostile Work Environment (June 2009-September 30, 2010)
◦Time and Attendance
--Denial of RDO in December 2009)
◦Disciplinary Action – Reprimand (May 2010) (AWOL)
◦Disciplinary Action – Reprimand (May 2010) (AWOL)
◦Denial of Training
--Two new black female employees sent to Acquisitions 101 in September 2010
--One black female employee sent to FINCEN Finance Procurement Desktop training in January 2008
--Two black female employees sent to FINCEN Finance Procurement Desktop training in July 2010
--Denial of alternative method to acquire Appropriations Law training in November 2009
--Denial of request to telework to complete Business Cost Fundamental 106, online training in July-October 2010
◦Reasonable Accommodation (Flexible work hours)
◦Assignment of Duties
--Work taken over by coworkers by direction of supervisor or lead team managers
--Excluded various meeting and communications (Only White/Hispanic female in CG-932/Surface)
◦Leave:
--Denial of Family Medical Leave Act (September 3, 2009-October 6, 2010)
--Denial of Leave Without Pay (LWOP) Denial of participation in the Voluntary Leave Transfer Program
--Denial of Leave Without Pay (LWOP)
◦Reasonable Accommodation
--Not granted in Feb 2010 (Flexible work schedule to arrive at 1100)
--Supervisor directed 0800 arrival; normal arrival 0815
--Doctor letter recommended 0930 arrival time (July 2010)

359.

--Supervisor directed 0900 arrival on July 23, 2010
- After attaining 0700 arrival, supervisor required 0800 arrival

#17 **REMEDY SOUGHT:**

1. Reinstatement to US Coast Guard in GS-13 position I am qulaified for outside of CG-9.
2. Reversal of denial for participation in the Voluntary Leave Transfer Program
3. Change all Absent Without Leave to Leave Without Pay (No time frame or amount specified)
4. Compensatory damages for pain and suffering in the amount of $300,000.00
5. Compensatory damages for all extra time worked from June 2009 to September 29, 2010(Amount undetermined at this time)
6. Investigation into how Human Resources addressed the denial of the reasonable accommodation request for flexible work schedule
7. Investigation into the qualifications of the Medical Review Officers (CAPT Brent Pennington and CDR Erica Schwartz) as it relates to the denial for reasonable accommodation
8. Monetary compensation for future lost wages due to termination (Effective 10/8/2010) which will force a five year early retirement (Amount undetermined at this time)

4054

# EXHIBIT 36

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT ("Agreement") is made and entered into by and between Edna Doak (hereinafter "Employee") and the United States Coast Guard ("the Agency"), representing the Secretary of the United States Department of Homeland Security, including its agents and employees, past and current.  The Agency issued a Notice of Decision on Proposed Removal based on (a) medical inability to perform the essential duties of your position, due to various medical reasons, which have caused you to be unable to maintain your regular work schedule, and (b) absent without leave (AWOL) effective 8 October 2010.

In consideration of the mutual promises expressed in this Agreement, the parties agree as follows:

1. This Agreement is the result of a compromise and does not constitute an admission of wrongdoing by either party.

2. The Agency agrees that in exchange for the actions of Employee set forth at paragraph 3 below, it will do the following:

   a. Authorize Administrative Leave for the Employee through 15 October 2010;
   b. Retain Employee on Leave Without Pay (hereinafter "LWOP") status beginning 18 October 2010 until the effective date of her Retirement separation date, 31 October 2010;
   c. Assist Employee with applying for a Retirement during the Employee's period of absence;
   d. To issue SF 50 documentation indicating Retirement was voluntary with no negative remarks;
   e. Expunge all records concerning the proposed removal and decision on proposed removal, including the Letter of Reprimand dated 24 May 2010, from Employee's Official Personnel Folder (hereinafter "OPF").

3. In exchange for the actions of the Agency listed in paragraph 2 above, Employee agrees to:

   a. Submit her application for Retirement to the Agency by 7 October 2010;
   b. Execute this Agreement and return to the Agency no later than 7 October 2010;
   c. Effect Retirement on 31 October 2010;
   d. Waive her right to file any grievances, complaints, appeals, or other legal actions in regard to the Notice of Decision on Proposed Removal (a) medical inability to perform the essential duties of your position, due to various medical reasons, which have caused you to be unable to maintain your regular work schedule, and (b) absent without leave (AWOL) and regarding any matters stemming from facts occurring before the date of the execution of this Agreement;
   e. Not to institute a lawsuit against the Agency, or any of its employees or former employees in any forum under the Civil Rights Act (Title VII), the Rehabilitation Act, the Age Discrimination in Employment Act, the Civil Service Reform Act, the Whistleblower Protection Act, the Federal Labor Relations Act, the U. S.

EXHIBIT
4

00028

Constitution, or any other state or federal law that relates to her removal from federal services. Employee agrees to withdraw any currently filed lawsuits or grievances that are related to her removal from federal services;

f.  To waive her right to any notice of proposal issued, which removes her from employment on the basis of (a) medical inability to perform the essential duties of your position, due to various medical reasons, which have caused you to be unable to maintain your regular work schedule, and (b) absent without leave (AWOL);

g.  To accept, without further appeal or cause of action, the Agency's decision to remove her from employment on the basis of (a) medical inability to perform the essential duties of your position, due to various medical reasons, which have caused you to be unable to maintain your regular work schedule, and (b) absent without leave (AWOL).

4. The terms of this agreement will not establish any precedent, nor will this agreement be used by Employee or any representative organization to seek or justify terms in similar cases.

5. This agreement shall constitute the complete understanding between Employee and the Agency. No other promises or agreements will be binding unless agreed-upon in writing by both parties.

6. This agreement does not constitute an admission by the Agency of any violation of the U. S. Constitution, the Civil Rights Act (Title VII), or of any other federal, state, or agency statute, rule or regulation.

7. All costs, including attorney fees, related to this matter will be borne by the respective parties.

8. The parties agree that the facts of this Agreement and all terms contained herein shall not be publicized in any manner, except as necessary for official government business, and will be kept strictly confidential, pursuant to the protections provided under the Privacy Act, 5 U.S.C. § 552a.

9. This Agreement will not be provided to the Office of Personnel Management (OPM). The Agency will not voluntarily release this agreement.

10. In the event the Office of Personnel Management requests a copy of this OR ANY agreement, the Agency agrees to provide Employee with notice fourteen (14) days prior to releasing a copy of the settlement agreement to the Office of Personnel Management.

11. Should any provision of this Agreement be declared or determined by any court or legal body to be illegal or invalid, or should either party breach any clause of this agreement, the entire agreement shall be voidable.



12. The parties to this agreement declare the above-mentioned case formally resolved through this settlement agreement.

2

For Employee:

Edna Doak

Date:

10/7/10

For the Agency:

Rory Souther

Date:

7 OCTOBER 2010.

# EXHIBIT 37

## REVOCATION OF SETTLEMENT AGREEMENT

This is to certify that I, Edna Doak (hereinafter "Employee") am hereby revoking a Settlement Agreement (the "Agreement") entered into with the United States Coast Guard (the "Agency") on 7 October 2010 with Rory Souther, representative for Agency.

At the time of signing the Agreement I am a CSRS-Offset Federal Employee, 61 years old, with only 19 years 9 months of creditable service as of 31 October 2010. I was my desire to retire at the age of 65.

I was "railroaded" into signing this agreement and forced to retire prematurely. I was presented the settlement agreement by Rory Souther approximately 3:00pm on 6 October 2010 and asked to sign immediately. I declined to sign and was allowed to consider the Agreement overnight. I lay awake sleepless most of that night.

At approximately 4:00 pm on 7 October 2010, while I was completing a Workers' Compensation Claim, Mr. Souther and Mrs. Star (King) Anderson appeared at the office door and insisted I conclude my paperwork and meet them in Ms. Anderson's office. During the meeting I was emotionally distraught. I signed reluctantly, and without benefit of legal counsel.

Since then I have had the opportunity to review the Agreement. I hereby revoke the Settlement Agreement of 7 October 2010 under the provisions of the Older Workers Benefit Protection Act.

Employee:

Edna Doak

Date 11/4/10

IN THE U.S. DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EDNA DOAK ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. 1:12 CV 1177-RC |
| ) | |
| JANET NAPOLITANO, SECRETARY, ) | |
| U.S. DEPARTMENT OF HOMELAND ) | |
| SECURITY ) | |
| ) | |
| Defendant. ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

Plaintiff, Edna Doak states the following in opposition to Defendant Janet Napolitano, Secretary, U.S. Department of Homeland Security's Motion to Dismiss and for Summary Judgment:

### I.   INTRODUCTION

Defendant does not dispute that Plaintiff' could perform her job duties with accommodations and has failed to demonstrate that accommodating Plaintiff would have posed an undue burden. Defendant's removal of Plaintiff based on a failure to maintain a regular work schedule is pretext and retaliatory because Plaintiff's absences were due to her disabilities and Defendant denied her requests for accommodations. Defendant's motion for summary judgment should be denied because Plaintiff has articulated a prima facie claim of disability discrimination and retaliation.

229

## II.    MATERIAL FACTS AS TO WHICH THERE EXISTS A GENUINE ISSUE NECESSARY TO BE LITIGATED

### Plaintiff is a Qualified Individual with a Disability:

1.   Plaintiff suffers from major depressive disorder, chronic migraines, hypothyroidism, hyperthyroidism and obstructive sleep apnea that substantially limit her major life activities of concentrating and sleeping.  Declaration of Edna Doak attached as Exhibit A ("Doak Decl") at 6, 8, 9, 10; Def's Ex. 19, Def's Ex. 25.

2.   In June 2009, Plaintiff was in a car accident in which she suffered closed head trauma resulting in migraines, back pain, neck pain, knee pain, shoulder pain, ankle pain, left eye and muscular pain, memory loss, attention loss and Plaintiff had to undergo physical therapy. Doak Decl. at 6.

3.   Shortly after the car accident, Plaintiff also began suffering from sleep apnea, leg and back spasms, increased intensity and frequency of migraines, and began having difficulty concentrating and sleeping.  Doak Decl. at 8.

4.   Plaintiff also suffers from hypothyroidism, which she was diagnosed with in 1993.  Due to the car accident, Plaintiff's medication had to be altered and which caused her to suffer from hyperthyroidism.  Both conditions substantially limit Plaintiff's ability to sleep. Doak Decl. at 9.

5.   Plaintiff also suffers from depression, which she was diagnosed with in 1993 and prescribed medication for in October 2009.  Plaintiff's depression substantially limits her major life activities of concentrating and sleeping.  Doak Decl. at 10.

6.   On August 13, 2009, Plaintiff submitted a request for intermittent leave under the Family and Medical Leave Act due to her delay and/or inability to attend work when having migraines or back/leg spasms or other symptoms due to her car accident.  Def's Ex. 3.

2

**230**

7.   Plaintiff's medications were effective in treating her conditions, but caused her to become drowsy and delayed her arrival to work.  Def's Ex. 25.

8.   Sleep deprivation and stress also contributed to the frequency of Plaintiff's migraines in the mornings which caused Plaintiff to have to take medication that made her drowsy, unable to drive, and to be late to work.  Def's Ex. 16.

9.   Plaintiff's doctor indicated that Plaintiff's sleep cycle was disrupted due to untreated sleep apnea, depression, medication side effects, and stress due to on-going issues at work and that she was working with Plaintiff to adjust dosing and scheduling of medications to treat Plaintiff's conditions effectively.  Def's Ex. 16.

**Defendant Denied Plaintiff Reasonable Accommodations:**

10. Defendant was aware that Plaintiff suffered from the foregoing medical conditions because Plaintiff informed Mr. Cohen of her car accident, the resulting migraines, and each time she was late to work indicated the reason and whether it was an FMLA or car accident related condition.  Doak Decl. at 7, 15.

11. In January 2010, Mr. Cohen informed Plaintiff that she had exhausted her FMLA leave.  This was not the case because Mr. Cohen required Plaintiff to use FMLA leave for non-FMLA related absences, such as when she had a sinus infection unrelated to her conditions.  Doak Decl. at 14.

12. Plaintiff then used sick leave, and later began requesting leave without pay (LWOP) or annual leave (in lieu of sick leave) each time she was late to work due to her medical conditions through WebTa when she arrived at work and detailed the reason for the leave and whether it was FMLA related or car accident related.  Ex. 9; Doak Decl. at 15.

13. Mr. Cohen frequently denied Plaintiff's leave requests saying that Plaintiff did not

3

**231**

have medical documentation to support the absence, even though he was aware of the car accident, migraines and other symptoms reported to him. Doak Decl. at 16. Plaintiff did not have medical documentation to submit for each absence because her doctor had directed her to take medication when she experienced a migraine or body pain in the morning instead of seeing her. *Id.* Later, Plaintiff had to start going to see her doctor each time she experienced a migraine in the morning in order to get medical documentation to submit. This caused her to be later for work and miss more work. *Id.*

14. Instead of accommodating Plaintiff, Mr. Cohen marked her as AWOL and issued her letters of reprimand. Def's Ex. 11; Def's Ex. 12 Def's Ex. 24. On February 22, 2010, Plaintiff received a letter of reprimand for her absences on January 25, 2010 and January 26, 2010. Def's Ex. 12. These absences were due to Plaintiff's medical conditions and she had requested LWOP, FMLA leave, or annual leave and later submitted medical documentation. Doak Decl. at 15, 18; Ex. 8, Ex. 9.

15. On March 24, 2010, Plaintiff submitted medical releases to Starlisha (King) Anderson, Human Resources. Doak Decl. at 21.

16. On April 16, 2010, Plaintiff submitted medical documentation requesting the following accommodations: telework; full-spectrum light for her work space; anti-glare computer monitor screen; work in an area in that is not subject to cool air currents; adjusted work schedule from 11 a.m. to 7 p.m. because of her difficulty arising in the morning due to her medical condition; and optional weekend work hours. Def's Ex. 16.

17. Plaintiff's medical documentation was submitted to Starlisha King who forwarded it to the Agency's Medical Review Office (MRO). Doak Decl. at 22, 34, King Tr. 14:14-15:4.

18. On April 28, 2010, Captain Boquard and Commander Schwartz in the Medical

Review Office recommended Ms. Doak be provided fluorescent light filters, anti-glare filter for computer monitor, allow her to wear sunglasses, be provided noise cancelling headsets, and provide her with a dark private area to go when medically necessary.  Def's Ex. 17.

19. Plaintiff did not receive a full- spectrum light or fluorescent light filters; instead, Mr. Cohen submitted a request to have some lights turned off above Plaintiff's desk.  So, Plaintiff continued to be exposed to fluorescent lighting which aggravated her migraines.  Def's Ex.19; Doak Decl. at 24.

20. Defendant denied Plaintiff's requests to telework, start time of 11:00 a.m., or optional weekend hours because Captain Boquard and Commander Schwartz reviewed the medical documentation and determined that telework, a start time of 11:00 a.m., and optional weekend hours were not supported by the medical documentation.  Schwartz Tr. at 12:12-12:15.

21. On May 6, 2010, Mr. Cohen denied Plaintiff's request for a later start time of 11:00 a.m. stating that Plaintiff's position required her to attend meetings in the morning and her job required her to travel and attend training offsite which could not be accomplished with her requested start time.  Def's Ex. 19.  Mr. Cohen did not address Plaintiff's request to telework or to work optional weekend hours.  *Id.*

22. Plaintiff's duties included budgeting and financial management duties such as preparing and monitoring budget obligation plans and preparing funds transfer requests, which could have been accomplished while teleworking and would not have been impacted by a later start time.  Doak Decl. at 4, 26.

23. On May 21, 2010, Plaintiff informed Mr. Cohen that an 11:00 a.m. start time would not interfere with her ability to do her job because there were few project interactions and she had not been required to travel or attend an off-site class in over one year.  Def's Ex. 22.

5

Plaintiff also requested a start time of 10:00 a.m. for a month or two to allow her to work toward a 9:00 a.m. arrival because her medication had recently been adjusted. Doak Decl. at 26-27.

24. On May 24, 2010, Mr. Cohen issued Plaintiff another Letter of Reprimand because of her absences due to her disabilities, despite the fact that Plaintiff had informed them that her absences were due to her disability and had requested LWOP. Def's Ex. 24; Doak Decl. at 28.

25. On June 1, 2010, Mr. Cohen denied Plaintiff's request for a 10:00 a.m. start time, and offered her a change in start time from 8:15 a.m. to 9:00 a.m. Def's Ex. 23.

26. On June 3, 2010, Plaintiff requested to meet with Rory Souther after Mr. Cohen denied her request for a 10:00 a.m. start time. Mr. Souther asked Plaintiff if she could come in at 9:30 a.m. and Plaintiff indicated that she would try. Doak Decl. at 30. Plaintiff continued to be charged leave from 8:15 am to 9:30 am. Doak Decl. at 32.

27. Plaintiff spoke with her doctor after the meeting and her doctor suggested altering the time Plaintiff took medication from 6:00 p.m. to 5:00 p.m. the day prior. Plaintiff began doing so, and it took several weeks for her body to adjust. By mid-July, Plaintiff was able to arrive by 9:30 a.m. on most days when she did not have a migraine or body pain in the morning. Doak Decl. at 31.

28. On July 16, 2010, Plaintiff submitted medical documentation from her physician to Ms. King requesting that her schedule be adjusted to 9:30 a.m. arrival or that she be permitted to telework while her body adjusted to changes in medication. Def's Ex. 25.

29. Commander Schwartz and Captain Pennington in the Medical Review Office

6

reviewed Plaintiff's July 16, 2010 medical documentation and again denied her requests on July 20, 2010 because they found the medical documentation to be insufficient to support Plaintiff's request for a later start time.  Schwartz Tr. at 19:9- 20:2.  Def's Ex. 26.

30. On July 23, 2010, Mr. Cohen and Mr. Souther met with Plaintiff and asked her to start coming in at 9:00 a.m.  Plaintiff indicated that she would try; however, it had taken her several weeks to adjust to a 9:30 a.m. start time.  Mr. Cohen responded, "I'll take that as a yes" and Plaintiff was told to come in at 9:00 a.m. beginning the following Monday, July 26, 2010.  Doak Decl. at 36.

31. This was not enough time to permit Plaintiff to adjust her medication to be able to arrive by 9:00 a.m.  Doak Decl. at 37.

### Plaintiff was Constructively Discharged:

32. Approximately two weeks later, on August 9, 2010, Mr. Cohen proposed Plaintiff's removal claiming she was unable to maintain her regular work schedule, specifically starting at 9:00 a.m. despite the fact that he was aware Plaintiff would need time to adjust her medication. Def's Ex. 32; Doak Decl. at 38.

33. Plaintiff responded to the proposal through her union representative who provided an analysis indicating that Plaintiff's attendance was improving and that, as of July 31, 2010, Plaintiff was at 85% attendance.  Def's Ex. 33.

34. On September 30, 2010, Plaintiff was removed from federal service, effective October 8, 2010.  Def's Ex. 34.  Plaintiff asked Mr. Souther if retirement might be an option in lieu of removal and Mr. Souther agreed.  Doak Decl. at 40.

35. On October 6, 2010, Plaintiff contacted an EEO officer.  Def's Ex. 35, Doak Decl. at 41.

7

36. On October 7, 2010, Mr. Souther and Ms. King gave Plaintiff a settlement agreement and a form to request retirement and told her to either sign it or she would be removed. Doak Decl. at 42. On the form, Plaintiff wrote the reason for retirement was because the agency refused to accommodate her and Mr. Souther became upset. Ex. 1.

37. November 4, 2010, Plaintiff, after consulting an attorney, called Mr. Souther and informed him that she was revoking the settlement agreement. Mr. Souther responded that he was looking forward to terminating Plaintiff's employment because "it will be fun." Plaintiff hung up and then emailed him her revocation. Ex. 2; Doak Decl. at 43.

38. On November 12, 2010, the Agency refused to accept Plaintiff's revocation of the settlement agreement. Ex. 3.

39. On February 22, 2011, Plaintiff filed a formal complaint of discrimination. Def's Ex. 35.

40. On July 11, 2011, the Agency issued a final agency decision dismissing Plaintiff's claims as moot. Ex. 4.

41. On September 28, 2011, Plaintiff appealed the final agency decision. Ex. 5.

42. On February 2, 2012, the EEOC issued a decision finding the settlement agreement void for failure to comply with the Older Workers' Benefit Protection Act (OWBPA) and reinstated Plaintiff's complaint. Ex. 6.

43. On June 19, 2012, Defendant issued a final agency decision on the merits of Plaintiff's claims. Ex. 7.

## III.   STANDARD FOR SUMMARY JUDMENT

Summary judgment may be granted only if "there is no genuine issue as to any material fact [and] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247 (1986). A dispute about a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In deciding a motion for summary judgment, the court must view the facts and the reasonable inferences from the facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[I]f reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

## IV.    LEGAL ARGUMENT

To establish a prima facie case of disparate treatment under the Rehabilitation Act, a plaintiff must show by a preponderance of the evidence that she: (1) is disabled within the meaning of the statute; (2) was qualified for the position with or without a reasonable accommodation; and (3) suffered an adverse employment action because of her disability. *Johnson v. District of Columbia*, 2013 U.S. Dist. LEXIS 78666 (D.D.C. June 5, 2013).

"The failure of an employer to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an ... employee" is a form of disability discrimination. 42 U.S.C. §12112(b)(5)(A) (2008). To establish a failure to accommodate claim, a Plaintiff must establish that "(1) she was an individual who had a disability within the meaning of the statute; (2) the employer had notice of her disability; (3) with reasonable accommodation she could perform the essential functions of the position; and (4) the employer refused to make such accommodations." *Jacob v. Didlake Corp.*, 2007 U.S. Dist. LEXIS 4095, *11, January 19, 2007 (D. Md. 2007) (quoting *Rhoads v. Fed. Deposit Ins. Co.*, 257 F. 3d 373, 387 n. 11 (4th Cir. 2001)).

In order to establish a prima facie case of reprisal discrimination, the plaintiff must prove that she: (1) participated in prior protected activity; (2) suffered a materially adverse action by

9

237

her employer; and (3) there is a causal link between the protected activity and the adverse action. *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 88 (D.D.C. 2009). Temporal proximity between the protected activity and adverse action can support an inference of causation. *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012).

### 1. Plaintiff Exhausted her Administrative Remedies

On June 19, 2012, Defendant issued a final agency decision on the merits of Plaintiff's claims. Ex. 7. Thus, Defendant has waived its exhaustion defense by accepting and investigating Plaintiff's claims and issuing a final agency decision on the merits. *See Nurriddin*, 674 F. Supp. 2d at 86 ("An agency waives the exhaustion defense if it accepts and investigates a discrimination complaint, and also "decide[s] it on the merits -- all without mentioning timeliness").

Should the Court find that Plaintiff's claims prior to August 22, 2010 were not sufficiently exhausted, such claims can be used as background evidence in support of Plaintiff's timely claims. *See AMTRAK v. Morgan*, 536 U.S. 101 (2002), *Morgan*, 536 U.S. at 113; *Stewart v. Gates*, 786 F. Supp. 2d 155, 166 (D.D.C. 2011) ("prior discriminatory acts may be used as background evidence to support a timely claim, even though the prior acts are not independently actionable because of the statute of limitations").

### 2. Plaintiff Can Establish a Prima Facie Case of Disability Discrimination

#### A. Plaintiff is a Qualified Individual with a Disability who could Perform the Essential Functions of her Job with a Reasonable Accommodation

Plaintiff suffers from major depressive disorder, chronic migraines, hypothyroidism, hyperthyroidism and obstructive sleep apnea. Doak Decl. at 6, 8; Def's Ex. 16. Plaintiff's disabilities substantially limit her major life activities of concentrating and sleeping. Doak Decl. at 8; Def's Ex. 16; Def's Ex. 25. Defendant does not dispute that Plaintiff is disabled. *See*

10

238

*generally, Def's motion.*  Defendant also does not dispute that Plaintiff could have performed her job with an accommodation, but rather incorrectly asserts that Plaintiff's requested accommodations were not necessary to address her medical conditions and improperly limits Plaintiff's disability solely to migraines. Def's motion at 35-36.

The accommodations requested, including telework, a later start time, or optional weekend hours were recommended by Plaintiff's doctor and were directly related to Plaintiff's treatment for multiple conditions, including major depressive disorder, migraines, hypothyroidism, and obstructive sleep apnea. Def's Ex. 16, Def's Ex. 25.  Due to a combination of sleep apnea and medications to treat Plaintiff's other disabilities, Plaintiff experienced fatigue and difficulties concentrating and sleeping. Def's Ex. 16.  Her doctor stated that the reasons for her disrupted sleep cycle included untreated obstructive sleep apnea, depression, medication side effects, and stress due to on-going issues at work. Def's Ex. 16.  Further, sleep deprivation and stress contributed to Plaintiff's frequency of migraines which caused Plaintiff to have to take medication and miss work. *Id.*

In sum, Plaintiff's conditions were in a state of flux and treatment of her conditions was interrelated. Def's Ex. 16, 25.  Plaintiff's doctor was working to align her sleep-wake cycle and requested accommodations to include a trial of flexible work hours or telework to permit Plaintiff's body to adjust to changes in dosing and scheduling of medications to treat Plaintiff's disabilities. Def's Ex., 25.  Such accommodations are clearly related to Plaintiff's treatment for her disabilities.

### B. Defendant Denied Plaintiff Reasonable Accommodations

Throughout 2010, Plaintiff had numerous discussions with Mr. Cohen, Mr. Souther, and Ms. King regarding her medical condition. King Tr. 6:3-8:6.  Plaintiff also provided signed medical releases to the agency on March 24, 2010. Doak Decl. at 21.  Despite being aware of

Plaintiff's need for accommodations and Plaintiff's specific requests for accommodations, Mr.
Cohen marked Plaintiff AWOL and issued her letters of reprimand for absences due to her
medical condition. Def's Ex. 11, 12, 24. Despite the fact that Plaintiff informed Mr. Cohen that
her absences were due to her medical conditions, Mr. Cohen would deny her leave requests,
stating that she did not have medical documentation which resulted in Plaintiff taking additional
time off to go to the doctor and miss additional work. Doak Decl. at 12-13.

On April 16, 2010, Plaintiff submitted medical documentation to Ms. King, who
forwarded it to the agency's medical review office, requesting that she be permitted to telework,
provided an adjusted work schedule from 11:00 a.m. to 7:00 p.m., or optional weekend work
hours because of her difficulty arising in the morning due to her medical conditions. Def's Ex.
16; Doak Decl. at 22; King Tr. 14:14-15:4.

Defendant denied Plaintiff's requests to telework, arrive at a later start time of 11:00 am,
and to work optional weekend hours. On May 6, 2010, Mr. Cohen, upon consultation with Ms.
King, also again specifically denied Plaintiff's request for a later start time of 11:00 am. Def's
Ex. 19; King Tr. 21:21-22:20.

On July 16, 2010, Plaintiff submitted medical documentation requesting that her
scheduled arrival time be adjusted to 9:30 a.m. or that she be permitted to telework while her
body adjusted to changes in medication. Def's Ex. 25. Plaintiff's physician explained that,
although Plaintiff's medications were effective in treating her disabilities, they caused significant
side effects, including drowsiness and that they were in the process of changing the dosing and
scheduling of her medications to align her sleep-wake cycle, organ systems, and emotional
health. *Id.*

Defendant denied Plaintiff's request for a 9:30 a.m. start time when on July 20, 2010

Commander Schwartz and Captain Pennington issued a recommendation stating that the medical

documentation was insufficient to support Plaintiff's request for a later start time and Plaintiff

was unable to work a predictable work schedule.  Schwartz Tr. at 19:9- 20:2; Def's Ex. 26.

Mr. Cohen and Mr. Souther later proposed a start time of 9:00 a.m., despite Plaintiff's

request for a 9:30 am start time, and even though Plaintiff informed them that she was in the

process of adjusting her medication dosage and timing and was not sure she could make it in by

9:00 a.m. but would try. Doak Decl. at 36.

Instead of providing Plaintiff with an accommodation, Defendant proposed Plaintiff's

removal two weeks later claiming that she was unable to maintain her regular work schedule.

Def's Ex. 32.  The proposed removal specifically states that Plaintiff was unable to adhere to her

work schedule of 9:00 a.m. to 5:30 p.m.  This schedule was suggested by Mr. Cohen and Mr.

Souther and Plaintiff did not agree to it, but rather stated that she would try to arrive by then, but

would need time to adjust.  Doak Decl. at 36; Def's Ex. 32.  Because her previous requests for a

later start time were declined, Plaintiff agreed to try to come in by 9:00 a.m., however, she was

only afforded two weeks to try to change her medication to enable her to arrive by 9:00 a.m.

before her removal was proposed. Doak Decl. at 36; Def's Ex. 32.

### C. Plaintiff Suffered an Adverse Action Based on her Disability

A plaintiff's resignation is an adverse action where it was not voluntary, but rather a

constructive discharge. *Joyce v. Office of the Architect of the Capitol*, 2013 U.S. Dist. LEXIS

126447 (D.D.C. Sept. 5, 2013).  "A finding of constructive discharge depends on whether the

employer deliberately made working conditions intolerable and drove the employee into 'an

involuntary quit.'" *Bishopp v. District of Columbia*, 788 F.2d 781, 789-90 (D.C. Cir. 1986)

(quoting Clark v. Marsh, 665 F.2d 1168, 1173 (D.C. Cir. 1981)). *Floyd v. Office of*

13

**241**

*Representative Sheila Jackson Lee*, 2013 U.S. Dist. LEXIS 140489 (D.D.C. 2013). Denying an employee a reasonable accommodation can serve as the basis for a constructive discharge claims. *Floyd v. Office of Representative Sheila Jackson Lee*, 2013 U.S. Dist. LEXIS 140489, 54-55 (D.D.C. 2013); *Johnson v. Shalala*, 991 F.2d 126, 132 (4th Cir. 1993) (recognizing "that a complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge").

Here, Plaintiff repeatedly requested accommodations, and instead of accommodating Plaintiff, the Agency marked her as AWOL, denied her requests for LWOP or annual leave, issued her letters of reprimand, and then proposed her removal when she failed to adhere to the 9:00 a.m. start time chosen by her supervisors that did not accommodate her disabilities. Moreover, the reason listed by Plaintiff on her request for retirement form was that the agency had failed to accommodate her. Ex. 1; Doak Decl. at 42. Such evidence is sufficient to support a constructive discharge.

### 3.    Plaintiff Can Establish a Prima Facie Case of Retaliation

Plaintiff participated in protected activity by requesting accommodations. *Ellison v. Napolitano*, 901 F. Supp. 2d 118, 129 (D.D.C. 2012) ("Requests for accommodation may constitute protected activity"). As set forth above, Plaintiff suffered an adverse action when she was forced to resign from her position and there is a causal link between Plaintiff's requests for accommodations from April 16, 2010 through July 16, 2010 and Defendant's first step in removing Plaintiff, the August 9, 2010 proposed removal. *See Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012) (recognizing there is no bright line rule for temporal proximity and the specific facts of each case must be evaluated).

### 4.    Defendant's Reasons for Terminating Plaintiff are False and Pretext

Defendant's claimed reason for terminating Plaintiff, her failure to maintain a regular

14

work schedule, is pretext for discrimination. Despite Defendant's failure to accommodate her, Plaintiff's attendance was improving and by mid-July 2010, Plaintiff, through adjustments to her dosage and scheduling of medication, was able to come in at 9:30 a.m. on most days when she did not experience a migraine or body pain. Doak Decl. at 31. Plaintiff's absences were due to Defendant's failure to accommodate her and Defendant has not argued that it would have been an undue burden to provide her with accommodations.

## V.    CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss and for summary judgment should be denied.

Date:  October  9, 2013                    Respectfully submitted,

                                    _____/s/_____
                                    Alan Lescht, DC Bar # 441691
                                    Susan L. Kruger, DC Bar # 414566
                                    Rani Rolston, DC Bar # 974052
                                    Alan Lescht & Assoc., PC
                                    1050 17th St., NW, Suite 400
                                    Washington, D.C. 20036
                                    Tel (202) 463-6036
                                    Fax (202) 463-6067
                                    Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that, on this 9th day of October 2013, I caused the foregoing to be served via ECF on the following persons:

Michelle Lo
Assistant United States Attorney
555 4th St. NW
Washington, DC 20530

_____/s/_____
Alan Lescht

# EXHIBIT A

IN THE U.S. DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDNA DOAK                                      )
                                               )
        Plaintiff,                             )
                                               )
    v.                                         )     Case No. 1:12 CV 1177-RC
                                               )
JANET NAPOLITANO, SECRETARY,                   )
U.S. DEPARTMENT OF HOMELAND                    )
SECURITY                                       )
                                               )
        Defendant.                             )
                                               )

## DECLARATION OF EDNA DOAK

I, Edna Doak, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the
following are true and based on my personal knowledge:

1. I am over the age of 18 and am fully competent to make this declaration.

2. I was formerly employed as a Program Analyst (Financial) in the Office of Acquisition
   Resources Management with the U.S. Coast Guard.

3. My first level supervisor was Gregory Cohen, Chief of the Business Management and
   Metrics Group, and my second level supervisor was Rory Souther, Chief of Acquisition
   Resources Management.

4. My job duties included budgeting and financial management duties such as preparing and
   monitoring budget obligation plans and preparing funds transfer requests, which could have
   been accomplished while teleworking.

5. My official start time was 8:15 a.m.

6. In June 2009, I was in a car accident and suffered closed head trauma. As a result, I began
   suffering migraines, back pain, neck pain, knee pain, shoulder pain, ankle pain, left eye and

246

muscular pain, memory loss, attention loss and began undergoing physical therapy. I was out from work for two weeks after the car accident.

7. Before I returned to work, I informed Mr. Cohen about the car accident. After I returned to work I told Mr. Cohen that I needed to request leave under the Family and Medical Leave Act (FMLA). I also later told Mr. Cohen that I was experiencing migraines due to the car accident and at one point I experienced a migraine at work in his presence.

8. Shortly after the car accident, I also began suffering from sleep apnea, leg and back spasms, and increased intensity and frequency of migraines and I began having difficulty concentrating and sleeping.

9. I also suffer from hypothyroidism, which I was diagnosed with in 1993. Due to the car accident, my medication had to be altered and which caused me to suffer from hyperthyroidism. Both conditions cause me to have difficulties sleeping.

10. I also suffer from depression, which I was diagnosed with in 1993 and I was prescribed medication for in October 2009 due to increasing anxiety from stressors in the workplace. I began seeing a psychiatrist and psychologist and continued treatment through 2010.

11. On August 13, 2009, I submitted a request for leave under the Family and Medical Leave Act (FMLA) to Starlisha King, Human Resources, requesting intermittent leave due to migraines and other symptoms related to the car accident noted in paragraph six above. After my FMLA leave was authorized on September 3, 2009, Mr. Cohen took over the responsibilities of timekeeper in order to keep an eye on my leave.

12. Shortly after the car accident, Dr. Gofreed put me on medication to help me sleep, however, this medication was so strong that it would knock me out and cause me to be late to work. I

2

informed Dr. Gofreed of this and she reduced the dosage three times, but it did not help and I continued to not be able to wake up for work.

13. In or around December 2009 or January 2010, I stopped taking the medication, but I still had difficulty falling asleep which caused me to be late for work. Lack of sleep caused me to experience migraines and fatigue in the mornings.

14. In January 2010, Mr. Cohen told me that I had exhausted my FMLA leave. This was not the case because Mr. Cohen required me to use FMLA leave for non-FMLA related absences, such as when I had a sinus infection unrelated to my medical conditions from the accident.

15. After Mr. Cohen said that I had exhausted my FMLA leave, I used my sick leave. After I exhausted my sick leave, I requested leave without pay (LWOP) or annual leave. Each time I was late to work due to my medical condition, I would request annual leave or LWOP (in lieu of sick leave) through WebTa when I got to work. Each time I detailed the reasons for the leave and whether it was FMLA related or car accident related.

16. Mr. Cohen would frequently deny my requests saying that I did not have medical documentation to support the absence, even though he was aware of my car accident and migraines. I did not have medical documentation to submit for each absence because my doctor had directed me to take medication when I experienced a migraine or body pain in the morning instead of seeing her. Later, I had to start going to see my doctor each time I experienced a migraine in the morning in order to get medical documentation to submit. This caused me to be later for work and miss more work.

17. In January 2010, my primary care physician Dr. Berbano put me back on the same medication that Dr. Gofreed had prescribed in order to help me sleep, however, she altered the dosing scheduling.

