## ORAL ARGUMENT SCHEDULED MAY 8, 2015

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

### No. 14-5053

EDNA DOAK,                                                Appellant,

     v.

JEH JOHNSON, Secretary,
U.S. Department of Homeland Security,                     Appellee.

### BRIEF FOR APPELLEE
_____

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA
_____

RONALD C. MACHEN JR.,
United States Attorney.

R. CRAIG LAWRENCE,
JOHN C. TRUONG,
Assistant United States Attorneys.

555 Fourth Street, N.W.
Civil Division
Washington, D.C. 20530
(202) 252-2524

(C.A. No. 12-1177)

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

### Parties

The Appellant is Edna Doak, who was the Plaintiff in the District Court. The Appellee is Jeh Johnson, Secretary, United States Department of Homeland Security, in his official capacity, who was the Defendant in the District Court. There is no amicus curiae.

### Ruling Under Review

At issue in this appeal is the February 10, 2014 Order and Memorandum Opinion by the Honorable Rudolph Contreras, granting the Secretary's Motion for Summary Judgment. JA 372-403.

### Related Cases

This case has not previously been before this Court, and there are currently no pending related cases.

# **TABLE OF CONTENTS**

STATEMENT OF JURISDICTION…………………………………………….1

COUNTERSTATEMENT OF ISSUES…………………………………………1

COUNTERSTATEMENT OF THE CASE……………………………………..2

COUNTERSTATEMENT OF THE FACTS……………………………………3

    I.      DOAK'S RESPONSIBILITIES AT THE COAST GUARD………..4

    II.    DOAK's ABSENCES AND IRREGULAR ATTENDANCE AT
          WORK………..………………………………………………..............5

          A.    Doak Was Granted Family and Medical Leave Act
                Protection Following Car Accident in June 2009……………...5

          B.    Attempts at Progressive Discipline to Address Doak's
                Attendance Issues……………………….………………………6

    III.   DOAK SUBMITTED REQUESTS FOR WORKPLACE
          ACCOMMODATIONS IN APRIL 2010 AND JULY 2010…………8

          A.    First Request for Accommodation in April 2010……………...9

          B.    Cohen Granted Every Workplace Accommodation
                Recommended by Medical Review Office…………………...11

          C.    Doak's Ongoing Attendance Problems………………………13

          D.    Revised Request for Accommodation in July 2010………….15

          E.    Doak Subsequently Agreed to 9 AM Start Time, But
                Attendance Issues Persist……………………………………..16

          F.    Doak's Failure to Complete Mandatory Trainings…………...17

    III.   PROPOSED REMOVAL AND AGREEMENT TO PERMIT
          DOAK's RETIREMENT IN LIEU OF REMOVAL………………..18

A.     Notice of Proposed Removal and Doak's Response…………18

B.     Notice of Decision on Proposed Removal……………………20

C.     Doak Contacted EEO Officer in October 2010, And The  Coast Guard Agreed to Permit Her Retirement in Lieu of Removal……………………………………………………………22

IV.    THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT……………………………………………………...24

SUMMARY OF THE ARGUMENT…………………………………………..26

ARGUMENT……………………………………………………………...30

I.     STANDARD OF REVIEW……………………………………30

II.    DOAK FAILED TO TIMELY EXHAUST CERTAIN CLAIMS…………………………………………………………...31

III.   DOAK WAIVED HER DISCRIMINATION CLAIM ON APPEAL……………………………………………………...33

IV.    THECOASTGUARD PROVIDED DOAK WITH  REASONABLE ACCOMMODATION SUPPORTED BY     MEDCIAL REASONS…………………………………………………………...34

A.     Statutory Framework – Rehabilitation Act……………33

B.     The Coast Guard Reasonably Accommodated Doak…36

C.     Doak's Job Required Her Physical Presence At Work At Specified Hours……………………………..40

D.     The Court's Ruling In *Solomon* Does Not Warrant Reversing The District Court's Grant of Summary Judgment Here……………………………………………48

V.    THE COAST GUARD HAD LEGITIMATE, NON-RETALIATORY REASONS FOR DECIDING TO FIRE DOAK DUE TO HER FREQUENT ABSENTEEISMS……..54

    A.    Retaliation Under The Rehabilitation Act……………..54

    B.    The Challenged Actions Were Based on Doak's Persistent Failure to Comply With Leave Policies and Repeated Instances of AWOL, and No Reasonable Jury Would Find That They Were Pretext for Retaliation……………………………………………..56

CONCLUSION…………………………………………………………...59

CERTIFICATE OF COMPLIANCE…………………………………………..60

CERTIFICATE OF SERVICE……………………………………………61

## TABLE OF AUTHORITIES
(Authorities chiefly relied upon are marked with asterisks)

### Federal Cases

*Abram v. Fulton County Gov't*,
-- Fed. Appx. --, 2015 WL 363944 (11th Cir. Jan. 25, 2015) .............................35

*Adeyemi v. District of Columbia*,
525 F.3d 1222 (D.C. Cir. 2008).....................................................................55

*\*Aka v. Wash. Hosp. Ctr.*,
156 F.3d 1284(D.C. Cir. 1998) ………………………………………30, 34, 36, 40

*Aliotta v Blair*,
614 F. 3d 556 (D.C. Cir. 2010).....................................................................56

*Brady v. Office of Sergeant at Arms*
520 F.3d 490 (D.C. Cir. 2008)............................................................... 55, 56

*Barth v. Gelb*,
2 F.3d 1180 (D.C. Cir. 1993)..........................................................................34

*Carr v. Reno*,
23 F.3d 525 (D.C. Cir. 1994)................................................................ 35, 52

*Czekalski v. Peters*,
475 F.3d 360 .................................................................................................30

*Desmond v. Mukasey*,
530 F.3d 944 (D.C. Cir. 2008).....................................................................50

*Doe v. District of Columbia*,
93 F.3d 861 (D.C.Cir.1996)..................................................................... 31, 33

*Fishbach v. Dist. of Columbia Dep't of Corrections*,
86 F.3d 1180 (D.C. Cir. 1996).......................................................................30

*Franklin-Mason v. Mabus*,
742 F. 3d 1051 (D.C. Cir. 2014)....................................................................56

*Guajacq v. EDF, Inc.*,
601 F.3d 565 (D.C. Cir. 2010).......................................................................54

*Jones v. Nationwide Life Ins. Co.*,
696 F. 3d 78 (1st Cir. 2012) .........................................................................51

*Keyes v. District of Columbia*,
372 F. 3d 434 (D.C. Cir. 2004).......................................................................56

*Koch v. White*,
744 F. 3d 162 (D.C. Cir. 2014).......................................................................32

*Langon v. U.S. Dep't of Health and Human Serv.*,
959 F. 2d 1053 (D.C. Cir. 1992).....................................................................40

*Mason v. Avaya Comm., Inc.*,
357 F. 3d 1114 (10th Cir. 2004) .......................................................... 30, 31, 46

*McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*
611 F. 3d 1, 4 (D.C. Cir. 2010)……………………………………………50
*McGrath v. Clinton*,
    666 F.3d 1377 (D.C. Cir. 2012)........................................................30
*Milton v. Weinberger*,
    696 F.2d 94 (D.C. Cir. 1982)..........................................................30
*Mogenhan v. Napolitano*,
    613 F.3d 1162 (D.C. Cir. 2010).......................................................54
*\*Mulloy v. Acushnet Co.*,
    460 F.3d  141 (1st Cir. 2006) .................................... 41, 43, 44, 45, 47
*Potter v. Dist. of Columbia*,
    558 F.3d 542 (D.C. Cir. 2009)........................................................30
*\*Samper v. Providence St. Vincent Medical Ctr.*,
    675 F. 3d 1233 (9th Cir. 2012)............................... 41, 44, 45, 46
*Sanchez v. Dall./Fort Worth Int'l Airport Bd.*,
    438 Fed. Appx. 343 (5th Cir. 2011) ................................................47
*Singletary v. District of Columbia*,
    351 F.3d 519 (D.C. Cir. 2003).................................................. 57, 58
*\*Solomon v. Vilsack*,
    763 F. 3d 1 (D.C. Cir. 2014)........ 28, 30, 34, 35, 36, 40, 41, 48, 49, 50, 52, 53, 56
*Spinelli v. Goss*,
    446 F.3d 159 (D.C. Cir. 2006)................................................. 31, 32
*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502 (1993) ............................................................. 55, 57
*Swanks v. Wash. Metro. Area Transit Auth.*,
    179 F.3d 929 (D.C. Cir. 1999)........................................................34
*Taylor v. Small*,
    350 F.3d 1286 (D.C. Cir. 2003).......................................................34
*Taylor v. Solis*,
    571 F.3d 1313 (D.C. Cir. 2009).......................................................54
*U.S. Dep't of State v. Coombs*
482 F. 3d 577, 581 (D.C. Cir. 2007)…………………………………………50
*Ward v. McDonald*,
    762 F.3d 24 (D.C. Cir. 2014)................................................. 34, 35

## Federal Statutes

28 U.S.C. § 1291 ...................................................................................1
29 U.S.C. § 705(20)(B) ........................................................................50
29 U.S.C. § 791 ...............................................................................1, 34
42 U.S.C. § 12111(8) ...........................................................................35
42 U.S.C. § 12112(b)(5)(A) .................................................................34

## Federal Rules

Fed. R. App. P. 4(a)(1)(B) ......................................................................1
Fed. R. Civ. P. 56(c) ............................................................................47
FRAP 32(a)(7)(C) ................................................................................60

## Federal Regulations

29 C.F.R. §1614.105(a)(1) ...................................................................32
29 C.F.R. §1630.9(a) ...........................................................................35

## RELEVANT STATUTORY PROVISIONS

### 29 U.S.C. § 791(f)
### (formerly 29 U.S.C. § 791(g))

The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204 and 12210), as such sections relate to employment.

### 29 U.S.C. § 794(a)

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such

regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

## 42 U.S.C. § 112112(b)(5)(A)

As used in subsection (a) of this section, the term "discriminate against a qualified individual on the basis of disability" includes—

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

## 42 U.S.C. § 12111(8)

(8) Qualified individual

The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

## 42 U.S.C. § 12111(9)

(9) Reasonable accommodation

The term "reasonable accommodation" may include—

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

## **GLOSSARY**

AWOL .................................................................................. Absent Without Leave

LWOP .................................................................................... Leave Without Pay

Secretary .............................................................Secretary of Homeland Security

Coast Guard…………………………………………..United States Coast Guard

Notice…………………………………………………Notice of Proposed Removal

Decision………………………………....Notice of Decision on Proposed Removal

## STATEMENT OF JURISDICTION

Doak asserted jurisdiction in the District Court exclusively under the Rehabilitation Act of 1973, codified at 29 U.S.C. § 791 *et seq*.  This Court has jurisdiction under 28 U.S.C. § 1291 because Doak filed a timely notice of appeal on March 5, 2014, from the entry of final judgment on February 10, 2014.  *See* R.21; Fed. R. App. P. 4(a)(1)(B).