3

18. In January 2010, Mr. Cohen marked me as Absent Without Leave (AWOL), for certain absences even though I had FMLA leave left or requested LWOP or annual leave. My absences were due to my medical condition. I did not submit medical documentation at the time because the policy only required medical documentation after three consecutive absences. In addition, I was never issued a "Letter of Requirement" stating that any absence required medical documentation.

19. On February 22, 2010, Mr. Cohen issued me a letter of reprimand citing my AWOL on January 25, 2010 and January 26, 2010 even though the leave policy said medical documentation was not needed for absences of three days or less.

20. Later, Mr. Cohen agreed to hold in abeyance the letter of reprimand and change my AWOL to LWOP after I provided medical documentation indicating that my absences were due to my medical conditions.

21. On March 24, 2010, Mr. Cohen and I met along with Ms. King and my Union Representative, Elena Hughes and I received a memo "Request For Medical Documentation" from Mr. Cohen in which he requested that I provide additional documentation addressing my need for accommodation. After I wanted to read the document before signing it, Mr. Cohen pounded his fist on the table and said, "Just sign it!" I told him I just wanted to read it first and he said, "I'm done with this" and stormed out of the room. From that day on I was afraid of him because he exhibited behavior similar to my abusive husband. During this meeting, I also signed medical releases effective to August 2010, and gave them to Ms. King.

22. On April 16, 2010, I submitted medical documentation to Ms. King requesting the following accommodations: telework; full-spectrum light; anti-glare computer monitor screen; work in an area in that is not subject to cool air currents; adjusted work schedule from 11:00 a.m. to

4

249

7:00 p.m. because of my difficulty arising in the morning due to my medical condition; and optional weekend work hours.

23. On April 28, 2010, Captain Boquard and Commander Schwartz recommended that I be provided fluorescent light filters, anti-glare filter for computer monitor, allowed to wear sunglasses, be provided noise cancelling headsets, and provide me with a dark private area to go when medically necessary. They did not address my request to telework, for an 11:00 a.m. start time, or optional weekend hours.

24. Despite Captain Boquard's recommendation, I did not receive a full spectrum light or fluorescent light filters. Instead, Mr. Cohen said that he submitted a request to have some lights turned off above my desk. As a result, I still had fluorescent lighting which aggravated my migraines.

25. On May 6, 2010, Mr. Cohen denied my request for a later start time of 11:00 a.m. stating that my position required me to attend meetings in the morning and my job required me to travel and attend training offsite which could not be accomplished with my requested start time. Mr. Cohen did not address my request to telework or to work optional weekend hours.

26. This was false because an 11:00 a.m. start time would not have interfered with my ability to do my job because there were few project interactions and I had not been required to travel or attend an off-site class in over a year. I informed Mr. Cohen of this on May 21, 2010.

27. On May 21, 2010, I requested a start time of 10:00 a.m. for a month or two to allow me to work toward a 9:00 a.m. arrival due to the fact that my medication had recently been adjusted.

5

250

28. Instead of accommodating me, Mr. Cohen again marked me AWOL on several occasions and on May 24, 2010 issued me another letter of reprimand even though he was aware that my absences were due to my disabilities and I had requested LWOP.

29. On June 1, 2010, Mr. Cohen denied my request for a 10:00 a.m. start time, and offered me a change in start time from 8:15 a.m. to 9:00 a.m. Def's Ex. 23.

30. In response, I requested a meeting with Mr. Souther. On June 3, 2010, I met with Mr. Souther and he asked me to come in at 9:30 a.m. He didn't give a reason, but asked if I could arrive by 9:30 a.m. and I said I would try.

31. I spoke with my doctor after the meeting and asked her what else I could do to prevent me from missing work. She suggested moving up the time I took my medication again from 6:00 p.m. to 5:00 p.m. the prior day. I started to do that, and it took several weeks for me to able to get up on time and make it to work around 9:30 a.m. By mid-July I was able to arrive by 9:30 a.m. on most days if I did not have a migraine or body pain.

32. No adjustment was made in WebTA to show I was scheduled to arrive at 9:30 a.m., however, so I continued to be charged leave from 8:15 a.m. to 9:30 a.m.

33. In July 2010, I submitted a request for leave donation and received hours. Tracy Tenwalde was going to donate 40 hours of leave to me, but after she told Mr. Cohen, she told me that he became upset with her and so she only donated 20 hours. The following week on July 8, 2010, Mr. Cohen filled out a form requesting that HR initiate a proposal to remove me. This was included in the documentation given to me later in support of my proposed removal on August 9, 2010, however, I was not permitted to make a copy of it. In addition Mr. Cohen blocked my access to WebTA for about three weeks so that I could not enter leave requests when I reported to work.

6

34. On July 16, 2010, I submitted medical documentation from my physician to Ms. King requesting that my schedule be adjusted to a 9:30 a.m. start time, or that I be permitted to telework while my body adjusted to multiple changes in medication dosing and scheduling.

35. My requests were denied on July 20, 2010.

36. On July 23, 2010, Mr. Cohen and Mr. Souther requested to meet with me. Mr. Souther began by asking me what time I arrived that morning. When I said, 9:30 a.m., he said, "Good!" Then he asked me some questions about my program after which he and Mr. Cohen asked me to start coming in at 9:00 a.m. I said I would try and explained that it had taken me several weeks to adjust to arrive at 9:30 a.m. Mr. Cohen said, 'I'll take that as a yes" and they told me to come in at 9:00 a.m. effective the following week, Monday July 26, 2010.

37. This was not enough time to adjust my medication. I adjusted taking my medication to 2:00 p.m. the day prior, however, I still had difficulties getting up and adjusting to a 9:00 a.m. start time. In addition no adjustment was made in WebTA to show I was scheduled to arrive at 9:00 a.m., so I continued to be charged leave from 8:15 a.m. to 9:00 a.m.

38. Two weeks later, on August 9, 2010, Mr. Cohen proposed my removal for my alleged inability to maintain a regular work schedule and come in at 9:00 a.m. before I had time to adjust. The proposed removal included AWOL charges for which medical documentation had been provided, two duplicate entries and AWOL for dates when I arrived at 9:30 a.m. or 9:00 a.m. I was even charged 30 minutes AWOL for arriving at 8:45 a.m. when I was supposed to be at work by 9:00 a.m.

39. I responded to the proposal through my union representative who did an analysis indicating that my attendance was improving and that as of July 31, 2010 I was at 85% attendance.

7

40. On September 30, 2010, I met with Mr. Cohen, Mr. Souther, and Ms. King and I was given the decision removing me from federal service, effective October 8, 2010. I asked Mr. Souther if retirement might be an option in lieu of removal and he said that would probably be fine. I went back to my desk and an hour or so later, Mr. Cohen and Ms. Hughes came by and told me to clean out my cube and Mr. Cohen called me a hoarder.

41. On October 6, 2010, I contacted an EEO officer.

42. On October 7, 2010, Mr. Souther and Ms. King came to see me at 4:00 p.m. and gave me the settlement agreement and a form to request retirement. They told me that I needed to sign the agreement then or they would have to remove me. On the form, I wrote the reason I was requesting retirement was because the agency refused to accommodate me and Mr. Souther became upset.

43. Later, on November 4, 2010, after I consulted with an attorney, I called Mr. Souther and informed him that I was revoking the settlement agreement. Mr. Souther responded that he was looking forward to terminating my employment and said, "It will be fun." I hung up and then emailed him my revocation.

_10/9/13_
Date

_Edna M Doak_
Edna Doak

8

# EXHIBIT 1

Standard Form 52
Rev. 7-91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 3

# REQUEST FOR PERSONNEL ACTION

## PART A - Requesting Office (Also complete Part B, items 1, 7-22; 32, 33, 36, and 39.)

| 1. Actions Requested | 2. Request Number |
|---|---|
| Voluntary Retirement | |

3. For Additional Information Call (Name and Telephone Number)

Jennifer Newman, Mgmt Analyst, 5-3042

3. Proposed Effective Date

10/31/2010

5. Action Requested By (Typed Name, Title, Signature, and Request Date)

Jennifer Newman, Mgmt Analyst

6. Action Authorized by (Typed Name, Title, Signature, and Concurrence Date)

Rory Souther, CG-9280

10/7/2010

## PART B - For Preparation of SF 50 (Use only codes in FPM Supplement 292-1) Show all dates in month-day-year order.

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| Doak, Edna | | | |

### FIRST ACTION

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| 5-C. Code | 5-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority |

### SECOND ACTION

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| 6-C. Code | 6-D. Legal Authority |
| 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| Mgmt & Program Analyst, #37432 | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 0343 | 13 | | | | | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| HEADQUARTERS, WASHINGTON, DC<br>US COAST GUARD<br>ACQUISITION DIRECTORATE-<br>CG-9283 | |

## EMPLOYEE DATA

| 23. Veterans Preference | | 24. Tenure | 25. Agency Use | 26. Veterans Pref for RIF |
|---|---|---|---|---|
| 1 - None   3 - 10-Point/Disability   5 - 10-Point/Other<br>2 - 5-Point   4 - 10-Point/Compensable   6 - 10-Point/Compensable/30% | | 0 - None   2 - Conditional<br>1 - Permanent   3 - Indefinite | | YES   NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| | | |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| | | | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 - Competitive Service   3 - SES General<br>2 - Excepted Service   4 - SES Career | E - Exempt<br>N - Nonexempt | | |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| | Washington, DC |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

| 45. Educational Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 49. Citizenship | 50. Veterans Status | 51. Supervisory Status |
|---|---|---|---|---|---|---|
| | | | | 1 - USA   8 - Other | | |

## PART C - Reviews and Approvals (Not to be used by requesting office.)

| 1. Office/Function | Initials/Signature | Date | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| A. | | | D. | | |
| B. | | | E. | | |
| C. | | | F. | | |

2. Approval: I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

| Signature | Approval Date |
|---|---|
| | |

CONTINUED ON REVERSE SIDE

OVER

Editions Prior to 7-91 Are Not Usable After 6-30-93
NSN 7540-01-333-6239

00169

**PART D - Remarks by Requesting Office**
(Note to Supervisors:   Do you know of additional or conflicting reasons for the employee's resignation/retirement?
If "YES", please state these facts on a separate sheet and attach to SF 52.)

☐ YES    ☐ NO

**PART E - Employee Resignation/Retirement**

Privacy Act Statement

You are requested to furnish a specific reason for your resignation or retirement and a forwarding address. Your reason may be considered in any future decision regarding your re-employment in the Federal service and may also be used to determine your eligibility for unemployment compensation benefits. Your forwarding address will be used primarily to mail you copies of any documents you should have or any pay or compensation to which you are entitled.

This information is requested under authority of sections 301, 3301, and 8506 of title 5, U.S. Code. Sections 301 and 3301 authorize OPM

and agencies to issue regulations with regard to employment of individuals in the Federal service and their records, while section 8506 requires agencies to furnish the specific reason for termination of Federal service to the Secretary of Labor or a State agency in connection with administration of unemployment compensation programs.

The furnishing of this information is voluntary; however, failure to provide it may result in your not receiving: (1) your copies of those documents you should have; (2) pay or other compensation due you; and (3) any unemployment compensation benefits to which you may be entitled.

1.   Reasons for Resignation/Retirement (NOTE: Your reasons are used in determining possible unemployment benefits. Please be specific and avoid generalizations. Your resignation/retirement is effective at the end of the day - midnight - unless you specify otherwise.)

*Economic Hardship caused by denial of reasonable accommodation for serious medical condition expected to improve in next few months.*

| 2. Effective Date | 3. Your Signature | 4. Date Signed | 5. Forwarding Address (Number, Street, City, State, ZIP Code) |
|---|---|---|---|
| 10/31/10 | *Edna M Clark* | 10/7/10 | *501 Granville St. Silver Spring MD 20901* |

**PART F - Remarks for SF 50**

Voluntary Retirement effective 31 Oct 2010

# EXHIBIT 2

501 Granville Drive
Silver Spring, MD 20901
November 4, 2010

Via Email: Rory.L.Souther@uscg.mil

Mr. Rory Souther
U.S. Coast Guard
Acquisition Directorate (CG-9)
1900 Half Street SW (11ᵗʰ Floor)
Washington, DC 20593

Dear Rory:

As I informed you today about 3:45pm by phone, enclosed please find the Revocation of Settlement Agreement signed today. I am invoking my rights under the Older Workers Protection Act.

Just so that you know, I was taken aback by your comment during our brief call that you will be looking forward to terminating me and your statement that "It will be fun!" As a result of that remark, I totally forgot the fax number you gave me. I am not calling you back to get the number as I do not wish to give you another opportunity to speak inappropriately. Therefore, I am sending this letter and revocation to you by email instead.

Sincerely,

Edna M. Doak

Copy:  Nate Nelson, AFGE Respresentative (via email)
       Elena Hughes, Union Representative (via email and fax)

Encl/as

00142

258

# EXHIBIT 3

U.S. Department of
**Homeland Security**

**United States
Coast Guard**

Commandant
United States Coast Guard

2100 Second Street, S.W. Ste. 1410
Washington, DC 20593-0001
Staff Symbol: CG-0944
Phone: (202) 372-3766
Fax: (202) 372-3971
Email: Lorna J.Jerome@uscg.mil

November 12, 2010

Edna Doak
501 Granville Drive
Silver Spring, MD 20901

Dear Ms. Doak:

It is the Agency's position that you have no grounds upon which to revoke the settlement
agreement which was executed on October 7, 2010. Accordingly, the settlement
agreement is still in effect and the Agency has complied with the terms found under
Paragraph 2. At all times relevant to negotiating the settlement agreement, you were duly
represented and had the opportunity to consult with your representatives.

Additionally, since the settlement agreement concerned your request for reasonable
accommodations, the Older Workers Benefit Protection Act is not relevant. At no time
prior to signing the settlement agreement did you inform the Agency verbally or in
writing that you believed that age played a role in your termination (or any of the
personnel actions leading up to your termination). Accordingly, you had no right to
revoke the settlement agreement after voluntarily executing it.

Respectfully Submitted,

LORNA JEROME, Esquire
Commandant (CG-094)
US Coast Guard
2100 2nd St SW Stop 7121
Washington, DC 20593-7121
P: (202) 372-3766
F: (202) 372-3971
Lorna.j.jerome@uscg.mil

00163

260

# EXHIBIT 4



*Office for Civil Rights and Civil Liberties*
**U.S. Department of Homeland Security**
Washington, DC 20528

*Complaint of Edna Doak v. Janet Napolitano,*
*Secretary, Department of Homeland Security*
Agency Number HS-USCG-00018-2011

July 1, 2011

### CERTIFIED MAIL: 7010 1870 0002 2384 6687
### RETURN RECEIPT REQUESTED

Edna Doak
501 Granville Drive
Silver Spring, MD 20901

Dear Ms. Doak:

This is the Department of Homeland Security's (DHS) Final Decision dismissing the above-referenced complaint. You alleged that the U.S. Coast Guard (USCG) discriminated against you and subjected you to a hostile work environment on the bases of race (White), national origin (Hispanic), sex (female), physical disability (sleep apnea, migraines, muscle spasms, body pain), mental disability (depression), age (DOB: ▨▨/48), and reprisal (prior EEO activity) when, from January 2009 through October 8, 2010, management denied your requests for training, leave, telework, and reasonable accommodation; charged you as Absent Without Leave (AWOL); reassigned your duties; excluded you from meetings; issued you reprimands and a proposal to remove; and terminated your employment.

DHS dismisses this complaint because the claims in your complaint are moot, and Title 29 Code of Federal Regulations (C.F.R.) Section 1614.107(a)(5) requires an Agency to dismiss such claims. The record shows that on October 7, 2010, you and USCG effected a Settlement Agreement (Agreement) wherein you resolved an earlier complaint which contained the same claims as the present complaint. EEOC case law holds that an agency may dismiss as moot a complaint which raises claims that an earlier agreement settled. To determine whether issues raised in a complaint are moot, the fact-finder must ascertain whether (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur; and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged discrimination. *Kuo v. Dep't of the Navy,* EEOC Request No. 05970343 (July 10, 1998). Here, it can be said that the alleged violations would not recur because your complaint stated that on October 31, 2010, you resigned from your USCG position; and the relief provided through the Agreement, along with your resignation, have completely and irrevocably eradicated the effects of the alleged discrimination. DHS also notes that as part of the settlement, you agreed to not bring forth allegations based upon "any matters stemming from facts occurring before the date of this Agreement [October 7, 2010]." In your present complaint, you alleged only incidents which

Exhibit C

occurred from January 2008 until October 6, 2010. In summation, DHS dismisses your complaint as moot because the claims upon which it is based have already been resolved and the alleged incidents will not again occur.

This letter is the final action by DHS on this complaint. If you are dissatisfied with this decision, you may file an appeal according to the instructions at Enclosure (1). The appeal form is at Enclosure (2).

Sincerely,

Veronica Venture
Deputy Officer, and Director for
Equal Employment Opportunity and Diversity Programs
Office for Civil Rights and Civil Liberties
U.S. Department of Homeland Security

Encl:  (1) Appeal Rights
       (2) EEOC Form 573

cc:   Director
      Office of Civil Rights CG-00H
      United States Coast Guard
      2100 2nd Street, SW, Room 4404
      Washington, DC 20593
      *(Uploaded and Notified Via Email)*

JJS

²00127

263

## NOTICE OF APPEAL RIGHTS

You have the right to appeal to the Equal Employment Opportunity Commission (EEOC) or to file a civil action in an appropriate United States District Court.

All time periods are given in calendar days. If a time period expires on a Saturday, Sunday or Federal holiday, you may file on the next business day. If an attorney represents you, the time periods begin to run from the date that your attorney receives this decision.

### FILING AN APPEAL WITH EEOC

You have the right to appeal this decision to EEOC within 30 days of the day you receive this final decision. File your appeal, and any supporting statement or brief, by mail addressed to:

**U.S. Equal Employment Opportunity Commission**
**Office of Federal Operations**
**P.O. Box 77960**
**Washington, DC 20013**

Or by personal delivery to:

**U.S. Equal Employment Opportunity Commission**
**Office of Federal Operations**
**131 M Street, NE**
**Suite 5SW12G**
**Washington, DC 20507**

Or by facsimile to (202) 663-7022.

At the same time you file an appeal with EEOC, you must also send a copy of your appeal, and any supporting statement or brief, to:

**Director**
**Office of Civil Rights CG-00H**
**United States Coast Guard**
**2100 2nd Street, SW, Room 4404**
**Washington, DC 20593**

And to:

**Department of Homeland Security**
**Office for Civil Rights and Civil Liberties / MS0191**
**245 Murray Lane, SW**
**Bldg 410**
**Washington, DC 20528**

00128

In your appeal to EEOC, you must state the date and method (for example, by certified mail or hand delivery) by which a copy of the appeal was sent to the Deputy Director, Office of Civil Rights, U.S. Coast Guard. You should use the attached EEOC Form 573, Notice of Appeal/Petition, to file your appeal. EEOC will dismiss your appeal if you do not file it within the time limits.

## FILING A CIVIL ACTION

You also have the right to file a civil action in an appropriate United States District Court within 90 days after you receive this final decision if you do not appeal to EEOC, or within 90 days after receipt of EEOC's final decision on appeal. You may also file a civil action after 180 days from the date of filing an appeal with EEOC if there has been no final decision by EEOC.

If your claim is based on age discrimination, the time limits noted above may not be applicable to you, especially if you are filing this civil action after giving EEOC not less than 30 days' notice of your intent to file such an action. Accordingly, you should consult an attorney if you desire further guidance regarding the timeliness of your case.

You must also comply with the following instructions:

(1) You must name Janet Napolitano, Secretary, Department of Homeland Security, as the defendant. Failure to provide her name and official title may result in dismissal of your case.

(2) If you decide to file a civil action and if you do not have, or cannot afford, the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. The grant or denial of the request is within the sole discretion of the Court. Filing a request for an attorney does not extend the time in which to file a civil action. Both the request and the civil action must be filed within 90 days of the date you receive the agency or EEOC final decision.

00129

## NOTICE OF APPEAL/PETITION
## TO THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

OFFICE OF FEDERAL OPERATIONS
P.O. Box 77960
Washington, DC 20013

**Complainant Information:** (Please Print or Type)

| | |
|---|---|
| Complainant's name (Last, First, M.I.): | |
| Home mailing address | |
| City, State, ZIP Code: | |
| Daytime Telephone # (with area code): | |
| E-mail address (if any): | |

**Attorney/Representative Information (if any):**

| | |
|---|---|
| Attorney name: | |
| Non-Attorney Representative name: | |
| Address: | |
| City, State, ZIP Code: | |
| Telephone number (if applicable): | |
| E-mail address (if any): | |

**General Information:**

| | |
|---|---|
| Name of the agency being charged with discrimination: | |
| Identify the Agency's complaint number: | |
| Location of the duty station or local facility in which the complaint arose: | |
| Has a final action been taken by the agency, an Arbitrator, FLRA, or MSPB on this complaint? | ☐ Yes;  Date Received _____ (Remember to attach a copy) <br> ☐ No <br> ☐ This appeal alleges a breach of settlement agreement |
| Has a complaint been filed on this same matter with the EEOC, another agency, or through any other administrative or collective bargaining procedures? | ☐ No <br> ☐ Yes (Indicate the agency or procedure, complaint/docket number, and attach a copy, if appropriate) |
| Has a civil action (lawsuit) been filed in connection with this complaint? | ☐ No <br> ☐ Yes (Attach a copy of the civil action filed) |

**NOTICE:** Please **attach a copy of the final decision or order** from which you are appealing. If a hearing was requested, please attach a copy of the agency's final order and a copy of the EEOC Administrative Judge's decision. Any comments or brief in support of this appeal MUST be filed with the EEOC **and** with the agency **within 30 days** of the date this appeal is filed. The date the appeal is filed is the date on which it is postmarked, hand delivered, or faxed to the EEOC at the address above.

| | |
|---|---|
| Signature of complainant or complainant's representative: | |
| Date: | |

EEOC Form 573 REV 1/01

00130

## PRIVACY ACT STATEMENT

(This form is covered by the Privacy Act of 1974. Public Law 93-597.
Authority for requesting the personal data and the use thereof are given below.)

1.  **FORM NUMBER/TITLE/DATE**: EEOC Form 573, Notice of Appeal/Petition, January 2001

2.  **AUTHORITY**: 42 U.S.C. § 2000e-16

3.  **PRINCIPAL PURPOSE**: The purpose of this questionnaire is to solicit information to enable the Commission to properly and efficiently adjudicate appeals filed by Federal employees, former Federal employees, and applicants for Federal employment.

4.  **ROUTINE USES**: Information provided on this form will be used by Commission employees to determine: (a) the appropriate agency from which to request relevant files; (b) whether the appeal is timely; (c) whether the Commission has jurisdiction over the issue(s) raised in the appeal, and (d) generally, to assist the Commission in properly processing and deciding appeals. Decisions of the Commission are final administrative decisions, and, as such, are available to the public under the provisions of the Freedom of Information Act. Some information may also be used in depersonalized form as a data base for statistical purposes.

5.  **WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION**: Since your appeal is a voluntary action, you are not required to provide any personal information in connection with it. However, failure to supply the Commission with the requested information could hinder timely processing of your case, or even result in the rejection or dismissal of your appeal.

00131

# EXHIBIT 5

RECEIVED

S 2011

B. G-OOH

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**RE: Complaint of Discrimination of Edna Doak**
**Docket No. 0120113970**

EDNA DOAK
501 Granville Drive
Silver Spring, MD 20901,
Appellant

APPELLANT'S BRIEF

Appeal From Final Agency Decision

Edna Doak, Appellant

Edna Doak, Appellant
501 Granville Drive
Silver Spring, M 20901
301-588-6198

RECEIVED

SEP 2 8 2011

BY: G-OOH

September 21, 2011

Exhibit 2

Doak Appeal
Docket No. 0120113970

September 21, 2011

## TABLE OF ATTACHMENTS

EEOC Form 573.................................................................................Attachment 1

US Coast Guard Final Agency Dismissal Letter...................................................Attachment 2

Revocation of Settlement Agreement...................................................... Attachment 3

Letter to Rory Souther on November 4, 2010........................................…..… Attachment 4

00133

Doak Appeal                                                    September 21, 2011
Docket No. 0120113970

## PRELIMINARY STATEMENT

I, Edna Doak, would like to appeal the July 1, 2011, dismissal of my complaint by Veronica

Venture, Deputy Officer, and Director for Equal Employment Opportunity and Diversity Programs,

Office for Civil Rights and Civil Liberties, U.S. Department of Homeland Security, because it ignores

the fact that I invoked the protections afforded older workers under the Older Workers Benefits

Protection Act ("OWBPA") on November 4, 2010 (see Attachment 1). Although I timely filed my

revocation to the agency Human Resources Directorate by certified and regular mail and e-mail to the

official who signed the Settlement Agreement, my rights under OWBPA have been treated as non-

existent. Further, I was subjected to reprisal for prior EEO activity on November 4, 2010, when Mr.

Souther threatened to terminate my employment and stop the FORCED retirement that occurred on

October 7, 2010, to cause further economic hardship and harm to my physical and emotional wellbeing.

The Final Agency Decision (see Attachment 2) should be remanded to agency for continued action.

## SUMMARY OF ARGUMENT

Ms. Doak made a timely revocation of the Settlement Agreement to the agency. Ms. Doak

exercised her rights under OWBPA and was retaliated against on November 4, 2010, after the filing of

the complaint.

## ARGUMENT

### I.  Legal Standard

The EEOC shall examine "the decision on appeal from an agency's final action" based "on a de

novo review..." 29 C.F.R. Section 1614.405(a). Furthermore, the EEOC has the power to "remand to

the agency..." for further proceedings.  29 C.F.R. Section 1614.401(a).

/

00134

Doak Appeal                                                    September 21, 2011
Docket No. 0120113970

## II. The USCG Erred by Not Accepting Ms. Doak's Revocation of Settlement Agreement Executed on November 4, 2010

Ms. Doak signed a Settlement Agreement on October 7, 2010, under duress, coercion and without benefit of legal counsel or a sufficient amount of time to review the document considering she was suffering from severe emotional and physical distress exacerbated by the hostile work environment to which she was subjected for approximately two years. At the time of the FORCED retirement Ms. Doak did not have sufficient age or years of service to collect a normal retirement pension. The agency required Ms. Doak to sign the Settlement Agreement and involuntarily retire prematurely.

After consulting with a lawyer Ms. Doak learned she was permitted under the law to have at least 21 days to review any settlement due to her age. Therefore, Ms. Doak timely filed on November 4, 2010, her Revocation of Settlement Agreement under the Older Workers Benefit Protection Act of 1990 (Pub. L. 101-433) (see Attachment 3). The agency disregarded Ms. Doak's rights under OWBPA and dismissed her EEO complaint in its Final Agency Decision.

## III. Ms. Doak Suffered Reprisal on November 4, 2010, by Mr. Rory Souther

On November 4, 2010 Ms. Doak called her second-level supervisor who executed the Settlement Agreement on behalf of the agency and advised him she was invoking her rights under the OWBPA. He reacted by threatening to terminate her employment, thus stopping the retirement processing. In fact, Mr. Souther stated to Ms. Doak "It will be fun!" (see Attachment 4). Of course, Ms. Doak was hurt, distressed and surprised by this hostile comment from someone who is Chief of the Division. It is illegal under the Civil Service Reform Act of 1978 ("CSRA") to retaliate against a federal employee for exercising rights afforded under the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended by the OWBPA.

2

00135

Doak Appeal
Docket No. 0120113970

September 21, 2011

## CONCLUSION

Based on the information presented in this brief, I urge your office to reverse the dismissal of my complaint. The rights exercised under OWBPA and ADEA by Ms. Doak deserve to be acknowledged by the agency and disciplinary action against Mr. Souther for retaliation against Ms. Doak should take place. The complaint should not be dismissed. Rather, the Final Agency Decision should be VACATED and REMANDED back to the agency to be decided on the merits of the complaint.

3

CERTIFICATE OF SERVICE

I, Edna Doak, hereby certify that on this 21st day of September, 2011, a true and correct copy of the foregoing Appellant's Brief for Edna Doak (Docket No. 01201139700) was sent by ~~certified mail~~ regular mail to:

U.S. Equal Opportunity Commission, Office of Federal Operations, P.O. Box 77960, Washington DC 20013

Director, Office of Civil Right CG-00H, US. Coast Guard 2100 2nd St. SW Room 4404, Washington DC 20593

Department of Homeland Security Office for Civil Rights + Civil liberties / MS0191 245 Murray Lane, SW, Bldg #10 Washington DC 20528

I declare under penalty of perjury that the foregoing is true and correct.

Signature _____

Name (Print) _____EDNA DOAK_____

Executed On _____9/21/11_____

✗

00137

RECEIVED

**NOTICE OF APPEAL/PETITION
TO THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

OFFICE OF FEDERAL OPERATIONS
P.O. Box 77960
Washington, DC 20013

BY: G-00H

**Complainant Information: (Please Print or Type)**

| | |
|---|---|
| Complainant's name (Last, First, M.I.): | DOAK, EDNA M. |
| Home/mailing address: | 501 GRANVILLE DR |
| City, State, ZIP Code: | SILVER SPRING, MD 20901 |
| Daytime Telephone # (with area code): | 301-588-6198 |
| E-mail address (if any): | edoak 2010 @ verizon. net |

**Attorney/Representative Information (if any):**

| | |
|---|---|
| Attorney name: | |
| Non-Attorney Representative name: | |
| Address: | |
| City, State, ZIP Code: | |
| Telephone number (if applicable): | |
| E-mail address (if any): | |

**General Information:**

| | |
|---|---|
| Name of the agency being charged with discrimination: | U.S. COAST GUARD DEPT. OF HOMELAND SECURITY |
| Identify the Agency's complaint number: | HS-USCG-00018-2011 |
| Location of the duty station or local facility in which the complaint arose: | 2100 SECOND ST SW (JEMAL BLDG) WASHINGTON DC 20593 |
| Has a final action been taken by the agency, an Arbitrator, FLRA, or MSPB on this complaint? | X Yes; Date Received 7/23/11 (Remember to attach a copy) No This appeal alleges a breach of settlement agreement |
| Has a complaint been filed on this same matter with the EEOC, another agency, or through any other administrative or collective bargaining procedures? | X No Yes (Indicate the agency or procedure, complaint/docket number, and attach a copy, if appropriate) |
| Has a civil action (lawsuit) been filed in connection with this complaint? | X No Yes (Attach a copy of the civil action filed) |

**NOTICE:** Please **attach a copy of the final decision or order** from which you are appealing. If a hearing was requested, please attach a copy of the agency's final order and a copy of the EEOC Administrative Judge's decision. Any comments or brief in support of this appeal MUST be filed with the EEOC and with the agency **within 30 days** of the date this appeal is filed. The date the appeal is filed is the date on which it is postmarked, hand delivered, or fixed to the EEOC at the address above.

| | |
|---|---|
| Signature of complainant or complainant's representative: | Edna M Doak |
| Date: | 8/22/11 |
| EEOC Form 573 REV 1/01 | |

RECEIVED

SEP 28 2011

BY: G-00H

00138



*Office for Civil Rights and Civil Liberties*
**U.S. Department of Homeland Security**
Washington, DC 20528

*Complaint of Edna Doak v. Janet Napolitano,*
*Secretary, Department of Homeland Security*
Agency Number HS-USCG-00018-2011                                July 1, 2011

**CERTIFIED MAIL:  7010 1870 0002 2384 6687**
**RETURN RECEIPT REQUESTED**

Edna Doak
501 Granville Drive
Silver Spring, MD 20901

Dear Ms. Doak:

This is the Department of Homeland Security's (DHS) Final Decision dismissing the above-referenced complaint. You alleged that the U.S. Coast Guard (USCG) discriminated against you and subjected you to a hostile work environment on the bases of race (White), national origin (Hispanic), sex (female), physical disability (sleep apnea, migraines, muscle spasms, body pain), mental disability (depression), age (DOB: 48), and reprisal (prior EEO activity) when, from January 2009 through October 8, 2010, management denied your requests for training, leave, telework, and reasonable accommodation; charged you as Absent Without Leave (AWOL); reassigned your duties; excluded you from meetings; issued you reprimands and a proposal to remove; and terminated your employment.

DHS dismisses this complaint because the claims in your complaint are moot, and Title 29 Code of Federal Regulations (C.F.R.) Section 1614.107(a)(5) requires an Agency to dismiss such claims. The record shows that on October 7, 2010, you and USCG effected a Settlement Agreement (Agreement) wherein you resolved an earlier complaint which contained the same claims as the present complaint. EEOC case law holds that an agency may dismiss as moot a complaint which raises claims that an earlier agreement settled. To determine whether issues raised in a complaint are moot, the fact-finder must ascertain whether (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur; and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged discrimination. *Kuo v. Dep't of the Navy*, EEOC Request No. 05970343 (July 10, 1998). Here, it can be said that the alleged violations would not recur because your complaint stated that on October 31, 2010, you resigned from your USCG position; and the relief provided through the Agreement, along with your resignation, have completely and irrevocably eradicated the effects of the alleged discrimination. DHS also notes that as part of the settlement, you agreed to not bring forth allegations based upon "any matters stemming from facts occurring before the date of this Agreement [October 7, 2010]." In your present complaint, you alleged only incidents which

00139

occurred from January 2008 until October 6, 2010. In summation, DHS dismisses your complaint as moot because the claims upon which it is based have already been resolved and the alleged incidents will not again occur.

This letter is the final action by DHS on this complaint. If you are dissatisfied with this decision, you may file an appeal according to the instructions at Enclosure (1). The appeal form is at Enclosure (2).

Sincerely,

Veronica Venture
Deputy Officer, and Director for
Equal Employment Opportunity and Diversity Programs
Office for Civil Rights and Civil Liberties
U.S. Department of Homeland Security

Encl: (1) Appeal Rights
(2) EEOC Form 573

cc: Director
Office of Civil Rights CG-00H
United States Coast Guard
2100 2nd Street, SW, Room 4404
Washington, DC 20593
*(Uploaded and Notified Via Email)*

JJS

00140

277

## REVOCATION OF SETTLEMENT AGREEMENT

This is to certify that I, Edna Doak (hereinafter "Employee") am hereby revoking a Settlement Agreement (the "Agreement") entered into with the United States Coast Guard (the "Agency") on 7 October 2010 with Rory Souther, representative for Agency.

At the time of signing the Agreement I am a CSRS-Offset Federal Employee, 61 years old, with only 19 years 9 months of creditable service as of 31 October 2010. I was my desire to retire at the age of 65.

I was "railroaded" into signing this agreement and forced to retire prematurely. I was presented the settlement agreement by Rory Souther approximately 3:00pm on 6 October 2010 and asked to sign immediately. I declined to sign and was allowed to consider the Agreement overnight. I lay awake sleepless most of that night.

At approximately 4:00 pm on 7 October 2010, while I was completing a Workers' Compensation Claim, Mr. Souther and Mrs. Star (King) Anderson appeared at the office door and insisted I conclude my paperwork and meet them in Ms. Anderson's office. During the meeting I was emotionally distraught. I signed reluctantly, and without benefit of legal counsel.

Since then I have had the opportunity to review the Agreement. I hereby revoke the Settlement Agreement of 7 October 2010 under the provisions of the Older Workers Benefit Protection Act.

Employee:

_Edna Doak_ (signature)
Edna Doak

_11/4/10_
Date

# EXHIBIT 6



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P.O. Box 77960**
**Washington, DC 20013**

RECEIVED

Edna M. Doak,
Complainant,

FEB 10 2012

v.

BY: G-OOH

Janet Napolitano,
Secretary,
Department of Homeland Security
(U.S. Coast Guard),
Agency.

Appeal No. 0120113970

Agency No. HS-USCG-00018-2011

### DECISION

Complainant filed a timely appeal with this Commission from the Agency's final decision dated July 1, 2011, dismissing a formal complaint of unlawful employment discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e et seq., Section 501 of the Rehabilitation Act of 1973 (Rehabilitation Act), as amended, 29 U.S.C. § 791 et seq., and the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 621 et seq.

### BACKGROUND

During the period at issue, Complainant worked as a Management Analyst at the Agency's facility in Washington, DC. On February 22, 2011, Complainant filed a formal complaint. Therein, Complainant claimed that the Agency subjected her to discrimination on the bases of race, national origin, sex (female), disability, age, and in reprisal for prior protected activity.