## COUNTERSTATEMENT OF ISSUES

In the opinion of the Coast Guard, the following issues are presented:

1.     Whether the District Court properly dismissed Doak's disparate treatment claims and her failure to accommodate claims under the Rehabilitation Act because she failed to contact an EEO counselor within 45 days of the alleged unlawful act or, alternatively, because she failed to exhaust administrative remedies entirely when she did not cooperate with the EEO investigation.

2.     Even if Doak properly exhausted all her claim, whether she has waived her disparate treatment claims by not raising any challenge to the Distrit Court's analysis in her opening brief.

3.     Whether the District Court correctly held that the Coast Guard provided Doak with reasonable accommodations and, because her position required real-time interaction and physical presence at work during a specified

there, were essential functions, a request for telework, a later start time, and/or make-up weekend hours were unreasonable requests under the Rehabilitation Act.

4.    Whether Doak has failed to proffer evidence from which a reasonable jury could infer that the Coast Guard's decision to fire her was not because of her perpetual and irregular attendance but because of her having requested for accommodations.

## COUNTERSTATEMENT OF THE CASE

Doak, a GS-13 Management and Program Analyst, was employed by the United States Coast Guard, a component of the U.S. Department of Homeland Security, filed this action in July 2012, alleging disability discrimination and retaliation under the Rehabilitation Act in connection with her termination.  JA 5-9.  On September 24, 2012, the Coast Guard filed an Answer.  *See* JA 10-14.  After discovery, the Coast Guard moved for summary judgment on all claims.  *See* JA 15-16, R. 14.  Doak opposed the motion.  *See* R. 17, 18.

The District Court granted the Coast Guard's motion for summary judgment on February 10, 2014.  *See* JA 372-403.  Overall, the District Court found that Doak had failed to timely exhaust administrative remedies for all discrete acts occurring before August 22, 2010, 45 days before her initial EEO contact on October 6, 2010.  JA 385.  The District Court concluded that it lacked jurisdiction over claims arising before August 22, 2010.  JA 381-85.

2

Nonetheless, the District Court considered all of Doak's claims, including the untimely exhausted ones, and found in the Coast Guard's favor on the merits on all claims.  Reviewing the evidence in the light most favorable to Doak, the District Court addressed four items:   (1) Whether Doak timely exhausted administrative remedies for certain of her Rehabilitation Act claims; (2) Doak's claim that the Coast Guard violated the Rehabilitation Act by proposing to fire her because of her actual or perceived disability; (3) Doak's claim that the Coast Guard failed to provide her with reasonable accommodations by adjusting her work schedule, allowing her to telecommute and allowing her to work weekend hours to make up for time missed unpredictably during the week; and (4) Doak's claim that the Coast Guard retaliated against her by deciding to fire her after she requested for reasonable accommodations. *See* JA 385-403.  The District Court analyzed each claim under applicable law, and granted summary judgment in the Coast Guard's favor.

This appeal followed.

## COUNTERSTATEMENT OF THE FACTS

Doak claimed that the Coast Guard discriminated against her due to her disability and retaliated against her based on her protected activity under the Rehabilitation Act when her supervisors failed to provide her with reasonable accommodations and ultimately decided to fire her.

## I.    DOAK'S RESPONSIBILITIES AT THE COAST GUARD

Appellant Edna Doak was employed as a GS-13 Management Program Analyst with the Coast Guard.  JA 5-9 (¶ 6).  From November 2007 until October 2010, Doak worked in the Office of Acquisition Resources Management within the Acquisition Directorate.  JA 505; JA  93. Doak's first-line supervisor was Greg Cohen, Chief of the Business Management and Metrics group, and her second-line supervisor was Rory Souther, Chief of Acquisition Resources Management.  JA 506-07; JA 93.

Initially, Doak worked in the Air Program, but due to a conflict with a co-worker (JA 506), she complained to Cohen and requested a transfer. Cohen agreed and transferred her to the Surface Program in August 2009.  JA 506.  Doak viewed Cohen's granting her request as helpful to her.   JA 519.   Doak's day-to-day responsibilities were to support the Surface Program, which included monitoring the budget, preparing obligation plans, working with the program manager, preparing procurement requests, and meeting with the program manager and the support team to plan for the building of boats. JA 508.   Doak was required to attend frequent meetings with program and business managers, during which it was necessary for attendees to review the same documentation, including reviews of bulky files maintained by the contracting team.  JA 429-30 ( No. 5).

4

## II.     DOAK's ABSENCES AND IRREGULAR ATTENDANCE AT WORK

### A.     Doak Was Granted Family and Medical Leave Act Protection Following Car Accident in June 2009

On June 1, 2009, Doak was in a car accident, which caused her to be out of the office for about two weeks for medical treatment.  JA 523.  In August 2009, Doak submitted a medical certification for a serious health condition relating to the car accident to support her request for benefits under the Family and Medical Leave Act ("FMLA").  JA 440-43.  Before her FMLA leave, Doak's work schedule consisted of eight "nine-hour days" and one "eight-hour day," with one regular day off over a two-week pay period.  *See* JA 99-100; JA 104. The FMLA entitles an eligible employee to take up to 12 weeks of unpaid leave for specified family and medical reasons, including leave for "a serious health condition of the employee that makes the employee unable to perform the essential functions of his or her job."  JA 95-97.  An employee may use annual and/or sick leave in lieu of unpaid leave under the FMLA if consistent with current laws and OPM regulations for using annual and sick leave. JA 95-97.  The Coast Guard approved Doak's request for FMLA leave on September 3, 2009. JA 445.  Since  September  2009, Doak has been "granted 480 hours of FMLA (approximately 12 weeks) with the use of sick and annual, and leave without pay."  JA 132 (¶2).  Around late December 2009, Cohen met with Doak to discuss her inability to work "nine-hour days" and told her that she needed to monitor her leave balances because she was

5

using up her leave quickly. *See* JA 99-100. Cohen recommended that Doak return to an eight-hour work-day, and explained that he would reauthorize the nine-hour regular day off schedule once there was demonstrated improvement in her attendance. *See* JA 99-100; JA 515. Doak's start time was 8:15 AM, the latest start time of the approximately 20 staff members in Cohen's group. *See* JA 20; JA 84-85; JA 559.

### B. Attempts at Progressive Discipline to Address Doak's Attendance Issues

Doak was not on full-time duty status from August 2009 through January 2010because she was on leave under the FMLA. JA 99-100. Consequently, in January 2010, Cohen issued an "Employment Status" memorandum requesting that Doak return immediately to a full-time duty status and notifying her that her continued absences were having a negative impact on her work because her position required daily interactions with project, contracting, and resource staff and Doak had not completed required certifications and mandatory training. JA 120 (¶¶ 1-2). Specifically, Cohen advised Doak that from August 2009 to January 19, 2010, she had used 440.30 hours (approximately 11.5 weeks) of FMLA leave and had negative balances of 233 hours of sick leave and 35.15 hours of annual leave. JA 120 (¶ 3). Cohen stated that he could no longer approve advance leave, and that Doak was required to request leave without pay ("LWOP") for his approval along with supporting documentation for future absences. *Id.* Cohen reminded

6

Doak's need to request leave properly, and put her on notice that her failure to submit appropriate requests could result in disciplinary action. JA 120 (¶ 4); JA 124-25 (sick leave procedures). Finally, he asked that Doak inform him if she needed accommodations and encouraged her to use the Employee Assistance Program, if she felt that were appropriate. JA 120 (¶¶ 5-6).

Less than one week later, Doak was absent without leave ("AWOL") for three and one-half hours. JA 128 (¶ 1). Cohen reiterated that he could no longer approve advance sick or annual leave. JA 128 (¶ 2). Finally, Cohen reminded Doak of leave request procedure and asked her to let him know if she suffered from a medical condition that required an accommodation. JA 128 (¶¶ 3-4). Doak acknowledged that the -237:45 hours of sick leave was a large negative balance, and that her supervisor likely was frustrated by her absences and negative leave balances. JA 532.

On February 22, 2010, Cohen officially reprimanded Doak for being AWOL for three and one-half hours on January 25, 2010, and for more than four hours on January 26, 2010, and for failing to comply with leave request procedures. JA 131-34 (¶ 1). Doak did not request leave in advance on either day, but instead left a message for Cohen a couple hours after her work day started stating that she had just woken up. JA 131-34 (¶ 1). Cohen again lamented Doak's inability to

7

adequately support her project and to complete mandatory training.  JA 131-34 ( ¶ 4).

Doak sought the union's assistance and and the Coast Guard agreed to hold the letter of reprimand in abeyance so that Doak could provide acceptable medical documentation to support (1) absences unrelated to FMLA leave; (2) AWOL absences on January 25 and 26, 2010; and (3) pending or outstanding leave requests related to medical issues or doctor's appointments.  JA 136.  On March 9, 2010, Doak submitted a memorandum to Cohen telling him that she was separately submitting three medical letters directly to the Coast Guard's medical review officers.  JA. 447.  Based on the medical officers' report that the documentation failed to support Doak's absences, or indicate whether she had medical conditions that required accommodations, Cohen issued a "Request for Medical Documentation" on March 24, 2010, and directed that Doak provide medical information to Starlisha King Anderson, a HR specialist, by April 9, 2010.  JA 138 (¶¶ 2-3).

## III.   DOAK SUBMITTED REQUESTS FOR WORKPLACE ACCOMMODATIONS IN APRIL 2010 AND JULY 2010

The Coast Guard's Division of Operational Medicine and Medical Readiness reviewed requests for accommodations made by civilian employees.  JA 483; JA 495-96.   HR forwarded accommodation requests and supporting documents directly to the Division's physicians (also called "medical review officers") to

8

determine whether the requested accommodations were medically justified.  JA 33-34; JA 483-84; JA 495-96.

### A.     First Request for Accommodation in April 2010

In April 2010, Doak submitted to Human Resources her first request for workplace accommodation.  JA 542.  In an April 16, 2010 letter, Doak's treating physician, Dr. Elizabeth Berbano, indicated that Doak had been diagnosed with major depressive disorder, migraines, hypothyroidism (and hyperthyroidism), and obstructive sleep apnea. JA 499-5.  Doak had these conditions since 1993.  JA 247. Due to a car accident in June 2009, she suffered head trauma and began suffering from migraines.  JA 246 (¶6), JA 449 (¶3).  As a result of her migraine condition, Dr. Berbano recommended that Doak be granted certain accommodations: (1) telecommuting; (2) full-spectrum lighting for her workspace; (3) anti-glare computer screen; (4) work in an area not subjected to cold air currents; (5) an adjusted work schedule from 11 AM to 7 PM; and (6) permission to work weekend work hours to make up for missed weekday hours.  JA 449-51 (¶ 7).

Dr. Berbano noted that when Doak took medications for her migraine the side effects would cause her to be drowsy and inhibit her ability to concentrate.  JA 449-52 (¶ 4); JA 475.  Dr. Berbano also explained that she was titrating Doak's medicine to facilitate a more normal sleep-wake cycle for Doak.  JA 449-52 (¶ 5). Dr. Berbano's recommendation of an 11 AM to 7 PM schedule was based on

Doak's report of her optimal time to work, just as her recommendation of weekend work hours was also based on Doak's suggestion.  JA 477-78.  As Dr. Berbano testified, when Doak suffered a migraine, she could be incapacitated for an indeterminate number of hours, whether at home or at work, and thus be unable to work for an entire day. JA 475; *see also* JA 539, 560-61.