In its July 1, 2011 final decision, the Agency determined that Complainant's formal complaint was comprised of the following claim:

> From January 2009 through October 8, 2010, management denied her requests for training, leave, telework, and reasonable accommodations; charged her as Absent Without Leave, reassigned her duties; excluded her from meetings, issued her reprimands and a proposal to remove, and terminated her employment.

00187

Exhibit E 3

2                                                          0120113970

The Agency dismissed Complainant's complaint on the grounds that it had been rendered moot reasoning that Complainant had signed a settlement agreement regarding this matter on October 7, 2010.

## CONTENTIONS ON APPEAL

On appeal, Complainant asserts the Agency's final decision dismissing her formal complaint is improper. Complainant asserts that the October 7, 2010 settlement agreement should be revoked because it failed to comply with the Older Workers' Benefit Protection Act (OWBPA). Complainant states that she informed the Agency on November 4, 2010, that she was revoking the settlement agreement due to the Agency's failure to comply with OWBPA.[1]

## ANALYSIS AND FINDINGS

The Agency did not process Complainant's claim as a breach claim. However, Complainant's claim could be construed as a settlement breach claim. The Older Workers' Benefit Protection Act (OWBPA) amended the Age Discrimination in Employment Act (ADEA) effective October 16, 1990, and provides the minimum requirements for waiver of ADEA claims. Juhola v. Dep't of the Army, EEOC Appeal No. 01934032 (June 30, 1994). To meet the standards of the OWBPA, a waiver is not considered knowing and voluntary unless, at a minimum: (1) the waiver is clearly written from the viewpoint of the complainant; (2) the waiver specifically refers to rights or claims under the ADEA; (3) the complainant does not waive rights or claims arising following execution of the waiver; (4) valuable consideration is given in exchange for the waiver; (5) the complainant is advised in writing to consult with an attorney prior to executing the agreement; and (6) the complainant is given a reasonable period of time in which to consider the agreement. Id. (citing 29 U.S.C. § 626(f)(2)).

The record reflects that Complainant's settled complaint in part was based on age. We note that the record contains a letter from an Agency attorney to Complainant dated November 12, 2010. Therein, the Agency stated that Complainant had no grounds to revoke the settlement agreement. The Agency further stated that the OWBPA was not relevant because "[a]t no time prior to signing the settlement agreement did you inform the Agency verbally or in writing that you believed age played a role in your termination (or any of the personnel actions leading up to your termination)." However, the record reflects that the Agency was on notice before the execution of the settlement agreement that Complainant was alleging age as a basis. The record contains a copy of a "Pre-Complaint Intake Form" dated October 6, 2010 (one day

---

[1] The record contains a letter to the Agency from Complainant dated November 4, 2010. Therein, Complainant asserts that she is seeking to revoke the settlement agreement pursuant to the OWBPA.

3                                         0120113970

before the execution of the settlement agreement).  The Pre-Complaint form is signed by an EEO Counselor.  Age is listed as one of the bases on the Pre-Complaint form.[2]

In this case, we find that the October 7, 2010 settlement agreement did not comply with the provisions of the OWBPA.    Specifically, the settlement agreement does not advise Complainant in writing to consult with an attorney before executing the settlement agreement. Moreover, the record does not support a finding that Complainant was given a reasonable period of time in which to consider the settlement agreement.  Thus, the Commission finds that Complainant's decision to enter into the settlement agreement was neither knowing nor voluntary.  Therefore, the Commission determines that the settlement agreement is void and reinstates Complainant's underlying complaint.[3]

## CONCLUSION

Accordingly, the Commission REVERSES the Agency's final decision dismissing Complainant's complaint and we REMAND this matter to the Agency for further processing in accordance with Order below.

## ORDER

The Agency is ORDERED to reinstate Complainant's underlying complaint from the point processing ceased.    The Agency shall acknowledge to Complainant that is has resumed processing of Complainant's complaint within thirty (30) calendar days from the date this decision becomes final.

A copy of the Agency's letter of acknowledgment notifying Complainant of the reinstatement of her complaint must be sent to the Compliance Officer as referenced below.

## IMPLEMENTATION OF THE COMMISSION'S DECISION (K0610)

Compliance with the Commission's corrective action is mandatory.  The Agency shall submit its compliance report **within thirty (30) calendar days** of the completion of all ordered corrective action. The report shall be submitted to the Compliance Officer, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 77960, Washington, DC 20013.  The Agency's report must contain supporting documentation, and the Agency must send a copy of all submissions to the Complainant.  If the Agency does not comply with the Commission's order, the Complainant may petition the Commission for enforcement of the

---

[2] The Pre-Complaint form also lists race, sex, national origin, and disability as bases.

[3] Provision (11) of the settlement agreement provides "[s]hould any provision of this Agreement be declared or determined by any court or legal body to be illegal or invalid, or should either party breach any clause of this agreement, the entire agreement shall be voidable."

00189

4                                          0120113970

order. 29 C.F.R. § 1614.503(a). The Complainant also has the right to file a civil action to enforce compliance with the Commission's order prior to or following an administrative petition for enforcement.    See 29 C.F.R. §§ 1614.407, 1614.408, and 29 C.F.R. § 1614.503(g). Alternatively, the Complainant has the right to file a civil action on the underlying complaint in accordance with the paragraph below entitled "Right to File a Civil Action." 29 C.F.R. §§ 1614.407 and 1614.408. A civil action for enforcement or a civil action on the underlying complaint is subject to the deadline stated in 42 U.S.C. 2000e-16(c) (1994 & Supp. IV 1999). If the Complainant files a civil action, the administrative processing of the complaint, including any petition for enforcement, will be terminated. See 29 C.F.R. § 1614.409.

## STATEMENT OF RIGHTS - ON APPEAL

### RECONSIDERATION (M0610)

The Commission may, in its discretion, reconsider the decision in this case if the Complainant or the Agency submits a written request containing arguments or evidence which tend to establish that:

1.    The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2.    The appellate decision will have a substantial impact on the policies, practices, or operations of the Agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) **within thirty (30) calendar days** of receipt of this decision or **within twenty (20) calendar days** of receipt of another party's timely request for reconsideration. See 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), at 9-18 (November 9, 1999). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 77960, Washington, DC 20013. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. See 29 C.F.R. § 1614.604. The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. See 29 C.F.R. § 1614.604(c).

00190

5                                              0120113970

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (R0610)

This is a decision requiring the Agency to continue its administrative processing of your complaint. However, if you wish to file a civil action, you have the right to file such action in an appropriate United States District Court within ninety (90) calendar days from the date that you receive this decision. In the alternative, you may file a civil action after one hundred and eighty (180) calendar days of the date you filed your complaint with the Agency, or filed your appeal with the Commission. If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. Filing a civil action will terminate the administrative processing of your complaint.

## RIGHT TO REQUEST COUNSEL (Z0610)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request from the Court that the Court appoint an attorney to represent you and that the Court also permit you to file the action without payment of fees, costs, or other security. See Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). The grant or denial of the request is within the sole discretion of the Court. Filing a request for an attorney with the Court does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File a Civil Action").

FOR THE COMMISSION:

Carlton M. Hadden, Director
Office of Federal Operations

FEB - 2 2012

Date

00191

6                                    0120113970

## CERTIFICATE OF MAILING

For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed. I certify that this decision was mailed to the following recipients on the date below:

Edna M. Doak
501 Granville Dr
Silver Spring, MD  20901

U.S. Department of Homeland Security
Office for Civil Rights and Civil Liberties
245 Murray Ln., SW  Bldg. 410
Mail Stop 0191
Washington, DC  20528

Deputy Director, Office of Civil Rights
United States Coast Guard
2100 2nd Street, SW, Room 2400
Washington, DC  20593

FEB - 2 2012
Date

Equal Opportunity Assistant

00192

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
OFFICE OF FEDERAL OPERATIONS
P.O. BOX 77960
WASHINGTON, D.C. 20013

OFFICIAL BUSINESS   TUE 02/06/2012 05:15:45

$ 00.650
0004601824   FEB03 2012
MAILED FROM ZIP CODE 20507
02 1A

RECEIVED

FEB 10 2012

BY: C-OOH

Reference #: 0120113970
Deputy Director, Office of Civil Rights
United States Coast Guard
2100 2nd Street, SW, Room 2400
Washington, DC 20593

00193

# EXHIBIT 7

*Office for Civil Rights and Civil Liberties*
**U.S. Department of Homeland Security**
Washington, DC 20528



**Homeland Security**

rec'd
6/28/12

Edna Doak,               )
                         )
    *Complainant*      )
                         )
v.                       )       Agency Case No. USCG-00018-2011
                         )
Janet Napolitano, Secretary,   )
U.S. Department of Homeland Security,   )
                         )
    *Agency*          )
_____)

## FINAL AGENCY DECISION

Pursuant to 29 C.F.R § 1614.110(b), the U.S. Department of Homeland Security (DHS), Office for Civil Rights and Civil Liberties (CRCL) hereby takes final action on the above-captioned complaint by issuing a Final Agency Decision (FAD).[1]  Based upon a review of the full Investigative File (IF), CRCL finds Complainant failed to prove by a preponderance of the evidence that United States Coast Guard (USCG) discriminated against Complainant. A notice is attached to this Decision informing Complainant of the right to appeal to the Merit Systems Protection Board (MSPB) or to file a civil action in federal district court.  Also, a copy of MSPB Form 185 is attached for Complainant's submission to MSPB's Washington D.C. Regional Office, should Complainant decide to file an appeal.

### PROCEDURAL HISTORY

1. On October 6, 2010, Complainant initiated contact with an Equal Employment Opportunity (EEO) Counselor.  (Investigative File (IF) at 12-16).

2. On January 3, 2011, USCG notified Complainant of the conclusion of EEO counseling and Complainant's right to file a formal complaint.

---

[1] Pursuant to the Homeland Security Act of 2002, *as amended*, 6 U.S.C. § 345, the Officer for Civil Rights and Civil Liberties (CRCL) shall ensure that the protection of civil rights and civil liberties is appropriately incorporated into Departmental programs and activities.  On June 5, 2003, the Secretary for DHS issued Delegation Number 3095, which delegated to CRCL the authority to adjudicate the Department's EEO complaints.

3. On February 22, 2011, Complainant filed the formal complaint at issue. (IF at 1-4).

4. On July 1, 2011, CRCL dismissed the complaint for mootness. (IF at 126-27).

5. On February 2, 2012, OFO reversed the dismissal of the complaint, and remanded it for further processing. (IF at 187-91).

6. On April 27, 2012, USCG forwarded Complainant a copy of the Investigative File.

7. On May 1, 2012, CRCL received USCG's request for a FAD.

## CLAIMS AT ISSUE

Whether Complainant was subjected to a hostile work environment on the bases of race (White), national origin (Hispanic), sex (female), physical disability (sleep apnea, migraines, muscle spasms, body pain), mental disability (depression), age (YOB: 1948), and reprisal when, from January 2009 through October 8, 2010:

1) Management denied Complainant's request for training.

2) Management denied Complainant's request for leave.

3) Management denied Complainant's request for telework.

4) Management denied Complainant's request for reasonable accommodation.

5) Management charged Complainant with Absent Without Leave

6) Management reassigned Complainant's duties

7) Management excluded Complainant from meetings.

8) Management issued Complainant reprimands.

9) Management issued Complainant a proposal to remove.

10) Management terminated Complainant's employment.

## FINDINGS OF FACT

1. During the relevant time period, USCG employed Complainant as a Management Analyst in Washington D.C. (IF at 12).

2

289

2. Complainant's first level supervisor was the Chief, Business Management and Metrics (CBMM). Her second level supervisor was the Chief, Office of Resource Management (CRM).

3. On September 30, 2010, the CRM issued a "Notice of Decision on Proposed Removal, which would have removed Complainant from federal service, but Complainant entered into voluntary retirement. (IF at 17-21, 367-68).

4. With regard to Complainant's basis of reprisal, she cited EEO activity in July 2010, and October 2010.

## STANDARD OF REVIEW

### A. Disparate Treatment

Section 717 of Title VII of the Civil Rights Act of 1964 ("Title VII"), *as amended*, 42 U.S.C. § 2000e *et seq.*, prohibits discrimination based on race, color, religion, sex, and national origin. Section 501 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), *as amended*, 29 U.S.C. § 791 *et seq.*, prohibits employment discrimination against otherwise qualified federal employees on the basis of disability. The standards for determining a violation of the Rehabilitation Act, as amended in 1992, are the same as those for a violation of the Americans with Disability Act (ADA). 42 U.S.C. § 794(d) and 42 U.S.C. § 12101, *et seq.*[2]  The Rehabilitation Act "constitutes the exclusive remedy for a federal employee alleging disability-based discrimination." *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007). Additionally, the Age Discrimination in Employment Act of 1967 ("ADEA"), *as amended*, 29 U.S.C. § 621 *et seq.*, protects Federal employees who are 40 years of age or older from employment discrimination based on age. Title VII, the Rehabilitation Act, and the ADEA also prohibit reprisal or retaliation against participation in the EEO process or for opposing any unlawful employment practices covered by these statutes. 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 794(d); 29 U.S.C. § 623(d); 29 C.F.R. § 1614.101(b).

In the absence of direct evidence of discrimination, the tripartite analysis first enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), applies to claims of discrimination alleging disparate treatment. *O'Connor v. Consol. Coin Caterers*, 517 U.S. 308 (1996); *McDonnell Douglas*, 411 U.S. at 802. Under this analytical framework, the complainant must first establish a *prima facie* case of discrimination by presenting facts reasonably giving rise to an inference of discrimination when unexplained: *i.e.*, a prohibited reason was a factor in the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. Once the record establishes a *prima facie* case, a presumption arises that the employer unlawfully discriminated against the complainant, and the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" to rebut the *prima facie* case. *Tex. Dep't of Cmty. Affairs v. Burdine,*

---

[2] In September 2008, Congress amended the Americans with Disabilities Act (ADA) by enacting the Americans with Disabilities Act Amendments Act of 2008 (ADAAA), effective as of January 1, 2009, "to restore the intent and protections of the Americans with Disabilities Act of 1990." Pub. L. No. 110-325, 122 Stat. 3553 (2008). The ADAAA, was the legislative response to a series of Supreme Court cases that had narrowed the class of individuals protected by the ADA. Thus, among other things, the ADAAA expanded the class of individuals to be protected by providing a more expansive definition of "disability."

3

450 U.S. 248, 253-54 (1981). Should the employer meet this burden of production, the complainant "must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by [the Agency] were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 254. Ultimately, the burden of showing the employer intentionally discriminated against the complainant on the basis of his or her protected status remains at all times with the complainant. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

With regard to reprisal, in the absence of direct evidence of discrimination, a complainant may establish a *prima facie* case by proving: (1) he/she engaged in a statutorily protected EEO activity; (2) the Agency was aware of the EEO activity; (3) the employer took an adverse employment action against Complainant; and (4) a causal connection exists between the EEO activity and the adverse action (*e.g.*, action in question followed the protected activity within such a period of time that a retaliatory motivation may be inferred). *See Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1423 (D.C. Cir. 1988).

To prove a case of disability discrimination, a complainant must initially establish that he or she is a qualified individual with a disability. *See* 29 C.F.R. §§ 1614.203(b) and 1630.2. A "qualified individual with a disability" is an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the position in question. 29 C.F.R. § 1630.203(m). An "individual with a disability" is defined as one who: "(i) has a physical or mental impairment [3] which substantially limits one or more of such person's major life activities (including major bodily functions); (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." 29 C.F.R. § 1630.2(g). The determination of whether a major life activity is substantially limited by an impairment shall be made without regard to the ameliorative effects of mitigating measures, such as medication, prosthetics hearing aids, etc., with the exception of ordinary eyeglasses or contact lenses. 42 U.S.C. § 12102(3)(E). [4] The term "major life activities" includes, but is not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. 42 U.S.C. § 12102(2)(A). The term "major bodily functions" includes, but is not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, circulatory, respiratory, endocrine, hemic, lymphatic, musculoskeletal, special sense organs and skin, genitourinary, and cardiovascular systems, and reproductive functions. *Id.* § 12102(2)(B).

If a complainant proves he or she is a qualified individual with a disability, the factfinder may then continue analyzing the claim along traditional Title VII lines (*see Hicks*, 509 U.S. at 506-07) or, if reasonable accommodation is at issue, then the Agency must demonstrate it could not

---

[3] However, impairments that are "transitory and minor," (*i.e.*, impairments with an actual or expected duration of six months or less) are not covered although impairments that are episodic or in remission are considered a disability if it would substantially limit a major activity when active.

[4] According to the ADAAA, the definition of disability is to be construed in favor of "broad coverage," and the question of whether an individual's impairment constitutes a disability should not demand extensive analysis. *See* Pub. L. No. 110-325, §§ 2(b)(5) and 3(4)(A).

4

accommodate the disability without undue hardship on the operation of its program. 29 C.F.R. § 1630.9; *Carter v. Bennett*, 840 F.2d 63, 65-66 (D.C. Cir. 1988).[5]

In a case where the employer has articulated legitimate, nondiscriminatory reasons for its actions, the factfinder need not determine whether the complainant has established a *prima facie* case of discrimination. Instead, the factfinder should review the entire record to determine whether the record supports a finding of discrimination. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-15 (1983); *Austin v. Dep't of the Navy*, EEOC Appeal No. 01900068 (Dec. 8, 1989). Therefore, this decision does not include a *prima facie* case analysis on the disparate treatment claims at issue.[6]

## B. Hostile Work Environment

Harassment claims involve one or both of the following categories: (1) harassment by a supervisor that results in a tangible employment action, and (2) harassment which creates a hostile work environment. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *see also* Equal Employment Opportunity Commission *Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors*. In a case where a complainant proves a supervisor subjects the complainant to unlawful discriminatory harassment which results in a tangible employment action, the employer will be found liable since no affirmative defense is available to the employer. *Id.*

In order to prevail on a claim of a hostile work environment, a complainant must prove the workplace was permeated with discriminatory behavior sufficiently severe or pervasive to create a discriminatorily hostile or abusive work environment — one that a reasonable person would find hostile or abusive in addition to the victim's own subjective perception. *Harris v. Forklift Sys. Inc.*, 510 U.S. 17 (1993); *Meritor Savs. Bank v. Vinson*, 477 U.S. 57 (1986). To establish a claim of hostile environment, a complainant must prove the following elements: (1) the complainant is a member of a protected group; (2) the complainant was subjected to unwelcome verbal or physical conduct involving the protected class; (3) the unwelcome conduct was based upon the complainant's protected class; (4) the unwelcome conduct affected a term or condition of the complainant's employment, or had the effect of unreasonably interfering with the work environment, or creating an intimidating, hostile or offensive work environment; and (5) there is

---

[5] While the burden of persuasion in proving inability to accommodate always remains on the Agency, once the employing Agency presents credible evidence that accommodation would not reasonably be possible, the complainant bears the burden of coming forward with evidence concerning the complainant's individual capabilities and suggestions for possible accommodations to rebut the Agency's evidence. *Carter*, 840 F.2d at 66-67.

[6] This decision will proceed with an analysis of the disparate treatment allegations raised in Claims 1-3, 5-8, and 10 For the sake of completeness, this decision will include an analysis of all of the claims in this complaint — including the non-discrete allegation raised in Claim 9, along with the discrete acts raised in each of the remaining claims — under a hostile work environment theory even though the EEOC has held: a "discrete act of discrimination may be part of a hostile work environment only if it is related to abusive conduct or language, *i.e.*, a pattern of discriminatory intimidation, ridicule, and insult. A discrete act that is unrelated to abusive conduct or language ordinarily would not support a hostile work environment claim." *See EEOC Compliance Manual Number 915.003*. The discrete acts at issue, even if unrelated to abusive conduct or language, are nevertheless relevant as background evidence.

5

a basis for imputing liability to the employer. *See McCleod v. Soc. Sec. Admin.*, EEOC Appeal No. 01963810 (Aug. 5, 1999) (*citing Henson v. City of Dundee*, 682 F.2d 897, 901 (11th Cir. 1982). In cases involving supervisory harassment where no tangible employment action is taken, the employer may prove an affirmative defense comprised of two elements: (1) that the employer exercised reasonable care to prevent and promptly correct any harassing behavior, and (2) that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *See Ellerth*, 524 U.S. 742; *see Faragher*, 524 U.S. 775; *see also* Equal Employment Opportunity Commission *Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors*. In cases involving harassment by a coworker or non-employee where no tangible action is taken, the employer will be found liable if the complainant proves the employer knew or should have known of the conduct, unless the employer can prove that it took immediate and appropriate corrective action. 29 C.F.R. § 1604.11(d); *see* Equal Employment Opportunity Commission *Policy Guidance on Current Issues of Sexual Harassment; see also Owens v. Dep't of Transp.*, EEOC Request No. 05940824 (Sept. 5, 1996).

## ANALYSIS

### A. Threshhold Disability Analysis

Complainant established that she is an individual with a disability under the Rehabilitation Act. Complainant produced sufficient medical documentation from her provider indicating that she suffered from major depressive disorder, migraines, hyperthyroidism, and sleep apnea. (IF at 259-64).

### A. Disparate Treatment

Management articulated legitimate, nondiscriminatory reasons for the actions in question. The CBMM, who was Complainant's first-line supervisor, stated that Complainant had submitted requests for training, all of which began before her start time for work. He explained that Complainant had difficulty getting to work by 9:00 a.m. due to medication, and she had agreed that it would not be wise to enroll in courses until she had stabilized on medication. The CBMM further stated that he informed Complainant that he would be more comfortable sending her to training when her hours became more regular and she was managing her medication better. He added that she was enrolled in an appropriation law course that was cancelled. (IF at 210).

The CRM, Complainant's second-line supervisor, contended that Complainant's requests for training related to her job responsibilities were not denied. He added that such training was available on line and could be completed during work hours. He noted Complainant failed to complete at least one required course despite multiple enrollments, and being allowed work time to complete the course.

The CRM added that Complainant's position required certification at three levels, with the first level to be completed in one year. He indicated that Complaint failed to complete that training in three years. The CRM explained that, if there was an instance where Complainant requested a

6

course that was not required, she was told to first complete training necessary for her certification before taking something else. He added that Complainant asserted at one point that she had been denied "Acquisitions 101" training required of new employees, but had actually taken it previously. (IF at 222-23).

The CBMM disputed that he ever denied Complainant's leave requests, and stated that she was advanced the maximum allowable regular leave and maximum allowable sick leave. (IF at 210). He acknowledged that he charged Complainant AWOL on numerous occasions because "she did not show up for work, had not put in for leave, and did not call in during the required timeframe to call in sick." (IF at 211)

The CBMM also denied that he ever permanently reassigned Complainant's duties, but stated that others had to "regularly cover her duties because she was gone from work so often." He added that Complainant created an "undue hardship on other employees" when they had to attend meetings or meet deadlines when she was absent." He also denied that Complainant was ever excluded from work meetings. (IF at 211).

According to the CBMM, Complainant was issued one official reprimand. He added that, on February 22, 2010, Complainant was issued a reprimand, but it was put in abeyance after an agreement was reached with Complaisant about requesting leave and providing proper documentation. The CBMM added that Complainant failed to properly request leave again, and was issued an official reprimand as a result on May 24, 2010. (IF at 212, 289-92).

With respect to complainant's removal, the CRM explained that the CBMM proposed her removal on August 9, 2010, and that he concurred. The CRM stated that his decision was based on Complainant's medical inability to perform the essential functions of her position due to her inability to maintain a regular schedule, and her significant number of AWOLs. He added that Complainant retired from federal service before the removal went into effect. (IF at 226).

Complainant failed to prove by a preponderance of the evidence that management's legitimate, nondiscriminatory reasons for the actions in question were a pretext for discrimination based on race, national origin, sex, disability, age, or in reprisal for prior EEO activity in July 2010 and October 2010.[7]

### B. Reasonable Accommodation

This Office determines that USCG engaged in good faith efforts to accommodate Complainant. The record establishes that management provided Complainant with reasonable accommodations to ameliorate the effects of her disability, and only denied particular accommodations that were either unreasonable or presented an undue hardship. In addition, Complainant failed to provide evidence that she was discriminatorily denied a reasonable accommodation to which she was entitled. (IF at 281-82).

---

[7] Complainant declined to participate in a telephonic interview with the investigator, and did not respond to a certified letter containing interrogatories. (Investigative Summary at 3; Investigative File at 194-205).

7

The CRM stated that, in response to her requests, Complainant received noise cancelling headphones, reduced lighting in her workspace, anti-glare protectors, and a delayed start time to 9:00 a.m. He explained that an even later start was not possible because of the core hours of her work group. Regarding telework, the CRM stated that Complainant never submitted the draft telework agreement, or a "Self-Certification Safety Checklist" for teleworkers. (IF at 223).

The CBBM added that accommodations were provided within one of Complainant's request. He noted that Complainant requested a later start time, and was allowed to adjust her hours to a later time, but not to the extent that she requested. He added that, since Complainant's position required her to interact daily with staff, she needed to be present for core hours. With regard to telework, the CBMM noted that Complainant did not "formally" request telework, using proper forms, and her informal request was denied because her physician stated that she "was incapacitated due to pain and cannot concentrate on the tasks at hand whether at her job or at home performing the routine tasks of daily living . . ." He further noted that Complainant did not have an internet connection at home, and had once requested to be able to work from a Kinko's. (IF at 209). Complainant failed to provide evidence that he was discriminatorily denied a reasonable accommodation to which she was entitled.

*C. Hostile Work Environment*

Here, Complainant did not produce sufficient evidence proving that USCG subjected her to an unlawful, discriminatory, hostile work environment based on race, national origin, sex, disability, age, or reprisal. An abusive or hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule and insults that is sufficiently severe or pervasive to alter the condition of the victim's employment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993). Complainant's complaint allegations related to alleged harassment fail to rise to this level of a workplace permeated with discriminatory ridicule and insults. Equally significantly, the record does not contain sufficient evidence demonstrating that the alleged incidents of hostile work environment were based on Complainant's protected characteristics.

## CONCLUSION

Based upon the full evidentiary record, CRCL concludes Complainant failed to prove USCG discriminated against Complainant. Since Complainant is not the prevailing party, she is not entitled to payment of attorney's fees, costs, or compensatory damages, and no corrective action is required.

_____                    ____June 19, 2012____
Veronica Venture                                     Date
Deputy Officer, Office for Civil Rights and Civil Liberties
Director for EEO & Diversity Programs
Department of Homeland Security

GVB

8

## NOTICE OF APPEAL RIGHTS

You have the right to file a civil action in an appropriate United States District Court, or, you may first file an appeal with the Merit Systems Protection Board (MSPB), but not, with the Equal Employment Opportunity Commission (EEOC).

All time periods are given in calendar days. If a time period expires on a Saturday, Sunday or Federal holiday, you may file on the next business day. If an attorney represents you, the time periods begin to run from the date that your attorney receives this decision.

### FILING AN APPEAL WITH MSPB

You have the right to appeal this decision to MSPB within 30 days of the day you receive this final decision. File your appeal by mail addressed to:

**REGIONAL DIRECTOR & CHIEF ADMINISTRATIVE JUDGE**
**MERIT SYSTEMS PROTECTION BOARD**
**WASHINGTON, DC REGIONAL OFFICE**
**1800 DIAGONAL ROAD, SUITE 205**
**ALEXANDRIA, VA 22314-2840**

Enclosed is MSPB Form 185 that you may use to file your appeal. You may file an appeal by mail, personal delivery, or via facsimile to (703) 756-7112.

### FILING A CIVIL ACTION

You also have the right to file a civil action in an appropriate United States District Court within 30 days after you receive this final decision unless an appeal is filed with MSPB.

You may also file a civil action after 120 days from the date you file an appeal with MSPB if MSPB has not issued a decision.

You must also comply with the following instructions:

(1) You must name Janet Napolitano, Secretary, Department of Homeland Security, as the defendant. Failure to provide her name and official title may result in dismissal of your case.

(2) If you decide to file a civil action and if you do not have, or cannot afford, the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. The grant or denial of the request is within the sole discretion of the Court. Filing a request for an attorney does not extend the time in which to file a civil action. Both the request and the civil action must be filed within 90 days of the date you receive the agency or MSPB final decision.

# EXHIBIT 8



**DEPARTMENT OF THE ARMY**
WALTER REED ARMY MEDICAL CENTER
WASHINGTON DC 20307-8001

REPLY TO
ATTENTION OF

3 Mar 2010

MEMORANDUM FOR SUPERVISOR: Medical Statement for Employee Edna Doak, 8072

FROM: Elizabeth P. Berbano MD MPH FACP, Internal Medicine Staff Physician, General Internal Medicine Clinic, Ward 73, Walter Reed Army Medical Center, Washington DC 20307

Ms. Edna Doak is a patient that I have been following in the Walter Reed Army Medical Center, General Internal Medicine Clinic since Sep 2009.

In December through the first couple of weeks of January, Ms. Doak reports that another provider placed her on two medications (that have potential to cause somnolence and fatigue). Ms. Doak reports that these medications caused her to sleep through her alarm and she could not awaken without feeling fatigued in the morning. These medications were tapered then discontinued in the latter part of January and she was feeling better with reported increase in energy level (which she reported to me Jan 22).

I had seen her Jan 22 in a routine follow-up visit in which we addressed her medical issues. She was given a pain medication at that time which she took Jan 24-26. She experienced the side effect of extreme fatigue, again, with morning somnolence and grogginess the days after she took the medication.

On Jan 27, she began having a migraine and still had fatigue. She made an appointment to see me Jan 28. During that visit, she was treated with medication in the clinic and seemed somewhat improved. I advised that she not return to work that day because of the condition as well as the medication.

She was then seen by one of my colleagues Feb 18, diagnosed with an acute medical illness, and given antibiotics. Feb 22, she called my colleague in follow-up to her visit with new symptoms (infectious but not life-threatening) and was given a plan.

She made an appointment to see me Feb 25 in follow-up. NOTE: I have very limited appointments (for routine follow-up due to my part-time status) and even more limitation with same-day appointment availability. Thus, typically, I cannot see Ms. Doak in a same-day visit.

I appreciate your consideration of Ms. Doak's on-going medical issues and reactions to medications that have required her to seek medical consultation and have changed her treatment plan when assessing her overall work performance.

If you have any questions, please contact me at: elizabeth.berbano@amedd.army.mil or 202-782-6886.

Respectfully,

Elizabeth P. Berbano, MD MPH FACP
Internal Medicine Staff Physician, GIMC
Walter Reed Army Medical Center

# EXHIBIT 9

| Name: | EDNA M DOAK | Pay Period: | 26 : Dec 20, 2009 to Jan 2, 2010 | |
|---|---|---|---|---|
| Time Card Type: | Regular | Leave Year: | 2009 | |
| Time in Pay: 64:00 | Other Time: 16:00 | Dollar Transactions: $0.00 | | Days in Pay: 8 |

| Transaction | Plx | Stx | Account | Dec 20 S | 21 M | 22 T | 23 W | 24 T | 25 F | 26 S | Wk1 | Dec 27 S | 28 M | 29 T | 30 W | 31 T | Jan 1 F | 2 S | Wk2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Regular Base Pay | | | (NFC Stored Account) | | | 4:30 | | | | | 4:30 | | 2 | 3:45 | 4:30 | | | | 10:15 | 14:45 |
| Work Time Total | | | | | | 4:30 | | | | | 4:30 | | 2 | 3:45 | 4:30 | | | | 10:15 | 14:45 |
| Sick Leave-FMLA | | | | | | 3:30 | 4 | | | | 7:30 | 3 | 6 | 4:15 | 3:30 | | | | 18:45 | 21 15 |
| Admin/Excused Absence | | | (NFC Stored Account) | 8 | | | | | | | 8 | | | | | | | | | 8 |
| Holiday Leave | | | | | | | 4 | 8 | | | 12 | | | | | 8 | | 8 | 8 | 20 |
| LWOP | | | | | | 8 | | | | | 8 | | | | | 8 | | 8 | 8 | 16 |
| Leave and Other Time Total | | | | 8 | 3:30 | 8 | 8 | 8 | | | 35:30 | 8 | 4:15 | 3:30 | 8 | 8 | | | 29:45 | 65:15 |
| Daily Total | | | | 8 | 8 | 8 | 8 | 8 | | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

Blizzard 2009 12/21-22; car accident related - migraines/spasms

| Type | Status | Date | Supervisor | Dec 20 S | 21 M | 22 T | 23 W | 24 T | 25 F | 26 S | Dec 27 S | 28 M | 29 T | 30 W | 31 T | Jan 1 F | 2 S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sick Leave | Approved | 28-DEC-09 | GREGORY K. COHEN (COHENG5946) | | | 4 | | | | | | | | | | | |
| Sick Leave | Approved | 28-DEC-09 | GREGORY K. COHEN (COHENG5946) | | | | | | | | | 6 | | | | | |
| Leave Without Pay | Approved | 28-DEC-09 | GREGORY K. COHEN (COHENG5946) | | | 8 | | | | | | | | | | | |
| Admin/Excused Absence | Approved | 28-DEC-09 | GREGORY K. COHEN (COHENG5946) | 8 | 3:30 | | | | | | | | | | | | |
| Sick Leave | Approved | 30-DEC-09 | GREGORY K. COHEN (COHENG5946) | | | | | | | | | | 4:15 | | | | |
| Sick Leave | Approved | 30-DEC-09 | GREGORY K. COHEN (COHENG5946) | | | | | | | | | | 3:30 | | | | |

(No Premium Pay Requests submitted)

| Pay Plan | GS General Schedule |
|---|---|
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Date | Exception Processing |
| Account Data Code | Use Stored Account (NFC) |
| Stored Account (NFC) | 001K2990670901A70509ZZZZZZ FY10 CIVILIAN PAYROLL |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 6 hr/pp |

| Leave Data | Fwd | Accr | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -6:00 | 8:00 | | | |
| Advance Sick Leave is used: | | | | | |
| Sick | -219:00 | 4:00 | -215:00 | 21:15 | -236:15 |
| LWOP | 60:00 | | | 16:00 | 78:00 |
| FMLA | 347:30 | | | 21:15 | 368:45 |
| Other | | | | 28:00 | |
| Leave Year Projection: | | | | | |
| Maximum Available Annual | | | | | |
| Maximum Available Sick | | | | | -236:15 |
| Use of Lone Leave | | | | | |

**Supervisor Remarks:**

Your signature certifies that all reported time was worked and approved according to law and regulation.