Dr. Erica Schwartz, a board certified occupational medicine physician in the Division of Operational Medicine, evaluated Dr. Berbano's April 2010 letter and consulted with the DOL's Job Accommodation Network in order to determine which of the requested accommodations were reasonable.  JA 497-98.  Based on her assessment, Dr. Schwartz recommended the following accommodations to be provided: (1) adding fluorescent light filters to existing lights, a change in lighting, or a move to a private area to allow for personal lighting adjustment; (2) an anti-glare filter for the computer monitor; (3) use of sunglasses or anti-glare glasses; (4) noise-canceling headsets; and (5) a dark, private area for use when medically necessary.  JA 453; JA 497-99.  Dr. Schwartz viewed the requests for telework, the 11 AM to 7 PM schedule, and make-up weekend work hours to be medically unsupported and did not address them in her April 28, 2010, memorandum.  *See* JA 497-98. (". . . I did not understand why Ms. Doak could not take her medications earlier and come in on time.  It didn't make sense to me medically.").

### B.  Cohen Granted Every Workplace Accommodation Recommended by Medical Review Office

At the time Cohen considered Doak's accommodation request, he did not have Doak's supporting medical documentation because she had submitted the materials directly to Human Resources basedon her privacy concerns.  JA 48, 62-63 JA 536; JA 77-78.  Cohen's understanding of Doak's medical condition was limited to his knowledge that she had been in a car accident and that she suffered from migraines.  JA 48-49; JA 529.  Although supervisors were not required to follow the recommendations of medical review officers, Doak's supervisors nevertheless adopted recommendations from the medical review officers because they "have the medical education the same as any other doctor, so they were the only ones in a position to assess" materials from Doak's physician.  JA 77; *see also* JA 62-63, 69.  Cohen also relied on Anderson's guidance, the HR specialist, who assisted him with drafting the response to Doak's request for accommodations.  JA 35-37.

In helping Cohen, Anderson considered pertinent Coast Guard policies.  *See* JA 35-37.  Specifically, the Acquisition Directorate's Standard Operating Procedure #1 establishes policies for alternate work schedules for all Directorate staff.  JA 102-07.  Under SOP #1, the Directorate's designated working hours were "between 0600 and 1800 Monday through Friday," with the Directorate closed on weekends and government holidays.  JA 102-08 (¶¶ 5.f, 5.j); JA 53-55.  The policy

allowed for a flexible work schedule program, under which supervisors are to maintain business hour coverage Monday to Friday from 7 AM to 4 PM, and to ensure that all employees are present for work or in a leave status during the core hours of 9:30-10:30 AM and 1:30-2:30 PM. JA 102-07 (¶¶ 7.a(1)) and 7.b(1)(b)). Supervisors were also permitted to authorize telecommuting where it benefited mission performance. *See, e.g.*, JA 142-47. Pursuant to Commandant Instruction 12630.1, supervisors had the option of permitting telecommuting provided that the employee occupies a position with "[p]ortable work activities members and employees can perform effectively outside the office" and "[t]he worker can meet the requirements for face-to-face contact with other workers or the public by working in the office at least one day a week." JA 142-47 (¶¶ 8.e(1), 8e(7)). In addition to signing and maintaining a written agreement, an employee who seeks to telework must also submit a "Self-Certification Safety Checklist" and a "Self-Certification Security Audit Checklist." JA 157-62.

On May 6, 2010, based on Dr. Schwartz's April 28, 2010 Memorandum (JA 453), on May 6th, Cohen (i) provided Doak with anti-glare device for her computer; (ii) gave her noise cancelling headsets; (iii) permitted her to wear sunglasses in the office as needed; (iv) asked that three of the overhead lights directly above her desk turned off; and (v) identified break for use as necessary for medical reasons. *See* JA 455-56; JA 167 (No. 6); JA 537-38. Cohen provided all

12

the accommodations recommended by the medical review officers because "[t]he goal was always to get Edna back to work, so [he] provided everything in this April 28, 2010 memo as best as [he] could." JA 51, 64.  Additionally, Cohen offered to move Doak to a cubicle in a darker area, which she rejected.  *See* JA 455-57 (¶ 3e); JA 537.  But Cohen denied to Doak's request for an 11:00AM to 7:00PM work schedule, explaining that because her position with an acquisition project required daily and frequent interaction with project staff, other business managers, resource staff, and numerous agencies, the proposed 11 AM arrival time was not feasible as it would place the project and resource office in a hardship position.  *See* JA 455-56 (¶ 4).

On May 21, 2010, Doak replied to Cohen, stating she understood that he did not approve "1100-1900 work schedule" but she believed that she could work a temporary schedule of 10:00am-6:30pm. JA 459-60 (¶ 3); JA 539, 562-63. Doak indicated that she wanted to work toward a "9:00am arrival."  JA 459-60 (¶ 3). Cohen understood Doak to have rescinded her request for an 11 AM start time, and responded that a 10:00AM start time was also unacceptable.  JA 177.  He countered with an offer to change her start time "from 0815 to 0900." *Id*

## C.     Doak's Ongoing Attendance Problems.

On May 24, 2010, Cohen issued an official reprimand, lifting the "Abeyance Agreement."  JA 1789-82.  In that letter, Cohen explained that Doak had failed to

13

provide documentation for her absences and tardiness on January 25 and January 26, 2010, and therefore he charged her with a total of 7:45 hours of AWOL for those two days. JA 179-80. Cohen also noted that he charged Doak with AWOL on May 10 and May 11, 2010, when she had called in sick and had not come to work, and she also had failed to provide documents to support her absences. JA 180. Furthermore, Cohen charged Doak four hours of AWOL when she arrived at work at 12:15PM on May 13, 2010 (her start time was at 8:15AM). *Id.* Cohen noted that Doak had taken an additional 99 hours of unscheduled absences since March 24, 2010, and had been AWOL for approximately 23:30 hours the week of May 10, 2010. JA 179-82 ( ¶¶ 1-2). Doak's leave balances reflected -137:45 hours of annual leave, -238 sick leave, and 134:15 hours of LWOP (JA 179-82 at ¶ 3), all of which Doak agreed would be "concerning" to an employer. JA 541.

Additionally, around this time, Doak's managers learned through a timecard audit of her potential misuse of leave. JA 436-37 (No. 19). On December 18, 2009, Doak had requested and received approval for nine hours of "Sick Leave – FMLA," yet records showed that she had entered another Headquarters building at 2:16 PM and remained there until sometime after 7:51 PM on that date. *See id.* Doak had earlier informed Cohen that she wished to attend a holiday party for a couple hours at same day. JA 164-71 (No. 21). According to Doak, she had awoken that morning with a migraine that required her to call in sick. *See id.*

14

Doak later felt  better and drove to the party around 2 PM, and remained there for about 45 minutes until her migraine returned, at which time she went to rest in the dark and eventually fell asleep until around 8 PM.  *See id.*

### D.     Revised Request for Accommodation in July 2010

Three months after Dr. Berbano's April 2010 letter, Doak submitted another letter from Dr. Berbano dated July 16, 2010, entitled "Clarification of Medical Letter dated 16 Apr 2010."  JA 462-64.  In it, Dr. Berbano explained that Doak "suffers from periodic migraines" and "[w]hen she experiences acute onset of a migraine, she is incapacitated due to the pain and cannot concentrate on the tasks at hand, whether at her job or at home." *Id.* (¶3).  Doak would need to take "abortive medication which immediately makes her drowsy, completely incapacitating her while she is under the influence of the medication, necessitating that she rest in a darkened, quiet room." *Id.*  Dr. Berbano explained that she was working with Doak on "adjusting the timing of when she takes it so that the drowsiness has the least impact on her work schedule."   *Id.* (¶4.d).   Dr. Berbano revised the prior accommodation request and recommended instead that Doak be given a trial of flexible "start time of 0930 or telecommuting."  *Id.* (¶5); JA 542.  As with her prior suggestion, Dr. Berbano's revised recommendation of a 9:30 AM start time was based on "the patient letting me know when she felt most optimal to concentrate on her work and be the most productive." JA 479.  Dr. Berbano elaborated that the

9:30AM recommendation was not based on any independent medical assessment. *Id.*

Dr. Brent Pennington, Chief of the Division of Occupational Medicine, reviewed Dr. Berbano's July 2010 letter and opined that the medical documents "do not provide appropriate medical justification to support an arbitrary start time of 0930 instead of 0830 or 0900." JA 466. He noted Dr. Berbano's description of Doak's medical episodes as unpredictable and incapable of being stabilized. JA 466; JA 484-85. Dr. Pennington did not believe that any sort of fixed work schedule was possible due to Doak's unpredictable incapacitating conditions. JA 486-87. He further explained that, given that Doak's conditions were "incapacitating regardless of schedule," "it still didn't make sense to say that she would work on the weekends when she had unpredictable incapacitating episodes." JA 491. Dr. Schwartz likewise found Dr. Berbano's July 16 letter to be confusing since it did not address why Doak could not take her medications earlier and get to work on time, and was concerned by Dr. Berbano's description of the degree of Doak's incapacitation following the onset of a migraine. *See* JA 498-99.

### E.    Doak Subsequently Agreed to 9 AM Start Time, But Attendance Issues Persist

On July 23, 2010, Souther met with Doak and Cohen to address Doak's ongoing attendance issues and alleviate the tension created by her absences. JA 81. During this meeting, Doak stated that she had arrived at 9AM that day and her

16

supervisors asked whether she could continue to arrive at that hour.  JA 78.  The parties agreed to a 9 A.M. arrival time.  JA 184 ("At this point, [Doak] is on a 0900 a.m. arrival time as agreed to and Edna is doing all she can to make that arrival at 0900.").  Despite agreeing to the 9 AM start time, Doak was still unable to arrive at work on time consistently.  *See* JA 67-69; JA 468-472 (list of days when Doak did not arrive at work at 9:00AM). Due to her frequent absences and late arrivals, Doak was not fulfilling her duties on her projects, thus requiring co-workers to perform her duties, including attending meetings, preparing and processing funding documents, developing obligations plans, and gathering data to respond to Congressional inquiries.  JA 187-190; JA 431-32 (¶16).

### F.    Doak's Failure to Complete Mandatory Trainings.

Doak's position required that she complete Financial Management Level I certification within the first year of employment, as well as participate in Appropriations Law training.   JA 432 (¶17); JA 534.   To obtain Level I certification, Doak was required to complete BCF 106, Fundamentals of Cost Analysis, but had not done so as of February 2010.  JA 192; JA 534.  "Despite [her] failure to complete this course, [Doak] was certified at Level I as an accommodation to reduce stress, but still had to complete CCF 106." JA 432-33 (¶17); JA 549-50.