Validated By : GREGORY COHEN
Validation Date : Jan 04 2010 8:13 AM

Certified By : GREGORY COHEN
Certification Date : Jan 04 2010 8:16 AM

The complete T&A status history is displayed below; it may contain events that happened since the certification shown above took place.

| Timestamp | Status | Name | Message |
|---|---|---|---|
| Jan 17 2010 03:27 AM | Built | SYSTEM | Built in Build ID 3985. |
| Jan 14 2010 09:36 AM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Jan 14 2010 09:32 AM | Timekeeper Validated | COHEN, GREGORY (COHENG5946) | |
| Jan 14 2010 09:32 AM | Historical Correction Record | COHEN, GREGORY (COHENG5946) | |
| Jan 04 2010 10:02 AM | Built | SYSTEM | Built in Build ID 3921. |
| Jan 04 2010 08:14 AM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |

USCG712

300

| | | | |
|---|---|---|---|
| Jan 04 2010 08:13 AM | Timekeeper Validated | COHEN, GREGORY (COHENG5946) | |
| Jan 04 2010 08:13 AM | Validation Reset By Edit | COHEN, GREGORY (COHENG5946) | |
| Dec 31 2009 02:02 PM | Timekeeper Validated | COHEN, GREGORY (COHENG5946) | |
| Dec 18 2009 12:07 PM | New Record Created | SYSTEM | Created during Build ID 3844 for pay period 26. |

USCG713

**301**

| Name: | EDNA DOAK | | Pay Period: | 26 : Dec 20, 2009 to Jan 2, 2010 |
| Time Card Type: | Correction | | Leave Year: | 2009 |
| Status: | Certified | | SSN: | |

| Time In Pay: | 64:00 | Other Time: 16:00 | Dollar Transactions: $0.00 | Days In Pay: 8 |

| | | | | | Dec | | | | | | | | Dec | | | | Jan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 20 | 21 | 22 | 23 | 24 | 25 | 26 | | 27 | 28 | 29 | 30 | 31 | 1 | 2 | | |
| Transaction | Pfx | Sfx | Account | S | M | T | W | T | F | S | Wk 1 | S | M | T | W | T | F | S | Wk 2 | Total |
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | | 4:30 | | | | | 4:30 | | 2 | 3:45 | 4:30 | | | | 10:15 | 14:45 |
| | | | Work Time Total | | | 4:30 | | | | | 4:30 | | 2 | 3:45 | 4:30 | | | | 10:15 | 14:45 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| Sick Leave-FMLA | | | | | | 3:30 | | 4 | | | 7:30 | | 8 | 4:15 | 3:30 | | | | 13:45 | 21:15 |
| Admin/Excused Absence | | | | | 8 | | | | | | 8 | | | | | | | | | 8 |
| Holiday Leave | | | | | | | | 4 | 8 | | 12 | | | | | | 8 | | 8 | 20 |
| LWOP/FMLA | | | | | | | 8 | | | | 8 | | | | | 8 | | | 8 | 16 |
| | | | Leave and Other Time Total | | 8 | 3:30 | 8 | 8 | 8 | | 35:30 | | 8 | 4:15 | 3:30 | 8 | 8 | | 29:45 | 65:15 |
| | | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

Blizzard 2009 12/21-22; car accident related - migraines/spasms

| Leave Data | Fwd | Accr | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -11:00 | 7:00 | -4:00 | -- | -4:00 |
| Annual Unapplied | 6:00 | | | | -- |
| Sick | -223:00 | 4:00 | -219:00 | 21:15 | -240:15 |
| Sick Unapplied | 16:00 | | | | -- |
| LWOP | 64:00 | | | 16:00 | 80:00 |
| FMLA | 344:15 | | | 37:15 | 381:30 |
| Other | | | | 26:00 | |

| Recieved To Liquidate | | | | | |
|---|---|---|---|---|---|
| Advance Annual | | | | | -- |
| Advance Sick | | | | | -- |
| LWOP | | | | | -- |

| Leave Year Projection | | | | | |
|---|---|---|---|---|---|
| Maximum Available Annual | | | | | -4:00 |
| Maximum Available Sick | | | | | -240:15 |
| Use or Lose Leave | | | | | -- |

USCG7114

302

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | None |
| Account Data Code | Use Stored Account (NFC) |
| Stored Account (NFC) | 001K2990870601A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Approved Leave Recipient (VLTP) | Yes |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation.

| | |
|---|---|
| Affirmed By: | GREGORY COHEN |
| Affirmed Date: | Jan 14 2010 9:32 AM |
| Certified By: | GREGORY COHEN |
| Certified Date: | Jan 14 2010 9:36 AM |

| Status History | | | |
|---|---|---|---|
| Jan 17 2010 04:27 AM | Built | | Built In Build ID 3985. |
| Jan 14 2010 09:36 AM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Jan 14 2010 09:32 AM | Timekeeper Validated | COHEN, GREGORY (COHENG5946) | |
| Jan 14 2010 09:32 AM | Historical Correction Record | COHEN, GREGORY (COHENG5946) | |
| Jan 04 2010 10:02 AM | Built | | Built In Build ID 3921. |
| Jan 04 2010 06:14 AM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Jan 04 2010 06:13 AM | Timekeeper Validated | COHEN, GREGORY (COHENG5946) | |
| Jan 04 2010 06:13 AM | Timekeeper Validated | COHEN, GREGORY (COHENG5946) | |
| Jan 04 2010 06:13 AM | Validation Reset By Edit | COHEN, GREGORY (COHENG5946) | |
| Dec 31 2009 02:02 PM | Timekeeper Validated | COHEN, GREGORY (COHENG5946) | |
| Dec 18 2009 12:07 PM | New Record Created | | Created during Build ID 3844 for pay |

| Name: | EDNA DOAK | | Pay Period: | 01 : Jan 3, 2010 to Jan 16, 2010 |
| Time Card Type: | Regular | | Leave Year: | 2010 |
| Status: | Certified | | SSN: | |

Time In Pay: 67:45   Other Time: 12:15   Dollar Transactions: $0.00   Days in Pay: 10

| Transaction | Pfx | Sfx | Account | 3 S | 4 M | 5 T | 6 W | 7 T | 8 F | 9 S | Wk 1 | 10 S | 11 M | 12 T | 13 W | 14 T | 15 F | 16 S | Wk 2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | | | 2:45 | 2:45 | 2:30 | | 8 | | 1:45 | 1:45 | | 2 | 2:45 | | 8:15 | 16:15 |
| Work Time Total | | | | | | | 2:45 | 2:45 | 2:30 | | 8 | | 1:45 | 1:45 | | 2 | 2:45 | | 8:15 | 16:15 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| Annual Leave-FMLA | | | | | 8 | 8 | 5:15 | 5:15 | | | 26:30 | | 6:15 | | 8 | | 5:15 | | 19:30 | 46 |
| Sick Leave-FMLA | | | | | | | | | 5:30 | | 5:30 | | | | | | | | | 5:30 |
| LWOP/FMLA | | | | | | | | | | | | | | 6:15 | | 6 | | | 12:15 | 12:15 |
| Leave and Other Time Total | | | | | 8 | 8 | 5:15 | 5:15 | 5:30 | | 32 | | 6:15 | 6:15 | 8 | 6 | 5:15 | | 31:45 | 63:45 |
| Daily Total | | | | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

car accident related-migraines/back spasms/med effects/appts

| Leave Data | Fwd | Accr | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -4:00 | 6:00 | 2:00 | 46:00 | -44:00 |
| Annual Unapplied | -- | | | | 7:45 |
| Sick | -240:15 | 3:00 | -237:15 | 5:30 | -242:45 |
| Sick Unapplied | -- | | | | 7:45 |
| LWOP | -- | | | 12:15 | 12:15 |
| FMLA | 381:30 | | | 63:45 | 445:15 |

| Recieved To Liquidate | | | | | |
|---|---|---|---|---|---|
| Advance Annual | | | | | -- |
| Advance Sick | | | | | -- |
| LWOP | | | | | -- |

| Leave Year Projection | |
|---|---|
| Maximum Available Annual | 156:00 |
| Maximum Available Sick | -142:45 |
| Use or Lose Leave | -- |

| T&A Profile | |
| --- | --- |
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | History Exception Pr |
| Account Data Code | Use Stored Account (NFC) |
| Stored Account (NFC) | 001K299087D801A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Approved Leave Recipient (VLTP) | Yes |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation
Affirmed By:        EDNA DOAK
Affirmed Date:      Jan 15 2010 12:02 PM
Certified By:       GREGORY COHEN
Certified Date:     Jan 15 2010 1:33 PM

| Status History | | | |
| --- | --- | --- | --- |
| Jan 17 2010 04:40 AM | Built | | Built in Build ID 3987. |
| Jan 15 2010 01:33 PM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Jan 15 2010 12:02 PM | Employee Attested | DOAK, EDNA (DOAKE8072) | |
| Jan 15 2010 12:02 PM | Employee Validated | DOAK, EDNA (DOAKE8072) | |
| Jan 04 2010 10:02 AM | New Record Created | | Created during Build ID 3921 for pay |

| Name: | EDNA DOAK | | | Pay Period: | 02 : Jan 17, 2010 to Jan 30, 2010 |
| Time Card Type: | Regular | | | Leave Year: | 2010 |
| Status: | Certified | | | SSN: | |

| Time In Pay: | 52:15 | | Other Time: 27:45 | | | Dollar Transactions: $0.00 | | | | | Days In Pay: 9 |

| | | | | | | Jan | | | | | | | | Jan | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | | |
| Transaction | Pfx | Sfx | Account | S | M | T | W | T | F | S | Wk 1 | S | M | T | W | T | F | S | Wk 2 | Total |
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | | | | 8 | | | 8 | | 3 | 3:45 | 3 | 1:30 | 3 | | 14:15 | 20:15 |
| | | | Work Time Total | | | | | 8 | | | 8 | | 3 | 3:45 | 3 | 1:30 | 3 | | 14:15 | 20:15 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| Annual Leave | | | | | | | | | | | | | | | 4:30 | | | 4:30 | 4:30 |
| Annual Leave-FMLA | | | | | | | 4 | | 8 | | 12 | 1:30 | | | | | | 1:30 | 13:30 |
| Sick Leave | | | | | | | | | | | | | | | 2 | | | 2 | 2 |
| Sick Leave-FMLA | | | | | | | 4 | | | | 4 | | | | | | | | 4 |
| Holiday Leave | | | | | | 8 | | | | | 8 | | | | | | | | 8 |
| LWOP/FMLA | | | | | | | 8 | 2 | | | 10 | | | | | | | | 10 |
| AWOL | | | | | | | | | | | | 3:30 | 4:15 | 5 | | 5 | | 17:45 | 17:45 |
| | | | Leave and Other Time Total | | 8 | 8 | 8 | 2 | 8 | | 34 | 5 | 4:15 | 5 | 6:30 | 5 | | 25:45 | 59:45 |
| | | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

car accident related - migraines/shoulder-neck pain/med effects

| Leave Data | Beg. | Accr. | Avail. | Used | Bal. |
|---|---|---|---|---|---|
| Annual | -44:00 | 6:00 | -38:00 | 18:00 | -56:00 |
| Annual Unapplied | 7:45 | | | | -- |
| Sick | -242:45 | 3:00 | -239:45 | 6:00 | -245:45 |
| Sick Unapplied | 7:45 | | | | -- |
| LWOP | 12:15 | | | 10:00 | 22:15 |
| AWOL | -- | | | 17:45 | 17:45 |
| FMLA | 445:15 | | | 27:30 | 472:45 |
| Other | | | | 8:00 | |

| Recieved To Liquidate | | | | | |
|---|---|---|---|---|---|
| Advance Annual | | | | | -- |
| Advance Sick | | | | | -- |
| LWOP | | | | | -- |

| Leave Year Projection | | | | | |
|---|---|---|---|---|---|
| Maximum Available Annual | | | | 136:00 | |
| Maximum Available Sick | | | | -149:45 | |
| Use or Lose Leave | | | | -- | |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | D1 |
| Retain Data | History Exception Pr |
| Account Data Code | Use Stored Account (NFC) |
| Stored Account (NFC) | 001K2990870601A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Approved Leave Recipient (VLTP) | Yes |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation.

| | |
|---|---|
| Affirmed By | GREGORY COHEN |
| Affirmed Date | Jan 29 2010 2:52 PM |
| Certified By | GREGORY COHEN |
| Certified Date | Jan 30 2010 3:08 PM |

| Status History | | | |
|---|---|---|---|
| Jan 31 2010 04:11 AM | Built | | Built in Build ID 4083. |
| Jan 30 2010 03:06 PM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Jan 29 2010 02:52 PM | Timekeeper Validated | COHEN, GREGORY (COHENG5946) | |
| Jan 17 2010 04:40 AM | New Record Created | | Created during Build ID 3987 for pay |

| Name: | EDNA DOAK | | | | | | | | Pay Period: | 03 : Jan 31, 2010 to Feb 13, 2010 | | | | | | |
| Time Card Type | Regular | | | | | | | | Leave Year: | 2010 | | | | | | |
| Status: | Certified | | | | | | | | SSN: | | | | | | | |

Time In Pay: 67:15    Other Time: 12:45    Dollar Transactions: $0.00    Days In Pay: 9

| | | | | | | Jan | | Feb | | | | | | | Feb | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Transaction | Pfx | Sfx | Account | 31 | 1 | 2 | 3 | 4 | 5 | 6 | | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | |
| | | | | S | M | T | W | T | F | S | Wk 1 | S | M | T | W | T | F | S | Wk 2 | Total |
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | 1:45 | 8 | 3:15 | 4 | 4 | | 21 | | | | | | | | | 21 |
| | | | Work Time Total | | 1:45 | 8 | 3:15 | 4 | 4 | | 21 | | | | | | | | | 21 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| Annual Leave | | | | | 6:15 | | | | | | 6:15 | | | | | | | | | 6:15 |
| Sick Leave | | | | | | | | 4 | | | 4 | | | | | | | | | 4 |
| Hazardous Weather | | | | | | | | | 4 | | 4 | | 8 | 8 | 8 | 8 | | | 32 | 36 |
| LWOP | | | | | | | 4:45 | | | | 4:45 | | | | | | 8 | | 8 | 12:45 |
| | | | Leave and Other Time Total | | 6:15 | | 4:45 | 4 | 4 | | 19 | | 8 | 8 | 8 | 8 | 8 | | 40 | 59 |
| | | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll:**

car accident related - med appts/FMLA bal not carried over PP26-PP1

| Leave Data | Fwd | Accrued | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -56:00 | 6:00 | -50:00 | 6:15 | -56:15 |
| Annual Unapplied | -- | | | | 7:15 |
| Sick | -245:45 | 3:00 | -242:45 | 4:00 | -246:45 |
| Sick Unapplied | -- | | | | 7:15 |
| LWOP | 22:15 | | | 12:45 | 35:00 |
| AWOL | 17:45 | | | -- | 17:45 |
| FMLA | 492:45 | | | -- | 492:45 |
| Other | | | | 36:00 | - |

| Recieved To Liquidate | | | | | Bal |
|---|---|---|---|---|---|
| Advance Annual | | | | | -- |
| Advance Sick | | | | | -- |
| LWOP | | | | | -- |

| Leave Year Projection | | | | | |
|---|---|---|---|---|---|
| Maximum Available Annual | | | | | 127:45 |
| Maximum Available Sick | | | | | -154:45 |
| Use or Lose Leave | | | | | -- |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | History Exception Pr |
| Account Data Code | Use Stored Account (NFC) |
| Stored Account (NFC) | 001K2990870601A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Approved Leave Recipient (VLTP) | Yes |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation

| | |
|---|---|
| Affirmed By: | GREGORY COHEN |
| Affirmed Date | Feb 12 2010 11:59 AM |
| Certified By | GREGORY COHEN |
| Certified Date | Feb 12 2010 12:00 PM |

| Status History | | | |
|---|---|---|---|
| Feb 12 2010 12:05 PM | Built | | Built in Build ID 4145. |
| Feb 12 2010 12:00 PM | Supervisor Certified | COHEN, GREGORY (COHENG5948) | |
| Feb 12 2010 11:59 AM | Timekeeper Validated | COHEN, GREGORY (COHENG5948) | |
| Feb 04 2010 12:06 PM | Leave adjusted | HITCH, WANDA (HITCHW5347) | FMLA Forward adjusted 20:00 hours. |
| Jan 31 2010 04:11 AM | New Record Created | | Created during Build ID 4063 for pay |

| Name: | EDNA DOAK | Pay Period: | 04 : Feb 14, 2010 to Feb 27, 2010 |
|---|---|---|---|
| Time Card Type: | Regular | Leave Year: | 2010 |
| Status: | Certified | SSN: | |

| Time in Pay: | 68:15 | Other Time: 11:45 | | Dollar Transactions: $0.00 | | Days in Pay: 10 |

| Transaction | Pfx | Sfx | Account | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Feb | | | | | | Feb | | | | | |
| | | | | S | M | T | W | T | F | S | Wk 1 | S | M | T | W | T | F | S | Wk 2 | Total |
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | | | 8 | | 4 | | 12 | | 3:45 | 8 | 6:15 | 3:45 | 6:15 | | 28 | 40 |
| | | | Work Time Total | | | | 8 | | 4 | | 12 | | 3:45 | 8 | 6:15 | 3:45 | 6:15 | | 28 | 40 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| Annual Leave | | | | | | 4 | | 8 | | | 12 | | | | | 4:15 | | | 4:15 | 16:15 |
| Sick Leave | | | | | | 4 | | | | | 4 | | | | | | | | | 4 |
| Holiday Leave | | | | | | 8 | | | | | 8 | | | | | | | | | 8 |
| AWOL | | | | | | | | | 4 | | 4 | | 4:15 | | 1:45 | | 1:45 | | 7:45 | 11:45 |
| | | | Leave and Other Time Total | | | 8 | 8 | 8 | 4 | | 28 | | 4:15 | | 1:45 | 4:15 | 1:45 | | 12 | 40 |
| | | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

Non-FMLA illness recurred/med appt/treatmt; FMLA - migraine

| Leave Data | Fwd | Accru | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -56:15 | 7:00 | -49:15 | 16:15 | -85:30 |
| Annual Unapplied | 7:15 | | | | -5:30 |
| Sick | -246:45 | 3:00 | -243:45 | 4:00 | -247:45 |
| Sick Unapplied | 7:15 | | | | 15:30 |
| LWOP | 35:00 | | -- | | 35:00 |
| AWOL | 17:45 | | | 11:45 | 29:30 |
| FMLA | 492:45 | | -- | | 492:45 |
| Other | | | | 8:00 | |

| Recieved To Liquidate | | | | | |
|---|---|---|---|---|---|
| Advance Annual | | | | | -- |
| Advance Sick | | | | | -- |
| LWOP | | | | | -- |

| Leave Year Projection | |
|---|---|
| Maximum Available Annual | 110:30 |
| Maximum Available Sick | -159:45 |
| Use or Lose Leave | -- |

USG8722

310

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | History Exception Pr |
| Account Data Code | Use Stored Account (NFC) |
| Stored Account (NFC) | 001K2980670801A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Approved Leave Recipient (VLTP) | Yes |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation.

Affirmed By: EDNA DOAK
Affirmed Date: Feb 26 2010 1:59 PM
Certified By: GREGORY COHEN
Certified Date: Feb 26 2010 4:01 PM

| Status History | | | |
|---|---|---|---|
| Feb 28 2010 05:21 AM | Built | | Built in Build ID 4239. |
| Feb 26 2010 04:01 PM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Feb 26 2010 01:59 PM | Employee Attested | DOAK, EDNA (DOAKE8072) | |
| Feb 26 2010 01:59 PM | Employee Validated | DOAK, EDNA (DOAKE8072) | |
| Feb 12 2010 12:05 PM | New Record Created | | Created during Build ID 4145 for pay |

| Name: | **EDNA DOAK** | | Pay Period: | 05 : Feb 28, 2010 to Mar 13, 2010 |
| Time Card Type: | Regular | | Leave Year: | 2010 |
| Status: | Certified | | SSN: | |

| Time in Pay: | 80:00 | | Other Time: 0:00 | | Dollar Transactions: $0.00 | | Days in Pay: 10 |

| | | | Feb | | | | Mar | | | | | Mar | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Transaction** | Pfx | Sfx | Account | 28 | 1 | 2 | 3 | 4 | 5 | 6 | | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | |
| | | | | S | M | T | W | T | F | S | Wk 1 | S | M | T | W | T | F | S | Wk 2 | Total |
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | | 3:45 | 4 | 2 | 3 | | 12:45 | | 6 | 4:30 | 8 | | 7:30 | | 26 | 38:45 |
| | | | Work Time Total | | | 3:45 | 4 | 2 | 3 | | 12:45 | | 6 | 4:30 | 8 | | 7:30 | | 26 | 38:45 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| Annual Leave | | | | | 8 | 4:15 | | 5 | 5 | | 23:15 | | 2 | 3:30 | | 8 | 0:30 | | 14 | 37:15 |
| Sick Leave | | | | | | | 4 | | | | 4 | | | | | | | | | 4 |
| | | | Leave and Other Time Total | | 8 | 4:15 | 4 | 6 | 5 | | 27:15 | | 2 | 3:30 | | 8 | 0:30 | | 14 | 41:15 |
| | | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

car accident related-migraine,leg spasms,insomnia,med effects

| Leave Data | Pre | Abvr | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -66:30 | 8:00 | -57:30 | 37:15 | -94:45 |
| Annual Unapplied | 5:30 | | | | 5:30 |
| Sick | -247:45 | 4:00 | -243:45 | 4:00 | -247:45 |
| Sick Unapplied | 15:30 | | | | 15:30 |
| LWOP | 35:00 | | | -- | 35:00 |
| AWOL | 29:30 | | | -- | 29:30 |
| FMLA | 492:45 | | | -- | 492:45 |

| Recieved To Liquidate | | | | | |
|---|---|---|---|---|---|
| Advance Annual | | | | | -- |
| Advance Sick | | | | | -- |
| LWOP | | | | | -- |

| Leave Year Projection | | | | | |
|---|---|---|---|---|---|
| Maximum Available Annual | | | | | 73:15 |
| Maximum Available Sick | | | | | -163:45 |
| Use or Lose Leave | | | | | -- |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | History Exception Pr |
| Account Data Code | Use Stored Account (NFC) |
| Stored Account (NFC) | 001K2890B70601A70506ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Approved Leave Recipient (VLTP) | Yes |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation

Affirmed By:        EDNA DOAK
Affirmed Date:      Mar 12 2010 10:20 AM
Certified By:       GREGORY COHEN
Certified Date:     Mar 15 2010 5:43 AM

| Status History | | | |
|---|---|---|---|
| Mar 15 2010 06:00 AM | Built | | Built in Build ID 4330. |
| Mar 15 2010 05:43 AM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Mar 12 2010 10:20 AM | Employee Attested | DOAK, EDNA (DOAKE8072) | |
| Mar 12 2010 10:20 AM | Employee Validated | DOAK, EDNA (DOAKE8072) | |
| Mar 12 2010 07:37 AM | Validation Reset By Edit | COUNTEE, KENDRIA | |
| Mar 12 2010 06:56 AM | Employee Attested | DOAK, EDNA (DOAKE8072) | |
| Mar 12 2010 06:56 AM | Employee Validated | DOAK, EDNA (DOAKE8072) | |
| Feb 28 2010 05:21 AM | New Record Created | | Created during Build ID 4239 for pay |

| Name: | EDNA DOAK | | Pay Period: | 06 : Mar 14, 2010 to Mar 27, 2010 |
|---|---|---|---|---|
| Time Card Type: | Regular | | Leave Year: | 2010 |
| Status: | Certified | | SSN: | |

| Time in Pay: | 80:00 | Other Time: 0:00 | Dollar Transactions: $0.00 | Days in Pay: 10 |
|---|---|---|---|---|

| | | | | | Mar | | | | | | | | Mar | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | | |
| Transaction | Pfx | Sfx | Account | S | M | T | W | T | F | S | Wk 1 | S | M | T | W | T | F | S | Wk 2 | Total |
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | 3 | | | | 1:45 | | 4:45 | | 3:45 | | 5:15 | 8 | 5:30 | | 22:00 | 27:15 |
| | | | Work Time Total | | 3 | | | | 1:45 | | 4:45 | | 3:45 | | 5:15 | 8 | 5:30 | | 22:00 | 27:15 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| Annual Leave | | | | | 5 | 8 | 8 | 8 | 6:15 | | 35:15 | | 4:15 | 8 | | | 1 | | 13:15 | 48:30 |
| Sick Leave | | | | | | | | | | | | | | | 2:45 | | 1:30 | | 4:15 | 4:15 |
| | | | Leave and Other Time Total | | 5 | 8 | 8 | 8 | 6:15 | | 35:15 | | 4:15 | 8 | 2:45 | | 2:30 | | 17:30 | 52:45 |
| | | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

car accident related-med appts; migraines/nausea/vomit/diarrhea/spasms

| Leave Data | Fwd | Accr | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -94:45 | 8:00 | -86:45 | 48:30 | -135:15 |
| Annual Unapplied | 5:30 | | | | 5:30 |
| Sick | -247:45 | 4:00 | -243:45 | 4:15 | -248:00 |
| Sick Unapplied | 15:30 | | | | 15:30 |
| LWOP | 35:00 | | | -- | 35:00 |
| AWOL | 29:30 | | | -- | 29:30 |
| FMLA | 492:45 | | | -- | 492:45 |

| Recieved To Liquidate | | | | | |
|---|---|---|---|---|---|
| Advance Annual | | | | | -- |
| Advance Sick | | | | | -- |
| LWOP | | | | | -- |

| Leave Year Projection | | | | | |
|---|---|---|---|---|---|
| Maximum Available Annual | | | | | 24:45 |
| Maximum Available Sick | | | | | -169:00 |
| Use or Loss Leave | | | | | -- |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | History Exception Pr |
| Account Data Code | Use Stored Account (NFC) |
| Stored Account (NFC) | 001K2990870801A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Approved Leave Recipient (VLTP) | Yes |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation.

Affirmed By: EDNA DOAK

Affirmed Date: Mar 26 2010 2:47 PM

Certified By: GREGORY COHEN

Certified Date: Mar 26 2010 3:05 PM

| Status History | | | |
|---|---|---|---|
| Mar 26 2010 05:23 AM | Built | | Built in Build ID 4400. |
| Mar 26 2010 03:05 PM | Supervisor Certified | COHEN, GREGORY (COHENG5948) | |
| Mar 26 2010 02:47 PM | Employee Attested | DOAK, EDNA (DOAKE8072) | |
| Mar 26 2010 02:47 PM | Employee Validated | DOAK, EDNA (DOAKE8072) | |
| Mar 15 2010 08:00 AM | New Record Created | | Created during Build ID 4330 for pay |

| Name: | EDNA DOAK | Pay Period: | 07 : Mar 28, 2010 to Apr 10, 2010 |
|---|---|---|---|
| Time Card Type: | Regular | Leave Year: | 2010 |
| Status: | Certified | SSN: | |

| Time In Pay: | 80:00 | Other Time: 0:00 | Dollar Transactions: $0.00 | Days In Pay: 10 |
|---|---|---|---|---|

| Transaction | Pfx | Sfx | Account | Mar 28 S | 29 M | 30 T | 31 W | Apr 1 T | 2 F | 3 S | Wk 1 | 4 S | 5 M | 6 T | 7 W | 8 T | 9 F | 10 S | Wk 2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | 5 | 5 | 5:15 | 5 | 5:15 | | 25:30 | | | 2 | 3 | 5 | 8 | | 18 | 43:30 |
| | | | Work Time Total | | 5 | 5 | 5:15 | 5 | 5:15 | | 25:30 | | | 2 | 3 | 5 | 8 | | 18 | 43:30 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| Annual Leave | | | | | 3 | 3 | 2:45 | | 2:45 | | 11:30 | | 8 | 6 | 5 | 2 | | | 21 | 32:30 |
| Sick Leave | | | | | | | | 3 | | | 3 | | | | | 1 | | | 1 | 4 |
| | | | Leave and Other Time Total | | 3 | 3 | 2:45 | 3 | 2:45 | | 14:30 | | 8 | 6 | 5 | 3 | | | 22 | 36:30 |
| | | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

car accident related-migraine/shoulder pain/med effects/appts

| Leave Data | Fwd | Accrue | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -135:15 | 8:00 | -127:15 | 32:30 | -159:45 |
| Annual Unapplied | 5:30 | | | | 5:30 |
| Sick | -246:00 | 4:00 | -244:00 | 4:00 | -248:00 |
| Sick Unapplied | 15:30 | | | | 15:30 |
| LWOP | 35:00 | | | -- | 35:00 |
| AWOL | 29:30 | | | -- | 29:30 |
| FMLA | 492:45 | | | -- | 492:45 |

| Recieved To Liquidate | | | | | |
|---|---|---|---|---|---|
| Advance Annual | | | | | -- |
| Advance Sick | | | | | -- |
| LWOP | | | | | -- |

| Leave Year Projection | |
|---|---|
| Maximum Available Annual | -7:45 |
| Maximum Available Sick | -172:00 |
| Use or Lose Leave | -- |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | History Exception Pr |
| Account Data Code | Use Stored Account (NFC) |
| Stored Account (NFC) | 001K2990670601A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Approved Leave Recipient (VLTP) | Yes |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation.

| | |
|---|---|
| Affirmed By: | GREGORY COHEN |
| Affirmed Date: | Apr 12 2010 6:10 AM |
| Certified By: | GREGORY COHEN |
| Certified Date | Apr 12 2010 6:11 AM |

| Status History | | | |
|---|---|---|---|
| Apr 12 2010 10:39 AM | Built | | Built in Build ID 4493. |
| Apr 12 2010 06:11 AM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Apr 12 2010 06:10 AM | Timekeeper Validated | COHEN, GREGORY (COHENG5946) | |
| Apr 12 2010 06:09 AM | Validation Reset By Edit | COHEN, GREGORY (COHENG5946) | |
| Apr 09 2010 03:18 PM | Employee Attested | DOAK, EDNA (DOAKE8072) | |
| Apr 09 2010 03:18 PM | Employee Validated | DOAK, EDNA (DOAKE8072) | |
| Mar 28 2010 05:23 AM | New Record Created | | Created during Build ID 4400 for pay |

Printed by Kronos webTA

| Name: | EDNA DOAK | | Pay Period: | 08 : Apr 11, 2010 to Apr 24, 2010 |
|---|---|---|---|---|
| Time Card Type: | Regular | | Leave Year: | 2010 |
| Status: | Certified | | SSN: | |

| Time in Pay: | 42:30 | Other Time: 37:30 | | Dollar Transactions: $0.00 | | Days In Pay: 10 |

| Transaction | Pfx | Sfx | Account | Apr 11 S | 12 M | 13 T | 14 W | 15 T | 16 F | 17 S | Wk 1 | 18 S | 19 M | 20 T | 21 W | 22 T | 23 F | 24 S | Wk 2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | 4 | 5:30 | 7:15 | 3 | 1:15 | | 21 | | 4 | 4:45 | 3:15 | 3:15 | 4:15 | | 19:30 | 40:30 |
| | | | Work Time Total | | 4 | 5:30 | 7:15 | 3 | 1:15 | | 21 | | 4 | 4:45 | 3:15 | 3:15 | 4:15 | | 19:30 | 40:30 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| Sick Leave | | | | | 2 | | | | | | 2 | | | | | | | | | 2 |
| LWOP | | | | | 2 | 2:30 | 0:45 | 5 | 6:45 | | 17 | | 4 | 3:15 | 4:45 | 4:45 | 3:45 | | 20:30 | 37:30 |
| | | | Leave and Other Time Total | | 4 | 2:30 | 0:45 | 5 | 6:45 | | 19 | | 4 | 3:15 | 4:45 | 4:45 | 3:45 | | 20:30 | 39:30 |
| | | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

car accident related - med appts; migraine/nausea/stom.cramps

| Leave Data | Fwd | Accr | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -159:45 | 4:00 | -155:45 | -- | -155:45 |
| Annual Unapplied | 5:30 | | | | 8:00 |
| Sick | -248:00 | 2:00 | -246:00 | 2:00 | -248:00 |
| Sick Unapplied | 15:30 | | | | 18:00 |
| LWOP | 35:00 | | | 37:30 | 72:30 |
| AWOL | 29:30 | | | -- | 29:30 |
| FMLA | 492:45 | | | -- | 492:45 |
| **Recieved To Liquidate** | | | | | |
| Advance Annual | | | | | -- |
| Advance Sick | | | | | -- |
| LWOP | | | | | -- |
| **Leave Year Projection** | | | | | |
| Maximum Available Annual | | | | | -11:45 |
| Maximum Available Sick | | | | | -176:00 |
| Use or Lose Leave | | | | | -- |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | History Exception Pr |
| Account Data Code | Use Stored Account (NFC) |
| Stored Account (NFC) | 001K2990870601A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Approved Leave Recipient (VLTP) | Yes |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation.

| | |
|---|---|
| Affirmed By: | GREGORY COHEN |
| Affirmed Date | Apr 25 2010 2:39 PM |
| Certified By: | GREGORY COHEN |
| Certified Date | Apr 25 2010 2:41 PM |

| Status History | | | |
|---|---|---|---|
| Apr 25 2010 03:01 PM | Built | | Built in Build ID 4561. |
| Apr 25 2010 02:41 PM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Apr 25 2010 02:39 PM | Timekeeper Validated | COHEN, GREGORY (COHENG5946) | |
| Apr 25 2010 02:37 PM | Validation Reset By Edit | COHEN, GREGORY (COHENG5946) | |
| Apr 23 2010 11:00 AM | Employee Attested | DOAK, EDNA (DOAKE8072) | |
| Apr 23 2010 11:00 AM | Employee Validated | DOAK, EDNA (DOAKE8072) | |
| Apr 12 2010 10:39 AM | New Record Created | | Created during Build ID 4493 for pay |

| Name: | **EDNA DOAK** | Pay Period: | 09 : Apr 25, 2010 to May 8, 2010 |
|---|---|---|---|
| Time Card Type: | **Regular** | Leave Year: | **2010** |
| Status: | **Certified** | SSN: | |

| Time in Pay: | 30:15 | Other Time: 49:45 | Dollar Transactions: $0.00 | Days in Pay: 7. |
|---|---|---|---|---|

| Transaction | Pfx | Sfx | Account | 25 S | 26 M | 27 T | 28 W | 29 T | 30 F | 1 S | Wk 1 | 2 S | 3 M | 4 T | 5 W | 6 T | 7 F | 8 S | Wk 2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | 4:30 | | | 4:15 | | | 8:45 | | | 4:30 | 6:15 | 4:30 | 5:15 | | 20:30 | 29:15 |
| | | | Work Time Total | | 4:30 | | | 4:15 | | | 8:45 | | | 4:30 | 6:15 | 4:30 | 5:15 | | 20:30 | 29:15 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| Sick Leave | | | | | | | | | 1 | | 1 | | | | | | | | | 1 |
| LWOP | | | | | 3:30 | 8 | 8 | 3:45 | 7 | | 30:15 | | 8 | 3:30 | 1:45 | 3:30 | 2:45 | | 19:30 | 49:45 |
| | | | Leave and Other Time Total | | 3:30 | 8 | 8 | 3:45 | 8 | | 31:15 | | 8 | 3:30 | 1:45 | 3:30 | 2:45 | | 19:30 | 50:45 |
| | | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

Remarks To Payroll
car accident related-migraine;insomnia;med effects

| Leave Data | Earned | Taken | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -155:45 | 3:00 | -152:45 | -- | -152:45 |
| Annual Unapplied | 8:00 | | | | 8:15 |
| Sick | -248:00 | 2:00 | -246:00 | 1:00 | -247:00 |
| Sick Unapplied | 18:00 | | | | 8:15 |
| LWOP | 72:30 | | | 49:45 | 122:15 |
| AWOL | 29:30 | | | -- | 29:30 |
| FMLA | 492:45 | | | -- | 492:45 |

| Recieved To Liquidate | | | | | |
|---|---|---|---|---|---|
| Advance Annual | | | | | -- |
| Advance Sick | | | | | -- |
| LWOP | | | | | -- |

| Leave Year Projection | |
|---|---|
| Maximum Available Annual | -16:45 |
| Maximum Available Sick | -179:00 |
| Use or Lose Leave | -- |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | History Exception Pr |
| Account Data Code | Use Stored Account (NFC) |
| Stored Account (NFC) | 001K2990870601A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Approved Leave Recipient (VLTP) | Yes |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation.

| | |
|---|---|
| Affirmed By | GREGORY COHEN |
| Affirmed Date | May 11 2010 9:50 AM |
| Certified By | GREGORY COHEN |
| Certified Date | May 11 2010 9:50 AM |

| Status History | | | |
|---|---|---|---|
| May 11 2010 10:20 AM | Built | | Built in Build ID 4573. |
| May 11 2010 09:50 AM | Supervisor Certified | COHEN, GREGORY, (COHENG5946) | |
| May 11 2010 09:50 AM | Timekeeper Validated | COHEN, GREGORY, (COHENG5946) | |
| May 10 2010 06:28 AM | Validation Reset By Edit | COHEN, GREGORY (COHENG5946) | |
| May 07 2010 09:43 AM | Employee Attested | DOAK, EDNA (DOAKE8072) | |
| May 07 2010 09:43 AM | Employee Validated | DOAK, EDNA (DOAKE8072) | |
| Apr 25 2010 03:01 PM | New Record Created | | Created during Build ID 4561 for pay. |

| Name: | EDNA DOAK | | Pay Period: | 10 : May 9, 2010 to May 22, 2010 |
|---|---|---|---|---|
| Time Card Type: | Regular | | Leave Year: | 2010 |
| Status: | Certified | | SSN: | _ |

| Time In Pay: | 21:30 | Other Time: 58:30 | | Dollar Transactions: $0.00 | | Days In Pay: 6 |

|  |  |  |  |  | | | | | May | | | | | | | | | | May | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 9 | 10 | 11 | 12 | 13 | 14 | 15 | | 16 | 17 | 18 | 19 | 20 | 21 | 22 | | |
| Transaction | Pfx | Sfx | Account | S | M | T | W | T | F | S | Wk 1 | S | M | T | W | T | F | S | Wk 2 | Total |
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | | | | 4 | 4:30 | | 8:30 | | 1:45 | 2:45 | 3:15 | | 5:15 | | 13 | 21:30 |
| | | | Work Time Total | | | | | 4 | 4:30 | | 8:30 | | 1:45 | 2:45 | 3:15 | | 5:15 | | 13 | 21:30 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| LWOP | | | | | | | 8 | | | | 8 | 6:15 | | | | | | | 6:15 | 14:15 |
| AWOL | | | | | 8 | 8 | | 4 | 3:30 | | 23:30 | | 5:15 | 4:45 | 4:45 | 8 | 2:45 | | 20:45 | 44:15 |
| | | | Leave and Other Time Total | | 8 | 8 | 8 | 4 | 3:30 | | 31:30 | 6:15 | 5:15 | 4:45 | 4:45 | 8 | 2:45 | | 27 | 58:30 |
| | | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | 8 | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

car accident related-migraine;leg/neck/shldr/back spasms;med effects

| Leave Data | Fwd | Acc | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -152:45 | 2:00 | -150:45 | -- | -150:45 |
| Annual Unapplied | 8:15 | | | | 9:45 |
| Sick | -247:00 | 1:00 | -246:00 | -- | -246:00 |
| Sick Unapplied | 8:15 | | | | 9:45 |
| LWOP | 122:15 | | | 14:15 | 136:30 |
| AWOL | 29:30 | | | 44:15 | 73:45 |
| FMLA | 492:45 | | | -- | 492:45 |

| Recieved To Liquidate | | | | | |
|---|---|---|---|---|---|
| Advance Annual | | | | | -- |
| Advance Sick | | | | | -- |
| LWOP | | | | | -- |

| Leave Year Projection | |
|---|---|
| Maximum Available Annual | -22:45 |
| Maximum Available Sick | -182:00 |
| Use or Lose Leave | -- |