On August 4, 2010, Doak asked Cohen for compensatory time after hours or weekends to complete BCF106, or to telecommute to complete the course.  JA 194-95.  The very next morning, Cohen responded that the Coast Guard did not authorize compensatory time for training and that Doak should be able to complete the training during normal work hours.  *Id.*  If Doak was still not finished with the course by September, he indicated he would permit her to work from home to complete the course as long as she provided proof of her ability to telecommute. *Id.*  Doak did not follow up until September 2, 2010, when she stated that she was unsuccessful in completing the course during the workday, and again asked if she could telecommute on September 7, 2010, to complete the course, adding that she could use the computers at Kinko's if her computer was offline.  *Id.*  In response, Cohen informed Doak that there was insufficient time to establish a telecommuting agreement and recommended that she use a quiet remote workstation, to which Doak responded, "OK, that should work fine."  JA 194; *see also* 546.  Doak never completed BCF 106 or Appropriations Law training.  JA 549-50.

## III.   PROPOSED REMOVAL AND AGREEMENT TO PERMIT DOAK's RETIREMENT IN LIEU OF REMOVAL

### A.   Notice of Proposed Removal and Doak's Response

On August 9, 2010, Cohen provided Doak with the "Notice of Proposed Removal" ("Notice") recommending terminating her employment because of her (1) "medical inability to perform the essential duties of her position, due to various

18

medical reasons, which caused her to be unable to maintain her regular work schedule" and (2) hours in AWOL status.  JA 197-202.  The Notice indicated that since July 2009 Doak had been granted a combination of annual and sick leave, advanced annual and sick leave, and LWOP, and incurred AWOL, resulting in absences that "have continued for an unreasonable period of time with no foreseeable end in sight."  JA 197-202 ( ¶ 2a).  Doak was absent from duty for at least 52 percent of her scheduled work hours since January 31, 2010, had exhausted all of her sick and annual leave, and had been granted over 173.45 hours of LWOP.  *See id.*  In addition, Doak failed to report to duty as scheduled and to submit acceptable documentation to support absences on approximately 45 separate dates between February 19, 2010, and August 4, 2010.  JA 197-202 (¶2b). Although Doak's supervisors agreed to change her start time from 8:15 AM to 9:00 AM, effective July 26, 2010, Doak continued to have unscheduled and unexplained absences on July 27, 28, 29, 30, and August 2, 3, 4, 2010.  *Id.*  Cohen noted that Doak's position required physical presence in the office during normal work hours to interact with project staff and, as a consequence of her repeated absences, co-workers had to help out with her workload.  *See* JA 197-202 (¶ 3).  The Coast Guard gave Doak the opportunity to answer the proposed action within seven calendar days.  JA 197-202 (¶6).

On behalf of Doak, the union responded to the Notice on August 31, 2010.
JA 205-09.  The union representative claimed that the Coast Guard purportedly
violated the ADA when it "relied upon faulty and very bad medical advice from
someone identified as B. Pennington," and further asserted that he "reviewed Dr.
Ber[b]ano's letter and it fully complied with all of the legal requirements that
certified Ms. Doak as a person with a legitimate disability."  *See* JA 205-09 (p. 2).
In response to the over 40 instances of AWOL charges, the union argued that
Cohen should have placed Doak on LWOP instead.  *See id.*  Finally, the union
identified a chart, prepared by shop steward of Doak's attendance since May 2010
and noted that it "reveal[s] a significant improvement from May 2010 until the
present."  *See* JA 210.  Doak also submitted an oral reply to Souther on September
1, 2010.  JA 212-17 (¶ 2).

## B.    Notice of Decision on Proposed Removal

Souther considered the union's response and Doak's oral reply, and decided
on September 30, 2010, that Doak's removal from Federal service was warranted
to promote the efficiency of the service. JA 212-17.  Souther concurred with the
charges outlined by Cohen's Notice.  *Id.* (¶ 3).  Souther noted that Doak's
unscheduled absences decreased briefly after her receipt of the Notice; however,
her unscheduled absences "continued and increased significantly since 10
September 2010," preventing her from participating in meetings and creating

20

undue hardship for her colleagues. JA 212-17 (¶ 3). Due to Doak's frequent absences, she failed to complete the required BCF 106 and Appropriations Law training. *See id.* In addition, Doak exhausted 492.75 hours of FMLA, including the maximum allowable annual and sick leave and advanced annual and sick leave, and also incurred 209 hours of LWOP in all instances where she had a documented medical appointment between January 31 and September 11, 2010. *See* JA 212-17 (a ¶ 4).

Souther also considered the request that Doak's AWOL hours be treated as LWOP, and concluded that her absences "remain 52 percent of the work time between 31 January 2010 and 17 July 2010, and 45 percent of the work time through 11 September 2010." *See* JA 212-17 (¶ 6). While these numbers reflected an incremental improvement, Doak recorded additional unscheduled absences on September 1, 10, 13, 14, and 15, 2010, and provided medical documentation only for her absences on September 14 and 15, 2010. *See id.* Souther also considered the "lack of a foreseeable end to [Doak's] medical situation when the anticipated improvement moves from as six months in April 2010 to 12 months in July 2010." JA 212-17 (¶ 7). Dr. Berbano's April 2010 letter anticipated that Doak's conditions would improve with treatment over the next 3-6 months. JA 449-51 (¶6); JA 212-17 (¶ 7). Yet, the union's response to the Notice referenced Dr. Berbano's July 9, 2010 letter, in which she had stated that "it is anticipated that

21

Ms. Doak will continue to improve over the course of 6 to 12 months." JA 205-09

(p. 4); *see also* JA 212-17 ( ¶ 7). Souther noted that the conflicting information

"creates significant uncertainty regarding the end to [Doak's] medical situation,

and creates undue hardship on [her] co-workers and on the Coast Guard." JA 212-

17 (¶ 7). Based on this evidence, Souther informed Doak of his decision to remove

her from Federal service effective October 8, 2010. *See id.* (¶ 8).

### C.     Doak Contacted EEO Officer in October 2010, And The Coast Guard Agreed to Permit Her Retirement in Lieu of Removal

On October 6, 2010, Doak contacted an EEO officer to file an informal

complaint.  JA 5-9 (¶ 21); JA 219-22 (Box 19).  Although Doak claimed to have

complained to an EEO counselor about "the things that were going on that [she]

was unhappy with" in June 2010, she filed no complaints at that time.  JA 511.  In

her October 6, 2010 EEO Complaint, Doak stated that she was challenging

Cohen's Notice and Souther's termination decision, which she believed was taken

on the bases of race, national origin, sex, age, disability, and reprisal.  JA 219-22.

She further indicated that the date she first became aware of the alleged

discrimination was "8/9/10." *See* JA 219-22 (Box 25).

On October 7, 2010, Doak and the Coast Guard entered into a settlement

agreement, under which Doak agreed to retire effective October 31, 2010, in lieu

termination.  JA 568; JA 224-26 (Settlement Agreement dated October 7, 2010).

For its part, the Coast Guard agreed to issue the SF 50 indicating "Retirement" and

22

expunge "all records concerning the proposed removal and decision on proposed removal, including the Letter of Reprimand dated May 24, 2010" from Doak's OPF. JA 224.

Invoking the Older Workers' Benefit Protection Act ("OWBPA"), Doak revoked the settlement agreement on November 4, 2010, claiming that she was "railroaded" into signing the agreement. JA 228. Thereafter, on February 22, 2011, Doak filed a formal complaint alleging discrimination on the bases of race, national origin, disability, sex, age, and retaliation. JA 5-9 (¶ 22); JA 219-22.

On July 1, 2011, the Coast Guard dismissed her EEO complaint as moot because of the October 7, 2010 Settlement Agreement. JA 276-277. Doak appealed the agency's decision to the EEOC, which found that the October 7, 2010 Settlement Agreement "did not comply with the provisions of OWBPA" and reversed the Coast Guard's dismissal of Doak's complaint. JA 282. The EEOC ordered the Coast Guard to "reinstate [Doak's] underlying complaint from the point processing ceased." JA 282. Doak, however, did not participate in the EEO investigation of her claims at the administrative level. JA 513.

Despite Doak's revocation of the Settlement Agreement, the Coast Guard did not undo her retirement. JA 88-89. Doak has been receiving $2,500 in retirement benefits per month since December 2010, and her separation was

designated a retirement, not termination. JA 568. In fact, Doak understood that her separation from the Coast Guard was a retirement, not a termination. *Id.*

The Coast Guard issued a Final Agency Decision on June 19, 2012, finding no unlawful employment practice. JA 288-96. Doak filed this lawsuit on July 18, 2102. JA 5.

## IV.  THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT

On February 10, 2104, the District Court granted summary judgment in the Coast Guard's favor and primarily addressed four issues. First, the District Court found that Doak had first initiated contact with an EEO counselor on October 6, 2010, complaining of the Coast Guard's decision to fire her. JA 382. The District Court therefore concluded that all discrete acts of discrimination and retaliation occurring outside the 45-day window (i.e. before August 22, 2010) were untimely and that it lacked jurisdiction over those claims. Specifically, the District Court held that (i) the February 22, 2010 and May 24, 2010 reprimand letters; (ii) the August 9, 2010 Notice of Proposed Removal; and (iv) all AWOL charged included within those letters and the Notice were untimely. JA385 n.13. The District Court further found that Doak's reasonable accommodation claim (Count II) was similarly untimely. JA 382. The District Court nonetheless considered these untimely exhausted claims along with the remaining claims, and entered judgment in the Coast Guard's favor on the merits on all claims.

Second, Doak claimed that the Coast Guard engaged in disability discrimination when it took the following actions: (i) issued the August 9, 2010 Notice; (ii) issued the September 30, 2010 decision to terminate her employment; (iii) generally failed to accommodate her disability; (iv) issued two letters of reprimand; and (v) charged her with AWOL. JA 387-88. The District Court, however, found that the Coast Guard took those actions because of Doak's perpetual attendance problem. JA 388. The District Court further concluded that Doak failed to produce sufficient evidence for a reasonable jury to find that the Coast Guard's proffered reasons were pretext for disability discrimination. JA 389-90.

Third, on Doak's failure to accommodate claim, the District Court found that the Coast Guard provided Doak with all workplace accommodations by providing her with (i) fluorescent light filters; (ii) anti-glare for her computer; (iii) permission to wear sunglasses in the office; (iv) noise-cancelling headphones; and (v) a dark, private area to use when medically necessary. JA 391. The District Court observed that the Coast Guard did not provide Doak with the requested modified schedule but concluded that that request was unreasonable. In particular, the District Court noted that, because her physical presence at the office at a specified time was an essential function, her requested modified schedule (later start time, telework, or weekend hours) was an unreasonable accommodation request. JA

392-95.  The District Court further found that, even with the requested accommodation, Doak could not have performed her job due to her unpredictable incapacitation because of her migraine conditions.  JA 396-97.  Therefore, the Court concluded that, either working from home or in the office, the unpredictable migraine episodes would incapacitate Doak and prevented her from working altogether.  *Id.* at 400.

Finally, on Doak's retaliation claim, the District Court found that, like her disability claim, Doak has not provided any evidence for a factfinder to believe that the Coast Guard's proffered reasons were pretext for reprisal.  *Id.*

## SUMMARY OF THE ARGUMENT

The District Court correctly granted summary judgment in the Coast Guard's favor on all of Doak's claims of discrimination, failure to provide reasonable accommodation and retaliation under the Rehabilitation Act.