## T&A Profile

| | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Return Data | History Exception Pr. |
| Account Data Code | Use Stored Account (NFC) |
| Stored Account (NFC) | 001K2890870901A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Approved Leave Recipient (VLTP) | Yes |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation.

| | |
|---|---|
| Affirmed By: | GREGORY COHEN |
| Affirmed Date | May 24 2010 5:35 AM |
| Certified By | GREGORY COHEN |
| Certified Date | May 24 2010 5:38 AM |

## Status History

| | | | |
|---|---|---|---|
| May 24 2010 06:02 AM | Built | | Built in Build ID 4714. |
| May 24 2010 05:38 AM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| May 24 2010 05:35 AM | Timekeeper Validated | COHEN, GREGORY (COHENG5946) | |
| May 24 2010 05:34 AM | Validation Reset By Edit | COHEN, GREGORY (COHENG5946) | |
| May 24 2010 05:33 AM | Timekeeper Validated | COHEN, GREGORY (COHENG5946) | |
| May 11 2010 10:20 AM | New Record Created | | Created during Build ID 4674 for pay |

| Name: | **EDNA DOAK** | | Pay Period: | 11 : May 23, 2010 to Jun 5, 2010 |
| Time Card Type: | Regular | | Leave Year: | 2010 |
| Status: | Certified | | SSN: | |

Time In Pay:  46:45          Other Time: 33:15          Dollar Transactions: $0.00          Days In Pay: 9

| | | | | | | May | | | | | | May | | | | | Jun | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Transaction | Pfx | Sfx | Account | 23 | 24 | 25 | 26 | 27 | 28 | 29 | | 30 | 31 | 1 | 2 | 3 | 4 | 5 | | |
| | | | | S | M | T | W | T | F | S | Wk 1 | S | M | T | W | T | F | S | Wk 2 | Total |
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | 3 | 5:45 | 6:30 | 5 | 5:15 | | 25:30 | | | 3:45 | | 4:30 | 5 | | 13:15 | 38:45 |
| | | | Work Time Total | | 3 | 5:45 | 6:30 | 5 | 5:15 | | 25:30 | | | 3:45 | | 4:30 | 5 | | 13:15 | 38:45 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| Holiday Leave | | | | | | | | | | | | | 8 | | | | | | 8 | 8 |
| LWOP | | | | | 5 | | | | | | 5 | | | | 8 | | | | 8 | 13 |
| AWOL | | | | | | 2:15 | 1:30 | 3 | 2:45 | | 9:30 | | | 4:15 | | 3:30 | 3 | | 10:45 | 20:15 |
| | | | Leave and Other Time Total | | 5 | 2:15 | 1:30 | 3 | 2:45 | | 14:30 | | 8 | 4:15 | 8 | 3:30 | 3 | | 26:45 | 41:15 |
| | | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

Remarks To Payroll:

car accident related-migraine;leg spasms;neck/shldr;med effects

| Leave Data | | Fwd. | Accr. | Avail. | Used | Bal. |
|---|---|---|---|---|---|---|
| Annual | | -150:45 | 5:00 | -145:45 | -- | -145:45 |
| Annual Unapplied | | 9:45 | | | | 6:30 |
| Sick | | -246:00 | 2:00 | -244:00 | -- | -244:00 |
| Sick Unapplied | | 9:45 | | | | 16:30 |
| LWOP | | 136:30 | | | -13:00 | 149:30 |
| AWOL | | 73:45 | | | 20:15 | 94:00 |
| FMLA | | 492:45 | | | -- | 492:45 |
| Other | | | | | 8:00 | |

| Recieved To Liquidate | | | | | | |
|---|---|---|---|---|---|---|
| Advance Annual | | | | | | -- |
| Advance Sick | | | | | | -- |
| LWOP | | | | | | -- |

| Leave Year Projection | | | | | | |
|---|---|---|---|---|---|---|
| Maximum Available Annual | | | | | -25:45 | |
| Maximum Available Sick | | | | | -184:00 | |
| Use or Lose Leave | | | | | -- | |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI. |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | History Exception Pr |
| Account Data Code | Use Stored Account (NFC) |
| Stored Account (NFC) | 001K289087080 1A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Approved Leave Recipient (VLTP) | Yes |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation

Affirmed By:          KENDRIA COUNTEE
Affirmed Date:        Jun 07 2010 9:15 AM
Certified By:          GREGORY COHEN
Certified Date:        Jun 07 2010 9:27 AM

| Status History | | | |
|---|---|---|---|
| Jun 07 2010 10:24 AM | Built | | Built in Build ID 4801. |
| Jun 07 2010 09:27 AM | Supervisor Certified | COHEN, GREGORY (COHENG5948) | |
| Jun 07 2010 09:15 AM | Validation Overridden | COUNTEE, KENDRIA | |
| May 24 2010 08:02 AM | New Record Created | | Created during Build ID 4714 for pay |

| Name: | EDNA M DOAK | Pay Period: | 12 : Jun 6, 2010 to Jun 19, 2010 | | |
|---|---|---|---|---|---|
| Time Card Type: | Regular | Leave Year: | 2010 | | |
| Time in Pay: 74:15 | | Other Time: 5:45 | Dollar Transactions: $0.00 | | Days in Pay: 10 |

| Transaction | P/x | B/x | Account | Jun 6 S | 7 M | 8 T | 9 W | 10 T | 11 F | 12 S | Wk1 | Jun 13 S | 14 M | 15 T | 16 W | 17 T | 18 F | 19 S | Wk2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Work Time | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | (NFC Stored Account) | | 2:15 | 4:15 | 6:30 | 4:45 | 6:15 | | 24 | | 2:45 | 3:45 | 6:15 | 1:15 | 4:45 | | | 18:45 | 42:45 |
| | | | Work Time Total | | 2:15 | 4:15 | 6:30 | 4:45 | 6:15 | | 24 | | 2:45 | 3:45 | 6:15 | 1:16 | 4:45 | | | 18:45 | 42:45 |
| Leave and Other Time | | | | | | | | | | | | | | | | | | | | |
| LWOP | | | | | 5:45 | | | | | | 5:45 | | | | | | | | | 5:45 |
| VLTP Leave Used (Event: Head injury recovery) | | | (NFC Stored Account) | | | 3:45 | 1:30 | 3:15 | 1:45 | | 10:15 | | 6:15 | 4:15 | 1:45 | 6:45 | 3:15 | | | 21:15 | 31:30 |
| | | | Leave and Other Time Total | | 5:45 | 3:45 | 1:30 | 3:15 | 1:46 | | 16 | | 5:45 | 4:15 | 1:45 | 6:45 | 3:15 | | | 21:15 | 37:15 |
| | | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | | 40 | 80 |

**Remarks To Payroll**

car accident related-migraine;neck/shoulder pain;insomnia;med appts

| Type | Status | Date | Supervisor | Jun 6 S | 7 M | 8 T | 9 W | 10 T | 11 F | 12 S | 13 S | 14 M | 15 T | 16 W | 17 T | 18 F | 19 S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Other Paid Absence | Approved | 15-JUN-10 | GREGORY K COHEN (COHENG5946) | | | | 3:15 | | | | | | | | | | |
| Other Paid Absence | Denied | 16-JUN-10 | GREGORY K COHEN (COHENG5946) | | | | | | | | | | 3:45 | | | | |
| Leave Without Pay | Approved | 07-JUN-10 | GREGORY K COHEN (COHENG5946) | | 5:45 | | | | | | | | | | | | |
| Sick Leave | Denied | 21-JUN-10 | GREGORY K COHEN (COHENG5946) | | | | | | | | | | | | 6:45 | | |
| Other Paid Absence | Denied | 08-JUN-10 | GREGORY K COHEN (COHENG5946) | | | 3:45 | | | | | | | | | | | |

(No Premium Pay Requests submitted)

| TA Data | | | | Week | Fwd | Accr | Avail | Used | Bal |
|---|---|---|---|---|---|---|---|---|---|
| Pay Plan | GS General Schedule | | | Annual | -145:45 | 4:00 | -141:45 | | -141:45 |
| Tour of Duty | Full Time | | | Annual Unapplied | 8:30 | | | | 8:15 |
| Duty Hours | 80 | | | Sick | -244:00 | 2:00 | -242:00 | | -242:00 |
| Work Week | MON-FRI | | | Sick Unapplied | 16:30 | | | | 16:15 |
| Alternative Schedule | Regular 8-hour Days | | | LWOP | 149:30 | | | 5:45 | 155:15 |
| Agency | USCG | | | AWOL | 94:00 | | | | 94:00 |
| State | DC | | | FMLA | 492:45 | | | | 492:45 |
| Town | 0010 | | | Received To Liquidate | | | | | |
| Unit | 94 | | | Advance Annual | | | | | |
| Timekeeper | 01 | | | Advance Sick | | | | | |
| Retain Data | Exception Processing | | | LWOP | | | | | |
| Account Data Code | Use Stored Account (NFC) | | | Voluntary Leave Transfer | | | | | |
| Stored Account (NFC) | 001K2990870901A7050927ZZZZZ FY10 CIVILIAN PAYROLL | | | Used (Injury recovery (Max Available):1:30 | | | | | |
| | | | | VLTP Usage | | | | 31:30 | 31:30 |
| Service Computation Date | Jan 15 1991 | | | Deferred Annual | | 3:00 | 3:00 | | 4:00 |
| Annual Leave Category | 8 hrpp | | | Def Annual Total | | | | | 3:00 |
| Approved Leave Recipient (VLTP) | Yes | | | Def Annual Unapplied | | | | | 1:30 |
| Personal Leave Ceiling | 9999:00 | | | Deferred Sick | | 1:00 | 1:00 | | 1:00 |
| | | | | Def Sick Total | | | | | 1:00 |
| | | | | Def Sick Unapplied | | | | | 11:30 |
| | | | | Leave Year Ceiling | | | | | |
| | | | | Maximum Available Annual | | | | | -29:45 |
| | | | | Maximum Available Sick | | | | | -186:00 |
| | | | | Use of Lost Leave | | | | | |

**Supervisor Remarks:**

Your signature certifies that all reported time was worked and approved according to law and regulation.

Validated By : KENDRIA COUNTEE
Validation Date : Jun 21 2010 8:24 AM

Certified By : GREGORY COHEN
Certification Date : Jun 21 2010 8:37 AM

The complete T&A status history is displayed below; it may contain events that happened since the certification shown above took place.

| Status History | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

USCG738

326

| Timestamp | Status | Name | Message |
|---|---|---|---|
| Jun 22 2010 05:06 PM | Built | SYSTEM | Built in Build ID 4909. |
| Jun 22 2010 02:34 PM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Jun 22 2010 02:20 PM | Master Timekeeper Validated | COUNTEE, KENDRIA (COUNTEEK1023) | |
| Jun 22 2010 02:12 PM | Leave adjusted | COUNTEE, KENDRIA (COUNTEEK1023) | Sick Unapplied Forward adjusted (-16:30) hours. Annual Unapplied Forward adjusted (-6:30) hours. Sick Forward adjusted 5:00 hours. Annual Forward adjusted 6:00 hours. |
| Jun 22 2010 01:32 PM | Historical Correction Record | COHEN, GREGORY (COHENG5946) | |
| Jun 21 2010 11:12 AM | Built | SYSTEM | Built in Build ID 4877. |
| Jun 21 2010 08:36 AM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Jun 21 2010 08:24 AM | Validation Overridden | COUNTEE, KENDRIA (COUNTEEK1023) | |
| Jun 07 2010 10:24 AM | New Record Created | SYSTEM | Created during Build ID 4801 for pay period 12. |

USCG739

| Name: | EDNA DOAK | | Pay Period: | 12 : Jun 6, 2010 to Jun 19, 2010 |
|---|---|---|---|---|
| Time Card Type: | Correction | | Leave Year: | 2010 |
| Status: | Certified | | SSN: | |

| Time In Pay: | 64:15 | | Other Time: 15:45 | | | | | Dollar Transactions: $0.00 | | | | | | Days In Pay: 10 | |

| Transaction | Pfx | Sfx | Account | 6 S | 7 M | 8 T | 9 W | 30 T | 11 F | 12 S | 13 Wk | 14 M | 15 T | 16 W | 17 T | 18 F | 19 S | Wk 2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Work Time** | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | 2:15 | 4:15 | 6:30 | 4:45 | 6:15 | | 24 | | 2:45 | 3:45 | 6:15 | 1:15 | 4:45 | | 18:45 | 42:45 |
| Work Time Total | | | | | 2:15 | 4:15 | 6:30 | 4:45 | 6:15 | | 24 | | 2:45 | 3:45 | 6:15 | 1:15 | 4:45 | | 18:45 | 42:45 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | |
| LWOP | | | | | 5:45 | | | | | | 5:45 | | | | | 6:45 | 3:15 | | 10 | 15:45 |
| VLTP Leave Used | | | | | | 3:45 | 1:30 | 3:15 | 1:45 | | 10:15 | | 5:15 | 4:15 | 1:45 | | | | 11:15 | 21:30 |
| Leave and Other Time Total | | | | | 5:45 | 3:45 | 1:30 | 3:15 | 1:45 | | 16 | | 5:15 | 4:15 | 1:45 | 6:45 | 3:15 | | 21:15 | 37:15 |
| Daily Total | | | | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

car accident related-migraine;neck/shoulder pain;insomnia;med appts

| Leave Data | Fwd | Accr | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -140:45 | 4:00 | -136:45 | -- | -136:45 |
| Annual Unappllec | -- | | | | 2:45 |
| Sick | -239:00 | 2:00 | -237:00 | -- | -237:00 |
| Sick Unapplied | -- | | | | 2:45 |
| LWOP | 149:30 | | | 15:45 | 165:15 |
| AWOL | 94:00 | | | -- | 94:00 |
| FMLA | 492:45 | | | -- | 492:45 |

| Recieved To Liquidate | | | | | |
|---|---|---|---|---|---|
| Advance Annual | | | | | -- |
| Advance Sick | | | | | -- |
| LWOP | | | | | -- |

| Leave Year Projection | | | | | |
|---|---|---|---|---|---|
| Maximum Available Annual | | | | | -24:45 |
| Maximum Available Sick | | | | | -161:00 |
| Use or Lose Leave | | | | | -- |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | History Exception Pr |
| Account Data Code | Use Stored Account (NFC) |
| Stored Account (NFC) | 001K2960870601A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Approved Leave Recipient (VLTR) | Yes |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation.

| | |
|---|---|
| Affirmed By: | KENDRIA COUNTEE |
| Affirmed Date: | Jun 22 2010 2:20 PM |
| Certified By | GREGORY COHEN |
| Certified Date | Jun 22 2010 2:34 PM |

| Status History | | | |
|---|---|---|---|
| Jun 22 2010 05:06 PM | Built | | Built in Build ID 4909. |
| Jun 22 2010 02:34 PM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Jun 22 2010 02:20 PM | Master Timekeeper Validated | COUNTEE, KENDRIA | |
| Jun 22 2010 02:12 PM | Leave adjusted | COUNTEE, KENDRIA | Sick Unapplied Forward adjusted |
| Jun 22 2010 02:12 PM | Leave adjusted | COUNTEE, KENDRIA | Annual Unapplied Forward adjusted |
| Jun 22 2010 02:12 PM | Leave adjusted | COUNTEE, KENDRIA | Sick Forward adjusted 5:00 hours. |
| Jun 22 2010 02:12 PM | Leave adjusted | COUNTEE, KENDRIA | Annual Forward adjusted 5:00 hours. |
| Jun 22 2010 01:32 PM | Historical Correction Record | COHEN, GREGORY (COHENG5946) | |
| Jun 21 2010 11:12 AM | Built | | Built in Build ID 4877. |
| Jun 21 2010 08:38 AM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Jun 21 2010 08:24 AM | Validation Overridden | COUNTEE, KENDRIA | |
| Jun 07 2010 10:24 AM | New Record Created | | Created during Build ID 4801 for pay |

| Name: | **EDNA DOAK** | | Pay Period: | 13 : Jun 20, 2010 to Jul 3, 2010 |
|---|---|---|---|---|
| Time Card Type: | Regular | | Leave Year: | 2010 |
| Status: | Certified | | SSN: | |

Time In Pay: 44:45　　Other Time: 35:15　　Dollar Transactions: $0.00　　Days In Pay: 9

| | | | | Jun | | | | | | | | Jul | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Transaction | Pfx | Sfx | Account | 20 | 21 | 22 | 23 | 24 | 25 | 26 | Wk 1 | 27 | 28 | 29 | 30 | 1 | 2 | 3 | Wk 2 | Total |
| | | | | S | M | T | W | T | F | S | | S | M | T | W | T | F | S | | |
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | | 4:15 | 5:45 | 5 | 4:30 | | 19:30 | | 3:45 | 4:15 | 5:45 | 4:45 | 5:45 | | | 25:15 | 44:45 |
| Work Time Total | | | | | | 4:15 | 5:45 | 5 | 4:30 | | 19:30 | | 3:45 | 4:15 | 6:45 | 4:45 | 5:45 | | | 25:15 | 44:45 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| LWOP | | | | | 8 | | | | | | 8 | | | | | | | | | 8 |
| AWOL | | | | | | 3:45 | 2:15 | 3 | 3:30 | | 12:30 | | 4:15 | 3:45 | 1:15 | 3:15 | 2:15 | | | 14:45 | 27:15 |
| Leave and Other Time Total | | | | | 8 | 3:45 | 2:15 | 3 | 3:30 | | 20:30 | | 4:15 | 3:45 | 1:15 | 3:15 | 2:15 | | | 14:45 | 35:15 |
| Daily Total | | | | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | | 40 | 80 |

**Remarks To Payroll**

car accident related-migraine, leg spasms, med effects, appts

| Leave Data | Fwd | App | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -127:45 | 3:00 | -124:45 | -- | -124:45 |
| Annual Unapplied | -6:30 | | | | 8:15 |
| Sick | -230:00 | 1:00 | -229:00 | -- | -229:00 |
| Sick Unapplied | -16:30 | | | | 8:15 |
| LWOP | 165:15 | | | 8:00 | 173:15 |
| AWOL | 94:00 | | | 27:15 | 121:15 |
| FMLA | 492:45 | | | -- | 492:45 |

| Recieved To Liquidate | | | | | |
|---|---|---|---|---|---|
| Advance Annual | | | | | -- |
| Advance Sick | | | | | -- |
| LWOP | | | | | -- |

| Leave Year Projection | |
|---|---|
| Maximum Available Annual | -20:45 |
| Maximum Available Sick | -177:00 |
| Use or Lose Leave | -- |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | History Exception Pr |
| Account Data Code | Use Stored Account (NFC) |
| Stored Account (NFC) | 001K2990870601A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Approved Leave Recipient (VLTP) | Yes |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation

| | |
|---|---|
| Affirmed By | GREGORY COHEN |
| Affirmed Date | Jul 07 2010, 1:53 PM |
| Certified By | GREGORY COHEN |
| Certified Date | Jul 07 2010 2:13 PM |

| Status History | | | |
|---|---|---|---|
| Jul 07 2010 04:00 PM | Built | | Built In Build ID 5014. |
| Jul 07 2010 02:13 PM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Jul 07 2010 01:54 PM | Timekeeper Validated | COHEN, GREGORY (COHENG5946) | |
| Jul 07 2010 01:53 PM | Timekeeper Validated | COHEN, GREGORY (COHENG5946) | |
| Jul 07 2010 01:53 PM | Validation Reset By Edit | COHEN, GREGORY (COHENG5946) | |
| Jul 07 2010 01:47 PM | Certification Rejected | COHEN, GREGORY (COHENG5946) | employee has been editing her |
| Jul 07 2010 01:25 PM | Employee Attested | DOAK, EDNA (DOAKE8072) | |
| Jul 07 2010 01:25 PM | Employee Validated | DOAK, EDNA (DOAKE8072) | |
| Jul 07 2010 12:01 PM | Validation Reset By Edit | COHEN, GREGORY (COHENG5946) | |
| Jul 06 2010 08:30 PM | Certification Rejected | COHEN, GREGORY (COHENG5946) | You do not have sick leave to take, |
| Jul 06 2010 03:16 PM | Employee Attested | DOAK, EDNA (DOAKE8072) | |
| Jul 06 2010 03:16 PM | Employee Validated | DOAK, EDNA (DOAKE8072) | |
| Jun 22 2010 11:56 AM | Leave adjusted | COUNTEE, KENDRIA | Sick Unapplied Forward adjusted |
| Jun 22 2010 11:56 AM | Leave adjusted | COUNTEE, KENDRIA | Annual Unapplied Forward adjusted |
| Jun 22 2010 11:56 AM | Leave adjusted | COUNTEE, KENDRIA | Sick Forward adjusted 7:00 hours. |
| Jun 22 2010 11:56 AM | Leave adjusted | COUNTEE, KENDRIA | Annual Forward adjusted 8:00 hours. |
| Jun 21 2010 11:12 AM | New Record Created | | Created during Build ID 4877 for pay |

| Name: | **EDNA DOAK** | | Pay Period: | **14 : Jul 4, 2010 to Jul 17, 2010** |
| Time Card Type: | **Regular** | | Leave Year: | **2010** |
| Status: | **Certified** | | SSN: | |

| Time In Pay: | 44:45 | Other Time: 35:15 | Dollar Transactions: $0.00 | Days In Pay: 9 |

| | | | | | | | Jul | | | | | | | | Jul | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Transaction | Pfx | Sfx | Account | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | | |
| | | | | S | M | T | W | T | F | S | Wk 1 | S | M | T | W | T | F | S | Wk 2 | Total |
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | | 4 | 6:15 | 2:45 | 2:15 | | 15:15 | | | 5 | 6:15 | 6:30 | 3:45 | | 21:30 | 36:45 |
| | | | Work Time Total | | | 4 | 6:15 | 2:45 | 2:15 | | 15:15 | | | 5 | 6:15 | 6:30 | 3:45 | | 21:30 | 36:45 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| Holiday Leave | | | | | 8 | | | | | | 8 | | | | | | | | | 8 |
| LWOP | | | | | | 4 | | | | | 4 | | 8 | 3 | | | | | 11 | 15 |
| AWOL | | | | | | | 1:45 | 5:15 | 5:45 | | 12:45 | | | | 1:45 | 1:30 | 4:15 | | 7:30 | 20:15 |
| | | | Leave and Other Time Total | | 8 | 4 | 1:45 | 5:15 | 5:45 | | 24:45 | | 8 | 3 | 1:45 | 1:30 | 4:15 | | 18:30 | 43:15 |
| | | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

car accident related - migraines; med appts; leg spasms; pain

| Leave Data | Fwd | Accr. | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -124:45 | -- | -122:45 | -- | -122:45 |
| Sick | -229:00 | -- | -228:00 | -- | -228:00 |
| LWOP | 173:15 | | | 15:00 | 188:15 |
| AWOL | 121:15 | | | 20:15 | 141:30 |
| FMLA | 492:45 | | | -- | 492:45 |
| Other | | | | 8:00 | |

| Leave Year Projection | |
|---|---|
| Maximum Available Annual | -28:45 |
| Maximum Available Sick | -180:00 |
| Use or Lose Leave | |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |

| Retain Data | History Exception Pr |
| --- | --- |
| Account Data Code | Use Stored Account (NFC) |
| Stored Account (NFC) | 001K2990870601A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation.

Affirmed By       WANDA HITCH
Affirmed Date      Jul 21 2010 7:02 AM
Certified By       GREGORY COHEN
Certified Date      Jul 21 2010 7:04 AM

**Status History**

| Date | Status | Name | Note |
| --- | --- | --- | --- |
| Jul 21 2010 10:01 AM | Built | | Built in Build ID 5087. |
| Jul 21 2010 07:04 AM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Jul 21 2010 07:02 AM | Validation Overridden | HITCH, WANDA (HITCHW5347) | |
| Jul 21 2010 07:00 AM | Validation Reset By Edit | COHEN, GREGORY (COHENG5946) | |
| Jul 21 2010 06:59 AM | Certification Rejected | COHEN, GREGORY (COHENG5946) | Other paid leave is not authorized and |
| Jul 21 2010 06:54 AM | Validation Overridden | HITCH, WANDA (HITCHW5347) | |
| Jul 19 2010 03:27 PM | Validation Reset By Edit | DOAK, EDNA (DOAKE8072) | |
| Jul 19 2010 09:00 AM | Validation Overridden | HITCH, WANDA (HITCHW5347) | |
| Jul 07 2010 04:00 PM | New Record Created | | Created during Build ID 5014 for pay |

| Name: | EDNA DOAK | | Pay Period: | 15 : Jul 18, 2010 to Jul 31, 2010 |
|---|---|---|---|---|
| Time Card Type: | Regular | | Leave Year: | 2010 |
| Status: | Certified | | SSN: | |

| Time In Pay: | 56:45 | Other Time: 23:15 | Dollar Transactions: $0.00 | Days In Pay: 10 |
|---|---|---|---|---|

| Transaction | Ptx | Stx | Account | 18 S | 19 M | 20 T | 21 W | 22 T | 23 F | 24 S | Wk 1 | 25 S | 26 M | 27 T | 28 W | 29 T | 30 F | 31 S | Wk 2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | 4:45 | 6:30 | 2:45 | 4:30 | 6:45 | | 25:15 | | -4 | 6:30 | 6:45 | 6:45 | 7:30 | | | 31:30 | 56:45 |
| | | | Work Time Total | | 4:45 | 6:30 | 2:45 | 4:30 | 6:45 | | 25:15 | | 4 | 6:30 | 6:45 | 6:45 | 7:30 | | | 31:30 | 56:45 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| LWOP | | | | | | | | | | | | | 4 | | | | | | | 4 | 4 |
| AWOL | | | | | 3:15 | 1:30 | 5:15 | 3:30 | 1:15 | | 14:45 | | | 1:30 | 1:15 | 1:15 | 0:30 | | | 4:30 | 19:15 |
| | | | Leave and Other Time Total | | 3:15 | 1:30 | 5:15 | 3:30 | 1:15 | | 14:45 | | 4 | 1:30 | 1:15 | 1:15 | 0:30 | | | 8:30 | 23:15 |
| | | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | | 40 | 80 |

**Remarks To Payroll**

car accident related - migraine; med effects; appts; insomnia

| Leave Data | Fwd | Accr | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -122:45 | 8:00 | -114:45 | -- | -114:45 |
| Sick | -228:00 | 4:00 | -224:00 | -- | -224:00 |
| LWOP | 188:15 | | | 4:00 | 192:15 |
| AWOL | 141:30 | | | 19:15 | 160:45 |
| FMLA | 492:45 | | | -- | 492:45 |

| Leave Year Projection | |
|---|---|
| Maximum Available Annual | -26:45 |
| Maximum Available Sick | -180:00 |
| Use or Lose Leave | -- |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schecule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | History Exception Pr |
| Account Data Code | Use Stored Account (NFC) |

| Stored Account (NFC) | 001K2990B70501A70509ZZZZZZ |
|---|---|
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation

| | |
|---|---|
| Affirmed By | WANDA HITCH |
| Affirmed Date | Aug 02 2010 6:31 AM |
| Certified By | GREGORY COHEN |
| Certified Date | Aug 02 2010 7:44 AM |

| Status History | | | |
|---|---|---|---|
| Aug 02 2010 10:09 AM | Built | | Built in Build ID 5125. |
| Aug 02 2010 07:44 AM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Aug 02 2010 06:31 AM | Validation Overridden | HITCH, WANDA (HITCHW5347) | |
| Jul 21 2010 10:01 AM | New Record Created | | Created during Build ID 5087 for pay |

| Name: | EDNA DOAK | | | | Pay Period: | 16 : Aug 1, 2010 to Aug 14, 2010 | | | |
|---|---|---|---|---|---|---|---|---|---|
| Time Card Type | Regular | | | | Leave Year: | 2010 | | | |
| Status: | Certified | | | | SSN: | | | | |
| Time In Pay: | 66:30 | | Other Time: 13:30 | | Dollar Transactions: $0.00 | | | Days in Pay: 9 | |

| | | | | | | Aug | | | | | | | | Aug | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Transaction | Prx | Six | Account | 1 S | 2 M | 3 T | 4 W | 5 T | 6 F | 7 S | Wk 1 | 8 S | 9 M | 10 T | 11 W | 12 T | 13 F | 14 S | Wk 2 | Total |
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | | 3:45 | 8 | 6:45 | 8 | | 26:30 | | 8 | 8 | 8 | 8 | 8 | | 40 | 66:30 |
| | | | Work Time Total | | | 3:45 | 8 | 6:45 | 8 | | 26:30 | | 8 | 8 | 8 | 8 | 8 | | 40 | 66:30 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| LWOP | | | | | 8 | 3:45 | | | | | 11:45 | | | | | | | | | 11:45 |
| AWOL | | | | | | 0:30 | | 1:15 | | | 1:45 | | | | | | | | | 1:45 |
| | | | Leave and Other Time Total | | 8 | 4:15 | | 1:15 | | | 13:30 | | | | | | | | | 13:30 |
| | | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

car accident related - migraine; back pain; med appts/validate neg AL

| Leave Data | Fwd | Accr | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -114:45 | 8:00 | -108:45 | -- | -108:45 |
| Sick | -224:00 | 4:00 | -220:00 | -- | -220:00 |
| LWOP | 192:15 | | | 11:45 | 204:00 |
| AWOL | 160:45 | | | 1:45 | 162:30 |
| FMLA | 492:45 | | | -- | 492:45 |

| Leave Year Projection | | |
|---|---|---|
| Maximum Available Annual | | -26:45 |
| Maximum Available Sick | | -160:00 |
| Use or Lose Leave | | -- |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | History Exception Pr |
| Account Data Code | Use Stored Account (NFC) |

| Stored Account (NFC) | 001K2990870001A70509ZZZZZZ |
|---|---|
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation.
Affirmed By          WANDA HITCH
Affirmed Date        Aug 18 2010 8:27 AM
Certified By         GREGORY COHEN
Certified Date       Aug 18 2010 8:28 AM

| Status History | | | |
|---|---|---|---|
| Aug 18 2010 10:00 AM | Built | | Built in Build ID 5242. |
| Aug 18 2010 08:28 AM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Aug 18 2010 08:27 AM | Validation Overridden | HITCH, WANDA (HITCHW5347) | |
| Aug 18 2010 08:13 AM | Validation Reset By Edit | COHEN, GREGORY (COHENG5946) | - |
| Aug 18 2010 08:13 AM | Certification Rejected | COHEN, GREGORY (COHENG5946) | awol from 2 august adjusted to LWOP |
| Aug 18 2010 08:07 AM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Aug 16 2010 02:54 PM | Validation Overridden | HITCH, WANDA (HITCHW5347) | |
| Aug 02 2010 10:09 AM | New Record Created | | Created during Build ID 5125 for pay |

| Name: | EDNA DOAK | Pay Period: | 17 : Aug 15, 2010 to Aug 28, 2010 |
|---|---|---|---|
| Time Card Type: | Regular | Leave Year: | 2010 |
| Status: | Certified | SSN: | |

Time In Pay: 67:45   Other Time: 12:15   Dollar Transactions: $0.00   Days In Pay: 10

| Transaction | Pfx | Sfx | Account | 15 S | 16 M | 17 T | 18 W | 19 T | 20 F | 21 S | Wk 1 | 22 S | 23 M | 24 T | 25 W | 26 T | 27 F | 28 S | Wk 2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | 5:30 | 5:30 | 8 | 8 | 8 | | 35 | | 3:15 | 4:30 | 8 | 3 | 8 | | 26:45 | 61:45 |
| **Work Time Total** | | | | | 5:30 | 5:30 | 8 | 8 | 8 | | 35 | | 3:15 | 4:30 | 8 | 3 | 8 | | 26:45 | 61:45 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| Admin/Excused Absence | | | | | | 2:30 | | | | | 2:30 | | | 3:30 | | | | | 3:30 | 6 |
| LWOP | | | | | | 2:30 | | | | | 2:30 | | 4:45 | | | 5 | | | 9:45 | 12:15 |
| **Leave and Other Time Total** | | | | | | 2:30 | 2:30 | | | | 5 | | 4:45 | 3:30 | | 5 | | | 13:15 | 18:15 |
| **Daily Total** | | | | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

car accident related-8/16-med appt;8/23-FMLA MD;8/26-migraine

| Leave Data | Fwd | Accr | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -106:45 | 8:00 | -98:45 | -- | -98:45 |
| Sick | -220:00 | 4:00 | -216:00 | -- | -216:00 |
| LWOP | 204:00 | | | 12:15 | 216:15 |
| AWOL | 162:30 | | | -- | 162:30 |
| FMLA | 492:45 | | | -- | 492:45 |
| Other | | | | 8:00 | |

| Leave Year Projection | |
|---|---|
| Maximum Available Annual | -28:45 |
| Maximum Available Sick | -160:00 |
| Use or Lose Leave | -- |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | History Exception Pr |

338

| Account Data Code | Use Stored Account (NFC) |
|---|---|
| Stored Account (NFC) | 001K2990870601A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation.
Affirmed By         KENDRIA COUNTEE
Affirmed Date       Aug 30 2010 2:18 PM
Certified By        GREGORY COHEN
Certified Date      Aug 30 2010 2:21 PM

### Status History

| | | | |
|---|---|---|---|
| Aug 30 2010 04:20 PM | Built | | Built in Build ID 5286. |
| Aug 30 2010 02:21 PM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Aug 30 2010 02:18 PM | Validation Overridden | COUNTEE, KENDRIA | |
| Aug 18 2010 10:00 AM | New Record Created | | Created during Build ID 5242 for pay |

| Name: | EDNA DOAK | | Pay Period: | 18 : Aug 29, 2010 to Sep 11, 2010 |
|---|---|---|---|---|
| Time Card Type: | Regular | | Leave Year: | 2010 |
| Status: | Certified | | SSN: | |

| Time In Pay: | 59:45 | | Other Time: 20:15 | | Dollar Transactions: $0.00 | | Days In Pay: 9 |
|---|---|---|---|---|---|---|---|

| | | | | Aug | | | | Sep | | | | | | Sep | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Transaction | Pfx | Sfx | Account | 29 | 30 | 31 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | | |
| | | | | S | M | T | W | T | F | S | Wk 1 | S | M | T | W | T | F | S | Wk 2 | Total |
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | 4:30 | 8 | 4:15 | 8 | 3:30 | | 28:15 | | | 5:30 | 8 | | 4:15 | | 17:45 | 46 |
| | | | Work Time Total | 4:30 | 8 | 4:15 | 8 | 3:30 | | 28:15 | | | 5:30 | 8 | | 4:15 | | 17:45 | 46 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| Admin/Excused Absence | | | | 3:30 | | 2:15 | | | | 5:45 | | | | | | | | | 5:45 |
| Holiday Leave | | | | | | | | | | | 8 | | | | | | | 8 | 8 |
| LWOP | | | | | | | | 4:30 | | 4:30 | | | 2:30 | | 8 | | | 10:30 | 15 |
| AWOL | | | | | | 1:30 | | | | 1:30 | | | | | | 3:45 | | 3:45 | 5:15 |
| | | | Leave and Other Time Total | 3:30 | | 3:45 | | 4:30 | | 11:45 | | 8 | 2:30 | | 8 | 3:45 | | 22:15 | 34 |
| | | | Daily Total | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

car accident related-appts 9/3,9/7;migraine 9/1,9/9;meds 9/10

| Leave Data | Fwd | Accr. | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -98:45 | 8:00 | -90:45 | -- | -90:45 |
| Sick | -216:00 | 4:00 | -212:00 | -- | -212:00 |
| LWOP | 216:15 | | | 15:00 | 231:15 |
| AWOL | 162:30 | | | 5:15 | 167:45 |
| FMLA | 492:45 | | | -- | 492:45 |
| Other | | | | 13:45 | |

| Leave Year Projection | |
|---|---|
| Maximum Available Annual | -28:45 |
| Maximum Available Sick | -160:00 |
| Use or Lose Leave | -- |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |

USCG752

| Retain Data | History Exception Pr |
|---|---|
| Account Data Code | Use Stored Account (NFC) |
| Stored Account (NFC) | 001K2990870601A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation

| | |
|---|---|
| Affirmed By | KENDRIA COUNTEE |
| Affirmed Date | Sep 13 2010 2:06 PM |
| Certified By | GREGORY COHEN |
| Certified Date | Sep 13 2010 2:11 PM |

| Status History | | | |
|---|---|---|---|
| Sep 13 2010 04:19 PM | Built | | Built in Build ID 5369. |
| Sep 13 2010 02:11 PM | Supervisor Certified | COHEN, GREGORY (COHENG5846) | |
| Sep 13 2010 02:06 PM | Validation Overridden | COUNTEE, KENDRIA | |
| Aug 30 2010 04:20 PM | New Record Created | | Created during Build ID 5286 for pay |

| Name: | EDNA DOAK | | | Pay Period: | 19 : Sep 12, 2010 to Sep 25, 2010 |
| Time Card Type: | Regular | | | Leave Year: | 2010 |
| Status: | Certified | | | SSN: | |

| Time In Pay: | 48:30 | Other Time: 31:30 | Dollar Transactions: $0.00 | Days In Pay: 8 |

|  |  |  |  |  | Sep |  |  |  |  |  |  | Sep |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Transaction | Pfx | Sfx | Account | 12 | 13 | 14 | 15 | 16 | 17 | 18 | | 19 | 20 | 21 | 22 | 23 | 24 | 25 | |
|  |  |  |  | S | M | T | W | T | F | S | Wk 1 | S | M | T | W | T | F | S | Wk 2 | Total |
| **Work Time** | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | 5:15 | | | 4 | 8 | | 17:15 | 1:45 | 5:30 | 8 | 8 | 8 | | 31:15 | 48:30 |
| Work Time Total | | | | 5:15 | | | 4 | 8 | | 17:15 | 1:45 | 5:30 | 8 | 8 | 8 | | 31:15 | 48:30 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | |
| LWOP | | | | | 8 | 8 | | | | 16 | 6:15 | | | | | | 6:15 | 22:15 |
| AWOL | | | | 2:45 | | | 4 | | | 6:45 | | 2:30 | | | | | 2:30 | 9:15 |
| Leave and Other Time Total | | | | 2:45 | 8 | 8 | 4 | | | 22:45 | 6:15 | 2:30 | | | | | 8:45 | 31:30 |
| Daily Total | | | | 8 | 8 | 8 | 8 | 8 | | 40 | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

car accident related - Sep 13/20/21/22; sinuslIis 9/14-9/16or neg lea

| Leave Data | Fwd | Accr | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -90:45 | -- | -90:45 | -- | -90:45 |
| Sick | -212:00 | -- | -212:00 | -- | -212:00 |
| LWOP | 231:15 | | | 22:15 | 253:30 |
| AWOL | 167:45 | | | 9:15 | 177:00 |
| FMLA | 492:45 | | | -- | 492:45 |

| Leave Year Projection | |
|---|---|
| Maximum Available Annual | -34:45 |
| Maximum Available Sick | -184:00 |
| Use or Lose Leave | -- |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | History Exception Pr |
| Account Data Code | Use Stored Account (NFC) |

| Stored Account (NFC) | 001K2980B70801A70509ZZZZZZ |
| --- | --- |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation

| | |
| --- | --- |
| Affirmed By | WANDA HITCH |
| Affirmed Date | Sep 28 2010 2:31 PM |
| Certified By | GREGORY COHEN |
| Certified Date | Sep 28 2010 2:38 PM |

**Status History**

| Sep 28 2010 04:11 PM | Built | | Built in Build ID 5467. |
| --- | --- | --- | --- |
| Sep 28 2010 02:36 PM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Sep 28 2010 02:31 PM | Validation Overridden | HITCH, WANDA (HITCHW5347) | |
| Sep 13 2010 04:18 PM | New Record Created | | Created during Build ID 5359 for pay |

| Name: | EDNA DOAK | | Pay Period: | 20 : Sep 26, 2010 to Oct 9, 2010 |
|---|---|---|---|---|
| Time Card Type | Regular | | Leave Year: | 2010 |
| Status: | Certified | | SSN: | |

| Time In Pay: | 67:30 | Other Time: 12:30 | Dollar Transactions: $0.00 | Days In Pay: 9 |
|---|---|---|---|---|

| | | | | Sep | | | | | Oct | | | | | | Oct | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Transaction | Pfx | Sfx | Account | 26 S | 27 M | 28 T | 29 W | 30 T | 1 F | 2 S | Wk1 | 3 S | 4 M | 5 T | 6 W | 7 T | 8 F | 9 S | Wk2 | Total |
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| Regular Base Pay | | | | | | 3:30 | 8 | 8 | 8 | | 27:30 | | | | | | | | | 27:30 |
| | | | Work Time Total | | | 3:30 | 8 | 8 | 8 | | 27:30 | | | | | | | | | 27:30 |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| Admin/Excused Absence | | | | | | | | | | | | | 8 | 8 | 8 | 8 | 8 | | 40 | 40 |
| LWOP | | | | | 8 | 4:30 | | | | | 12:30 | | | | | | | | | 12:30 |
| | | | Leave and Other Time Total | | 8 | 4:30 | | | | | 12:30 | | 8 | 8 | 8 | 8 | 8 | | 40 | 52:30 |
| | | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

Validate due to negative annual leave

| Leave Data | Fwd | Accr | Avail. | Used | Bal. |
|---|---|---|---|---|---|
| Annual | -90:45 | 8:00 | -82:45 | -- | -82:45 |
| Sick | -212:00 | 4:00 | -208:00 | -- | -208:00 |
| LWOP | 253:30 | | | 12:30 | 266:00 |
| AWOL | 177:00 | | | -- | 177:00 |
| FMLA | 492:45 | | | -- | 492:45 |
| Other | | | | 40:00 | |

| Leave Year Projection | |
|---|---|
| Maximum Available Annual | -34:45 |
| Maximum Available Sick | -184:00 |
| Use or Lose Leave | -- |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | History Exception Pr |

| Account Data Code | Use Stored Account (NFC) |
|---|---|
| Stored Account (NFC) | 001K2990B70601A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation.

| | |
|---|---|
| Affirmed By | WANDA HITCH |
| Affirmed Date | Oct 05 2010 3:55 AM |
| Certified By | GREGORY COHEN |
| Certified Date | Oct 05 2010 6:14 AM |

| Status History | | | |
|---|---|---|---|
| Oct 10 2010 04:41 AM | Built | | Built in Build ID 5508. |
| Oct 05 2010 06:14 AM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Oct 05 2010 04:55 AM | Validation Overridden | HITCH, WANDA (HITCHW5347) | |
| Oct 05 2010 04:55 AM | Validation Reset By Edit | HITCH, WANDA (HITCHW5347) | |
| Oct 05 2010 04:54 AM | Validation Overridden | HITCH, WANDA (HITCHW5347) | |
| Sep 28 2010 04:11 PM | New Record Created | | Created during Build ID 5467 for pay |

| Name: | EDNA DOAK | | Pay Period: | 21 : Oct 10, 2010 to Oct 23, 2010 |
|---|---|---|---|---|
| Time Card Type: | Regular | | Leave Year: | 2010 |
| Status: | Certified | | SSN: | |

Time in Pay: 40:00  Other Time: 40:00.  Dollar Transactions: $0.00  Days In Pay: 5

| Transaction | Pfx | Sfx | Account | 10 S | 11 M | 12 T | 13 W | 14 T | 15 F | 16 S | Wk1 | 17 S | 18 M | 19 T | 20 W | 21 T | 22 F | 23 S | Wk 2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Work Time** | | | | | | | | | | | | | | | | | | | | |
| | | | Time In | | | | | | | | | | | | | | | | | |
| | | | Time Out | | | | | | | | | | | | | | | | | |
| (No Work Time Transactions) | | | | | | | | | | | | | | | | | | | | |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | | | |
| Admin/Excused Absence | | | | | | | 8 | 8 | 8 | 8 | 32 | | | | | | | | | 32 |
| Holiday Leave | | | | | 8 | | | | | | 8 | | | | | | | | | 8 |
| LWOP | | | | | | | | | | | | 8 | 8 | 8 | 8 | 8 | | | 40 | 40 |
| | | | Leave and Other Time Total | | 8 | 8 | 8 | 8 | 8 | | 40 | 8 | 8 | 8 | 8 | 8 | | | 40 | 80 |
| | | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | 8 | 8 | 8 | 8 | 8 | | | 40 | 80 |

**Remarks To Payroll**

31.50 hrs annual lv liquidated with remaining donated leave hours

| Leave Data | Fwd | Acrl | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -86:45 | 4:00 | -51:15 | -- | -51:15 |
| Annual Unapplied | -- | | | | -- |
| Sick | -212:00 | 2:00 | -210:00 | -- | -210:00 |
| Sick Unapplied | -- | | | | -- |
| LWOP | 266:00 | | | 40:00 | 306:00 |
| AWOL | 177:00 | | | -- | 177:00 |
| FMLA | 492:45 | | | -- | 492:45 |
| Other | | | | 40:00 | |

| Recieved To Liquidate | | | | | |
|---|---|---|---|---|---|
| Advance Annual | | | | | 31:30 |
| Advance Sick | | | | | -- |
| LWOP | | | | | -- |

| Leave Year Projection | | | | | |
|---|---|---|---|---|---|
| Maximum Available Annual | | | | | -11:15 |
| Maximum Available Sick | | | | | -180:00 |
| Use or Lose Leave | | | | | -- |

| T&A Profile | |
|---|---|
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Retain Data | History Exception Pr |
| Account Data Code | Store Account (NFC) |
| Stored Account (NFC) | 101K2990870801A70509ZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Approved Leave Recipient (VLTP) | Yes |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation.

| | |
|---|---|
| Affirmed By: | KENDRIA COUNTEE |
| Affirmed Date: | Oct 18 2010 11:51 AM |
| Certified By: | GREGORY COHEN |
| Certified Date: | Oct 18 2010 11:54 AM |

| Status History | | | |
|---|---|---|---|
| Oct 24 2010 04:19 AM | Built | | Built in Build ID 5580. |
| Oct 18 2010 11:54 AM | Supervisor Certified | COHEN, GREGORY (COHENG5946) | |
| Oct 18 2010 11:51 AM | Master/Timekeeper Validated | COUNTEE, KENDRIA | |
| Oct 13 2010 06:19 AM | Leave adjusted | COUNTEE, KENDRIA | Sick Forward adjusted (-4:00) hours. |
| Oct 13 2010 06:19 AM | Leave adjusted | COUNTEE, KENDRIA | Annual Forward adjusted (-4:00) |
| Oct 10 2010 04:41 AM | New Record Created | | Created during Build ID 5506 for pay |

| Name: | **EDNA DOAK** | Pay Period: | **22 : Oct 24, 2010 to Nov 6, 2010** |
| Time Card Type: | **Regular** | Leave Year: | **2010** |
| Status: | **Certified** | SSN: | |

| Time In Pay: | 0:00 | Other Time: 80:00 | Dollar Transactions: $0.00 | Days In Pay: 0 |

| | | | Oct | | | | | | Oct | | | | Nov | | | |
| | | | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 1 | 2 | 3 | 4 | 5 | 6 | |
| Transaction | Pfx | Sfx Account | S | M | T | W | T | F | S | Wk 1 | S | M | T | W | T | F | S | Wk 2 | Total |
| **Work Time** | | | | | | | | | | | | | | | | | | |
| | | Time In | | | | | | | | | | | | | | | | |
| | | Time Out | | | | | | | | | | | | | | | | |
| (No Work Time Transactions) | | | | | | | | | | | | | | | | | | |
| **Leave and Other Time** | | | | | | | | | | | | | | | | | | |
| LWOP | | | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |
| | | Leave and Other Time Total | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |
| | | Daily Total | | 8 | 8 | 8 | 8 | 8 | | 40 | | 8 | 8 | 8 | 8 | 8 | | 40 | 80 |

**Remarks To Payroll**

lv audit completed, lv bal updtd and VLTP acct. closed.

| Leave Data | Fwd | Accr | Avail | Used | Bal |
|---|---|---|---|---|---|
| Annual | -55:15 | | -55:15 | | -55:15 |
| Sick | -212:00 | | -212:00 | | -212:00 |
| LWOP | 306:00 | | | 80:00 | 386:00 |
| AWOL | 177:00 | | | | 177:00 |
| FMLA | 492:45 | | | | 492:45 |

| Leave Year Projection | |
|---|---|
| Maximum Available Annual | -23:15 |
| Maximum Available Sick | -196:00 |
| Use or Lose Leave | |

| T&A Profile | |
|---|---|
| Status Change | End |
| Change Day | Week2: Sun |
| Pay Plan | GS General Schedule |
| Tour of Duty | Full Time |
| Duty Hours | 80 |
| Work Week | MON-FRI |
| Alternative Schedule | Regular 8-hour Days |
| Agency | USCG |
| State | DC |
| Town | 0010 |
| Unit | 04 |
| Timekeeper | 01 |
| Final Report | Yes |
| Retain Data | History Exception Pr |

| Account Data Code | Use Stored Account (NFC) |
|---|---|
| Stored Account (NFC) | 101K2990870801A70509ZZZZZZ |
| Service Computation Date | Jan 15 1991 |
| Annual Leave Category | 8 hr/pp |
| Personal Leave Ceiling | 9999:00 |

Your signature certifies that all reported time was worked and approved according to law and regulation

| Affirmed By: | KENDRIA COUNTEE |
|---|---|
| Affirmed Date: | Oct 25 2010 11:22 AM |
| Certified By: | GREGORY COHEN |
| Certified Date: | Nov 02 2010 5:45 AM |

**Status History**

| Nov 07 2010 04:21 AM | Built | | Built in Build ID 5860. |
|---|---|---|---|
| Nov 02 2010 05:45 AM | Supervisor Certified | COHEN, GREGORY (COHENG5948) | |
| Oct 25 2010 11:22 AM | Validation Overridden | COUNTEE, KENDRIA | |
| Oct 25 2010 11:21 AM | Leave adjusted | COUNTEE, KENDRIA | Sick Forward adjusted (-2:00) hours. |
| Oct 25 2010 11:21 AM | Leave adjusted | COUNTEE, KENDRIA | Annual Forward adjusted (-4:00) |
| Oct 24 2010 04:19 AM | New Record Created | | Created during Build ID 5860 for pay |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EDNA DOAK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:12-cv-01177-RC |
| v. | ) |
| | ) |
| JANET NAPOLITANO, | ) |
| Secretary, U.S. Department of Homeland | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |

## REPLY IN FURTHER SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

This case involves a business manager at the United States Coast Guard ("Coast Guard" or "Agency") who believed that she should be granted leave whenever she requested it and afforded the unfettered ability to perform her role at the hours of her choosing, notwithstanding the judgment of the Agency's independent medical review officers that her requests for an 11 A.M. start time (subsequently superseded by her requests for a 10 A.M. and a 9:30 A.M. start time, and her agreement to a 9 A.M. start time), telework, and weekend work hours were not medically justified. The undisputed evidence establishes that Plaintiff's supervisors relied upon the judgment of the medical review officers and provided all of the accommodations they recommended. Notwithstanding the supervisors' multiple attempts to accommodate Plaintiff and their repeated instructions on the need to follow proper procedures for requesting leave, Plaintiff was nevertheless absent from duty for over 50 percent of her scheduled work hours between January and August 2010, even after exhausting her leave under the Family and Medical Leave Act. Faced with Plaintiff's irregular and unreliable attendance, her supervisors concluded that her removal was warranted due to her inability to perform the essential duties of her position.

In response to Defendant's Motion for Summary Judgment, Plaintiff has submitted an anemic opposition ("Opp'n") that tellingly ignores the majority of the evidence in this case and chiefly relies upon conclusory assertions in a self-serving declaration that lack basis in the record. Rather than offer competent evidence to overcome the legitimate, non-discriminatory, and non-retaliatory reasons that the Coast Guard has articulated, Plaintiff flatly, and erroneously, contends that "Defendant does not dispute that Plaintiff[ ] could perform her job duties with accommodations and has failed to demonstrate that accommodating Plaintiff would have posed an undue burden." For a host of reasons, Plaintiff's opposition and statement of facts fail to identify a single genuine issue of material fact necessary to be litigated.

*First*, Plaintiff's opposition fails to address Defendant's arguments that there was no evidence that the Absence Without Leave ("AWOL") charges and the letters of reprimand were discriminatory, nor was there any evidence that her supervisors retaliated against her by reassigning her work to co-workers, excluding her from meetings, and denying her training opportunities, *see* Def.'s Mem. at 27-30, 38, thereby conceding these issues. *See Glass v. LaHood*, 786 F. Supp. 2d 189, 210 (D.D.C. 2011) (treating as conceded argument that plaintiff completely failed to contest); *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (noting that "it is well understood . . . that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded"), *aff'd*, 98 Fed. App'x 8 (D.C. Cir. 2004).

*Second*, Plaintiff does not dispute that she failed to exhaust any claims that arose prior to August 22, 2010, including her alleged failure to accommodate claim in Count 2 of her Complaint. Plaintiff's argument that the Coast Guard waived this defense is unavailing because

2

the Agency did not have a meaningful opportunity to investigate Plaintiff's claims on account of Plaintiff's refusal to participate in the administrative proceedings.

*Third*, Plaintiff's conclusory and uncorroborated allegations of disability discrimination fail to overcome the ample evidence showing that Plaintiff's supervisors made multiple concerted efforts to provide her with all of the reasonable accommodations that the medical review officers recommended in order to facilitate her return to work. Even after concluding that Plaintiff could not satisfactorily perform the essential functions of her position, Plaintiff's supervisors further attempted to minimize any economic hardship by permitting Plaintiff to retire and obtain full retirement benefits in lieu of removal.

*Finally*, Plaintiff fails to adduce any evidence from which a reasonable fact-finder could infer that the Agency subjected Plaintiff to reprisal for requesting accommodations. To the contrary, the evidence shows that Plaintiff's supervisors, after many months of attempting to work out a schedule that would facilitate her return to the office in a regular and productive status, reached the unavoidable conclusion that Plaintiff could no longer perform the essential functions of her business manager job on account of her sustained absences.

Accordingly, for the reasons set forth below and in its opening brief, Defendant respectfully submits that the Court should grant summary judgment in its favor and dismiss all claims raised in the Complaint.

## ARGUMENT

**I.    PLAINTIFF'S UNCORROBORATED ALLEGATIONS OF DISCRIMINATORY ANIMUS AND PRETEXT ARE INSUFFICIENT TO DEFEAT SUMMARY JUDGMENT**

To begin with, Plaintiff's "Material Facts As to Which There Exists A Genuine Issue Necessary to Be Litigated," Opp'n at 2-8, is not sufficient to overcome Defendant's Motion for

3

Summary Judgment.  The D.C. Circuit has repeatedly upheld district court rulings that require "strict compliance" with Local Rule 7(h).  *See, e.g., Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002); *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996); *Gardels v. CIA*, 637 F.2d 770, 773 (D.C. Cir. 1980).  Local Rule 7(h) contemplates a procedure that "isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record."  *Jackson*, 101 F.3d at 150 (quoting *Gardels*, 637 F.2d at 773).  Not only has Plaintiff failed to respond to "Defendant's Statement of Undisputed Material Facts," but, rather than submitting a "separate concise statement of genuine issues setting forth all material facts" as to which there purportedly exists a genuine issue necessary to be litigated, Plaintiff has instead included a number of facts that are not material to the issues before this Court (and, in many instances, duplicative of facts identified by Defendant as undisputed), in addition to self-serving assertions and arguments that lack evidentiary support.  *See* Def.'s Reply Ex. 1.

As explained below, Plaintiff's conclusory allegations are inadequate to raise a triable issue.  *See Hussain v. Nicholson*, 435 F.3d 359, 365 (D.C. Cir.), *cert. denied*, 549 U.S. 993 (2006) (finding that the district court properly disregarded conclusory allegations of discriminatory animus); *Glass*, 786 F. Supp. 2d at 198 (D.D.C. 2011) (finding unsupported and non-specific allegations of unlawful or improper animus insufficient to defeat summary judgment).

## II.     PLAINTIFF'S LACK OF EXHAUSTION OF HER FAILURE TO ACCOMMODATE CLAIM DEPRIVES THIS COURT OF JURISDICTION

Plaintiff does not dispute that she failed to exhaust any claims that arose prior to August 22, 2010, which marked 45 days prior to her first contact with an EEO counselor on October 6,

4

2010). *See* Opp'n at 10. This includes her alleged failure to accommodate claims, which stem from requests for accommodation that she submitted through letters dated April 16, 2010, and July 16, 2010. Def.'s Exs. 16, 25. Her supervisors responded to these two requests on May 6, 2010, and July 23, 2010, respectively, *see* Def.'s Exs. 19, 27, more than 45 days prior to October 6, 2010.[1] *See Greer v. Paulson*, 505 F.3d 1306, 1316-17 (D.C. Cir. 2007) (no exhaustion of termination claim due to failure to meet with EEO counselor within 45 days).

In response, Plaintiff simply asserts, without any explanation, that "Defendant has waived its exhaustion defense by accepting and investigating Plaintiff's claims and issuing a final agency decision on the merits." Opp'n at 10 (citing *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 86 (D.D.C. 2009)). The facts of this case do not support Plaintiff's waiver argument. Here, the Agency initially dismissed Plaintiff's complaint on mootness grounds, but its decision was reversed and remanded for further processing. *See* Pl.'s Ex. 7 at 2. Unlike in *Nurriddin* and *Bowden v. United States*, 106 F.3d 433, 438 (D.C. Cir. 1997), upon which the *Nurriddin* court relies, *see Nurriddin*, 674 F. Supp. 2d at 86-87, the Coast Guard did not have a meaningful opportunity to investigate Plaintiff's claims at the administrative level because she "declined to participate in a telephonic interview with the investigator, and did not respond to a certified letter containing interrogatories." *See* Pl.'s Ex. 7 at 7 n.7; Doak Tr. at 42:25-43:8[2] (Q: "Did you participate in the EEO investigation?" A: "No." Q: "Why not?" A: "I wasn't able to. I didn't

---

[1] Defendant also argued that Plaintiff failed to exhaust certain of her disparate treatment claims in Count 1--in particular, claims stemming from the letters of reprimand issued in February and May 2010, the Notice of Proposed Removal, and the AWOL charges, *see* Def.'s Mem. at 24-26-- but Plaintiff failed to address these arguments anywhere in her brief and should be deemed to have conceded them. *See Glass*, 786 F. Supp. 2d at 210 (treating as conceded argument that plaintiff completely failed to contest); *Hopkins*, 238 F. Supp. 2d at 25.

[2] Excerpts of the deposition transcripts cited herein are attached to Defendant's opening brief.

know I had the document from the investigator because I was behind in my mail. When I discovered it, I just fell apart. I couldn't handle it, so I couldn't respond."). Under these circumstances, it can hardly be said that the Agency accepted, investigated fully, and decided on the merits all of Plaintiff's claims.

Furthermore, Plaintiff's waiver argument is unavailing because, unlike in the Title VII context, the failure to exhaust administrative remedies for a Rehabilitation Act claim is a jurisdictional defect. *See Ellison v. Napolitano*, 901 F. Supp. 2d 118, 124 (D.D.C. 2012); *Mahoney v. Donovan*, 824 F. Supp. 2d 49, 58 (D.D.C. 2011), *aff'd*, No. 12-5016, 2012 WL 3243983 (D.C. Cir. Aug. 7, 2012). Plaintiff has failed to carry her burden of pleading and proving that she satisfied the jurisdictional requirement here. *See Ellison*, 901 F. Supp. 2d at 124. Consequently, because Plaintiff failed to timely exhaust her claim in Count 2 for failure to accommodate, the Court should dismiss this claim for want of subject matter jurisdiction.

## III.   NO REASONABLE JURY WOULD INFER THAT THE AGENCY FAILED TO PROVIDE PLAINTIFF WITH REASONABLE ACCOMMODATIONS

In support of her failure to accommodate claim, Plaintiff contends that "Defendant also does not dispute that Plaintiff could have performed her job with an accommodation, but rather incorrectly asserts that Plaintiff's accommodations were not necessary to address her medical conditions and improperly limits Plaintiff's disability solely to migraines." Opp'n at 10-13. These assertions are inaccurate, and fail to proffer evidence from which a reasonable jury could find that Plaintiff's supervisors failed to reasonably accommodate the medical conditions of which they were aware. Moreover, Plaintiff's cherry-picked account of the reasonable accommodation process mischaracterizes the evidence and, tellingly, ignores the wealth of

6

evidence showing that her supervisors engaged in an interactive dialogue over many months. Plaintiff's failure to accommodate claim fails for the following reasons.

To begin with, Plaintiff's claim that the Agency does not dispute that she could have performed her job with an accommodation misstates the Agency's position. As the Agency explained, Plaintiff could not have performed her job with the *specific* accommodations of 11 AM start time, telework, and optional weekend work hours that she demanded. *See* Def.'s Mem. at 13-14, 30-36. Indeed, as the record demonstrates, the Agency's assessment of the accommodation request took into account the essential functions of the business manager position that Plaintiff occupied. Plaintiff's responsibilities were to support the Surface Program, which included monitoring the budget, preparing obligation plans, working with the program manager, preparing procurement requests, and meeting with the program manager and the support team to plan for the building of boats. Doak Tr. at 21:13-22:15; Def.'s Ex. 2 at Resp. to Interrogatory No. 5. Prior to her request for an 11 AM start time, Plaintiff's 8:15 AM start time was already the latest start time of the approximately 20 staff members in Mr. Cohen's group. *See* Cohen Tr. at 64:14-19; Doak Tr. at 226:15-227:4; Souther Tr. at 49:1-51:1. Her frequent absences and late arrivals meant that she was not fulfilling her duties or completing mandatory training. Def.'s Ex. 29; Ex. 2 at Resp. to Interrogatory Nos. 16, 17; Doak Tr. at 126:9-19, 185:5-188:4. Moreover, the accommodation decision also considered the Acquisition Directorate's policies, which required all employees to be present for work or in a leave status during the core hours of 9:30-10:30 AM and 1:30-2:30 PM, and stated that the Directorate was closed on weekends, thereby making weekend work hours a non-starter. Def.'s Ex. 7 ¶ 7. Plaintiff also never made any effort to submit any of the requisite telework certifications. *See* Def.'s Ex. 18 at Enclosures 3 & 4; Def.'s Ex. 31. Plaintiff completely ignores all of this evidence.

7

Next, Plaintiff challenges the Defendant's argument that her requested accommodations were not necessary to address her medical conditions and claims that Defendant improperly limited her disability to migraines. Opp'n at 11. Once again, Plaintiff fails to address the majority of the evidence in the record, which do not offer support for Plaintiff's position. Here, the evidence is undisputed that the requested accommodations of an 11 AM start time, the amended request for a 9:30 A.M. start time, and the request for weekend work hours were all based solely on Plaintiff's report of her optimal time to work. Berbano Tr. at 42:25-45:24; 62:5-63:7. Neither the delayed start time nor the telework request accommodated Plaintiff's stated need of treating migraines, however, because Plaintiff would be incapacitated and unable to work once she suffered a migraine, whether she was at home or at the office. *See* Def.'s Ex. 25 ¶ 3; Doak Tr. at 144:15-145:14; Pennington Tr. at 11:3-13:8, 17:5-19:1, 22:21-23:17, 39:5-40:16; Schwartz Tr. at 14:4-18:4. And, although Plaintiff claims that the Agency improperly limited her disabilities to her migraines, Dr. Berbano linked the need for a delayed start time to Plaintiff's migraine medication and stated that "we are continuing this medication, but adjusting the timing of when she takes it so that the drowsiness has the least impact on her work schedule." Def.'s Ex. 25 at 2.

Finally, the record overwhelmingly contravenes Plaintiff's conclusory allegation that her supervisors failed to provide her with reasonable accommodations. To the contrary, the evidence shows that Plaintiff's supervisors made multiple attempts beginning in January 2010 to encourage Plaintiff to seek accommodations if necessary, *see* Def.'s Ex. 11 ¶¶ 3-4, and engaged her in a dialogue to find accommodations that would enable her to return to work in a productive status. Moreover, Mr. Cohen had no influence or input into the recommendations of the independent medical review officers, and relied on their synopsis and opinions because he was

8

not privy to any of the medical documentation that Plaintiff submitted. *See* Pennington Tr. at 40:17-41:2; Schwartz Tr. at 22:3-8, 23:6-13; Cohen Tr. at 17:14-22, 44:10-45:9, 47:19-48:16, 60:11-20. Plaintiff admits this is so. *See* Pl.'s "Material Facts As to Which There Exists A Genuine Issue Necessary to Be Litigated" ¶¶ 20, 29. The record is undisputed that Mr. Cohen promptly provided to Plaintiff all of the workplace accommodations that the Agency's medical review officers recommended as medically justified. *See* Ex. 19; Ex. 20 at Resp. to Interrogatory No. 6; Ex. 21; Doak Tr. at 138:9-142:25. If Plaintiff believed any of the accommodations were insufficient, she did not convey that to Mr. Cohen. *See* Doak Tr. at 139:11-140:20. Moreover, although Plaintiff now suggests that she did not agree to a 9 A.M. start time at the July 23, 2010, meeting, she testified under oath at her deposition that she had in fact "agreed to try" to meet a 9 A.M. start time. *See* Doak Tr. at 240:20-242:22; Def.'s Ex. 27 ("At this point, she is on a 0900 a.m. arrival as agreed to and Edna is doing all she can to make the arrival at 0900.").

In light of the numerous steps that the Coast Guard took to engage in an interactive dialogue with Plaintiff over many months and promptly address her accommodation requests, no reasonable jury could conclude that the Agency failed to reasonably accommodate Plaintiff. In sum, Plaintiff's ultimate claim that "Defendant denied Plaintiff reasonable accommodation" is the classic example of a conclusory allegation that is insufficient to defeat a motion for summary judgment. *See Hussain*, 435 F.3d at 365; *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (holding that a non-moving party may not defeat summary judgment by relying solely on allegations or conclusory statements).

IV.   **NO REASONABLE JURY COULD FIND THAT THE AGENCY'S REMOVAL DECISION WAS MOTIVATED BY DISABILITY DISCRIMINATION**

Although Plaintiff acknowledges that her separation was a retirement, she argues that she nonetheless suffered an adverse action because her resignation should be deemed a constructive discharge. *See* Opp'n at 13-14.  The D.C. Circuit has held that "resignations or retirements are presumed to be voluntary." *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010) (holding that employees who voluntarily accepted a buyout suffered no adverse employment action). Consequently, "'a retirement request initiated by an employee is presumed to be a voluntary act,' and 'where an employee is faced merely with the unpleasant alternatives of resigning or being subject to removal for cause, such limited choices do not make the resulting resignation an involuntary act.'" *Keyes v. Dist. of Columbia*, 372 F.3d 434, 439 (D.C. Cir. 2004) (quoting *Schultz v. U.S. Navy*, 810 F.2d 1133, 1136 (Fed. Cir. 1987)).  The voluntariness of an employee's decision to retire or resign "turns on such things as: did the person receive information about what would happen in response to the choice? [W]as the choice free from fraud or other misconduct? [D]id the person have an opportunity to say no?" *Aliotta*, 614 F.3d at 566-67; (quoting *Henn v. Nat'l Geographic Soc'y*, 819 F.2d 824, 828 (7th Cir. 1987)).

Without any discussion of this Circuit law, Plaintiff simply asserts that the Agency "proposed her removal when she failed to adhere to the 9:00 a.m. start time chosen by her supervisors that did not accommodate her disabilities" and points to her stated reason for retirement on her form requesting a "Voluntary Retirement," and claims that this is sufficient evidence of a constructive discharge. *See* Opp'n at 14.  Plaintiff's argument is undercut by her admission that she asked Mr. Souther "if retirement might be an option in lieu of removal and he said that would probably be fine."  Pl.'s Ex. A (Decl. of Edna Doak) ¶ 40.  In effect, she was

faced with the two alternatives of retiring or being removed, which, as the court in *Keyes* explained, "do not make the resulting resignation an involuntary act." *Keyes*, 372 F.3d at 439.

Moreover and in any event, Plaintiff has failed to adduce any evidence from which a reasonable jury could infer that Mr. Souther's decision that Plaintiff's removal was warranted was in any way animated by disability discrimination. The decision on the proposed removal was spurred by Plaintiff's admittedly "concerning" negative leave balances. *See* Doak Tr. at 155:9-22. Plaintiff's frequent absences prevented her from performing her business manager role and completing mandatory training and created undue hardship for her colleagues. *See* Def.'s Ex. 34. Ignoring this evidence, Plaintiff proffers only the vague and heavily qualified assertion that by mid-July 2010, she "was able to come in at 9:30 a.m. on most days when she did not experience a migraine or body pain," Opp'n at 15, but this fails to raise any inference of pretext. Indeed, Plaintiff makes no attempt to address the evidence that she exhausted 492.75 hours of FMLA, including the maximum allowable annual and sick leave and advanced annual and sick leave, on top of which she also incurred 209 hours of LWOP between January 31 and September 11, 2010. *See* Ex. 34 ¶ 4; Doak Tr. at 255:7-261:8 (Q: "Is that statement accurate?" A: "I do not know if it is accurate or inaccurate." Q: "So you have not independently verified the accuracy of that statement?" A: "No, I have not."); Doak Tr. at 53:12-15 (Q: "Are you aware of instances where your time records would say you were not in the office, but you actually were?" A: "No, I'm not aware at this moment.").

In sum, in view of the undisputed evidence of Plaintiff's inability to maintain a regular work schedule in spite of the accommodations she was granted and her supervisors' multiple attempts to reach agreement on a viable start time, Plaintiff has failed to adduce any evidence to show that her supervisors' removal decision—which was never effectuated—was based on

11

discrimination.  The Court should therefore grant summary judgment in favor of the Coast Guard on Plaintiff's disability discrimination claim.

## V.   NO REASONABLE JURY COULD FIND THAT THE AGENCY RETALIATED AGAINST PLAINTIFF FOR REQUESTING ACCOMMODATIONS

Finally, devoting just one scant paragraph to her retaliation claim, Plaintiff argues that she can establish a *prima facie* case of retaliation because there is a causal link between her requests for accommodation and Defendant's notice of proposed removal. *See* Opp'n at 14.  No reasonable jury would, however, infer retaliation based on the time between Plaintiff's requests for accommodation in April 2010 and July 2010 and the Notice of Removal issued by Mr. Cohen in August 2010.  To begin with, the Agency did not make any decision on Plaintiff's proposed removal until September 30, 2010, more than five months after Plaintiff first sought accommodations, when Mr. Souther determined that Plaintiff's removal was warranted because she was not able to perform the essential functions of her job. *See* Def.'s Ex. 34.  As the D.C. Circuit has explained, temporal proximity, without more, is insufficient to establish an inference of retaliatory motive. *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011) (noting that a plaintiff must present "positive evidence beyond mere proximity to defeat the presumption that the proffered explanations are genuine"); *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (concluding that "an inference of retaliatory motive based upon the 'mere proximity' in time between [plaintiff's] filing her first suit and the [challenged action] two and one-half months later would be untenable"); *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007) ("positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine").