First, the District Court properly dismissed a number of Doak's disparate treatment and failure to accommodate claims for failure to timely exhaust administrative remedies.  Furthermore, the District Court alternatively dismissed these claims because Doak did not cooperate with the EEO investigation.  On appeal, however, Doak appears to challenge only the District Court's dismissal on jurisdictional grounds of her failure to accommodate.  Therefore, Doak waives argument that the same claims were properly dismissed based on failure to

26

participate in the EEO investigation. The waiver encompasses (i) the February 22, 2010 and May 24, 2010 reprimand letters; (ii) the August 9, 2010 Notice of Proposed Removal; and (iv) all AWOL charges included within those letters and the Notice.

Second, the District Court dismissed Doak's disability discrimination claims on the merit; however, Doak failed to contest that ruling in her opening brief. Therefore, Doak waived her disparate treatment claims.

Third, on Doak's failure to accommodate claim, she fails to create a genuine issue of material fact that the schedule adjustments she requested were reasonable. Indeed, the Coast Guard provided Doak with medically supported accommodations including (i) fluorescent light filters; (ii) anti-glare for her computer; (iii) permission to wear sunglasses in the office; (iv) noise-cancelling headphones; and (v) a dark, private area to use when medically necessary.

Despite these office accommodations, Doak argues that the Coast Guard violated the Rehabilitation Act by denying her a later start time, telework, or make-up weekend hours. The Coast Guard's medical reviewers considered those requests but found that the medical documentations did not support the requested modified schedule. Specifically, both Dr. Erica Shwartz and Dr. Bret Pennington reviewed Dr. Berbano's two letters and other medical documents, and noted that Doak suffered from unpredictable episodes of migraines, which incapacitated her

from a few  hours to an entire day.  Given the unpredictability of her migraine episode, these two medical reviewers concluded that Doak would be unable to work either at home or in the office, or even with a delayed start time.  Doak does not dispute this.

Furthermore, even with the requested accommodations, Doak could not have performed the essential functions of her job due to her conditions.  Doak's job required her physical presence in the office at a specified time.  Specifically, some of the critical functions of Doak's job required her to have frequent meetings and interactions with project managers, team leads, and other staff.  In addition, Doak had project interactions responsibilities. Given the teamwork and interactive nature of her job, Doak's requested modified schedule of a later work start time, telework, or make-up weekend hours would prevent her from interacting with her team and have project interactions.  However, given Doak's perpetual, irregular attendance record, she could not make it to work regularly, which was an essential function of her job.

Fourth, although this Court's ruling in *Solomon v.  Vilsack*, 763 F. 3d 1 (D.C. Cir. 2014) establishes that maximum flexibility work schedules are not unreasonable as a matter of law, this case warrants a different result on the facts. For example, the employee in *Solomon* had been performing her duties successfully for several months on a maxi-flex schedule.  Doak was having

significant difficulty accomplishing her duties while missing substantial amounts of work.  At best, Doak and her supervisor met and agreed to a 9:00AM start time, a change from 8:15AM start time.  Yet, even with a later start, Doak continued to have irregular attendance and accumulated AWOL hours, which negative impacted the work of her section.

Moreover, the employee in *Solomon* met all deadlines without help from her co-workers, despite her conditions.  Unlike that employee, Doak's absenteeism caused her to miss deadlines and mandatory trainings.  Indeed, Doak's erratic attendance required her co-workers to divert their time to assisting her on meeting deadlines and completing assignments. This had a detrimental effect on the Coast Guard.  Finally, unlike in *Solomon* where the employee appeared to work alone and not in a team-oriented setting, Doak's job required her to have frequent meetings and project interactions with her co-workers, making her physical presence at work an essential function.

Finally, Doak failed to offer evidence for a reasonable jury to find that the Coast Guard's proffered reasons for deciding to fire her were a pretext for retaliation.  The Coast Guard removed Doak from federal service because of her chronic absenteeism and tardiness.  Doak, however, failed to show that this proffered explanation was untrue and mere pretext to retaliation for her requests for accommodation.

29

# ARGUMENT

## I.     STANDARD OF REVIEW

The Court reviews summary judgment *de novo, McGrath v. Clinton*, 666 F.3d 1377, 1379 (D.C. Cir. 2012), analyzing for itself the arguments and evidence advanced in the District Court and preserved on appeal.   *Potter v. Dist. of Columbia*, 558 F.3d 542, 547 (D.C. Cir. 2009).  On Doak's retaliation claims, once the Coast Guard came forward with a legitimate, non-retaliatory explanation for its action, the *McDonnell-Douglas* burden-shifting framework fell away and the only questions is "the ultimate factual issue in the case – retaliation *vel non*."  Solomon, 663 F. 3d at 14 (internal quotations omitted).  *See also Czekalski v. Peters*, 475 F.3d 360, 363–64 (D.C. Cir. 2007); *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (*en banc*)).   Likewise, the Court reviews the District Court's conclusion on Doak's reasonable accommodation claim *de novo*.  *See Solomon v Vilsack*, 763 F. 3d at 8-9.  In assessing the totality of the evidence in the record in the light most favorable to Doak, the Court refrain from "second-guess[ing] an employer's personnel decision absent demonstrably discriminatory motive." *Fishbach v. Dist. of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)); *see also Mason v. Avaya Comm., Inc.*, 357 F. 3d 1114, 1122 (10th Cir. 2004) (noting that

"[i]n cases arising under the ADA, we do not sit as a super personnel department that second guesses employers' business judgments").

## II.    DOAK FAILED TO TIMELY EXHAUST CERTAIN CLAIMS.

The District Court dismissed certain claims in Count I and all of Count II (failure to accommodate claim) because Doak failed to seek timely EEO counseling for these claims.  JA 381-385 n.13 & 15.  According to the District Court, the only "timely" claims were "the September 30, 2010 Notice of Proposed Removal Decision" and all of Count III (retaliation claim).  *Id.* at n.15.  On appeal, Doak only challenges the District Court's dismissal of her "Failure to Accommodate Claim" on jurisdictional grounds.  Br. Applt. at 20-21.  Therefore, Doak appears to abandon and thus waives arguments as to certain claims in Count I dismissed for want of jurisdiction.  *See Doe v. District of Columbia*, 93 F.3d 861, 875 n.14 (D.C.Cir.1996) (appellant waived argument not raised on appeal).  The abandoned untimely claims include (i) the February 22, 2010 and May 24, 2010 Letters of Reprimand, (ii) the August 9, 2010 Proposed Removal; and (iii) all AWOL charges included within those letters and the Proposed Removal Notice. JA 385 n.13.

On the failure to accommodate claim (Count II), citing *Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006), the District Court determined that it lacked jurisdiction over Count II because Doak failed to contact the EEO counselor until

more than 45 days after the Coast Guard denied her some of her requests for accommodation. JA 381-84. Construing the facts in Doak's favor, she made requests for reasonable accommodations when she submitted two letters from Dr. Berbano dated on April 16, 2010 (JA 449-51) and on July 16, 2010 (JA 462-64). The Coast Guard responded to Dr. Berbano's two letters on April 28, 2010 (JA 453) and July 20, 2010 (JA 466), respectively. Under 29 C.F.R. §1614.105(a)(1), Doak was required to seek informal counseling 45 days after the Coast Guard allegedly denied her requests for accommodations. Yet, Doak failed to complain of the Coast Guard's failure to accommodate her until October 6, 2010, when she first contacted an EEO counselor alleging various unlawful employment practices. JA 5-9 (¶21). Citing *Spinelli*, *supra*, the District Court found that it lacked jurisdiction over Doak's failure to accommodate claim because that claim was untimely. JA 381-85.

Furthermore, as the District Court pointed out and Doak admitted, she failed to cooperate with the EEO investigation of her claims. JA 385 n.14; JA 513. Therefore, the District Court correctly concluded that Doak's "failure to cooperate during the EEO investigation and that it in itself, constitutes a failure to exhaust." JA 385 n.14. *See Koch v. White*, 744 F. 3d 162, 165 (D.C. Cir. 2014) (affirming the district court's dismissal of plaintiff's Rehabilitation Act claim for failure to exhaust administrative remedies because plaintiff refused to cooperate with the

EEO investigation).[1]    Accordingly, the Court need not resolve whether the dismissal was for lack of jurisdiction because dismissal was plainly proper under *Koch*. And alternatively, even had Doak timely exhausted her failure to accommodate claim, as shown below, the claim lacks merit.

## III.     DOAK WAIVED HER DISCRIMINATION CLAIM ON APPEAL.

Doak does not challenge the District Court's grant of summary judgment on her discrimination claim (JA 385-90) on appeal and thus waives all arguments pertaining to the District Court's dismissal of her discrimination claim under the Rehabilitation Act before this Court.  *See Doe*, 93 F.3d at 875 n .14 (D.C. Cir. 1996) (appellant waived argument not raised on appeal).  The Court, therefore, should affirm the District Court's dismissal of Doak's disability discrimination claims, including the issuance of the August 9, 2010 Notice of Proposed Removal, the September 30, 2010 decision to fire her, the Coast Guard's failure to accommodate her disability, the issuance of the letters of reprimand, and charges of AWOL.  JA 387-90.

---

[1]     The District Court's Memorandum Opinion was issued on February 20, 2010, approximately two weeks *before* this Court's March 7, 2014 decision in *Koch v. White*.

## IV.   THE COAST GUARD PROVIDED DOAK WITH REASONABLE ACCOMMODATION SUPPORTED BY MEDCIAL REASONS

### A.   Statutory Framework – Rehabilitation Act

Section 501 of the Rehabilitation Act, codified at 29 U.S.C. § 791, is the exclusive remedy for federal employees alleging that federal agencies engaged in disability discrimination.  *See Taylor v. Small*, 350 F.3d 1286, 1291 (D.C. Cir. 2003).   The Rehabilitation Act incorporates the standards applied under the Americans with Disabilities Act of 1990 ("ADA").  *See Ward v. McDonald*, 762 F.3d 24, 28 (D.C. Cir. 2014) (citing 29 U.S.C. § 794(d)).   Claims of disability discrimination can include a disparate treatment claim that a qualified individual with a disability was treated differently than a non-disabled employee due to her disability, *see, e.g.*, *Swanks v. Wash. Metro. Area Transit Auth.*, 179 F.3d 929, 935 (D.C. Cir. 1999); and a failure to accommodate claim that the employer did not make reasonable accommodations for a disabled but otherwise qualified individual, *see, e.g.*, *Aka*, 156 F.3d at 1288.