12

Furthermore, it is unclear whether Plaintiff's bare assertion of pretext goes to her disability discrimination claim or her retaliation claim, as her opposition simply states that "Defendant's claimed reason for terminating Plaintiff, her failure to maintain a regular work schedule, is pretext for discrimination," without any mention of her retaliation claim. *See* Opp'n at 14-15. In any event, any such claim of pretext would fail for the same reasons as discussed above. *See* Part IV, *supra*. The Court should therefore grant summary judgment in favor of the Coast Guard on Plaintiff's retaliation claim.

## **CONCLUSION**

For the reasons set forth above and in its opening brief, Defendant respectfully requests that the Court grant its motion to dismiss and for summary judgment and dismiss this case in its entirety.

Date:  November 6, 2013

Respectfully submitted,

RONALD C. MACHEN JR., D.C. Bar #447889
United States Attorney
for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By:   /s/ Michelle Lo
MICHELLE LO
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
Tel: (202) 252-2541  Fax: (202) 252-2599
Michelle.Lo2@usdoj.gov

*Of counsel:*
Lorna Jerome, Esq.
United States Coast Guard

13

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EDNA DOAK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:12-cv-01177-RC |
| v. | ) |
| | ) |
| JANET NAPOLITANO, | ) |
| Secretary, U.S. Department of Homeland | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |

# DEFENDANT'S REPLY
# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| EDNA DOAK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:12-cv-01177-RC |
| v. | ) |
| | ) |
| JANET NAPOLITANO, | ) |
| Secretary, U.S. Department of Homeland | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |

---

**DEFENDANT'S REPLY TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS**
**TO WHICH THERE EXISTS A GENUINE ISSUE NECESSARY TO BE LITIGATED**

Defendant, Janet Napolitano, Secretary, U.S. Department of Homeland Security, by and through undersigned counsel, hereby responds to Plaintiff's "Material Facts As to Which There Exists a Genuine Issue Necessary to Be Litigated" ("Pl. SMF," ECF No. 17). Pursuant to Local Rule 7(h), Defendant responds to the numbered paragraphs of Plaintiff's Statement of Material Facts as follows.

1. This paragraph does not contain a genuine issue of material fact in dispute.

2. This paragraph does not contain a genuine issue of material fact in dispute. Defendant does not dispute that Plaintiff was in a car accident for which she submitted a medical certification of a serious health condition in August 2009. *See* Def.'s Statement of Undisputed Material Facts ("Def.'s SUMF," ECF No. 14) ¶ 7.

3. This paragraph does not contain a genuine issue of material fact in dispute.

4. This paragraph does not contain a genuine issue of material fact in dispute.

5. This paragraph does not contain a genuine issue of material fact in dispute.

364

6.     This paragraph does not contain a genuine issue of material fact in dispute.  *See* Def.'s SUMF ¶ 7.

7.     This paragraph does not contain a genuine issue of material fact in dispute.

8.     This paragraph does not contain a genuine issue of material fact in dispute. Defendant disputes Plaintiff's statement limiting her migraines to "mornings."  As the evidence shows, when Plaintiff suffered a migraine, she could be incapacitated for an indeterminate number of hours, whether at home or at work, and thus be unable to work for an entire day. Berbano Tr. at 34:3-35:21; *see also* Doak Tr. at 145:3-14, 230:2-233:4.

9.     This paragraph does not contain a genuine issue of material fact in dispute.

10.    Defendant disputes Plaintiff's statement that "Defendant was aware that Plaintiff suffered from the foregoing medical conditions" because the suggestion that Plaintiff's supervisor, Gregory Cohen, was aware of all her medical conditions is unsupported by the evidence.  Due to Plaintiff's private nature, Plaintiff bypassed her supervisors and provided her medical documentation to Human Resources for transmission to the medical review officers.  *See* Cohen Tr. at 9:9-17, 47:8-18; Doak Tr. at 133:18-134:15; Souther Tr. at 21:17-24:14; Anderson Tr. at 32:15-35:11. Mr. Cohen's understanding of Plaintiff's medical condition was limited to his knowledge that she had been in a car accident and that she suffered from migraines.  Cohen Tr. at 7:7-14, 9:2-8; Doak Tr. at 106:3-108:19.

11.    Plaintiff's assertion that she had not exhausted her FMLA leave is contradicted by her own testimony.  Plaintiff had not performed a complete leave audit and admitted that an independent audit of her FMLA usage had been performed by Human Resources, not Mr. Cohen. Doak Tr. at 52:5-53:15, 93:2-95:15, 200:14-201:14.

2

12.     Plaintiff's statement that she "then used sick leave, and later began requesting leave without pay (LWOP) or annual leave (in lieu of sick leave)" only after using her FMLA leave is unsupported by the evidence. As of January 19, 2010, Plaintiff had used 440.30 hours of FMLA, along with -233 hours of sick leave and -35.15 hours of annual leave. *See* Def.'s SUMF ¶ 11.

13.     Plaintiff's statement that "Mr. Cohen frequently denied Plaintiff's leave requests" presents argument, not facts.   Mr. Cohen sought medical documentation due to Plaintiff's negative leave balances and the amount of leave she had been advanced, and counseled Plaintiff multiple times on the need to submit proper leave requests. *See* Def.'s SUMF ¶¶ 10-14.

14.     Plaintiff's statement that "[i]nstead of accommodating Plaintiff, Mr. Cohen marked her as AWOL and issued her letters of reprimand" presents argument, not facts.  Mr. Cohen issued the letter of reprimand dated February 22, 2010, due to Plaintiff's failure to comply with leave request procedures. *See* Def.'s SUMF ¶ 17.  Plaintiff did not make a request for a workplace accommodation until nearly two months later April 2010. *See* Def.'s SUMF ¶ 23.

15.     This paragraph does not contain a genuine issue of material fact in dispute.

16.     This paragraph does not contain a genuine issue of material fact in dispute. *See* Def.'s SUMF ¶ 23.

17.     This paragraph does not contain a genuine issue of material fact in dispute. *See* Def.'s SUMF ¶ 33.

18.     This paragraph does not contain a genuine issue of material fact in dispute. *See* Def.'s SUMF ¶¶ 30-32.

19.     This paragraph does not contain a genuine issue of material fact in dispute. Plaintiff's statement that "Plaintiff continued to be exposed to fluorescent lighting which

3

366

aggravated her migraine" is not supported by the evidence she cites.  As Plaintiff testified under oath, she did not tell Mr. Cohen that she did not think it was sufficient for him to turn off the overhead lights.  *See* Doak Tr. at 139:11-140:20.

20.     This paragraph does not contain a genuine issue of material fact in dispute.  *See* Def.'s SUMF ¶ 32.

21.     This paragraph does not contain a genuine issue of material fact in dispute.  *See* Def.'s SUMF ¶ 43.

22.     This paragraph does not contain a genuine issue of material fact in dispute.  On May 21, 2010, Plaintiff replied to Mr. Cohen, stating: "I understand your decision not to allow an 1100-1900 work schedule, but believe at this point I am better able to work a temporary 10:00am-6:30pm schedule for a month or two.  It appears my medication change last week has leveled itself somewhat and I will work toward a 9:00am arrival during this time so that I will eventually be back on AWS and incur less LWOP."  *See* Def.'s SUMF ¶ 44.

23.     This paragraph does not contain a genuine issue of material fact in dispute. Plaintiff's characterization of the facts is not supported by the document she cites, in which she stated: "Until recently, there were very few 'project interactions.'  I am glad to be suddenly involved with the new progress in the Cutter Boats program and believe I will be an important member of the team."  *See* Def.'s Ex. 22.

24.     This paragraph does not contain a genuine issue of material fact in dispute. Plaintiff's statement that the letter of reprimand was "because of her absences due to her disabilities, despite the fact that Plaintiff had informed them that her absences were due to her disability and had requested LWOP" presents argument, not facts.  *See* Def.'s SUMF ¶ 48.

25. This paragraph does not contain a genuine issue of material fact in dispute. *See* Def.'s Ex. 23; Doak Tr. at 236:3-237:2. Plaintiff did not accept Mr. Cohen's offer to adjust her start time to 9 AM. Doak Tr. at 237:3-239:6.

26. Defendant disputes the suggestion in this paragraph that Plaintiff was granted a 9:30 am start time following her meeting with Mr. Souther on June 3, 2010. There was no approval for a 9:30 am start time as of June 2010, as evidenced by the fact that Plaintiff submitted a revised request for an accommodation in the form of a 9:30 am start time more than one month later on July 16, 2010. Def.'s Ex. 25.

27. Plaintiff's statement that "[b]y mid-July, Plaintiff was able to arrive by 9:30 a.m. on most days when she did not have a migraine or body pain in the morning" presents argument, not facts. Plaintiff's timesheets reflect multiple instances of AWOL after mid-July. See Def.'s Ex. 32; Doak Tr. at 53:12-15 (Q: "Are you aware of instances where your time records would say you were not in the office, but you actually were?" A: "No, I'm not aware at this moment.").

28. This paragraph does not contain a genuine issue of material fact in dispute. *See* Def.'s SUMF ¶ 52.

29. This paragraph does not contain a genuine issue of material fact in dispute. *See* Def.'s SUMF ¶¶ 57-58.

30. This paragraph does not contain a genuine issue of material fact in dispute. *See* Def.'s SUMF ¶ 60.

31. This paragraph does not contain a genuine issue of material fact in dispute. Plaintiff's statement that "[t]his was not enough time to permit Plaintiff to adjust her medication to be able to arrive by 9:00 a.m." presents argument, not facts. Despite agreeing to the 9 AM start time, Plaintiff was still unable to arrive at work on time. *See* Def.'s SUMF ¶ 61.

5

32.     Plaintiff's statement that "Mr. Cohen proposed Plaintiff's removal claiming she was unable to maintain her regular work schedule . . . despite the fact that he was aware Plaintiff would need time to adjust her medication" presents argument, not facts.  By memorandum dated August 9, 2010, Mr. Cohen provided Plaintiff with notice of his proposal to remove her from her management analyst position and from Federal service due to (1) her medical inability to perform the essential duties of her position, which caused her to be unable to maintain her regular work schedule and (2) her hours in AWOL status.  *See* Def.'s SUMF ¶¶ 64-66.

33.     Defendant disputes the suggestion in Plaintiff's statement that "as of July 31, 2010, Plaintiff was at 85% attendance" that Plaintiff's overall attendance record was at 85%, as this is unsupported by the evidence she cites.  The chart prepared by the union reflected that for the two-week pay period that constituted pay period 17, Plaintiff had worked 84.69% of her tour of duty.  *See* Def.'s Ex. 33.

34.     This paragraph does not contain a genuine issue of material fact in dispute.  *See* Def.'s SUMF ¶¶ 68, 75.

35.     This paragraph does not contain a genuine issue of material fact in dispute.  *See* Def.'s SUMF ¶ 73.

36.     This paragraph does not contain a genuine issue of material fact in dispute.

37.     This paragraph does not contain a genuine issue of material fact in dispute.  Plaintiff's statement that "Mr. Souther responded that he was looking forward to terminating Plaintiff's employment because 'it will be fun'" mischaracterizes the evidence.  As Mr. Souther testified, his sarcastic comment reflected his frustration because he "had no idea how we could take a letter of reprimand that had been destroyed and recreate it and how we would turn off retirement benefits once they are turned on."  Souther Tr. 65:13-68:4.

6

38.     This paragraph does not contain a genuine issue of material fact in dispute.

39.     This paragraph does not contain a genuine issue of material fact in dispute.

40.     This paragraph does not contain a genuine issue of material fact in dispute.

41.     This paragraph does not contain a genuine issue of material fact in dispute.

42.     This paragraph does not contain a genuine issue of material fact in dispute.

43.     This paragraph does not contain a genuine issue of material fact in dispute.   The final agency decision was issued after Plaintiff "declined to participate in a telephonic interview with the investigator, and did not respond to a certified letter containing interrogatories."   *See* Pl.'s Ex. 7 at 7 n.7; Doak Tr. at 42:25-43:8

Date:  November 6, 2013

Respectfully submitted,

RONALD C. MACHEN JR., D.C. Bar #447889
United States Attorney
for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By:   /s/ Michelle Lo
MICHELLE LO
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
Tel: (202) 252-2541  Fax: (202) 252-2599
Michelle.Lo2@usdoj.gov

*Of counsel:*
Lorna Jerome, Esq.
United States Coast Guard

7

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

EDNA DOAK,                                    :
                                              :
      Plaintiff,                            :    Civil Action No.:    12-1177 (RC)
                                              :
      v.                                    :    Re Document No.:    14
                                              :
JEH JOHNSON,[1]                               :
Secretary, United States                      :
Department of Homeland Security               :
                                              :
      Defendant.                            :

## ORDER

### Granting Defendant's Motion to Dismiss and Motion for Summary Judgment

    For the reasons stated in the Court's Memorandum Opinion separately issued today, the defendant's motion to dismiss and motion for summary judgment (ECF No. 14) is **GRANTED**. It is hereby **ORDERED** that:

1. As to Count III in its entirety, and Ms. Doak's challenge to the September 30, 2010, decision of removal in Count I, **JUDGMENT IS ENTERED** for the defendant;

2. All other claims are **DISMISSED WITH PREJUDICE** for failure to exhaust.[2]

This is a final, appealable order. *See* FED. R. APP. P. 4(a).  **SO ORDERED**.

Dated: February 10, 2014                          RUDOLPH CONTRERAS
                                                  United States District Judge

---

[1]     The plaintiff originally brought suit against Janet Napolitano, the Secretary of Homeland Security, at the time she filed her complaint on July 18, 2012. Pursuant to Fed. R. Civ. P. 25(d), Jeh Johnson is automatically substituted as the defendant, as he succeeded her in office on December 23, 2013.

[2]     These claims are: as to Count I's disparate treatment claims, the February 22, 2010 and May 24, 2010 letters of Reprimand, the August 9, 2010 Notice of Proposed Removal; and all the AWOL charges included within those letters and the Notice; and all of Count II.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDNA DOAK,                                        :
                                                  :
        Plaintiff,                                :        Civil Action No.:    12-1177 (RC)
                                                  :
        v.                                        :        Re Document No.:     14
                                                  :
JEH JOHNSON,[1]                                   :
Secretary, United States                          :
Department of Homeland Security                   :
                                                  :
        Defendant.                                :

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Edna Doak brings this employment discrimination action against Jeh Johnson, the

Secretary of Homeland Security ("Department"), in his official capacity.  Ms. Doak alleges that

her employer, the United States Coast Guard ("USCG"),[2] discriminated against her, and

retaliated against her on the basis of her disabilities in violation of section 501 of the

Rehabilitation Act of 1973, codified at 29 U.S.C. § 791, *et seq.*  The Department moved to

dismiss for failure to exhaust certain claims and also moved for summary judgment on all claims.

For the reasons that follow, the Court will grant the Department's motion on both grounds.

---

[1]        The plaintiff originally brought suit against Janet Napolitano, the Secretary of
Homeland Security, at the time she filed her complaint on July 18, 2012.  Pursuant to Fed. R.
Civ. P. 25(d), Jeh Johnson is automatically substituted as the defendant, as he succeeded her in
office on December 23, 2013.
[2]        The United States Coast Guard is a component of the United States Department of
Homeland Security.  *See* Def.'s Mot. Summ. J. 1, ECF No. 14.  *See also*
http://www.uscg.mil/top/about/ (last accessed January 7, 2014).

## II. FACTUAL BACKGROUND

Edna Doak was employed as a Program Analyst for the United States Coast Guard from November 2007 through August 2009, and as a Management Program Analyst from August 2009 through October 2010. Compl. ¶¶ 5–6, ECF No. 1. Her day-to-day responsibilities were to support the Surface Program, which included "[w]atching the budget, preparing obligation plans, working with the program manager, doing procurement requests," and "[m]eeting with the program manager and the support team" to plan for the building of boats. Doak Dep. 21:24–25, 22:1–9, ECF No. 16-13. Her position required frequent interaction with others. *See* Def.'s Resp. to Interrogatory 3, ECF No. 16-1.

Ms. Doak's scheduled start time at work was 8:15 a.m. *See* Def.'s Ex. 27, ECF No. 14-20 ("[m]y start time since 26 November 2007 has been 0815."); Def.'s Ex. 24, ECF No. 14-19. This was one of the later start times of anyone on her team. *See* Souther Dep. 49:12–15, ECF No. 14-3; Cohen Dep. 64:16–19, ECF No. 14-2. The USCG's Acquisition Directorate Standard Operating Procedure defines the designated working hours as "normally the hours between 0600 and 1800 Monday through Friday. The CG-9 directorate is closed on weekends and government holidays." *See* Def.'s Ex. 7 ¶5.f, ECF No. 14-7. The USCG policy also allowed for flexible hours, but stated that "[w]ork must be performed between the hours of 0600-1800, with all CF-9 employees/members present during the core hours of 0930-1030 and 1330-1430, Monday through Friday." *See id.* ¶ 7(a)(1).

Ms. Doak suffers from hypothyroidism and depression. She was diagnosed with both of these in 1993. Doak Decl. ¶¶ 9, 10, Pl.'s Ex. A, ECF No. 17-1. In June 2009,[3] Ms. Doak was in a car accident where she alleges that she "suffered closed head trauma." Doak Decl. ¶ 6. As a result, she began to suffer from migraines, various bodily pains, and obstructive sleep apnea. Doak Decl. ¶ 8. In August 2009, Ms. Doak submitted a request for intermittent leave under the Family and Medical Leave Act ("FMLA") because of the medical problems that resulted from her car accident. Greg Cohen, her supervisor, approved of that leave in September 2009. Def.'s Statement Undisputed Facts ¶ 7, ECF No. 16. Mr. Cohen was Ms. Doak's first-line supervisor; her second-line supervisor was Rory Souther, Chief of Acquisition Resources Management. *Id.* ¶¶ 2–3.

Around December 2009, Mr. Cohen met with Ms. Doak to discuss her inability to work a nine-hour shift and discuss the fact that she was absent from work a lot due to her illness. *See* Def.'s Ex. 6 at 1–2, ECF No. 14-6, Def.'s Ex. 8 at 6, ECF No. 14-8. On January 19, 2010, Mr. Cohen issued an Employment Status Memorandum requesting that Ms. Doak return to full-time duty immediately because she had nearly exhausted her FMLA leave, and her absences were disrupting the work routine and having a negative impact on her projects. *See* Def.'s Ex. 9 ¶ 2, ECF No. 14-9. In that letter, he explained that as of January 19, 2010, Ms. Doak had used 11.5 weeks of FMLA leave, and only had 2.5 days remaining, and that she currently had negative leaves balances of 233 hours of sick leave and negative 35.15 hours of annual leave. *Id.* ¶ 3. He further explained that Ms. Doak's "excessive absences and continued failure to submit

---

[3]     The defendant asserts that the car accident occurred around August 2009. *See* Def.'s Statement Undisputed Facts ¶ 7, ECF No. 16. Ms. Doak testified that her accident occurred in June 2009. *See* Doak Dep. 18:12-13, ECF No. 16-13. The difference in date is not material to this case. The fact remains that at some point between June 2009 and August 2009, Ms. Doak was in a car accident that had subsequent deleterious effects on her health.

appropriate requests for leave in advance cannot continue to be excused and may result in disciplinary action taken against" her. *Id.* ¶ 4.

Despite this letter, Ms. Doak was absent without leave ("AWOL") for several hours each on January 25, 2010, and January 26, 2010. On January 25, 2010, Mr. Cohen wrote another memorandum to Ms. Doak explaining that she had exhausted her FMLA leave and that she had to return to full-time duty status. *See* Def.'s Ex. 11, ECF No. 14-11. On February 22, 2010, Mr. Cohen officially reprimanded Ms. Doak by letter for being AWOL on January 25 and January 26, 2010. *See* Def.'s Ex. 12, ECF No. 14-12. However, the Department agreed to hold the official reprimand letter in abeyance so that Ms. Doak could provide medical documentation to support her absences (1) unrelated to her FMLA leave; (2) her AWOL absences on January 25 and 26, 2010, and (3) her pending or outstanding leave requests related to medical issues. *See* Def.'s Ex. 13, ECF No. 14-13. On March 24, 2010, Mr. Cohen submitted a request for medical documentation to Ms. Doak, because the documentation she had provided, *see, e.g.*, Def.'s Ex. 14, ECF No. 16-4, did not support her "absenteeism nor did it clearly address a diagnoses or whether [her] medical conditions require reasonable accommodations." Def.'s Ex. 15, ECF No. 14-14.

On April 16, 2010, Ms. Doak provided medical documentation to Mr. Cohen through her doctor, Dr. Elizabeth P. Berbano. *See* Def.'s Ex. 16, ECF No. 16-5. In Dr. Berbano's letter, she explained that Ms. Doak suffered from various impairments such as major depressive disorder, obstructive sleep apnea, hypothyroidism, and migraines. *See id.* She also recommended that Ms. Doak be given the following "accommodations to facilitate increased work or productivity: (a) telecommuting from home, (b) full-spectrum light for her work space," "(c) anti-glare computer screen (glare precipitates migraines), (d) work in an area in which she is not subject to

4

cold air currents that cause her muscle tension in the neck and head," "(e) consideration for adjustment of work schedule from 11 AM to 7 PM because of the difficulty of arising in the morning," and "(f) consideration for the option of weekend hours to make up for weekday hours missed." *Id.*

The Coast Guard's Division of Operational Medicine and Medical Readiness reviews requests for accommodations made by civilian employees. Def.'s Statement Undisputed Facts ¶ 21, ¶ 35. Dr. Erica Schwartz, a physician in the Division of Operational Medicine evaluated the April 16, 2010 letter from Dr. Berbano and recommended to Mr. Cohen[4] that the following accommodations be provided: (1) the addition of fluorescent light filters to existing lights, (2) an anti-glare filter for the computer monitor, (3) use of sunglasses or anti-glare glasses, (4) noise-canceling headsets, and (5) a dark, private area for use when medically necessary. *See* Def.'s Ex. 17,[5] ECF No. 16-6. Dr. Schwartz found the requests for telecommuting, a later start time, and weekend hours to be medically unsupported, so she did not recommend those accommodations to Mr. Cohen. *See* Schwartz Dep. at 12:12–13:14, ECF No. 16-15.

On May 6, 2010, Mr. Cohen provided Ms. Doak with "a noise cancelling headset and anti-glare screen for [her] computer screen, permitted her to wear sunglasses in the office as needed, asked that three of the overhead lights directly above her desk be turned off, and identified break rooms that the Plaintiff could use as necessary for medical reasons." Def.'s Statement Undisputed Facts ¶ 40. Mr. Cohen did not provide Ms. Doak with an 11:00 a.m. start time because, he explained, "her position with an acquisition project required daily and frequent

---

[4]  The record shows that Mr. Cohen did not have Ms. Doak's medical documentation record before him when evaluating her accommodation request, due to Ms. Doak's privacy concerns. *See* Def.'s Statement Undisputed Facts ¶ 33, ECF No. 14.
[5]  This memorandum was issued by Dr. Schwartz's supervisor, Captain Mike Boquard.

interaction with project staff, other business managers, resource staff, and numerous agencies," and an 11:00 a.m. start time "would place the project and resource office in a hardship position." *Id.* ¶ 43. *See also* Def.'s Ex. 19 ¶ 4, ECF No. 16-7 ("Your billet is a matrix position with a Coast Guard acquisition project, which requires you to interact daily, and frequently with the project staff, other business managers and resource staff and numerous external agencies. I do not believe you will be able to meet those obligations with a work schedule that does not have you arrive until 1100 daily and therefore would place the project and resource office in a hardship position by requiring personnel from other projects to attend these meetings on the behalf of the resource office.").

In response, on May 21, 2010, Ms. Doak wrote to Mr. Cohen, explaining that she would prefer a 10:00 a.m. start time, but would "work toward a 9:00 a.m. arrival" time. *See* Def.'s Ex. 22, ECF No. 16-8. Mr. Cohen replied via email on June 1, 2010, explaining that a 10:00 a.m. start time was not acceptable; he instead offered her a 9:00 a.m. start time. *See* Def.'s Ex. 23, ECF No. 14-18. Ms. Doak did not accept a 9:00 a.m. start time at that time. Doak Dep. 237:7–18. As such, her scheduled start time remained 8:15 a.m. *See* Doak Dep. 238:2–9.

By the end of May 2010, Ms. Doak was arriving to work anywhere between 10:00 a.m. and Noon. *See* Doak Dep. 271:3–10. Mr. Cohen issued another letter of reprimand to her on May 24, 2010, based on more than 30 AWOL hours that she had incurred since her February 2010 letter of reprimand. *See* Def.'s Ex. 24, ECF No. 14-19.

On July 16, 2010, Ms. Doak submitted another letter from Dr. Berbano "clarifying" her April letter. *See* Def.'s Ex. 25, ECF No. 16-9. In that letter, Dr. Berbano modified her recommended start time to 9:30 a.m. *Id.* Dr. Brent Pennington responded to that request on July 20, 2010, stating that Dr. Berbano's letter did not provide medical justification for "an arbitrary

6

start time of 0930 instead of 0830 or 0900." Def.'s Ex. 26, ECF No. 16-10. On July 23, 2010, Ms. Doak agreed to a 9:00 a.m. arrival time at work. Def.'s Ex. 27, ECF No. 14-20. *See also* Souther Dep. 13, ECF No. 14-3. Despite that, she was still "unable to arrive at work on time." Def.'s Statement Undisputed Facts ¶ 61. In addition, Ms. Doak was also AWOL on July 27, 28, 29, 30, and August 2, 3, and 4, 2010. *Id.* ¶¶ 66-67. From January 31 to August 9, 2010, Ms. Doak had missed approximately 52 percent of her scheduled work hours. *Id.* ¶ 64. *See also* Def.'s Ex. 32 at 1, ECF No. 14-24.

On August 9, 2010, Mr. Cohen issued a notice to Ms. Doak of her proposed removal from her position due to (1) her "medical inability to perform the essential duties of [her] position, due to various medical reasons, which have caused [her] to be unable to maintain [her] regular work schedule," and (2) her hours in AWOL status. *Id.* ¶ 1. The union responded to the Notice of Proposed Removal on behalf of Ms. Doak on August 31, 2010. *See* Def.'s Ex. 33, ECF No. 14-25. On September 30, 2010, after considering the evidence before him, Mr. Souther determined that Ms. Doak's removal "was warranted to promote the efficiency of the service." *See* Def.'s Statement Undisputed Facts ¶ 68.

The plaintiff contacted an Equal Employment Opportunity ("EEO") counselor on October 6, 2010, challenging her September 30 removal. *Id.* ¶ 73. The Department entered into a settlement agreement under which it agreed to allow Ms. Doak to retire effective October 31, 2010 instead of being terminated. *Id.* ¶ 75. *See also* Def.'s Ex. 36, ECF No. 14-28. On February 22, 2011, Ms. Doak filed a formal complaint against the Department, and on June 19, 2012, the Department issued a final agency decision, in which it found that Ms. Doak "failed to prove by a preponderance of the evidence that USCG discriminated against" her. *See* Pl.'s Ex. 7, ECF No. 17-1.

7

Ms. Doak then filed the instant action, alleging that the Department discriminated against her by "discharging her from her employment because of her disability," and by failing to reasonably accommodate her disability. *See* Compl. Counts I & II. She also alleges that the Department retaliated against her by terminating her for requesting reasonable accommodations in violation of the Rehabilitation Act. *See* Compl. Count III. The Department moved to dismiss for Ms. Doak's failure to exhaust her reasonable accommodation claims and certain disparate[6] treatment claims, and moved for summary judgment on all claims. *See* Def.'s Mot. Summ. J. 2, ECF No. 14. The Court now turns to the relevant legal standards.

## III. ANALYSIS

### A. Legal Standards

#### 1. Motion to Dismiss for Lack of Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction . . . ." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). It is the plaintiff's burden to establish that the court has subject matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely

---

[6]    In Count I of the Complaint, Ms. Doak alleges that "Defendant violated the Rehabilitation Act by discriminating against Plaintiff and discharging her from her employment because of her disability, its perception of her as if she were disabled, and its record of her disability." Compl. ¶ 26. Though not explicitly couched in "disparate treatment" terms, the parties' briefs reflect an understanding that Count I states plaintiff's disparate treatment claim. *See* Def.'s Mot. Summ. J. 24, 27, ECF No. 14; Pl.'s Opp'n Mot. 9, ECF No. 17. The Court also construes Count I as a disparate treatment claim and analyzes it as such.

devoid of merit as not to involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666 (1974)).

Because subject matter jurisdiction focuses on the Court's power to hear a claim, the Court must give the plaintiff's factual allegations closer scrutiny than would be required for a 12(b)(6) motion for failure to state a claim. *See Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001). Thus, the court is not limited to the allegations contained in the complaint. *See Wilderness Soc'y v. Griles*, 824 F.2d 4, 16 n.10 (D.C. Cir. 1987).

## 2. Summary Judgment

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must

"eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant. *See Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### B. Failure to Exhaust

As a threshold matter, the defendant argues that Ms. Doak's failure to accommodate claim in Count II, and certain of her disparate treatment claims in Count I should be dismissed for failure to exhaust administrative remedies. Under the Rehabilitation Act, federal employees may file an action "only after exhausting their administrative remedies before the relevant agency for each allegedly discriminatory act." *Mahoney v. Donovan*, 824 F. Supp. 2d 49, 58 (D.D.C. 2011). "[F]ailure to exhaust administrative remedies is a jurisdictional defect, requiring dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1)." *Ellison v. Napolitano*, 901 F. Supp. 2d 118, 124 (D.D.C. 2012) (citing *Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006)); *Moore v. Schafer*, 573 F. Supp. 2d 216, 219 (D.D.C. 2008). Because it is a jurisdictional requirement, "the plaintiff has the burden to plead and prove it." *Ellison*, 901 F. Supp. 2d at 124 (citing *Carty v. District of Columbia*, 699 F. Supp. 2d 1, 2 n.2 (D.D.C. 2010) ("under the Rehabilitation Act, exhaustion is a jurisdictional requirement that a plaintiff has the burden to plead and prove")).

Under the Rehabilitation Act, in order to exhaust, "an aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory . . . ." 29 C.F.R. § 1614.105(a)(1). The Counselor holds an initial counseling session, advises the complainant of certain rights, and holds a final interview. 29 C.F.R. § 1614.105(b)(1), (c),

10

(d).   If the matter is not resolved through counseling, the complainant may file a formal administrative complaint. 29 C.F.R. § 1614.106(b).  "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice[,]'" and a party must exhaust her administrative remedies for each discrete act of discrimination alleged or lose the ability to recover for it. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002).

As the plaintiff pled in her Complaint, she contacted an EEO counselor on October 6, 2010, challenging the Department's September 30, 2010 removal decision. Def.'s Statement Undisputed Facts ¶ 73, Compl. ¶¶ 21–23.  She followed-up this conversation by filing a formal administrative complaint on February 22, 2011.  In the formal administrative complaint, Ms. Doak stated that she was subjected to a continuous "hostile work environment[7] . . . from January 2009 to September 30, 2010," citing issues spanning that entire time period, including the denial of certain proposed accommodations. *See* Def.'s Ex. 35, ECF No. 14-27.  Her initial October 6, 2010 contact with an EEO counselor, however, occurred more than 45 days after USCG responded to Ms. Doak's request for accommodations:  Ms. Doak requested accommodations on April 16, 2010, and again on July 16, 2010, to which the Department responded on May 6, 2010, and July 20, 2010, respectively.[8]  Her October 6, 2010 contact with an EEO counselor (78 days after the final July 20, 2010 denial)—the first step in the administrative remedial process— therefore renders her failure to accommodate claims untimely.[9]

---

[7]     Ms. Doak does not raise a hostile work environment claim in her Complaint before this Court, nor were these issues raised in either party's briefs.

[8]     Ms. Doak does not quarrel with the Department's argument that the claim accrued upon the denial of her accommodation requests.

[9]     To make October 6, 2010 timely, the discriminatory action complained of would have to have occurred on August 22, 2010 or later.  Even the August 9, 2010 date Ms. Doak alleged was the date she first became aware of the discrimination (the date in which the

The plaintiff argues that USCG did not raise this failure to exhaust argument in the administrative proceedings,[10] and as such, waived it. *See Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 87-88 (D.D.C. 2009) ("waiver occurs when the agency decides the [administrative] complaint on the merits without addressing the untimeliness defense" (citation omitted)). *See also Bowden v. United States*, 106 F.3d 433, 438 (D.C. Cir. 1997); *Johnson v. Billington*, 404 F. Supp. 2d 157, 162 (D.D.C. 2005) ("when a complaint has proceeded through administrative channels prior to arriving at the federal courthouse, and the agency has accepted, investigated and decided that complaint on its merits without raising the exhaustion issue, the exhaustion defense may be found to have been waived"). However, where the relevant exhaustion inquiry is jurisdictional, as it is under the Rehabilitation Act, courts do not entertain equitable defenses such as waiver.[11] *See, e.g., Uzlyan v. Solis*, 706 F. Supp. 2d 44, 56 (D.D.C. 2010) ("exhaustion

---

Department issued its notice of proposed removal) would not make her October 6, 2010 initial contact with an EEO counselor timely with respect to her failure to accommodate claims. *See* Doak Dep. 37:2–6, ECF No. 16-13.

[10] As set forth above, the Department investigated Ms. Doak's formal complaint and issued a final decision on June 19, 2012. *See* Pl.'s Ex. 7, ECF No. 17-1. It did consider her failure to accommodate as well as her disparate impact claims, and at no point did it raise the timeliness argument. *Id.*

[11] Not all district court judges in this court have agreed on this proposition, due to differing interpretations of the D.C. Circuit's decision in *Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006). Most courts have read *Spinelli* as holding that the Rehabilitation Act's exhaustion requirement is jurisdictional, and therefore, not subject to equitable defenses, based on the court's language that: "[t]he district court also should have dismissed Spinelli's Rehabilitation Act claim *for lack of jurisdiction* on the ground that he failed to exhaust his administrative remedy. The Act limits judicial review to employees aggrieved by the final disposition of their administrative complaint." 446 F.3d at 162 (internal quotation marks and citations omitted) (emphasis added). *See, e.g., Ellison v. Napolitano*, 901 F. Supp. 2d 118, 124 (D.D.C. 2012); *Ragsdale v. Holder*, 668 F. Supp. 2d 7, 16–17 (D.D.C. 2009); *Porter v. Jackson*, 668 F. Supp. 2d 222, 230 n.6 (D.D.C. 2009); *Int'l Union v. Clark*, No. 02-1484 (GK), 2006 WL 2598046, at *9–10 (D.D.C. Sept. 11, 2006). However, in *Koch v. Schapiro*, the court found the "final disposition of their administrative complaint" language in *Spinelli* more dispositive, and found that "because there was a final disposition of [the plaintiff's administrative] complaint— albeit by way of dismissal and not on the merits—his Rehabilitation Act claim is not foreclosed by *Spinelli v. Goss*," even though the plaintiff refused to participate in the administrative

12

of administrative remedies under the Rehabilitation Act is a jurisdictional requirement and, therefore, cannot be waived or tolled"); *Ragsdale v. Holder*, 668 F. Supp. 2d 7, 16–17 (D.D.C. 2009) ("The District of Columbia Circuit has interpreted the exhaustion requirement of section 501 of the Rehabilitation Act as presenting a strict jurisdictional barrier to the filing of judicial complaints that fail to comply with that provision."); *see also Spinelli*, 446 F.3d at 162 (explaining that under the Rehabilitation Act, "[s]uch 'jurisdictional exhaustion,' as we have called it, may not be excused"); *accord Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 706 (D.C. Cir. 2009) ("Because we hold that the CAA's counseling and mediation requirements are jurisdictional, the district court correctly ruled that it was not empowered to apply the equitable doctrine of vicarious exhaustion to excuse compliance with those requirements."); *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004) ("If the statute does mandate exhaustion, a court cannot excuse it."). As such, even if the Department did not previously raise the exhaustion argument, the Court cannot hear the plaintiff's failure to accommodate claims because she did not timely contact an EEO counselor within 45 days of the Department issuing a decision that she viewed as discriminatory. As such, Ms. Doak's failure to accommodate claim in Count II must be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

---

proceedings on grounds of futility. 777 F. Supp. 2d 86, 90–92 (D.D.C. 2011) (holding on *prudential*, and not jurisdictional grounds, that there "was no reason to excuse" failure to exhaust). *See also Perry v. U.S. Dep't of State*, 669 F. Supp. 2d 60, 65 (D.D.C. 2009) (finding that "Mr. Perry's failure to comply with the EEOC's 45-day time limit in 29 C.F.R. § 1614.105(a)(1) does not divest the Court of statutory jurisdiction under Section 505 of the Rehabilitation Act" because the State Department finally disposed of Mr. Perry's administrative complaint before Mr. Perry filed suit). This Court aligns itself with the former line of cases that read the Rehabilitation Act and *Spinelli* as imposing a strict jurisdictional barrier to filing judicial complaints. And moreover, even if the Court did align itself with the latter two cases, it would not help Ms. Doak, as her claims would still fail on the merits.