The Rehabilitation Act instructs courts to employ the standards of the ADA in evaluating suits that allege an employer unlawfully denied an employee's request for reasonable accommodation.  *See Solomon*, 763 F. 3d at 5.   As this Court explained in *Solomon*, the Rehabilitation Act requires federal agencies to make reasonable accommodation to the known physical or mental limitation of an otherwise qualified individual with disability.  *Id.* at 5 (citing 42 U.S.C. §

12112(b)(5)(A)) (internal quotation mark omitted); *see also Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993); *see also Carr v. Reno*, 23 F.3d 525, 528 (D.C. Cir. 1994); 29 C.F.R. § 1630.9(a). To be a "qualified individual" entitled to protection from discrimination under the ADA, an individual must be able to perform, with or without reasonable accommodation, "the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

In a reasonable accommodation case, like this one, to survive summary judgment Doak must come forward with sufficient evidence to allow a reasonable jury to find that (i) she was disabled within the meaning of the Rehabilitation Act; (ii) the Coast Guard had notice of her disability; (iii) she could perform the essential functions of her job with or without reasonable accommodation; and (iv) the Coast Guard denied her request for reasonable accommodation. *Solomon*, 763 F. 3d at 9. *See also Ward*, 762 F.3d at 31 (outlining the four-factor test for purposes of evaluating a reasonable accommodation claim). An accommodation is reasonable and necessary when it enables the employee to perform the essential functions of her position. *See Abram v. Fulton County Gov't*, -- Fed. Appx. --, 2015 WL 363944, *5 (11th Cir. Jan. 25, 2015). "[W]hether a particular type of accommodation is reasonable is commonly a contextual and fact specific inquiry." *Solomon*, 763 F. 3d at 9. A reasonable accommodation includes "[m]odifications or adjustments to the work environment, or to the manner or circumstances under

which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). *See also Solomon*, 763 F. 3d at 10 (noting that a reasonable accommodation may include job restructuring, and part-time or modified work schedules).

### B.    The Coast Guard Reasonably Accommodated Doak.

The record is undisputed that Cohen, Doak's first line supervisor, promptly provided her with multiple workplace accommodations that she requested and that the Coast Guard's medical review officers found were medically justified.  An employer is "not required to provide an employee that accommodation he requests or prefers; the employer need only provide some reasonable accommodation." *Aka*, 156 F.3d at 1305.

In an April 16, 2010 letter, Dr. Elizabeth Berbano (Doak's treating physician) indicated that Doak had been diagnosed with major depressive disorder, migraines, hypothyroidism (and hyperthyroidism), and obstructive sleep apnea, and recommended that Doak be granted certain accommodations including: (1) telecommuting; (2) full-spectrum lighting for her workspace; (3) anti-glare computer screen; (4) work in an area not subjected to cold air currents; (5) an adjusted work schedule from 11 AM to 7 PM because her difficulties arising in the morning; and (6) the option of weekend work hours to make up for missed

36

weekday hours.  JA 449-51 ( ¶ 7).  Dr. Berbano noted that Doak suffered migraines and had to take medications, which would cause her to be drowsy.  JA 449-52 ( ¶ 4); JA 475.  Dr. Berbano further testified that when Doak suffered a migraine she could be incapacitated for an indeterminate number of hours, whether at home or at work, and thus be unable to work for an entire day. JA 475; *see also* JA 539, 560-61.

Dr. Erica Schwartz assessed Dr. Berbano's April 2010 letter to determine what accommodation, if any, could be provided.  JA 497-99.   Based on her assessment, Dr. Schwartz recommended that the Coast Guard provide Doak with workplace accommodations.  JA 453.  Dr. Schwartz also considered the request for the 11:00AM to 7:00PM schedule, telework, and weekend hours but found that these requests were not supported by the medical documentation. JA 497-99.  Specifically, for the later start time, Dr. Schwartz indicated that she did not understand why Doak could not take her medication earlier in the day and come in on time.  JA 497-98.

On the request for telework or work weekend hours, Dr. Schwartz explained that, given that Doak would be totally incapacitated with the onset of her migraines, "if she was truly incapacitated at home, how could she telework if she was truly incapacitated?"  JA 498.  On weekend hours, Dr. Bret Pennington, who reviewed documents submitted by Doak and discussed the matter with Dr.

Schwartz, testified that "given that [Doak] had medical conditions that were not stabilized and were incapacitating regardless of schedule, so I would have to say that it still didn't make sense to say that she would work on the weekends when she had unpredictable incapacitating episodes." JA 491; *see also* JA 487-92. Indeed, Doak's unpredictable incapacitation would prevent her from working "from home or other remote location, including participating in meetings via telephone and otherwise communicating with members of your work group." JA 213 (¶4).

Relying on Dr. Schwartz's report (JA 453), Cohen provided Doak with every accommodation listed in that report, providing Doak with (i) a noise-cancelling headset; (ii) an anti-glare screen for computer screen; (iii) the ability to wear sunglasses in the office as needed; (iv) turning off the overhead lights directly above her desk; and (v) break rooms that she could use as necessary for medical reasons.. *See* JA 455-57 ( ¶ 3); JA 167 (¶ 6) (Doak admitting that the Coast Guard provided her with certain accommodations); JA 175; JA 537. Cohen also offered to move Doak to a cubicle that was in a darker area, but she rejected this proposal. *See* JA 455-57 ( ¶ 3d); JA 537. Doak did not want to move because it would take her away from her team (JA 537) and reduce her project interactions (JA 539). Doak requested to adjust her start time from 8:15AM to 10:00AM, which Cohen construed as Doak withdrawing her previous request for an 11:00AM start. JA

177. Cohen countered her request for a 10:00AM start time with a 9:00AM arrival time. *Id.*

About three months after Dr. Berban's initial April 2010 letter, Dr. Berbano provided a July 16, 2010 letter, purportedly clarifying the April 2010 accommodation requests.  JA 462-64 ("Clarification of Medical Letter Dated 16 Apr 2010").  In the July 2010 letter, Dr. Berbano reiterated that Doak "suffers from periodic migraine"  and "[w]hen [Doak] experiences acute onset of a migraine, she is incapacitated due to the pain and cannot concentrate on the tasks at hand, *whether at her job or at home performing routine activities of daily living*, such as cooking and doing chores." *Id.* (¶3) (italics added).   Dr. Berbano noted that Doak "has experienced migraine in the morning." *Id.* According to Dr. Berbano, when Doak experienced migraine she would need to take abortive medications, which immediately would make her drowsy and completely incapacitate her.  *Id.*  Even with these unpredictable migraine episodes, Dr. Berbano nevertheless explained that Doak could work eight hours and recommended that her work hours start at 9:30AM. *Id.* (¶ 5).

Again, Dr. Schwartz evaluated Dr. Berbano's July 2010 letter and concluded that the "documents provided do not provide appropriate medical justification to support an arbitrary time of 0930 instead of 0830 or 0900." JA 466.  Dr. Schwartz explained that from a "clinical standpoint" Doak could take her medications earlier

in the day so she could get to work on time.  JA 498.  Ultimately, at a meeting on July 23, 2010, Doak agreed to a 9:00 A.M. arrival time.  JA 184.  Doak's supervisors understood that a resolution had been reached on the 9:00AM start time.  JA 78, 81; JA 66.

These facts amply show that the Coast Guard provided Doak with reasonable workplace accommodations and including a later 9:00AM start time, agreed upon by Doak, so that she could perform the essential functions of her job. The Coast Guard did not allow her to telework or make up hours on the weekends because the medical documents did not support these requested accommodations.[2] *See Langon v. U.S. Dep't of Health and Human Serv.*, 959 F. 2d 1053, 1057 (D.C. Cir. 1992) (noting that "although the agency did not have to provide every accommodation the handicapped employee proposed, the agency must, at a minimum, provide reasonable accommodation as is necessary to enable [her] to perform [her] essential functions.") (internal citations and quotations omitted).  At base, although the Coast Guard did not provide Doak with every single accommodation that she requested, the Coast Guard did make reasonable accommodations.  *See Aka*, 156 F.3d at 1305 (an employer is required to provide reasonable accommodations, not what the employee preferred.)

---

[2]     Doak never made an appropriate, formal request to telework. JA 425 (¶2).

### C.     Doak's Job Required Her Physical Presence At Work At Specified Hours.

This Court has held that "physical presence at or by a specific time is not, as a matter of law, an essential function of all employment.  *Solomon*, 763 F.3d at 10 (internal quotation marks omitted).  The Court emphasized that "penetrating factual analysis is required to determine whether a rigid on-site schedule is an essential function of the job in question."  *Id.*  Here, even without the benefit of this Court's holding in *Solomon*, the District Court acknowledged that physical presence, as a matter of law, was not required in order to fulfill the essential function of a job.  JA 398 n.21.  The District Court noted that "the analysis is whether the plaintiff's physical presence was required during specific business hours because of the nature of the position, and therefore whether the plaintiff's requested accommodation of flexible start times would have impaired an essential function of the job."  *Id.*  Indeed, "a penetrating factual analysis" of Doak's job supports the District Court's conclusion that Doak's physical presence at work and at a specified time was required.  *See* JA 398-400.

Specifically, because Doak's job required her to work in a team context and have frequent project interactions with her co-workers, her physical presence is an essential function of her job. *Samper v. Providence St. Vincent Medical Ctr.*, 675 F. 3d 1233, 1237 (9th Cir. 2012) (noting that regular job attendance is an essential function for employees who work part of a team or have frequent face-to-face

41

interactions with clients or other employees); *See Mulloy v. Acushnet Co.*, 460 F.3d 141,149-152 (1st Cir. 2006) (noting that the employee's request to work off-site unreasonable because the employee needed to interact with machine operators and machine itself, which are located at work). The record shows that Doak tacitly admitted that project interactions were an important part of her position. When Cohen proposed moving Doak to a different cubicle with less light exposure to accommodate her migraine conditions, Doak declined to move. JA 459-60; JA 537-539. In a May 21, 2010 Memorandum to Cohen, Doak explained that she chose not to move because "it is away from [her] team and 'project interactions' would be largely reduced." JA 459-60 (¶ 4). In her deposition, Doak reiterated that she did not move because "it's away from my team and project interactions would be largely reduced." *See* JA 539. Doak's testimony shows that she recognized the importance of her physical proximity to her "team" and a move away from her work area would reduce her "project interactions."

Although Doak tries to redefine her job on appeal (Br. Applt 19), her view of her job at that time is consistent with the job description provided by her supervisors. In Doak's "Performance Plan and Evaluation," ("Plan") her supervisor described the "nature of [her] job" to include "daily meetings with project managers and staff and required interaction with the project team and other surface business managers." JA 115. The Plan identified "Teamwork" as one of

the "Core Competencies." JA 111.   In a January 2010 letter on her irregular attendance, Cohen described Doak's job as requiring "daily interaction with the project staff, contracting and resources staff."   JA 120-121 (¶ 2).   In his Notice, Cohen reiterated that "[p]roject interaction is a critical part of [Doak's] job which requires [her] to be in the office during normal work hours in order to interact with project staff."  JA 197-203 ( ¶ 3).   Similarly, in his termination decision, Souther noted that Doak's position required her to participate in "program meetings and other work group collaboration" which are "essential to full performance" of her job.  JA 212-217 (¶ 3).

Given the nature of Doak's position, logically, telework would prevent her from interacting with her team and engage in any project interaction because of the nature of the meetings with her project or program managers required all attendees to view the same document at the same time. JA 429 (¶5).   "Being off-site compromises the efficiency" of the work to be performed.  *Id.* Indeed, the work files are maintained by Contracting Officers (KO), Contracting Specialists (KS) and Contracting Officer's Representatives (COR) in the office and their contents could not be conveniently accessible remotely.  JA 429-30 (¶5).