13

Applying that same principle to Ms. Doak's disparate impact claims in Count I,[12] the

Court finds that any agency action of which she complained occurring before August 22, 2010

(45 days before October 6, 2010, when she first contacted an EEO counselor), was not properly

and timely exhausted in accordance with 29 C.F.R. § 1614.105.[13] *See Lipscomb v. Winter*, 577

F. Supp. 2d 258, 271–273 (D.D.C. 2008) (finding that acts occurring before the 45-day window

to file a complaint with an EEO counselor were time-barred). As such, those claims are also

dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure

12(b)(1).[14]

## C. Discrimination

Even if the unexhausted claims[15] could survive a motion to dismiss for lack of subject

matter jurisdiction, the Court would nevertheless enter judgment for the defendant on the merits

---

[12] The defendant maintains that the plaintiff failed to address, and therefore conceded, the defendant's arguments pertaining to the failure to exhaust the Count I disparate treatment claims. *See* Def.'s Reply 5 n.1, ECF No. 18. The Court finds that the plaintiff's treatment of the defendant's failure to exhaust argument—though terse—did not address any Count in particular, and therefore that the plaintiff's treatment of the issue conceded nothing.

[13] Those claims are, to the extent they are challenged as adverse employment actions (which is not entirely clear based on the Complaint and Ms. Doak's Opposition brief): the February 22, 2010 and May 24, 2010 letters of Reprimand, the August 9, 2010 Notice of Proposed Removal; and all the AWOL charges included within those letters and the Notice.

[14] Moreover, Ms. Doak failed to cooperate during the EEO investigation (*see, e.g.*, Doak Dep. at 42:25–43:8, ECF No. 16-13) and that in itself, constitutes a failure to exhaust. *See Bell v. Donley*, 724 F. Supp. 2d 1, 13 (D.D.C. 2010) ("it is well-established that failure to cooperate in the investigation will be equated with a failure to exhaust administrative remedies." (citing *Rann v. Chao*, 346 F.2d 192, 197 (D.C. Cir. 2003)); *see also Wilson v. Pena*, 79 F.3d 154, 165 (D.C. Cir. 1996) ("if the plaintiff fails to make a good-faith attempt to comply with reasonable agency requests for information, the policy underlying the [exhaustion] doctrine is not served."); *Smith v. Koplan*, 362 F. Supp. 2d 266, 268 (D.D.C. 2005) ("Courts equate cases of failing to cooperate with the agency as cases where a plaintiff has failed to exhaust her administrative remedies.")

[15] The claims that remain as timely are: with respect to Count I, the challenge to the September 30, 2010 Notice of Proposed Removal Decision, and all of Count III.

14

385

on all Counts, because Ms. Doak has not shown that she was unlawfully discriminated against or retaliated against in violation of the Rehabilitation Act.

The Rehabilitation Act provides that a "qualified individual with a disability" may not "be subjected to discrimination" by any federal agency "solely by reason of her or his disability." 29 U.S.C. § 794(a); *see also Mogenhan v. Napolitano*, 613 F.3d 1162, 1165 (D.C. Cir. 2010). Claims of discrimination brought under the Rehabilitation Act are analyzed similarly to claims brought under the Americans with Disabilities Act of 1990 ("ADA"). 29 U.S.C. § 794(d). Under the ADA, claims of discrimination include disparate treatment claims and failure to accommodate claims. *See, e.g.*, *Lee v. District of Columbia*, 920 F. Supp. 2d 127, 132–33 (D.D.C. 2013) ("Claims of discrimination under the ADA can take one of four forms: intentional discrimination, disparate impact, hostile work environment, and failure to accommodate." (citations omitted)). Ms. Doak brings disparate treatment and failure to accommodate claims in this action, and the Court analyzes both in turn.

## 1. Disparate Treatment

Courts analyze disparate treatment disability discrimination claims under the *McDonnell Douglas* burden-shifting framework. *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288–89 (D.C. Cir. 1998) (en banc). Under this framework, the plaintiff bears the burden of establishing "a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff establishes a prima facie case, the employer must then articulate a legitimate, non-discriminatory reason for its actions. The plaintiff must then demonstrate that the employer's stated reason was pretextual and that the true reason was discriminatory." *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003) (citing *Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002)). A plaintiff can establish a prima facie case by showing that "(1) she is a member of a protected class; (2) she

15

386

suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference

of discrimination." *See Stella*, 284 F.3d at 145 (quoting *Brown v. Brody*, 199 F.3d 446, 452

(D.C. Cir. 1999)).

The D.C. Circuit, however, has modified the *McDonnell-Douglas* test, finding that "the

question whether the employee made out a prima facie case is almost always irrelevant." *Brady*

*v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). Therefore, instead,

> in considering an employer's motion for summary judgment or judgment as a
> matter of law [in a disparate treatment suit where an employee has suffered an
> adverse employment action and an employer has asserted a legitimate, non-
> discriminatory reason for the decision], the district court must resolve one central
> question: *Has the employee produced sufficient evidence for a reasonable jury to*
> *find that the employer's asserted non-discriminatory reason was not the actual*
> *reason and that the employer intentionally discriminated against the employee on*
> *the basis of race, color, religion, sex, or national origin?*

*Id.* at 494 (emphasis added). The Supreme Court has explained that "a reason cannot be proved

to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that

discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993)

(emphasis in original).

Ms. Doak asserts several adverse employment actions: the Department's August 9, 2010,

Notice of Proposed Removal, the Department's September 30, 2010, decision to terminate her

employment,[16] the Department's general failure to accommodate her disability, the Department

---

[16]     As a threshold matter, the Department argues that there was no adverse
employment action here because Ms. Doak was never terminated—but was instead permitted to
retire. *See* Def.'s Mot. Summ. J. 27–28, ECF No. 14. Ms. Doak argues that she was
constructively discharged because her retirement was not voluntary, and her proposed removal
on August 9, 2010, occurred when "she failed to adhere to the 9:00 a.m. start time chosen by her
supervisors that did not accommodate her disabilities." Pl.'s Opp'n Mot. 13–14.
     An employee's resignation or retirement is presumed to be voluntary, unless the
employee overcomes the presumption by showing that the resignation or retirement was
involuntary, and therefore qualifies as a constructive discharge. *Aliotta v. Bair*, 614 F.3d 556,
566–67 (D.C. Cir. 2010) (citing *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006) (Rogers,

16

issuing her letters of reprimand, and the Department charging her with being AWOL.  *See, e.g.*, Def.'s Ex. 20, Resp. to Interrogatory 8; Compl. ¶¶ 9, 26, 28, 30.

Regardless of the adverse employment action taken in this case—or whether any of them actually constitutes an adverse employment action—Ms. Doak has not "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated" against her.  *Brady*, 520 F.3d at 494.  The Department's non-discriminatory reason for proposing to remove Ms. Doak was her perpetual attendance problem.  In its August 9, 2010 Notice of Proposed Removal, the Department explained that it was considering Ms. Doak's removal from federal service because of her "medical inability to perform the essential duties of [her] position . . . which have caused [her] to be unable to maintain [her] regular work schedule," as well as her being "absent without leave."  Def.'s Ex. 32.  That Notice also listed all the dates in 2010—beginning *after* Ms. Doak's February 2010 reprimand for the same problem—in which Ms. Doak was in AWOL status.  The

---

J., concurring)).  If the plaintiff can show she was constructively discharged, that will constitute an adverse employment action.  *Joyce v. Office of Architect of Capitol*, No. 12-1837(JEB), 2013 WL 4758186, at *7 (D.D.C. Sept. 5, 2013).

A plaintiff suffers a constructive discharge when an employer deliberately denies the plaintiff a reasonable accommodation, and the employer knows that the denial will make the plaintiff's working conditions so intolerable that the plaintiff will be forced to resign.  *Floyd v. Office of Representative Sheila Jackson Lee*, No. 11-1228(RC), 2013 WL 5429265, at *15 (D.D.C. Sept. 30, 2013).  However, an employee's resignation or retirement, when the only other available option for the employee is removal by the employer for-cause, does not qualify as constructive discharge.  *Keyes v. District Of Columbia*, 372 F.3d 434, 439–40 (D.C. Cir. 2004) (explaining that when faced with the choice of retirement or for-cause termination, choosing retirement is a difficult choice for the employee, but not an involuntary choice).

The Court need not resolve this difficult issue because, even if it assumes without deciding that Ms. Doak was constructively discharged and therefore suffered an adverse employment action on September 30, 2010, as set forth above, Ms. Doak has not provided sufficient evidence for a reasonable jury to find that the Department's asserted non-discriminatory reason was not the actual reason and that it intentionally discriminated against her.  Therefore, to the extent there is any dispute on this issue, it is ultimately immaterial to the outcome of this case.

record shows that from January to July of 2010, Ms. Doak missed over 50 percent of her work hours, and from July 2010 to October 2010, missed over 40 percent of her work hours. *See id.* at 1; Def.'s Ex. 34 ¶ 6.  Despite being issued memoranda in January, a reprimand in February, another memorandum in May, and several emails from supervisors in June and July all regarding her poor attendance, Ms. Doak continued to have problems showing up to work on time—or even at all.

      The Department also explained that Ms. Doak's absences had negative effects on her team, and caused the team projects she worked on to suffer.  As Mr. Souther noted in his Notice of Decision on Proposed Removal, Ms. Doak's "frequent unscheduled absences prevent[ed] [her] from participating in program meetings and other work group collaboration essential to full performance, creating an undue hardship on co-workers required to perform these responsibilities on her behalf."  Def.'s Ex. 34 ¶ 3, ECF No. 14-26.  In addition, frequent absences caused her co-workers to lose time on their assignments, and also caused her to miss the training required of her position.  *Id.*  The repeated absences, and the deleterious effect they had on her team at the Coast Guard, therefore served as legitimate reasons for terminating Ms. Doak that are distinct from her disability.

      Ms. Doak has provided no evidence to the contrary indicating that this reason was pretextual and that discrimination because of her disability was the real reason.  She does not dispute that she had an attendance problem, but instead argues that her "absences were due to Defendant's failure to accommodate her" by failing to allow her to come in later in the day and alter her work schedule.  Pl.'s Opp'n Mot. 14–15, ECF No. 17.  But her failure to accommodate claim is a separate claim that is addressed below.  Ms. Doak has presented no evidence that her supervisors discriminated against her because of her disability or harbored any animus against

18

disabled individuals.  Ms. Doak therefore failed to "produce[] sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason" for terminating her.  *See Brady*, 520 F.3d at 494.

### 2. Reasonable Accommodations

Ms. Doak next asserts that the Department discriminated against her by failing to reasonably accommodate her disability.  To establish a prima facie case of discrimination based on the failure to accommodate under the Rehabilitation Act, a plaintiff must proffer evidence from which a reasonable fact-finder could find that (1) she had a qualifying disability within the meaning of the statute, (2) her employer had notice of the disability, (3) with reasonable accommodation, she could perform the essential functions of the position, and (4) she requested an accommodation but the employer denied her request.  *See Graffius v. Shinseki*, 672 F. Supp. 2d 119, 125 (D.D.C. 2009) (citing *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 19 (D.D.C. 2002)).  In the D.C. Circuit, failure to accommodate claims are not subject to the *McDonnell Douglas* burden-shifting framework.  *See Aka*, 156 F.3d at 1288 (explaining that the plaintiff's "reasonable-accommodation claim . . . is not subject to analysis under *McDonnell-Douglas*, but has its own specialized legal standards");  *accord Graffius*, 672 F. Supp. 2d at 125 n.8.

### a. Accommodations made in the workplace

The D.C. Circuit has explained that "an employer is not required to provide an employee that accommodation he requests or prefers, the employer need only provide some reasonable accommodation."  *Aka*, 156 F.3d at 1305 (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996)).  The regulations governing accommodations under the ADA, and in turn, the Rehabilitation Act, define reasonable accommodations as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is

customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). A "qualified individual" under the Rehabilitation Act is one who "satisfies the requisite skill, experience, education, and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m).

In this case, Ms. Doak's doctor, Dr. Berbano recommended that six accommodations be made regarding Ms. Doak's disabilities of migraines, sleep apnea, depressive disorder, and hypothyroidism: (1) telecommuting from home, (2) full-spectrum light for her work space, (3) anti-glare computer screen, (4) work in an area less subject to cold air currents,[17] (5) adjustment of work schedule to 11 a.m. to 7 p.m., (6) consideration of optional weekend hours. *See* Def.'s Ex. 16, ECF No. 16-5. Dr. Schwartz, the Coast Guard doctor who reviewed Dr. Berbano's suggestions recommended that Mr. Cohen grant the following accommodations to Ms. Doak: (1) the addition of fluorescent light filters to existing lights, (2) an anti-glare filter for the computer monitor, (3) use of sunglasses or anti-glare glasses, (4) noise-canceling headsets, and (5) a dark, private area for use when medically necessary. *See* Def.'s Ex. 17, ECF No. 16-6. The only requests she did not recommend were the adjusted work schedule hours and telecommuting, which she did not view as medically supported. *See* Schwartz Dep. at 12:12–13:14, ECF No. 16-15.

---

[17]     It is not clear from the record whether this accommodation was ever granted. Dr. Schwartz did not recommend this to Mr. Cohen, and Mr. Cohen did not include this accommodation in his May 6, 2010 letter to Ms. Doak. However, it seems that Ms. Doak rejected Mr. Cohen's cubicle move suggestion because there was an air vent above the new cubicle that would have put cold air directly on her head. *See* Doak Dep. at 138:24–25, 139:1. Thus, her decision to remain at her regular cubicle appeared to cure the problem. Regardless, neither party suggests that the failure to resolve an air current issue is what caused Ms. Doak's excessive tardiness and absenteeism.

Mr. Cohen immediately implemented all of Dr. Schwartz's suggestions. The email correspondence on the record shows that Mr. Cohen worked diligently to ensure that Ms. Doak had an accommodated work space immediately. *See, e.g.*, Cohen Dep. 22:9-14, ECF No. 14-2. ("The goal was always to get Edna back to work, so I provided everything in this April 28, 2010 [Dr. Schwartz] memo as best as I could."). For instance, on May 5, 2010, Mr. Cohen contacted a Facilities Specialist to request that three overhead lights be turned off above Ms. Doak's cubicle. *See* Def.'s Ex. 21, ECF No. 14-17. His May 6, 2010 letter to Ms. Doak also explained that he provided Ms. Doak with an anti-glare device for her computer and noise-cancelling headsets, allowed her to wear sunglasses in the office, and provided her a dark, private area for use when medically necessary. *See* Def.'s Ex. 19 ¶ 3, ECF No. 16-7. When Ms. Doak expressed dissatisfaction with her cubicle location, Mr. Cohen offered to move her to a different cubicle, "farther from the bright glare of the windows," which Ms. Doak did not accept, explaining that she needed to check with the union first. *Id.* ¶3.d. Though the Department did not ultimately implement every accommodation requested by Ms. Doak, it did make reasonable accommodations, which is all the law requires it to do. *See Aka*, 156 F.3d at 1305.

### b. Modified work schedule

Ms. Doak takes issue with the fact that the Department "denied [her] requests to telework,[18] arrive at a later start time of 11:00 a.m., and to work optional weekend hours" to make up any lost time during the week. *See* Pl.'s Opp'n Mot. 12. The ADA, and in turn, the Rehabilitation Act defines "reasonable accommodation" to include "part-time or modified work

---

[18]      The Department also explained, and it is clear from the record that Ms. Doak never made an appropriate, formal request to telework. *See* Def.'s Resp. to Interrogatory 2 at 2–3, ECF No. 16-1 ("Plaintiff never made an appropriate, formal request to telework in the manner required of all employees . . . [t]hus, because Plaintiff never submitted a formal request, there was no request to deny.").

schedules." 42 U.S.C. § 12111(9)(B).  Indeed, the D.C. Circuit has explained that section 501 of

the Rehabilitation Act "requires an agency to consider work at home . . . as [a] potential form[]

of accommodation." *Carr v. Reno*, 23 F.3d 525, 530 (D.C. Cir 1994);  *see also Langon v. HHS*,

959 F.2d 1053, 1060–61 (D.C. Cir. 1992);  *McNair v. District of Columbia*, No. 12-248(JEB),

2014 WL 242913, at *4 (D.D.C. Jan. 23, 2014) ("It is true that an employer must consider

telecommuting as a potential form of reasonable accommodation.").

As courts in this jurisdiction have explained, the modified work schedule as a reasonable

accommodation analysis generally turns on the nature of the position for which the employee is

requesting the accommodation.  For instance, in *Carr v. Reno*, the plaintiff requested, *inter alia*,

a flexible arrival time to work, because she had an ear disability that caused her periodic

dizziness, nausea, and vomiting, and that made it difficult for her to make it into work at her

scheduled 8:00 a.m. arrival time.  23 F.3d at 527, 529, 531.  Her employer denied that request

because of a daily 4:00 p.m. deadline that the employer had to make, that it would not be able to

if Ms. Carr could not arrive to work at 8:00 a.m. each day and work a full eight-hour shift.  *Id.* at

530.  The court held that "to require an employer to accept an open-ended 'work when able'

schedule for a time-sensitive job would stretch 'reasonable accommodation' to absurd

proportions and imperil the effectiveness of the employer's public enterprise."  *Id.* at 531.  The

daily deadline, in other words, was the critical element of her position that rendered the

employee's proposed accommodation of a flexible work time unfeasible.  *See Breen v. Dep't of

Transp.*, 282 F.3d 839, 843 (D.C. Cir. 2002).

In contrast, in *Langon*, the plaintiff, who suffered from multiple sclerosis, requested that

she be allowed to perform her job as a computer programmer at home.  *See Langon*, 959 F.2d at

1054–55.  The court found that summary judgment for the employer was inappropriate because

22

there was a genuine dispute of material fact as to whether the plaintiff could have performed the essential functions of her job—computer programming—at home. *See id.* at 1061.  Similarly in *Breen*, the court found summary judgment for the employer inappropriate because there was no "critical element" to the plaintiff's position that made her proposed alternative work schedule, which included an "hour of quiet time after business hours to do solid filing," incompatible with the essential functions of her position as a file clerk.  282 F.3d at 840, 843.

Lower courts have interpreted *Langon, Carr,* and *Breen* as establishing a dichotomy wherein a specific and well-defined accommodation is deemed reasonable, and an erratic and unpredictable accommodation, such as an open-ended "work whenever you want schedule" is unreasonable as a matter of law.  *See, e.g., Solomon v. Vilsack*, 845 F. Supp. 2d 61, 71 (D.D.C. 2012) ("D.C. Circuit precedent makes clear that an employee's request to work whenever he or she wants is unreasonable as a matter of law.  On the other hand, specific and well-defined accommodations are not unreasonable." (internal quotation marks and citations omitted)); *Scarborough*, 190 F. Supp. 2d at 26 n.21 (explaining that a request "to work only on the infrequent and unpredictable occasions" that the plaintiff felt able "was nothing like the specific and well-defined accommodations at issue in *Langon* and *Breen*, and thus was not reasonable").  Other courts have also agreed with this legal proposition.  *See Fisher v. Vizioncore, Inc.*, 429 F. App'x 613, 616 (7th Cir. 2011) (noting that "an open-ended schedule with the privilege to miss workdays frequently and without notice" is not reasonable as a matter of law); *E.E.O.C. v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 949 (7th Cir. 2001) (explaining that "the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability") (quoting *Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999)).

For instance, in *Scarborough v. Natsios*, the court found that the plaintiff's request for leave without pay anytime that he was unable to report to work because of his chronic flu-like symptoms was unreasonable as a matter of law. 190 F. Supp. 2d at 25. The court elaborated that the plaintiff's request that he be granted leave "in an erratic, unpredictable manner—whenever [the] plaintiff felt he needed to miss work"— was unreasonable as a matter of law, citing *Carr*. *Id.* The court similarly found such a "work whenever the employee wants" schedule request unreasonable as a matter of law in *Solomon v. Vilsack*, 845 F. Supp. 2d at 72–73. In that case, the plaintiff Ms. Solomon's ordinary working schedule was 7:30 a.m. to 6:00 p.m., four days a week, with Wednesdays off. *Id.* at 67. She requested a flexible schedule generally, and asked her employer if she could take it "day-by-day" because she was experiencing difficulty working her scheduled hours in light of her disability that included various mental health disorders. *Id.* at 72. The court found that because "she did not seek to shift her schedule in this matter on any predictable or regular basis," her request was really a request for "an open-ended schedule." *Id.* As such, it was unreasonable as a matter of law. *Id.* at 73.

Like the requests made by the plaintiffs in *Solomon* and *Scarborough*, Ms. Doak's request falls into the camp of the open-ended "work whenever you want" schedule that is unreasonable as a matter of law. In her initial April 2010 request for accommodations, Ms. Doak requested to be able to telework, to be given an adjusted schedule of 11:00 a.m. to 7:00 p.m., and to be allowed to make up missed hours on the weekend. *See* Def.'s Ex. 16. Though the alternative hours request was specific enough, in Ms. Doak's case, it was neither predictable nor an achievable reality. From April 2010 until she was notified of her removal in September 2010, Ms. Doak's attendance record was all over the place. Mr. Souther's Notice of Proposed Removal of Ms. Doak dated August 9, 2010 illustrates this. *See generally* Def.'s Ex. 32. For

instance, Ms. Doak was AWOL for the entire day on May 10, May 11, and May 20, and August

2, 2010. *Id.* She was AWOL for half the day or more on May 18, May 19, June 1, June 28, July

8, July 9, July 16, and July 21, 2010. *Id.* She also had hours in AWOL status (ranging from 15

minutes to 3 ¾ hours) on thirty-two (32) other work days between May and August 2010. *See*

*id.; see also* Ex. 28, ECF No. 16-11 (listing all the dates in 2010 that Ms. Doak was absent or

late and the reasons why).[19]

Moreover, it is undisputed that Ms. Doak's schedule was unpredictable. Ms. Doak

herself testified that her arrival time to work was inconsistent, regardless of the start time she

requested, *see* Doak Dep. 51–52, and that sometimes she would arrive to work as late as 2:00

p.m. *Id.* at 51:21–22. Ms. Doak also stated that sometimes she was "knocked out" for the entire

day and not able to get up or come into work at all, let alone late. Doak Dep. at 51:16–17. In

addition, the Department explained that Ms. Doak's inconsistent work schedule made it difficult

---

[19] Ms. Doak includes her biweekly pay statements as an exhibit to her brief. *See* Pl.'s Ex. 9, ECF No. 17-1. Without pointing to relevant pages or directing the Court to anything in particular about these statements, it is difficult for the Court to decipher their purpose, or whether they create any dispute of material fact as to her AWOL hours. The court need not engage in a fishing expedition looking itself for a genuine issue of material fact. *See Potter v. District of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009) (Williams, J., concurring) (explaining that Local Rule 7(h)'s requirement that an opposition to a summary judgment motion be accompanied by a separate concise statement of genuine issues setting forth all material facts that includes references to parts of the record relied on to support the statement "embodies the thought that judges 'are not like pigs, hunting for truffles buried in briefs' or the record") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). That being said, the Court notes that the Department's records regarding Ms. Doak's time in AWOL status are corroborated by Ms. Doak's pay statements. For instance, in the pay period from May 9, 2010 to May 22, 2010, Ms. Doak's pay statement reflects that she was in AWOL status for 8 hours on May 10, May 11, and May 22, 2010.
    Moreover, in her deposition, Ms. Doak repeatedly stated that the Department's numbers regarding her AWOL status were "inaccurate." *See* Doak Dep. at 252–253. However, Ms. Doak's pay statements generally reflect large periods of absences throughout 2010, and Ms. Doak herself never performed an independent analysis to see if the Department's numbers were correct. *See id.* at 253:23–24. Because the plaintiff has not pointed to anything on the record to create a genuine issue of material fact, the Court considers the facts regarding her hours undisputed.

to try to accommodate her. *See* Souther Dep. at 41 ("Based on the information I had . . . there were days [Ms. Doak] didn't come to work at all, there were days she came in at 2:00 or 2:30, there were days she was in by 11:00, there were days she was in by 9:00 . . . ."); Pennington Dep. at 17–18 ("Ms. Doak had unpredictable episodes of pain that required medication that had serious side effects, and because both the episodes were unpredictable and the side effects of the medications were incapacitations, that a fixed work schedule was not possible because of the unpredictability of her unstable medical condition."); Pennington Mem., Def.'s Ex. 26, ECF No. 16-10 ("Dr. Berbano indicated that Ms. Doak has a condition that causes her to be 'incapacitated due to the pain.' Additionally, the treatment for these incapacitating episodes completely incapacitate[s] her. These medical episodes are unpredictable and unless they are stabilized Ms. Doak will not be able to work a predictable work schedule."). In the end, Ms. Doak's requested work accommodation was an unpredictable, flexible schedule that allowed her to come into work whenever she could make it. This was unreasonable as a matter of law. *See Solomon*, 845 F. Supp. 2d at 71–73; *Scarborough*, 190 F. Supp. 2d at 25–26. Making it to work regularly is an essential function of the job that Ms. Doak could not muster even with the requested accommodation.[20]

---

[20] Ms. Doak also argues that the Department failed to accommodate her because it failed to take part in the interactive process. *See* Compl. ¶ 28. There is no independent cause of action for failure to engage in the interactive process—under the ADA, and in turn, the Rehabilitation Act, there is only a cause of action for failure to accommodate generally. *See McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 100–01 (2d Cir. 2009) ("failure to engage in an interactive process does not form the basis of an ADA [and in turn, a Rehabilitation Act], claim in the absence of evidence that accommodation was possible"); *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 951–52 (8th Cir. 1999) (explaining that many circuits hold that "an employer cannot be held independently liable under the ADA [and in turn, the Rehabilitation Act], for simply failing to engage in an interactive process to determine reasonable accommodations" and holding that "there is no per se liability under the ADA if an employer fails to engage in an interactive process"). The analysis for the failure to accommodate claim is set forth above.

26

Moreover, Ms. Doak's physical presence was required at work, making telecommuting in addition to, or instead of, a modified hourly schedule, an unreasonable accommodation. The reasonable accommodation analysis established by *Carr*, *Langon*, and *Breen* and their progeny turns, to a degree, on whether the plaintiff's physical presence at work was an essential function of her job.[21] Most recently, this Court has explained that "the few cases that touch on this precise subject suggest that if the job in question requires that an employee be present—that is, the employee can perform the essential function of her job only by being in the office—the employer need not grant a telecommuting request." *See McNair*, 2014 WL 242913, at *4. In *McNair*, the court concluded that the employer did not need to provide the plaintiff's accommodations because the essential functions of her job could only be completed from her employer's physical headquarters. *Id.* at *5–6.

In this case, the Department explained that Ms. Doak's need to work with her team made an adjusted work schedule or telework impracticable. Ms. Doak's colleagues arrived at work anytime between 6:00 a.m. and 8:00 a.m., *see* Souther Dep. at 28–31, and conducted meetings,[22]

---

[21]    While courts generally hold that regular work attendance is an essential function of a job, *see, e.g.*, *Carr*, 23 F.3d at 529 (explaining that "coming to work regularly" was an essential function of the job); *Valle-Arce v. Puerto Rico Ports Auth.*, 651 F.3d 190, 200 (1st Cir. 2011) ("[a]t the risk of stating the obvious, attendance is an essential function of any job" (citations omitted)); *Rosell v. Kelliher*, 468 F. Supp. 2d 39, 45–46 (D.D.C. 2006) ("One of the most fundamental requirements of any position is reporting for work."), courts do not hold that, *as a matter of law*, physical presence is required in order "to fulfill this essential function of attendance." *Valle-Arce*, 651 F.3d at 200; *McMillan v. City of New York*, 711 F.3d 120, 126–27 (2d Cir. 2013) ("Physical presence at or by a specific time is not, as a matter of law, an essential function of all employment."). Rather, the analysis is whether the plaintiff's physical presence was required during specific business hours because of the nature of the position, and therefore whether the plaintiff's requested accommodation of flexible start times would have impaired an essential function of the job. *Id.* at 127.

[22]    The record is unclear as to the exact start times of these meetings, but it is clear they occurred in the morning. It appears that in May 2010, Ken King, a new manager took over Ms. Doak's division and implemented morning meeting times instead of afternoon meeting times. *See* Doak Dep. at 143–144, 238.

and had regular team interactions that required a physical presence in the building.  Ms. Doak's job description included attending spontaneous meetings with program managers that "often requires attendees to review the same documentation at the same time" and, as the Department explained, having an off-site employee look at that document "compromise[d] the efficiency with which this work can be performed."  *See* Def.'s Resp. to Interrogatory 3, Def.'s Resp. to Interrogatory 5, ECF No. 16-1.  The Department also explained that the USCG Acquisitions Program often worked on short deadlines and the "pace of work / operations can sometimes be too fast for anything other than on-site presence."  Def.'s Resp. to Interrogatory 5.  In addition, the Coast Guard's Acquisition Directorate explained that "[w]ork must be performed between the hours of 0600-0800, with all CG-9 employees/members present during the core hours of 0930-1030 and 1330-1430."  Def.'s Ex. 7 ¶ 7(a)(1).  Ms. Doak's late arrival substantially diminished the amount of time she would be able to partake in these daily, much-needed interactions with her teammates, and prevented her from being present during core hours.  For instance, if she arrived at 11:00 a.m., she would have anywhere between three and five fewer hours per day to interact with her colleagues on projects—her colleagues who arrived to work at 6:00 a.m. would be gone by 2:30 p.m. or 3:30 p.m. (depending on whether they were on a nine-hour or eight-hour shift, with thirty minutes for lunch).  *See* Souther Dep. at 29;  *see also* Def.'s Statement Undisputed Facts ¶ 43; Def.'s Ex. 19 ¶ 4 (explaining that "you will not be able to meet those obligations [of interacting daily and frequently with the project staff] with a work schedule that does not have you arrive until 1100 daily and therefore would place the project and resource office in a hardship position by requiring personnel from other projects to attend these meetings on the behalf of the resource office.").  Thus, Ms. Doak's request for telecommuting was not a

reasonable request because her physical presence at the office was required for more than the few hours per day, if at all, that she was making it in.

Even if Ms. Doak's physical presence at work was not required, however, Ms. Doak was still not able to telework effectively because her disability incapacitated her regardless of where she was, and thus she could not perform the essential function of her job even with an accommodation.  Even if she had been granted the accommodation of teleworking or weekend hours, she still would not have been able to perform any work if a migraine struck.  *See, e.g.,* Def.'s Ex. 25, Dr. Berbano Mem. ("Ms. Doak suffers from periodic migraines.  When she experiences acute onset of a migraine, she is incapacitated due to the pain and cannot concentrate on the tasks at hand, *whether at her job or at home* performing routine activities of daily living . . . .") (emphasis added);  Doak Dep. at 145:3-14 (explaining that she would "likely not" be able to work *either at home or at the office* when she was suffering from a migraine) (emphasis added).  Thus, whether she was working in the office or from home, she still required a "work when I can" schedule that is unreasonable as a matter of law.[23]

In sum, the Department implemented all the reasonable office accommodations Ms. Doak requested because of her disability, and only denied Ms. Doak's requests for telework and a modified schedule because they were unreasonable as a matter of law.  The Department therefore reasonably accommodated Ms. Doak and did not discriminate against her on the basis of her disability.

---

[23]     Importantly, Ms. Doak's unpredictable incapacitation was not limited to the morning.  For instance, when Ms. Doak attended an office holiday party on December 18, 2009, she arrived to the party around 2:00 p.m. (after calling in sick that day).  *See* Def.'s Ex. 20, Resp. to Interrogatory No. 21, ECF No. 14-16.  Forty-five minutes after she arrived, her migraine returned and she had to take a nap, which she did in "the Chiefs' Mess" until 8:00 p.m.  *Id.*

### D. Retaliation

Ms. Doak's final claim is that the Department retaliated against her by deciding to terminate her in response to her request for reasonable accommodations. *See* Compl. ¶ 30.  The ADA, and in turn, the Rehabilitation Act, also contains an anti-retaliation provision.  *See Mogenhan*, 613 F.3d at 1165 (quoting 29 U.S.C. § 794(d)).  The elements of retaliation and discrimination claims are the same under Title VII and the Rehabilitation Act.  *Id.*; *see also Munro v. LaHood*, 839 F. Supp. 2d 354, 360 (D.D.C. 2012).  As such, retaliation claims are also governed by the *McDonnell Douglas* burden-shifting framework.  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  To establish a prima facie case of retaliation, which is the first step in the burden-shifting analysis, the plaintiff must show "(1) that [s]he engaged in [a] statutorily protected activity; (2) that [s]he suffered a materially adverse action by h[er] employer; and (3) that a causal link connects the two."  *Id.; see also Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009).  Though discrimination and retaliation claims are similarly analyzed, the D.C. Circuit has explained one difference in the elements: that "'[a]dverse actions' in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2009).  This is because, "[r]etaliation claims are 'not limited to discriminatory actions that affect the terms and conditions of employment' and may extend to harms that are not workplace-related or employment-related so long as 'a reasonable employee would have found the challenged action materially adverse.'"  *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 68 (2006)).  The D.C. Circuit has since elaborated that "materially adverse action" in the retaliation context "means [that] it well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination." *Mogenhan*, 613 F.3d at 1166 (quoting *Burlington N.*, 548 U.S. at 68); *accord*

*Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010).

"[Once] the plaintiff establishes a prima facie case, the burden shifts to the employer to

produce a legitimate, nondiscriminatory reason for its actions." *Jones*, 557 F.3d at 677 (internal

quotation marks and citation omitted). "If the employer does so, the burden-shifting framework

disappears, and a court . . . looks to whether a reasonable jury could infer . . . retaliation from all

the evidence, which includes not only the prima facie case but also the evidence the plaintiff

offers to attack the employer's proffered explanation for its action and other evidence of

retaliation." *Id.* (internal quotation marks omitted).

Ms. Doak argues that she has established a prima facie case of retaliation because she

"participated in protected activity by requesting accommodations," "suffered an adverse action

when she was forced to resign," and "there is a causal link between [her] requests for

accommodations from April 16, 2010 through July 16, 2010" and the Department's first step in

removing her in its proposed removal notice of August 9, 2010. *See* Pl.'s Opp'n Mot. 14. "A

plaintiff may satisfy [the causal link] . . . element of a prima facie case by showing 'the employer

had knowledge of the employee's protected activity, and . . . the adverse personnel action took

place shortly after that activity.'" *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006)

(quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)). The Court need not decide

whether there is sufficient temporal proximity here,[24] because once the employer proffers a

---

[24]     The D.C. Circuit has required "'positive evidence beyond mere proximity . . . to
defeat the presumption that the [employer's] proffered explanations are genuine.'" *Talavera v.
Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011) (quoting *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C.
Cir. 2007)). *See also Woodruff*, 482 F.3d at 530 ("If temporal proximity sufficed to rebut a
legitimate proffer, then protected activities would effectively grant employees a period of
immunity, during which no act, however egregious, would support summary judgment for the
employer in a subsequent retaliation claim.").

legitimate non-discriminatory reason for the adverse employment action, the prima facie case drops out and the ultimate issue is "whether a reasonable jury could infer retaliation from all the evidence." *Jones*, 557 F.3d at 677.

As set forth above, the Department's decision to remove Ms. Doak was due to her repeated absences, her failure to comply with leave procedures, and the effect of both on her team at the Coast Guard. Ms. Doak has not provided any evidence that this reason was pretextual and that the real reason for terminating her was retaliatory. Based on the fact that Ms. Doak missed nearly 50 percent of her work hours in 2010, no reasonable jury could conclude that chronic absenteeism and tardiness was not the real reason for Ms. Doak's termination and instead, that retaliatory animus was behind the Department's decision to terminate Ms. Doak's employment. As such, the Court must enter judgment for the Department on this claim.

## IV. CONCLUSION

For the foregoing reasons, the defendant's motion is GRANTED. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: February 10, 2014                          RUDOLPH CONTRERAS
                                                 United States District Judge