Furthermore, a request to work on the weekends is unworkable because the office is closed on the weekend and her team would not be present.  JA 102-08 (¶ 5j) ("The offices are closed on weekends and government holidays"); JA 104-05 (¶

7b(1)(b)).  A later start time at 11:00AM would likewise be impracticable.  The Coast Guard's Acquisition Directorate (CG-9) mandated that work must be performed between 0600-1800, with core of hours of 0930-1030 and 1330-1430 Monday through Friday.  JA 102-08 (¶ 7a(1)).  Most of her co-workers arrived at work between 6:00AM and departed at around 2:30PM or 3:00PM.  JA 79. Doak's requested late arrival would substantially reduce the number of hours that she would have to interact with her co-workers and engage in project interactions. Given the nature of Doak's work, her physical presence at a specified time in the office is an essential function of her job.

*Mulloy* and *Samper, supra,* are instructive here.  In *Mulloy*, the employee (an electrical engineer), among other duties, designed programs for golf ball manufacturing machines, evaluated machine capabilities, and trained and supervised maintenance personnel.  460 F. 3d 143.  While working at the paint spray room at the factory, the employee felt dizzy.  *Id.* at 144.  He was examined by a doctor, who recommended that he not be exposed to respiratory irritants.  *Id.* The company reassigned him to its headquarters.  At that location, although the employee could perform some functions of his job, his inability to enter the plant prevented him from performing others.  Because the employee could not perform his job without entering the plant, the company fired him.  He sued under the ADA alleging failure to provide reasonable accommodation.  In affirming summary

44

judgment, the First Circuit found the employee's job description included "teamwork, troubleshooting, evaluating, and training and supporting – all of which imply some level of interactions with the machines and personnel" at the ball manufacturing plant. *Id.* at 152. Based on this finding, the *Mulloy* court concluded that his physical presence at the plant was an essential function of his job. *Id.* The *Mulloy* court further observed that the employee's request to work away from the plant was not an accommodation but a redefinition of his job. *Id.* at 153.

Similarly, in *Samper*, the Ninth Circuit held that "regular attendance is an essential function of a neo-natal nursing position" and the nurse's request to be excused from the attendance policy was an unreasonable accommodation request. 675 F. 3d at 1235-37. In *Samper*, the nurse suffered from fibromyalgia, a condition that limited her sleep and caused her chronic pain. *Id.* at 1235. She was discharged due to, among other things, her problematic attendance. She sued under the ADA alleging that the hospital failed to reasonably accommodate her by not allowing her to opt out of the attendance policy. *Id.* at 1235.

The Ninth Circuit observed that "in those jobs where performance requires attendance at the job, irregular attendance compromises essential job functions." *Id.* at 1237. The *Samper* court further noted that attendance may be necessary simply because the employee must work as part of a team or have face-to-face interactions with clients or co-workers. *Samper*, 675 F.3d at 1237. The *Samper*

court found that the nurse's job "unites the trinity of requirements that make regular on-site presence necessary for regular performance: team-work, face-to-face interaction with patients and their families, and working with medical equipment." *Id.* at 1238. The Ninth Circuit ultimately concluded that the nurse's requested accommodation that "*exempts* her from an essential function" of her job "far exceeds the realm of reasonableness." *Id.* at 1240 (italics in original).

Given that Doak's work required frequent interactions with her co-workers, and project interactions, her request for a modified schedule (telework, a later start time, and weekend hours) that excuses her from her presence at her job during core business hours is similar to the unreasonable requests rejected in *Mulloy* and *Samper*. The Court should similarly reject Doak's requested accommodation here.

Citing to her own self-serving declaration, Doak argues that her job required few project interactions and that she could have performed her primary duties of "preparing budget obligation plans and funds transfer requests" via teleworking or with a late start time. Br. Applt. at 19. Doak is conveniently downplaying the nature of her job and the Court should not accept her attempt to redefine the essential functions of her job here. *See Mason*, 357 F. 3d at 1122 (noting that the court is "reluctant to allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience"). On project interactions, Doak's argument here contradicts her own deposition testimony in

46

which she claimed that she did not want to relocate to another area of the office because that would take her away from her team and project interactions. JA 537, 539. Now, Doak disavows that aspect of her job and claims that her position has "few project interactions." Br. Applt. 19. It is well settled that "a self-serving affidavit, without more evidence, will not defeat summary judgment." *Sanchez v. Dall./Fort Worth Int'l Airport Bd.*, 438 Fed. Appx. 343, 346-7 (5th Cir. 2011).

Furthermore, Doak has not pointed to any evidence in the record for a reasonable jury to find that she could perform other functions, such as preparing budget obligation plans and funds transfers requests, via teleworking (Br. Applt. 19) given her unpredictable incapacitation.[3] Indeed, even her own physician noted that when Doak experienced acute migraine, she would be "incapacitated due to the pain and cannot concentrate on the tasks at hand, *whether at her job or at home.*" JA 462-4 (at ¶ 3) (italics added).

In addition, there is some evidence calling Doak's ability to work independently into question. The Coast Guard conducted a timecard audit in March 2010 and found that she misused her sick leave. JA 430. Specifically, on December 18, 2009, Doak requested and was granted nine hours of "Sick Leave-

---

[3] An employee's own "self-serving testimony that he could perform the essential functions of his job from [off-site] is insufficient under Fed. R. Civ. P. 56(c) to create a genuine issue of material facts concerning the essential functions of his job." *See Mulloy*, 460 F.3d at 150.

FMLA," but her timecard showed that she had entered a workplace building  at "2:16pm" and remained there until "7:51pm".  *Id.*  It was later discovered that Doak drove to the "Transport Building" to attend a holiday party, even though she claimed that she was too ill to work.  JA 170; JA 430.  This episode gave her supervisor reasons to "doubt her level of trustworthiness and ability to work independently." JA 430.[4]

### D.  The Court's Ruling In *Solomon* Does Not Warrant Reversing The District Court's Grant of Summary Judgment Here.

Doak argues that, in light of *Solomon*, the District Court erred in holding that her request for a modified work schedule (a later start time, telework, or weekend hours) was unreasonable as a matter of law.  Br. Applt. 15.  Although the District Court did observe that her request for a modified work schedule was an open-ended one and that it was unreasonable as a matter of law (JA 395), the District Court's holding was not that limited.   After noting Doak's frequent and unanticipated absences, the District Court concluded that "[m]aking it to work regularly is an essential function of the job that Ms. Doak could not muster *even with the requested accommodation*."   JA 397 (italics added).  Given the District Court's alternative holding, *Solomon* does not require reversal.

---

[4]      The "Coast Guard Telecommuting Program" is appropriate only for those employees who are "[d]ependable self-starter who can work independently."  JA 142-47 (¶8f(1)).

*Solomon* is an announcement of the general principle of law that "whether a particular type of accommodation is reasonable is commonly contextual and fact specific inquiry." *Solomon*, 763 F.3d at 9.  Indeed, *Solomon* held that it is legally incorrect under the Rehabilitation Act to categorically hold that "an 'open-ended or maxiflex schedule is unreasonable as matter of law.'" *Solomon*, 763 F.3d at 11. The Court, however,  noted that "[w]hether a maxiflex or other flexible workplace schedule is a reasonable accommodation for a given employee in a given position is a case-by-case factual inquiry, not a foreordained legal conclusion." *Id.*

A "factual inquiry" in this case reveals several significant differences between this case and the circumstances in *Solomon*.  First, the employee in *Solomon* performed her essential duties successfully while on maxiflex schedule before the agency abruptly disallowed her to work an alternative schedule.  *Id.* at 4, 7.  Doak did not have any such arrangement here and her erratic attendance record does not supply a basis to conclude that Doak could have performed her essential functions on a modified schedule.

Indeed, although Doak initially requested for a work schedule from 11:00AM to 7:00PM in April 2010 (JA 450), her doctor later changed that request to a 9:30AM start time (JA 463).  Ultimately, Doak and her supervisor settled on a 9:00AM arrival time for her beginning July 23, 2010.  JA 184.  Yet, even with the new start time (as agreed to by Doak), she was on AWOL status on at least seven

49

different occasions from July 23 through August 9, 2010, the date of Cohen's Notice. *See* JA 197-203 (listing each day that Doak was on AWOL status). She was on AWOL status anywhere from 30 minutes to missing an entire day. JA 199. Although Doak's unscheduled absences improved slightly after Cohen's Notice, her erratic absences increased significantly up to the time when Souther decided to fire her at the end of September 2010. JA 212-13.

Second, in *Solomon*, the agency conceded that if maxi-flex schedule were available to Solomon, she could otherwise have performed the essential duties of her job. *Solomon*, 763 F.3d at 9. Unlike the employee in *Solomon*, the District Court correctly observed that even with the requested accommodation Doak could not have performed her job due to her unpredictable incapacitation. JA 396-397. Indeed, Doak failed to show that that her preferred work schedule was necessary to address her alleged medical conditions and allowed her to perform the essential functions of her job.[5] An employee seeking an accommodation must show some causal connection between the major life activity that is limited by the alleged disabling condition and the requested accommodation. *See, e.g.*, *Desmond v.*

---

[5]     *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F. 3d 1, 4 (D.C. Cir. 2010) ("the ADA does not prohibit an employer from terminating an employee who cannot perform the essential functions of her position, albeit with a reasonable accommodation"); *U.S. Dep't of State v. Coombs*, 482 F. 3d 577, 581 (D.C. Cir. 2007) ("In the Rehabilitation Act, for example, Congress provided that [an employer] may knowingly discharge a disabled employee who cannot be reasonably accommodated").
.

*Mukasey*, 530 F.3d 944, 959 (D.C. Cir. 2008) ("a request for a workplace accommodation . . . must [have] some causal connection between the major life activity that is limited and the accommodation sought."); *Jones v. Nationwide Life Ins. Co.*, 696 F. 3d 78, 89 (1st Cir. 2012) ("[a]n accommodation request must be sufficiently direct and specific, and it must explain how the accommodation is linked to plaintiff's disability").

Here, Doak's physician, Dr. Berbano, explained that the requested 11 AM start time and weekend hours were based solely on Doak's report of her optimal time to work and helpful to her.  JA 477-78 (testifying "[Doak] told me that this was her optimal time to work, from 11am to 7pm.")   In her July 2010 memorandum, Dr. Berbano revised this recommendation to propose a 9:30 AM start time, which was also based on Doak telling her "the most optimal" time to work  JA. 479; JA. 462-64.  The later start time did not bear a medical or logical relation to the manner in which Doak was allegedly disabled. Dr. Berbano admitted there was no way to test objectively "from a medical standpoint" "when a person is most optimal."  JA 479.  In that vein, Dr. Schwartz  explained that, from a "clinical standpoint," Doak "can take her medicine earlier, she can get to work on time."  JA 498.

Moreover, as Dr. Berbano further explained, when Doak experienced acute migraine and needed to take medication, that would completely incapacitate her

"*whether at her job or at home.*" JA 462-4 (at ¶ 3). Doak confirmed this was the case. *See* JA 538-39. Based on Dr. Berbano's explanations, the medical review officers did not understand how the requested accommodation of a later start time, telework or even weekend hours (i.e. modified schedule) accommodated Doak's stated need of treating migraines. *See* JA 484-87; JA 491 ("I thought that she had medical conditions that were not stabilized and were incapacitating regardless of schedule, so I would have to say that it still didn't make sense to say that she would work on the weekends when she had unpredictable incapacitating episodes."); JA 499 ("if the episodes truly were incapacitating at – just truly incapacitating, how could she even work from home?"). *See Carr*, 23 F.3d at 530 (even working from home "regular hours on a consistent basis" was required). In sum, the denied accommodations of a modified schedule were insufficiently justified medically; they were not connected to her stated need of treating migraines. And, unlike the employee in *Solomon*, Doak could not have otherwise performed her duties due to her unpredictable incapacitation, even with the requested accommodation of a modified schedule.

Third, although Solomon's job involved tight, unpredictable and firm deadlines, she met every single deadline by working a flexible schedule. 763 F.3d at 12. The district court in *Solomon* even acknowledged that the employee did not miss any actual deadlines. *Id.* Doak compared herself to Solomon and argued that

her work performance did not suffer "despite her tumultuous work environment and medical conditions." Br. Applt. at 19. Doak pointed to the fact that the Coast Guard did not place her on a Performance Improvement Plan ("PIP"). *Id.* at 20. This argument is not supported by the record.

Unlike *Solomon*, Cohen's Notice indicated that Doak missed deadlines due to her unscheduled absences and her co-workers had to divert their time to work on her assignments. JA 197-203 ( ¶ 3). Similarly, Souther's memorandum observed that her "frequent unscheduled absences" prevented her from participating in program meetings and other work group, creating an undue hardship on co-workers who were required to perform these duties for her. JA 212-217 (¶ 3). In fact, the Performance Plan indicated that Doak's "[a]ssignment are completed, but often requires assistance from team lead and/or peers to meet tight deadlines." JA 116. Unlike Doak's case, there is no evidence in *Solomon* to suggest that the employee met her deadlines because she had help from her colleagues.

In addition, Doak's frequent absences also prevented her from completing two trainings required for her position. JA 212-217 ( ¶ 7). Doak even admitted that she failed to complete the required BCF 106 or Appropriations Law training. JA 549-50. Finally, there is nothing in *Solomon* to suggest that the employee worked in a teamwork or interactive setting. In fact, she completed most of her work on her own and outside of normal business hours. 763 F. 3d at 6. Unlike the

nature of the work in *Solomon*, as discussed above, Doak's job required her to do work as a team and have project interactions.  JA 460 (refusing to move because it would be "away from my team and 'project interactions'").  These uncontroverted facts demonstrate that because of her frequent and unscheduled absences Doak could not have performed her job.

## V.    THE COAST GUARD HAD LEGITIMATE, NON-RETALIATORY REASONS FOR DECIDING TO FIRE DOAK DUE TO HER FREQUENT ABSENTEEISMS.

### A.    Retaliation Under The Rehabilitation Act

To establish a *prima facie* case of retaliation, Doak must show that (1) she engaged in statutorily protected activity; (2) a reasonable employee would have found the challenged action so materially adverse that she would have been dissuaded from making or supporting a charge of discrimination; and (3) a causal link connects the two.  *Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009); *Mogenhan v. Napolitano*, 613 F.3d 1162, 1165 (D.C. Cir. 2010) (explaining that Title VII "contains anti-discrimination and anti-retaliation provisions that are indistinguishable from those of the ADA" as incorporated into the Rehabilitation Act).  If the retaliation claim involves an adverse action and the defendant offers a legitimate non-retaliatory reason for its decision, the court must then determine whether there is sufficient evidence for a reasonable fact finder to conclude that defendant's asserted non-retaliatory reason for the action is a pretext for retaliation.

*Guajacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010); *Taylor*, 571 F.3d at

1320 n.\* (stating that the principle set forth in *Brady* applies to retaliation claims)

(citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008)).

In *Brady,* this Court refined the application of the *McDonnell Douglas*

framework and held that where an employee has suffered an adverse employment

decision and the employer has articulated a legitimate non-discriminatory reason

for its actions, the court "need not -- *and should not* -- decide whether the plaintiff

actually made out a *prima facie* case under *McDonnell Douglas*."  520 F.3d at 494

(emphasis in original); *see Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226

(D.C. Cir. 2008) (applying the *Brady* rationale to ADA case).  The court must

instead focus on one central question: "Has the employee produced sufficient

evidence for a reasonable jury to find that the employer's asserted [non-retaliatory]

reason was not the actual reason and that the employer intentionally discriminated

against the employee."  *Brady*, 520 F.3d at 494.  An employer's asserted reason

"cannot be proved to be 'a pretext for [retaliation]' unless it is shown *both* that the

reason was false, *and* that [retaliation] was the real reason."  *See St. Mary's Honor

Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original).  It is not enough, in

other words, to disbelieve the employer, the fact finder must believe employee's

explanation of intentional retaliation.  *Id.* at 519.

**B.    The Challenged Actions Were Based on Doak's Persistent Failure to Comply With Leave Policies and Repeated Instances of AWOL, and No Reasonable Jury Would Find That They Were Pretext for Retaliation.**

As Doak acknowledged, the Coast Guard never carried out the removal action that Doak complains of in this action; the Coast Guard agreed to a settlement agreement whereby Doak retired in lieu of termination so that she could collect retirement benefits.  JA 22-26.[6]  Even after Doak revoked this agreement, the Coast Guard did not undo her retirement. JA 88-89.  Doak acknowledged that her separation is designated as a retirement, and she continues to receive $2,500 in retirement benefits.  JA 568.

Even if Doak's retirement were deemed a constructive termination, the Coast Guard fired her because of her chronic absenteeism and tardiness, and not

---

[6]    In this appeal, Doak characterizes that Souther's termination decision as a "forced settlement."  Br. Applt. at 25.  "A retirement request initiated by an employee is presumed to be a voluntary act" *Keyes v. District of Columbia*, 372 F. 3d 434, 339 (D.C. Cir.  2004), and Doak has the burden of showing that her retirement was involuntary as to constitute a constructive discharge.  *See Aliotta v Blair*, 614 F. 3d 556, 566-67 (D.C. Cir. 2010).  Doak has not shown that the alleged "forced retirement" was a constructive discharge and thus an adverse personnel action.  This failure sinks her ability to establish a *prima case* for retaliation.  However, as the District Court correctly pointed out, whether Doak voluntarily retired or was constructively discharged is immaterial for purposes of her *prima facie* case because the Coast Guard presented legitimate reasons for its action.  JA 387-388 n.16; *see also Brady*, 520 F.3d at 494.  To the extent Doak's claim sought to vitiate an administrative settlement, it is unclear where jurisdiction would lie, *see Franklin-Mason v. Mabus*, 742 F. 3d 1051 (D.C. Cir. 2014), but she neither requested that as a form of relief nor argued for it below.

because of retaliation for seeking reasonable accommodations.[7] *See* JA 187-203;

JA 212-217.   Specifically, Cohen's Notice (JA 197-203) came after many months

of repeated attempts to counsel Doak, instruct her on the need to follow proper

leave procedures, and obtain adequate documentation to support her frequent

absences.  *See* JA 120-21; JA 128-29; JA 131-134; JA 138-140; and JA 179-182.

Doak, however, failed to heed Cohen's instructions.   This resulted in Cohen's

decision to propose to remove her from the Coast Guard. JA 197-203.

Cohen proposed to remove Doak was because of her "medical inability to

perform the essential duties of [her] position," her inability to maintain a regular

work schedule, and her AWOL issues.   JA 197-201 ( ¶ 1).   Specifically, Cohen

noted that Doak was absent from her work at least 52% of her work hours since

January through August 2010.   *Id.* ( ¶ 2).   Doak had exhausted all of her sick and

annual leave, and that she was granted more than 173.45 hours of LWOP time.   *Id.*

In addition, Cohen identified 46 different occasions from February 2010 through

August 2010 when Doak was on AWOL status.   JA 198-200.   Doak's perpetual

attendance problem prevented her from doing her job as her assigned projects were

not completed and she "missed key deadlines."   JA 197-201 (¶ 3).   Cohen

explained that project interactions were a critical part of her job, which required

her to be in the office to interact with project staff, and her absenteeism required

---

[7]     *Solomon*, 763 F.3d at 15 (holding that a request for reasonable
accommodation constitutes a protected activity).

co-workers to carry her workload." JA 197-201 ( ¶ 3). Doak, however, failed to refute Cohen's stated reasons as pretext for retaliation. *See Singletary v. District of Columbia*, 351 F.3d 519, 524 n5 (D.C. Cir. 2003) (holding that the employee "has the ultimate burden of establishing that the reason asserted by the employer is pretext for retaliation"). The granting of multiple accommodation requests suggests the absence of hostility to Doak's protected activity.

Likewise, Doak failed to put forth evidence showing that Souther's decision to fire her was a pretext for retaliation. Souther pointed out that Doak exhausted 492.75 hours of FMLA, including the maximum allowable annually and sick leave and advanced annual and sick leave, and had also been granted 209 hours of LWOP between January 31 and September 11, 2010. JA 212-17 (¶ 4). Souther acknowledged that Doak's unscheduled absences improved slightly after the removal proposal was issued, yet her unscheduled absences continued and even increased from September 10 to the date of his termination decision   JA 212-17 (¶ 3). He noted that Doak missed 45% of her work from July through September 2010. JA 214 (¶6). Souther found that Doak's frequent unscheduled absences prevented her from attending meetings, created an undue hardship on co-workers because they had to do her work. JA 212-17 (¶ 3). Moreover, Doak's frequent absences caused her co-workers to divert their time to her assignments and thus prevented them from completing their own assignments. *Id.* In addition, Doak's

frequent absences prevented her from completing mandatory BCF 106 and Appropriations Law trainings.  *Id.*  These reasons informed Souther's decision to terminate Doak from the Coast Guard. Doak, however, failed to adduce any evidence from the record for a reasonable jury to believe that these reasons were not the true reasons but merely a pretext for reprisal.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should affirm the judgment below.

RONALD C. MACHEN JR.
United States Attorney

R. CRAIG LAWRENCE
Assistant United States Attorney

<u>/s/  *John C. Truong*</u>
JOHN C. TRUONG
Assistant United States Attorney
555 Fourth Street, N.W.
Civil Division
Washington, D.C.  20530
(202) 252-2524

## <u>CERTIFICATE OF COMPLIANCE</u>
### FRAP 32(a)(7)(C)

The text for the Brief for Appellee was prepared using Times New Roman, 14 point and -- including the Statement of Issues but omitting those items described in Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(a)(1) – contains 13,989 words as counted by Microsoft Word 2010.

*/s/ John C. Truong*
JOHN C. TRUONG
Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 20th day of March, 2015, I caused a true and correct copy of the above Brief for Appellee to be served upon counsel for Appellant by filing it in the Court's ECF system.


       */s/ John C. Truong*
       JOHN C. TRUONG
       Assistant United States Attorney